## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| APPLESEED'S INTERMEDIATE HOLDINGS LLC, *et al.*,[1] | ) Case No. 11-10160 (KG) |
|  | ) |
| Debtors. | ) Joint Administration Requested |
|  | ) |

## DECLARATION OF T. NEALE
## ATTENBOROUGH, CHIEF EXECUTIVE OFFICER OF APPLESEED'S
## INTERMEDIATE HOLDINGS LLC, IN SUPPORT OF FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, T. Neale Attenborough, hereby declare as follows under penalty of perjury:

1.      I am the chief executive officer of Appleseed's Intermediate Holdings LLC d/b/a Orchard Brands ("*AIH*"), a limited liability company organized under the laws of the State of Delaware.  I have worked for AIH or its predecessor (together with its 27 affiliated debtors and debtors in possession in the above-captioned chapter 11 cases, the "*Debtors*") since 2001.  I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs and books and records.  Except as otherwise indicated, all facts set forth in this declaration are based

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688).  The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

upon my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents and information supplied to me by members of the Debtors' management team and advisors. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

2.      In June 2010, the Debtors reached out to certain of their secured lenders to discuss the Debtors' revised business projections, which reflected declines in the Debtors' earnings in the first part of 2010. These deteriorations in business fundamentals led to the Debtors' initiation of discussions with their secured lenders, and, ultimately, intense negotiations regarding a restructuring of the Debtors' overleveraged balance sheet and outstanding obligations. These negotiations were successful: contemporaneously herewith, the Debtors have filed a pre-negotiated plan of reorganization (the "***Plan***") that is supported by an overwhelming majority of the Debtors' secured lenders.[2] As evidenced by the Support Agreement, the Debtors and the Consenting Lenders are committed to implementing the restructuring in an expeditious fashion that ensures the Debtors' businesses continue to operate as a going concern. To that end, the Debtors have already secured, subject to Court approval, a commitment of $80 million for financing upon emergence from chapter 11.

3.      More specifically, and to ensure the Debtors' emerge from these cases as quickly as possible, the Support Agreement contemplates a going concern restructuring through the Plan

---

[2]      Attached hereto as **<u>Exhibit A</u>** is the Restructuring Support Agreement, pursuant to which secured lenders holding more than two-thirds in amount of the Debtors' secured obligations under the First Lien Credit Agreement, the Second Lien Purchase Agreement and the AIH Note Purchase Agreement (each as defined herein) have agreed to support the Plan (the "***Support Agreement***," and the non-Debtor parties thereto, the "***Consenting Lenders***"). A copy of the Plan is attached to the Support Agreement as **<u>Exhibit B</u>**. Capitalized terms but not otherwise defined herein have the meaning ascribed to such terms in the Plan.

or alternatively - to the extent certain Plan-related milestones are not achieved - the sale of substantially all of the Debtors' assets (the "***Sale***") pursuant to section 363 of chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Sale, which is intended to serve as a "back-stop" to the Plan, will be effectuated pursuant to procedures and an auction, as will be requested in a motion (the "***Sale Motion***") filed by the Debtors no later than five days after the date hereof (the "***Petition Date***"). As part of the Sale, it is contemplated that the Debtors' secured lenders will credit bid their secured claims pursuant to 363(k) of the Bankruptcy Code and implement a capital structure contemplated under the Plan through an entity created by the secured lenders for purposes of credit bidding at the auction. Whether accomplished through the Plan or the Sale, the Debtors will seek to eliminate more than $420 million of outstanding debt obligations and emerge as a stronger, more competitive operation.

4.     To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and ensure that their restructuring goals can be implemented with limited disruption to operations, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "***First Day Pleading***" and, collectively, the "***First Day Pleadings***"), filed concurrently herewith. I am generally familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

5.     I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruption to the Debtors' business operations, thereby

preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

6.     This declaration is submitted to assist this Court in becoming familiar with the Debtors, the Debtors' pre-negotiated chapter 11 restructuring and the initial relief sought by the Debtors to stabilize operations and facilitate a restructuring.  This declaration is organized as follows:  (a) Part I is an introduction and brief summary of the Debtors' operations; (b) Part II provides an overview of the Debtors' businesses and capital structure; (c) Part III describes the events leading up to the filing of these chapter 11 cases and provides an overview of the discussions that led to the Plan; and (d) Part IV and **Exhibit B** attached hereto provide an overview of the relief the Debtors seek at the outset of these chapter 11 cases.

# I.
# INTRODUCTION

## A.     Company Overview

7.     The Debtors are a leading, multi-channel marketer of apparel and home products focused on serving the needs of the growing market segment of women and men over the age of 55.  Through a portfolio of 17 brands, the Debtors offer apparel, accessories and shoes, as well as home, garden and health products.  The Debtors employ approximately 4,260 employees; approximately 3,000 are full-time and approximately 1,260 are part-time.  The Debtors manage their businesses from headquarters located in Beverly, Massachusetts.  In addition, the Debtors maintain seven brand headquarters located throughout the United States.[3]

---

[3]     Specifically, the Debtors' seven brand headquarters are located at the following locations:  (a) Arizona Mail Order Company, Inc., Tucson, Arizona 85710; (b) Blair LLC, Warren, Pennsylvania; (c) Draper's & Damon's LLC, Irvine, California; (d) Haband Company, LLC, Oakland, New Jersey; (e) Johnny Appleseed's Inc., Beverly, Massachusetts; (f) Norm Thompson Outfitters, Inc., Hillsboro, Oregon; and (g) Wintersilks, LLC, Madison, Wisconsin.

8.     The Debtors' collection of specialty clothing, footwear, household and health brands for women and men includes Bedford Fair Lifestyles™, Blair™, Draper's & Damon's™, Haband!™, Monterey Bay™ and Norm Thompson™.  Over the last five years, the Debtors have selectively acquired businesses and brands that strategically add distribution channels and vertical integration opportunities through new product offerings and entry into new markets.  The Debtors have also built their businesses through market share gains, new product development and operational improvements that have resulted from vertical integration, operational efficiencies and savings from increasing scale.  The Debtors had approximately $881 million in net sales in 2010, and approximately $954 million in net sales in 2009.[4]

**B.     Reason for the Filing of these Chapter 11 Cases**

9.     As discussed in Part III herein, although the foundation of the Debtors' business model remains intact and the Debtors' core operations remain strong, the Debtors' top-line sales decline, driven by a challenging consumer economy, and combined with a significantly leveraged balance sheet, led to the Debtors' inability to service their prepetition secured indebtedness and remain current with their trade obligations.  As of the end of the Debtors' most recent fiscal year, which ended on December 25, 2010, the Debtors had approximately $725.1 million in prepetition funded secured and unsecured indebtedness, which carried a total annual interest expense of approximately $52 million.

10.     As discussed in detail below, the Debtors have been proactive in exploring all possibilities to restructure their obligations, including an attempted out-of-court restructuring and

---

[4]     References to financial information contained in this declaration are based on the Debtors' consistently maintained internal reporting practices, and not in accordance with generally accepted accounting principles used in the United States.

exploring a sale of the company through prepetition marketing efforts. Notwithstanding significant efforts to avoid the commencement of these chapter 11 cases, a restructuring of the Debtors' businesses outside of chapter 11 could not be achieved. The Debtors, in turn, engaged in extended negotiations with their secured lenders to ensure an expeditious restructuring of the Debtors' obligations and continuation of their businesses as a going concern through chapter 11.

**C.      Commencement of the Chapter 11 Cases**

11.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

12.      Consistent with the terms of the Plan, and as described herein, through these chapter 11 cases the Debtors seek to efficiently reduce the substantial debt burden that hinders their ability to effectively compete in a competitive market that has been challenged by overall economic conditions. A successful restructuring will allow the Debtors to concentrate their resources on generating revenue and expanding market share. To this end, the Debtors and their advisors have spent more than six months negotiating with the Debtors' key creditor constituencies to ensure their businesses continue to operate as going concerns.

13.      These negotiations have been successful. The Support Agreement (attached hereto as **Exhibit A**) contemplates an expedited restructuring, to be consummated either through the Plan or the Sale, and binds the Consenting Lenders to support the Plan if the Debtors are successful in taking the steps necessary to meet the milestone deadlines included therein. In short, the Support Agreement enables the Debtors to enter into chapter 11 with the confidence to

6

ensure a quick and successful exit. The Debtors and the Consenting Lenders firmly believe that the Plan will maximize the value of their estates and will provide the best recovery to the Debtors' stakeholders.

14. To facilitate their restructuring and provide assurances to key constituents such as employees, customers and vendors that the Debtors' operations will continue uninterrupted, the Debtors have developed key strategies to effectuate a smooth transition of their operations into chapter 11, including the following:

- developing and presenting a comprehensive request for the "first-day" relief requested in the First Day Pleadings, including authority to access $140 million of postpetition financing and seeking relief targeted to ensure that employee obligations such as wages and benefits are honored, critical vendors are immediately paid and customer programs are continued (all as explained in detail on **Exhibit B** attached hereto and incorporated herein by reference);

- moving forward on an expedited basis with a pre-negotiated chapter 11 plan of reorganization or, if necessary, a sale of substantially all of the Debtors' assets, consistent with the terms of the Support Agreement;

- implementing a comprehensive communications plan so that all of the Debtors' key constituents know where they stand and are aware of the commencement of these chapter 11 cases and the Debtors' intentions to proceed as expeditiously as possible to exit; and

- hiring and seeking to retain qualified and experienced professionals to assist the Debtors with their reorganization plans, including the law firms of Kirkland & Ellis LLP and Klehr Harrison Harvey Branzburg LLP as the Debtors' bankruptcy counsel, Moelis & Company LLC ("*Moelis*") as the Debtors' financial advisor and Alvarez & Marsal North America, LLC, as the Debtors' restructuring advisor.

15.     The following Parts of this declaration and the exhibits attached hereto provide additional information regarding and the facts supporting the Debtors' chapter 11 cases and the relief sought in the various First Day Pleadings.

## II.
## OVERVIEW OF THE DEBTORS' BUSINESSES AND CAPITAL STRUCTURE

### A.     The Debtors' Business Operations

16.     The Debtors are a direct marketer of women's and men's apparel as well as home and lifestyle goods with a focus on the over-55 population.  The Debtors market their brands through mail-order catalogs, internet sites and retail stores.  According to internal estimates, the Debtors command a 21% share of the over-60 direct apparel and accessories market, a segment that is expected to grow as "baby boomers" (ages 44 through 64) mature.  Indeed, the Debtors are well positioned to serve a growing demographic, as the aging "baby boomer" population is expected to grow from approximately 57 million in 2010 to approximately 76 million in 2020.

#### i.     The Debtors' Brands and Business Segments

17.     The Debtors market seventeen brands in three operating segments.  The "**Premium Group**" of brands includes Appleseed's™, The TOG Shop™, Monterey Bay™, Sahalie™, Draper's & Damon's™, LinenSource™, Norm Thompson™ and Wintersilks™, targeting consumers searching for classic apparel and home products.  These brands appeal to a diverse range of tastes through differing product line themes, including classic New England attire, mature conservative classic apparel, unique and casual dress, upscale fashion, quality bedding and lifestyle solutions and active and outdoors attire for baby boomers.

18.     The Debtors' "**Value Group**" of brands includes Blair™, Haband!™ and A•M•O™, targeting consumers searching for high-value, low-price products.  The Value Group focuses on marketing quality apparel and home products to older cost-conscious purchasers.

19.     The Debtors' also market lifestyle products under their "**Solutions Group**" of brands, which includes Solutions™ and Gold Violin™.  The Gold Violin™ brand focuses on practical products targeted at women over the age of 50 who manage a household designed to make everyday activities easier.  The Solutions™ brand markets products that help seniors and "baby boomers" to remain active, independent and living comfortably in their own home.

**ii.     Business Channels**

20.     The Debtors market their products through multiple channels.  In 2010, the Debtors estimate that they circulated more than 450 million catalogs and letter mailers.  In addition, the Debtors maintain websites for each product brand to allow for online purchasing. The Debtors also maintain 55 retail stores, four call centers and three distribution centers (all located in the United States).  The following map illustrates the Debtors' various operations throughout the United States:



**B.   The Debtors' Prepetition Organizational Structure**

21.     AIH is the direct or indirect parent of each of the other 27 Debtors.  AIH is a wholly-owned subsidiary of Orchard Brands Corporation ("***Orchard Brands Corp.***"), which, in turn, is a wholly-owned subsidiary of Orchard Brands Topco LLC ("***Orchard TopCo***").  Orchard Brands Corp. and Orchard TopCo, which are holding companies that are not obligated on the Debtors' prepetition indebtedness obligations, are not Debtors in these chapter 11 cases.

22.     In 2005, investment funds managed by Golden Gate Private Equity, Inc. ("***Golden Gate***") acquired AIH.  As of the Petition Date, investment funds managed by Golden Gate indirectly own approximately 68.4% of the outstanding and issued equity interests of Orchard TopCo.  In 2007, AIH acquired Blair Corporation n/k/a Blair LLC and its subsidiaries (the "***Blair Acquisition***"), each of which is a Debtor in these chapter 11 cases.  At the time of the Blair Acquisition, the Debtors entered into three secured facilities on April 30, 2007, which together comprise the Debtors' prepetition secured debt obligations, as described below.  In July 12, 2007, the Debtors amended each of the secured facilities to facilitate syndication of the loans under those facilities.

23.     A chart depicting the Debtors' prepetition organizational structure, including the non-Debtor entities Orchard Brands Corp. and Orchard TopCo, is attached hereto as **Exhibit C**.[5]

**C.   The Debtors' Prepetition Capital Structure**

24.     As of the end of the Debtors' fiscal year, which ended on December 25, 2010, the Debtors had outstanding secured and unsecured indebtedness totaling approximately

---

[5]     Although depicted on **Exhibit C**, Orchard Brands Global Sourcing Limited(a Hong Kong entity) is not a Debtor in these chapter 11 cases.  The Debtors expect to provide additional reporting with respect to this entity during these chapter 11 cases as necessary to comply with the Bankruptcy Rules, including Bankruptcy Rule 2015.3.

$725.1 million.  These obligations include (a) $38.4 million outstanding under the ABL Credit Agreement (defined below); (b) $324.1 million outstanding under the First Lien Credit Agreement (defined below); (c) $289.3 outstanding under the Second Lien Purchase Agreement (defined below); and (d) with respect to AIH only, $73.3 outstanding under the AIH Note Purchase Agreement (defined below).

25.     The chart below summarizes the Debtors' prepetition indebtedness, including approximate current outstanding amounts as of December 25, 2010.

| Debt Obligation | Original Amount | Approximate Amount Outstanding[6] as of December 25, 2010 | Maturity Date | Security Status |
|---|---|---|---|---|
| ABL Credit Agreement | N/A | $38.4 million[7] | April 2012 | Secured |
| First Lien Credit Agreement | $335 million | $324.1 million | April 2013 | Secured |
| Second Lien Purchase Agreement | $250 million | $289.3 million | April 2014 | Secured |
| AIH Note Purchase Agreement | $50 million | $73.3 million | April 2014 | Unsecured |

**i.      Funded Secured Debt**

**a.      The ABL Credit Agreement**

26.     Each of the Debtors is obligated under the $125 million credit agreement (as amended, the "***ABL Credit Agreement***"), dated as of April 30, 2007, among American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners, American Capital Financial Services, Inc. as syndication agent, UBS Loan Finance LLC, as

---

[6]     These amounts are net of unamortized discounts.

[7]     Includes issued and outstanding letters of credit.

swingline lender and UBS AG, Stamford Branch, as issuing bank, administrative agent and co-collateral agent (the "**ABL Administrative Agent**") and Wells Fargo Retail Finance, LLC as co-collateral agents and the lenders party thereto from time to time (the "**ABL Lenders**").[8]

27.     The ABL Credit Agreement includes:  (a) a revolving credit facility in the amount of approximately $125 million; (b) a $20 million sublimit for the issuance of letters of credit; and (c) a $20 million sublimit for swing line loans.  A total of approximately $38.4 million was outstanding under the ABL Credit Agreement as of December 25, 2010.

28.     Pursuant to a security agreement dated April 30, 2007 (the "**ABL Security Agreement**"), the obligations under the ABL Credit Agreement are secured by each of Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 of the ABL Security Agreement, the "**ABL Collateral**").   The parties entered into an amendment to the ABL Credit Agreement on July 12, 2007.

### b.      The First Lien Credit Agreement

29.     Each of the Debtors is obligated under the $335 million term loan credit agreement (as amended, the "**First Lien Credit Agreement**"), dated as of April 30, 2007, among American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookmanagers, UBS Securities LLC, as syndication agent, Wilmington Trust FSB as successor

---

[8]     Specifically, the following Debtors are borrowers under the ABL Credit Agreement:  Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source Acquisition LLC.  The remaining Debtors are guarantors of the obligations under the ABL Credit Agreement.

to American Capital Financial Services, Inc., as administrative agent (the "***First Lien Administrative Agent***") and the lenders party thereto from time to time (the "***First Lien Lenders***").[9]

30.  A total of approximately $324.1 million was outstanding under the First Lien Credit Agreement as of December 25, 2010.

31.  Pursuant to a security agreement dated April 30, 2007 (the "***First Lien Security Agreement***"), the obligations under the First Lien Credit Agreement are secured by each of the Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 of the First Lien Security Agreement, the "***First Lien Collateral***").  Additionally, the Intercreditor Agreement (as defined below) provides that the lien granted to the First Lien Administrative Agent and the First Lien Lenders with respect to the Debtors' equipment, mortgaged premises, fixtures, intellectual property collateral and capital stock collateral (and as further defined in section I of the Intercreditor Agreement, the "***Term Loan Priority Collateral***"), is senior to any liens on the Term Loan Priority Collateral securing the ABL Lenders and Second Lien Purchasers.  The parties entered into an amendment to the First Lien Credit Agreement on July 12, 2007.

---

[9]  Specifically, the following Debtors are borrowers under the First Lien Credit Agreement:  Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source Acquisition LLC.  The remaining Debtors are guarantors of the outstanding obligations under the First Lien Credit Agreement.

### c. The Second Lien Purchase Agreement

32. Each of the Debtors is obligated under the $250 million note purchase agreement (as amended, the "***Second Lien Purchase Agreement***" and, together with the ABL Credit Agreement and the First Lien Credit Agreement, the "***Secured Credit Agreements***"), dated April 30, 2007, among American Capital Strategies, Ltd., as sole lead arranger and bookmanager, American Capital, Ltd. (successor by merger to American Capital Financial Services, Inc.), as documentation agent and administrative agent (the "***Second Lien Administrative Agent***," and together with the ABL Administrative Agent and the First Lien Administrative Agent, the "***Administrative Agents***") and purchasers party thereto from time to time (the "***Second Lien Purchasers***" and, together with the ABL Lenders and the First Lien Lenders, the "***Secured Lenders***").[10]

33. Pursuant to a security agreement dated April 30, 2007 (the "***Second Lien Security Agreement***"), the obligations under the Second Lien Purchase Agreement are secured by each of the Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 the Second Lien Security Agreement, the "***Second Lien Collateral***").  The parties entered into an amendment to the Second Lien Purchase Agreement on July 12, 2007.

---

[10]  Specifically, the following Debtors are issuers under the Second Lien Purchase Agreement:  Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source Acquisition LLC.  The remaining Debtors are guarantors of the outstanding obligations under the Second Lien Purchase.

34. A total of approximately $289.3 million was outstanding under the Second Lien Purchase Agreement as of December 25, 2010.

### d. Intercreditor Agreement

35. The Administrative Agents are party to an intercreditor agreement dated April 30, 2007 (as amended, the "***Intercreditor Agreement***"). Among other things, the Intercreditor Agreement sets forth the relative priority of the Secured Lenders' respective security interests in each of the ABL Collateral, the First Lien Collateral and the Second Lien Collateral. Specifically, the Intercreditor Agreement provides, in pertinent part, that:

- the lien granted to the ABL Administrative Agent and the ABL Lenders pursuant to the ABL Security Agreement is senior in all respects to the liens granted to the First Lien Administrative Agent, the First Lien Lenders, the Second Lien Administrative Agent and the Second Lien Purchasers, except with respect to Term Loan Priority Collateral (the "***ABL Priority Collateral***");

- the lien granted to the First Lien Administrative Agent and the First Lien Lenders with respect to the ABL Priority Collateral and the Term Loan Priority Collateral is senior to the lien granted to the Second Lien Administrative Agent and Second Lien Purchasers securing the obligations under the Second Lien Purchase Agreement; and

- the lien granted to the Second Lien Administrative Agent and the Second Lien Purchasers with respect to the Term Loan Priority Collateral is senior to the lien granted to the ABL Agent and the ABL Lenders securing the obligations under the ABL Credit Agreement as to the Term Loan Priority Collateral (but junior to the lien granted to the First Lien Administrative Agent and First Lien Lenders securing the obligations under the First Lien Credit Agreement secured in such collateral).

### ii. The AIH Notes

36. On July 12, 2007, AIH, as issuer, entered into a $50 million unsecured note purchase agreement with American Capital, Ltd. (successor by merger to American Capital

Financial Services, Inc.), as administrative agent and American Capital Strategies, Ltd., as sole lead arranger and bookrunner (the "**AIH Note Purchase Agreement**"), and the purchasers party thereto from time to time (the "**AIH Note Purchasers**").  A total of approximately $73.3 million was outstanding under the AIH Note Purchase Agreement as of December 25, 2010.

37.     The obligations under the AIH Note Purchase Agreement are unsecured.  None of the Debtors other than AIH is obligated under the AIH Note Purchase Agreement.  Additionally, pursuant to the subordination agreement (the "**Subordination Agreement**") dated July 12, 2007, the obligations under the AIH Note Purchase Agreement are subordinate and subject in right and time of payment to the prior discharge of the obligations under the ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Purchase Agreement.

**III.**
**COMMENCEMENT OF THE DEBTORS' PRE-NEGOTIATED CHAPTER 11 CASES**

**A.     Adverse Market Conditions and Changes in Business Practices**

38.     The Debtors operate in a competitive industry that is in the midst of a sustained recession that has caused business fundamentals to deteriorate.  Adverse economic conditions and increased levels of unemployment have led to a decrease in consumer confidence and a decline in consumer spending.

39.     The current market difficulties facing the retail industry have been widely recognized.  For example, the University of Michigan Index of Consumer Sentiment, a survey that has estimated the future course of the national economy since 1946, indicated in November 2010 that consumer confidence dropped from 96.9 (out of 100) in January 2007 to 56.4 in June 2008, representing a 42% decline in just 18 months.  Consumer confidence remained in the mid-60s in 2009 (down 33% from 2007) and slightly increased to the low-70s in first quarter of

2010.[11]  Additionally, the U.S. Census Bureau's retail trade figures show combined men's and women's retail clothing store sales fell by more than 15%, from $49.3 billion in 2007 to an estimated $41.8 billion in 2010.[12]  The Debtors' customer base - which is largely comprised of individuals who are retired and rely on investment income for consumption - has been adversely affected by declines in investment securities in the United States and around the world.[13]

40.      Notwithstanding poor market conditions, the Debtors fared relatively well during the early part of the current economic recession, through strategic initiatives and synergies implemented across their various brands.  For example, company-wide EBITDA improved from approximately $78 million in 2008 to approximately $87.4 million in 2009.

41.      Nonetheless, following the Debtor's strong performance in 2008 and 2009, the Debtors suffered a steep decline in their overall operations during 2010.  In particular, the Debtors experienced weakness in the Value Group, which markets to the value-oriented, lower income customer in the 55-year old segment and is traditionally the largest of the Debtors' business groups.  Specifically, the Debtors' Value Group experienced (a) decreased net sales from $615.6 million in 2009 to $520.2 million in 2010, which represents a 15.5% decline and (b) decreased EBITDA from $65.9 million in 2009 to $22.3 million in 2010, which represents a 66.2% decline.[14]  In addition to weakness in the Value Group, the Debtors' operations overall

---

[11]   *See* Thomson Reuters/University of Michigan, 2010 Annual Table 1. The Index of Consumer Sentiment, http://www.sca.isr.umich.edu/documents.php?c=tr.

[12]   *See* U.S. Census Bureau, August 2010 Monthly Retail Trade and Food Services Report, http://www.census.gov/retail/ (follow "Retail and Food Services Sales: Excel (1992-present)" hyperlink).

[13]   Many of the Debtors' customers also rely on income from federal Social Security, which remained relatively flat during 2010, and from certificates of deposit, the current rate for which is nominal.

[14]   The Debtors' research and data reveal that households representative of the Value Group customer base are generally more pessimistic with respect to the economy than customers in the Debtors' other businesses.

(Continued…)

experienced a significant decline in income received in connection with third-party business initiatives.

42. Conversely, and demonstrating the continued viability and value inherent in the Debtors' businesses, the Premium Group, which markets to the more fashion-conscious customer within the segment, experienced (a) increased net sales from $338.7 million in 2009 to $361.3 million in 2010, which represents a 6.7% improvement and (b) increased EBITDA from $21.5 million in 2009 to $25.2 million in 2010, which represents a 17.2% improvement.

43. As illustrated in the charts below, the Debtors estimate that combined EBITDA for 2010 will be approximately $47.5 million, down approximately 45.7% when compared to the previous year.



## B. The Debtors' Prepetition Restructuring Efforts, Continuing Operational Difficulty and Need for Additional Liquidity

44. Before the Petition Date, the Debtors took significant steps to reduce costs and improve efficiencies. These initiatives have included exiting certain brick-and-mortar retail

---

Additionally, average household income across the customers that are representative of the Debtors' three business groups has been most pronounced in the Value Group, which experienced a decline in average household income of approximately 4.1% for the period beginning in April 2009 and ending October 2010. By way of comparison, the Debtors estimate that during the same period average household incomes for the customers that are representative of the Solutions Group and the Premium Group have declined by 1.3% and 2.4%, respectively.

operations, downsizing unproductive physical locations, reducing work forces, shutting down and consolidating distribution centers as part of an ongoing effort to consolidate legacy brand information technology systems and brand operations into a single streamlined platform.[15]  For example, in October/November 2010, the Debtors terminated approximately 23 employees from their A•M•O™ business line and 16 information technology employees.

45.     As a result of a decline in the Debtors' growth during 2010, however, the Debtors experienced constrained liquidity and have been unable to comply with certain covenants under the ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Purchase Agreement.  Specifically, as of the end of June 2010, the Debtors were unable to satisfy the maximum "Consolidated Senior Leverage Ratio" covenant under the ABL Credit Agreement and the First Lien Credit Agreement, leading to the occurrence of defaults and cross-defaults under each of the ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Purchase Agreement.

46.     Consequently, in the third quarter of 2010, the Debtors entered into a series of forbearance agreements (collectively, the "***Forbearance Agreements***") with the Administrative Agents and Secured Lenders.  Following entry into the Forbearance Agreements, the Debtors worked closely with the Administrative Agents, the Secured Lenders and their respective advisors to explore strategic options in an effort to achieve a restructuring of the Debtors' prepetition obligations.  During this time, the Debtors and their advisors engaged in an ongoing discourse and negotiations with counsel and the advisors to the ABL Administrative Agent, the First Lien Administrative Agent and the Second Lien Administrative Agent.

---

[15]    In particular, the Debtors have previously consolidated and decreased their distribution centers from eleven to three and their call centers from twelve to four.

47.     Additionally, in October and November 2010, the Debtors, led by Moelis, commenced a process to market the Debtors' assets, which included preparing and distributing a presentation to potential third-party purchasers of the Debtors' business operations. Although Moelis contacted over 25 potential purchasers, only a handful of indicative offers were received and none presented a clear path forward in the time frame needed to facilitate a comprehensive restructuring.

48.     The Debtors' restricted access to liquidity during this period placed significant stress on business operations, including the Debtors' relationships with specialized third-party vendors and suppliers that are crucial to the Debtors' operations. Because of the demands inherent in the Debtors' highly coordinated production, purchasing, advertising and sale process, the Debtors rely on suppliers and vendors uniquely situated to provide the Debtors with the goods necessary to meet customer demands. As a result of sharp declines in the Debtors' performance over the course of the last year, however, trade vendors and suppliers have begun to impose tightened credit terms on the Debtors, thereby limiting the Debtors' access to key goods and services.

## C.     The Debtors' Proposed Postpetition Financing

49.     The Debtors' restricted access to both cash and trade credit has strained their supply chain and left the Debtors at their breaking point. With dwindling liquidity, the Debtors have been unable to remain current on their trade obligations. As of the Petition Date, the Debtors estimate that they have approximately $115 million outstanding in open accounts payable to trade vendors and suppliers, approximately $60 million of which is past due based upon invoice terms. Maintaining relationships with these vendors and suppliers during the course of these chapter 11 cases, including access to immediate liquidity, will be an important – if not the *most* important – focus of the Debtors following the Petition Date. Indeed, in

connection with these chapter 11 cases, the Debtors are seeking to access new postpetition credit in the form of a $140 million debtor-in-possession facility (the "***Proposed DIP Financing***").[16] The Proposed DIP Financing includes (a) a senior secured first-out revolving credit facility in the amount of $100 million (subject to a borrowing base) ("***Tranche A***") and (b) a senior secured term loan in the initial amount of $35 million, with an additional $5 million available under certain circumstances ("***Tranche B***"). The Debtors seek authority, on an immediate (and interim) basis, to access up $135 million of the Proposed DIP Financing - $100 million under Tranche A and $35 million under Tranche B. A portion of availability under Tranche A will be used to satisfy all outstanding obligations of the Debtors under the ABL Credit Agreement as of the Petition Date; the remaining portion of the availability under Tranche A and the proceeds of Tranche B will be used as needed to fund the Debtors' operations the course of the chapter 11 cases.

50. The Proposed DIP Financing is the cornerstone of the Debtors' restructuring. The Debtors' inability to maintain and stabilize their business operations would result in depleted inventories, missed supply obligations and potentially irreparably damaged customer relationships. This would be particularly damaging with respect to the Debtors' operations as they enter a critical time of year when they begin to implement their business plan for the coming spring season.

**D. Overview of the Debtors' Pre-Negotiated Restructuring and Proposed Dual-Track Process**

51. While the Secured Lenders agreed under the Forbearance Agreements to temporarily forbear from exercising remedies in connection with defaults under the Secured

---

[16] A 13-week budget with respect to the Proposed DIP Financing is attached hereto as **Exhibit D**.

Credit Agreements, the Debtors and the Secured Lenders recognized that a comprehensive restructuring was necessary to deleverage the Debtors' balance sheet to ensure the Debtors ability to operate as a going concern. Following discussions that began in July 2010, the Debtors and the Consenting Lenders entered into discussions and negotiations regarding a comprehensive restructuring.

52.     Over the course of the last several months, the Debtors and the Consenting Lenders have engaged in extensive discussions that ultimately led to an agreement among the parties as evidenced by the terms of the Plan and the related Support Agreement. The Plan and Support Agreement, which contemplate a "dual track" with respect to the Plan and Sale, provide the framework for a swift restructuring under the Bankruptcy Code.

53.     The Plan provides for the reorganization of the Debtors as a going concern and is based on a settlement among the Debtors and the Consenting Lenders. In the event the Plan is confirmed and becomes effective, the Debtors contemplate funding distributions under the Plan as follows:

- a senior secured asset-based revolving facility, referred to in the Plan as the "New ABL Facility," of up to a principal amount of $80 million (approximately $46.2 million of which will be drawn on the Effective Date),[17] which is fully committed as of the Petition Date and will be used to fund the Debtors' ongoing operations post-emergence;

- a new senior secured term loan, referred to in the Plan as the "New Senior Term Loan," in the principal amount of $35 million (or $40 million to the extent the amount of Tranche B is increased as of the Effective Date pursuant to the terms of the DIP Credit Agreement), which represents a conversion of the Proposed DIP Financing's term loan;

---

[17]     The estimated amount of the New ABL Facility assumes the Effective Date occurs on or about April 30, 2011 and includes an estimate of issued and undrawn letters of credit as of that time.

- a new first lien secured term loan referred to in the Plan as the "New First Lien Term Loan," in the principal amount of $200 million;

- a new junior secured term loan referred to in the Plan as the "New Junior Term Loan," in the principal amount of $43 million; and

- the issuance of stock in Reorganized AIH referred to in the Plan as the "New Common Stock."

54.     The Plan contemplates the following recoveries to holders of claims against the Debtors:

- DIP Facility Tranche A Lenders will receive will be paid in full, in cash, with proceeds from the New ABL Facility;

- DIP Facility Tranche B Lenders will receive a pro rata share of the New Senior Term Loan;

- First Lien Lenders will receive a pro rata share of (i) the New First Lien Term Loan, (ii) the New Junior Term Loan and (iii) 95% of the New Common Stock (subject to dilution on account of the Management Equity Incentive Program);

- Second Lien Lenders will receive a pro rata share of 5% of the New Common Stock (subject to dilution on account of the Management Equity Incentive Program);

- Holders of Qualified Unsecured Trade Claims will receive payment in accordance with a Qualified Vendor Support Agreement; and

- Holders of General Unsecured Claims and Holders of AIH Note Claims will not receive any distribution on account of such Claims, and Holders of Interests in AIH will not receive any distribution on account of such Interests.

55.     The Support Agreement, as well as the terms of the Proposed DIP Financing, seek to ensure that the Debtors move forward with the Plan or, if necessary, the Sale, as expeditiously as possible. Moreover, the Consenting Lenders have agreed to vote their claims in favor of the Plan and refrain from taking any actions that will interfere with, postpone or delay the

implementation of the Plan, so long as the Debtors are pursuing the Plan on the following agreed-upon timeline (collectively, the "***Plan Milestones***"):[18]

      a.      commencement of the chapter 11 cases on or before January 21, 2011;

      b.      on the Petition Date, the Debtors are to file (i) the Plan; (ii) the disclosure statement with respect to the Plan (the "***Disclosure Statement***"); and (iii) a motion to approve the Disclosure Statement and certain solicitation materials/procedures (the "***Solicitation Procedures Motion***");[19]

      c.      objections to approval of the disclosure statement with respect to the Plan (the "***Disclosure Statement***") are due 28 days after the Petition Date (or a later date agreed to by the Debtors and a third party, in consultation with the parties specified in the DIP Credit Agreement and the Support Agreement) (the "***Disclosure Statement Objection Deadline***");

      d.      the hearing to approve the Disclosure Statement (the "***Disclosure Statement Hearing***") is to be held seven days after the Disclosure Statement Objection Deadline (subject to the Court's availability);

      e.      the solicitation period with respect to votes to accept or reject the Plan (the "***Solicitation Period***") is to begin within

---

[18]  The Plan Milestones are attached as **Exhibit C** to the Support Agreement. Additionally, section 8.01(o)(xii) of the credit agreement governing the Proposed DIP Financing (the "***DIP Credit Agreement***") provides that it is an Event of Default (as defined in the DIP Credit Agreement) if the Debtors fail to achieve, comply with or proceed in accordance with, any of the milestones set forth in Schedule 8.01(o) to the DIP Credit Agreement by the dates specified therein (or such later date as may be agreed to by the parties specified in the DIP Credit Agreement). Section 8.01(o) of the DIP Credit Agreement goes on to provide, however, that if the Debtors fail to achieve, comply with or proceed in accordance with, any of the "Plan Milestones" set forth in Schedule 8.01(o) to the DIP Credit Agreement, it is not an Event of Default so long as the Debtors comply with the "Sale Milestones" set forth in Schedule 8.01(o) of the DIP Credit Agreement.

[19]  Contemporaneously with the filing of this declaration, the Debtors have filed (a) the *Disclosure Statement for the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* and (b) the *Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement; (B) Approving Solicitation Packages and Procedures for the Distribution Thereof; (C) Approving the Forms of Ballots and Manner of Notice; (D) Approving the Voting Record Date, Solicitation Deadline and Voting Deadline; and (E) Establishing Notice and Objection Procedures for Confirmation of the Plan.*

five days after entry of an order approving the Disclosure Statement (the "***Disclosure Statement Order***") is entered;

    f.    deadlines to vote on the Plan and to object to confirmation of the Plan are to be no later than 35 days after the commencement of the Solicitation Period;

    g.    the confirmation hearing is to be held 14 days after the Voting Deadline (subject to the Court's availability);

    h.    the order confirming the Plan (the "***Confirmation Order***") is to be entered no later than 90 days after the Petition Date; and

    i.    the Effective Date (as defined in the Plan) must occur within 15 days after the entry of the Confirmation Order.[20]

56.    In addition to the Plan Milestones set forth above, the Support Agreement also includes the "back-stop" concept of a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. More specifically, the Support Agreement contemplates that the Debtors comply with the following agreed-upon timeline with respect to the Sale (collectively, the "***Sale Milestones***"):

    a.    the Debtors are to file the Sale Motion to approve bidding procedures (the "***Bidding Procedures***") and the Sale no later than five days after the Petition Date;

    b.    objections to entry of an order approving the Bidding Procedures (the "***Bidding Procedures Order***") are due 28 days after the date on which the Debtors file the Sale Motion (or a later date agreed to by the Debtors and a third party, in consultation with the parties specified in the DIP Credit Agreement and the Support Agreement);

    c.    the hearing to approve the Bidding Procedures (the "***Bidding Procedures Hearing***") is to be held seven days after the deadline set forth above for the Disclosure Statement Hearing (or the first available date thereafter);

---

[20]   The Plan Milestones identified in sub-paragraphs (c) through (g) are subject to a 5-day grace period.

d. the Bidding Procedures Order is to be entered within five days after the Bidding Procedures Hearing (or later date agreed to by the Debtors and the parties specified in the DIP Credit Agreement and the Support Agreement);

e. if the Disclosure Statement Order is not entered, the Debtors are to proceed with a 30-day marketing process following the entry of the Bidding Procedures Order (with such marking process to include providing information to prospective buyers, as requested by the parties in the DIP Credit Agreement and the Support Agreement) (the "***Marketing Process***"), followed by an auction (the "***Auction***");

f. if the Confirmation Order is not entered, the Debtors are to proceed with the Marketing Process, followed by the Auction; and

g. the hearing to approve the Sale is to occur within five days after the Auction.[21]

57. In sum, the Debtors will only proceed with the Sale in accordance with the Sale Milestones to the extent they are unable to comply with the Plan Milestones.

58. Based on the foregoing, the Debtors have commenced these chapter 11 cases to provide the Debtors with the tools and the opportunity to achieve a restructuring and to prevent further deterioration in the value of their business operations.

## IV.
## RELIEF SOUGHT IN THE DEBTORS' FIRST DAY PLEADINGS

59. It is critically important for the Debtors to maintain the services, loyalty and goodwill of, among other constituencies, their employees, vendors and customers. Achieving this goal is likely to be particularly challenging while operating in chapter 11. The Debtors have filed First Day Pleadings seeking relief intended to allow the Debtors to effectively transition

---

[21] Additionally, the Sale Milestones identified in sub-paragraphs (c) through (g) are subject to a 5-day grace period.

into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer significant consequences because parties may refuse to continue to provide services to, or do business with, the Debtors.

60.     Several of the First Day Pleadings request authority to pay certain prepetition claims. I am told by my advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims in those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

61.     I have reviewed each of the First Day Pleadings. The facts stated therein and attached hereto as **<u>Exhibit B</u>** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.


*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on January 19th, 2011.

By: _____

T. Neale Attenborough
Chief Executive Officer of Appleseed's
Intermediate Holdings LLC

## Exhibit A

## Support Agreement

## RESTRUCTURING SUPPORT AGREEMENT

RESTRUCTURING SUPPORT AGREEMENT (this "<u>Restructuring Support Agreement</u>"), dated as of January 19, 2011, by and among: (i) Appleseed's Intermediate Holdings LLC, a Delaware limited liability company ("<u>AIH</u>"), on behalf of itself and each of its United States domestic subsidiaries (collectively, the "<u>Company</u>"); (ii) the undersigned lenders (the "<u>Consenting First Lien Lenders</u>") under that certain Credit Agreement, dated as of April 30, 2007, among Johnny Appleseed's, Inc. ("<u>JAI</u>") and the other borrowers party thereto, Wilmington Trust FSB, as successor administrative agent (the "<u>First Lien Agent</u>"), the lenders from time to time party thereto and the other agents party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>"); (iii) American Capital, Ltd. ("<u>ACAS</u>"), as (a) Consenting First Lien Lender,[1] (b) lender(s) (the "<u>Second Lien Lender</u>") under that certain Credit Agreement, dated as of April 30, 2007, among JAI and the other borrowers thereto, ACAS (successor by merger to American Capital Financial Services, Inc.), as administrative agent (the "<u>Second Lien Agent</u>") (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>") and (c) as administrative agent (the "<u>HoldCo Note Agent</u>") under that certain Note Purchase Agreement, dated as of July 12, 2007, among AIH, ACAS (successor by merger to American Capital Financial Services, Inc.) and ACAS as purchaser thereto (as amended, restated, supplemented or otherwise modified from time to time, the "<u>HoldCo Note</u>") and (iv) Stephen P. Walko, as holder of the HoldCo Note (the "<u>HoldCo Noteholder</u>"), transferee of the HoldCo Note. The Consenting First Lien Lenders, ACAS, as Second Lien Lender and HoldCo Note Agent, and the HoldCo Noteholder shall collectively be referred to as the "<u>Consenting Lenders</u>." The Consenting Lenders, the Company and each other Person that becomes a party hereto in accordance with the terms hereof shall be referred to herein individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>".

## W H E R E A S :

A.     Prior to the date hereof, representatives of the Company, the Consenting First Lien Lenders, and ACAS, in its capacity as Second Lien Lender and HoldCo Note Agent discussed consummating a restructuring of the Company's indebtedness and other obligations on terms consistent with those set forth in this Restructuring Support Agreement, the Restructuring Term Sheet (as defined below), which is attached hereto as <u>Exhibit A</u>, and the chapter 11 plan of reorganization (the "<u>Plan</u>"), which is attached hereto as <u>Exhibit B</u>, each of which Exhibits is incorporated herein by reference and made part of this Restructuring Support Agreement (the "<u>Restructuring</u>").

B.     It is anticipated that the Restructuring will be implemented through either (1) a solicitation of votes (the "<u>Solicitation</u>") on the Plan pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (as defined below) or (2) a 363 Sale (as defined below).

C.     This Restructuring Support Agreement, the Restructuring Term Sheet, and the Plan set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement and support the Restructuring. In the event the terms

---

[1] For the avoidance of doubt, "Consenting First Lien Lenders" shall include ACAS, in its capacity as First Lien Lender.

and conditions as set forth in the Restructuring Term Sheet, the Plan and this Restructuring Support Agreement are inconsistent, the terms and conditions contained in the Plan and the Restructuring Term Sheet (as applicable) shall control.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.  <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>363 Event</u>" has the meaning set forth in <u>Section 5.1</u> hereof.

"<u>363 Sale</u>" has the meaning set forth in <u>Section 5.2</u> hereof.

"<u>363 Triggering Event</u>" means the receipt of a notice by the Company from the Majority of Consenting First Lien Lenders notifying the Company of the occurrence of any of the 363 Events listed in <u>Section 5.1</u>.

"<u>ABL Agent</u>" has the meaning set forth in the Plan.

"<u>ABL Lenders</u>" has the meaning set forth in the Plan.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person.

"<u>Affiliated Transferee</u>" means with respect to each Consenting Lender, any Person that, as of the date a Consenting Lender becomes a Party to this Restructuring Support Agreement, is an Affiliate of such Consenting Lender and, as of the date of any Transfer of such Consenting Lender's Claim(s) to such Affiliate, continues to be an Affiliate of that Consenting Lender.

"<u>Automatic Stay</u>" has the meaning set forth in <u>Section 5.5</u> hereof.

"<u>Ballot</u>" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§101 *et seq.*

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

KL2 2682700.15

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Chapter 11 Cases" means the voluntary cases to be commenced by the Company pursuant to chapter 11 of the Bankruptcy Code.

"Claim" means a claim held by a Consenting Lender in its capacity as such.

"Commencement Date" means the date the Chapter 11 Cases of the Company are commenced.

"Company" has the meaning set forth in the preamble hereof.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, schedules, appendices and related documents, each in form and substance reasonably acceptable to each Consenting First Lien Lender holding 10% or more of the First Lien Claims.

"Consenting Lenders" has the meaning set forth in the preamble hereof; and any holder of a Claim who takes the actions required of a transferee in accordance with Section 6 hereof.

"Debtors" means, individually or collectively, AIH and each of its 27 United States domestic direct and indirect subsidiaries which commence a Chapter 11 Case under the Bankruptcy Code.

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement providing a (i) senior secured, super-priority debtor-in-possession revolving credit financing in the aggregate principal amount of $100,000,000 to the Debtors, which shall, subject to entry of the Interim DIP Order or the Final DIP Order, as applicable, be entered into by and between the Debtors, the ABL Agent and the ABL Lenders, in their capacity as lenders thereunder (the "Tranche A Facility") and (ii) senior secured, super-priority last out debtor-in-possession term loan in the aggregate principal amount of $40,000,000 to the Debtors, which shall be entered into by and between the Debtors and certain First Lien Lenders (the "Tranche B Facility").

"Disclosure Statement" means the disclosure statement in respect of the Plan.

"Effective Date" has the meaning set forth in the Plan.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing or such other proceedings as approved by the Bankruptcy Court which order shall be in form and substance reasonably acceptable to each Consenting First Lien Lender holding 10% or more of the First Lien Claims, and which has not been reversed, vacated, rescinded or stayed, together with all extensions, modifications and amendments thereto, in form and substance reasonably acceptable to each Consenting First Lien Lender holding 10% or more of the First Lien Claims, which, among other

3

matters but not by way of limitation, authorizes the Debtors to execute, deliver and perform their obligations under the DIP Credit Agreement.

"First Lien 363 Termination Event" means (x) the occurrence of a First Lien Plan Termination Event or (y) (i) the receipt of a notice by the Company from the Majority of Consenting First Lien Lenders indicating that (ii) the Company has failed to perform, or otherwise comply with, its obligations under Section 5.2 of this Restructuring Support Agreement after a 363 Triggering Event, (iii) the receipt of a notice by the Company from the Majority of Consenting First Lien Lenders that the winning bid in a 363 Sale after a 363 Triggering Event provides for a less favorable treatment for any First Lien Claims or Tranche B DIP Claims than is provided for in the Restructuring Term Sheet and the Plan, or (iv) the receipt of a notice by the Company from ACAS that the winning bid in a 363 Sale after a 363 Triggering Event provides for a less favorable treatment for Second Lien Note Claims than is provided for in the Restructuring Term Sheet and the Plan.

"First Lien Claim" means any Claim derived from or based upon the First Lien Credit Agreement.

"First Lien Plan Termination Event" means the date a Final Order is entered avoiding, or otherwise invalidating any or all of the liens securing the Company's obligations under the First Lien Credit Agreement.

"First Lien Lender" means a lender under the First Lien Credit Agreement.

"Final Order" has the meaning set forth in the Plan.

"HoldCo Note Agent" has the meaning set forth in the preamble hereof.

"HoldCo Note" has the meaning set forth in the preamble hereof.

"HoldCo Noteholder" has the meaning set forth in the preamble hereof.

"HoldCo Note Claim" means a Claim arising under the HoldCo Note.

"Interim DIP Order" means the order of the Bankruptcy Court, which shall be in form and substance reasonably acceptable to each Consenting First Lien Lender holding 10% or more of the First Lien Claims, entered in the Chapter 11 Case after an interim hearing, which, among other matters but not by way of limitation, authorizes the Debtors to, on an interim basis, execute, deliver and perform their obligations under the DIP Credit Agreement.

"Majority of Consenting First Lien Lenders" means Consenting First Lien Lenders holding more than 50% of the aggregate principal amount of outstanding obligations under the First Lien Credit Agreement held by the Consenting First Lien Lenders.

"Milestones" has the meaning set forth in Section 5.1(c) hereof and are included on Exhibit C attached hereto.

4

"Outside Date" means June 30, 2011, unless such date is extended by written agreement of each Consenting First Lien Lender holding 10% or more of the First Lien Claims.

"Party" or "Parties" has the meaning set forth in the preamble hereof.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any other legal entity or association.

"Plan Supplement" shall have the meaning ascribed to such term in the Plan.

"Restructuring Support Agreement" has the meaning set forth in the preamble hereof.

"Restructuring Term Sheet" means that certain term sheet, including all exhibits attached thereto, containing material terms and provisions of the Restructuring that are incorporated into the Plan or that may be effectuated pursuant to a credit bid submitted by the First Lien Agent in a 363 Sale in the event of a 363 Triggering Event, a copy of which is attached hereto as Exhibit A, and incorporated by reference and made a part of this Restructuring Support Agreement, as the same may be modified, amended or changed from time to time by agreement among each Consenting First Lien Lender holding 10% or more of the First Lien Claims; provided, however, that any change to the Restructuring Term Sheet that adversely affects the Company in a material manner may only be made with the Company's consent.

"Reorganized Debtors" means, collectively, each of the Debtors or any successors thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date.

"Restructuring" has the meaning set forth in clause A of the recitals hereto.

"Second Lien Agent" has the meaning set forth in the recitals hereto.

"Second Lien Lender" means a lender under the Second Lien Credit Agreement.

"Second Lien Note Claim" means any Claim derived from or based upon the Second Lien Note Purchase Agreement.

"Tranche A Agent" means the administrative agent under the Tranche A Facility.

"Tranche A DIP Claim" means a Claim for payment under the Tranche A Facility and all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto).

"Tranche A Lender" means a lender under the Tranche A Facility.

5

"Tranche B Agent" means the administrative agent under the Tranche B Facility.

"Tranche B DIP Claim" means a Claim for payment under the Tranche B Facility and all agreements and instruments relating to the foregoing (including, but not limited to, any guarantees with respect thereto).

"Tranche B Lender" shall mean a lender under the Tranche B Facility.

"Transfer" has the meaning set forth in Section 6 hereof.

2.      [Reserved.]

3.      Commitments of Lenders.

3.1     [Reserved.]

3.2     Commitment of the Consenting First Lien Lenders.   Provided that the Plan, Disclosure Statement and related documents are consistent with the Restructuring Term Sheet and no material modifications have been made to the Plan, except as provided for in Section 17 herein, each Consenting First Lien Lender (severally and not jointly) agrees that:

(a)     following the commencement of the Chapter 11 Cases and unless a First Lien Plan Termination Event or a 363 Triggering Event has occurred (and has not been rescinded) and further provided that such Consenting First Lien Lender has been solicited pursuant to an order of the Bankruptcy Court, it shall vote all First Lien Claims and Tranche B DIP Claims, as applicable, now or hereafter beneficially owned by such Consenting First Lien Lender and any of its Affiliates or any Person for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, in favor of the Plan in accordance with the applicable procedures set forth in the solicitation materials, and timely return a duly-executed Ballot in connection therewith, and it shall not, directly or indirectly in respect of such First Lien Claims and Tranche B DIP Claims:   (i) engage in any legal proceeding to object to, or interfere with, acceptance or implementation of the Restructuring in accordance with the Plan; (ii) seek, solicit, support or encourage any plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company (other than as provided in the Restructuring Term Sheet, the Plan, or this Restructuring Support Agreement); (iii) take any actions inconsistent with, or that would delay approval or confirmation of, the Plan, the Disclosure Statement or any related documents; (iv) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral under the First Lien Credit Agreement or the DIP Credit Agreement, as applicable; or (v) encourage any Person, including, without limitation, the First Lien Agent or the Tranche B DIP Agent, as applicable to undertake any action set forth in clauses (i), (ii), (iii) and (iv) herein;

(b)     after the occurrence of a 363 Triggering Event (that has not been rescinded) and provided a First Lien 363 Termination Event has not occurred, it shall take all

actions reasonably necessary to facilitate the expedient consummation of the Restructuring pursuant to the 363 Sale, including (x) directing the First Lien Agent and the Tranche B Agent to consent to the 363 Sale, (y) directing the First Lien Agent to attend the auction and submit one or more credit bids in an amount equal to all or a portion of the First Lien Claim until the First Lien Agent is selected by the Debtors as having submitted the highest and best bid, and (z) directing the First Lien Agent to implement the terms of the Restructuring, including without limitation the recoveries provided for the Parties as contemplated in the Plan and the Restructuring Term Sheet, and shall not, directly or indirectly: (i) engage in any legal proceeding to object to, or interfere with the implementation of the Restructuring pursuant to the 363 Sale; (ii) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral under the First Lien Credit Agreement or the DIP Credit Agreement, as applicable; or (iii) encourage any Person, including, without limitation, the First Lien Agent or the Tranche B Agent, as applicable, to undertake any action set forth in clauses (i) and (ii) herein; and

(c)     it shall not effectuate any Transfer in contravention of the provisions set forth in <u>Section 6</u> hereof.

3.3     <u>Commitment of ACAS and HoldCo Noteholder</u>.  Provided that the Plan, Disclosure Statement and related documents are consistent with the Restructuring Term Sheet and no material modifications have been made to the Plan, except as provided for in Section 17 herein, each of ACAS, in its capacity as First Lien Lender, Second Lien Lender and HoldCo Note Agent, and HoldCo Noteholder agrees that:

(a)     following the commencement of the Chapter 11 Cases and unless a First Lien Plan Termination Event or a 363 Triggering Event has occurred (and has not been rescinded) and provided that it has been solicited pursuant to an order of the Bankruptcy Court, it shall vote (i) in the case of ACAS, all First Lien Claims, Second Lien Lender Claims and, to the extent applicable, Tranche B DIP Claims now or hereafter beneficially owned by ACAS and any of its Affiliates or any Person for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, and (ii) in the case of HoldCo Noteholder, to the extent applicable, all HoldCo Note Claims, in favor of the Plan in accordance with the applicable procedures set forth in the solicitation materials, and timely return a duly-executed Ballot in connection therewith, and it shall not, directly or indirectly: (i) engage in any legal proceeding to object to, or interfere with, acceptance or implementation of the Restructuring in accordance with the Plan; (ii) seek, solicit, support or encourage any plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company (other than as provided in the Restructuring Term Sheet, the Plan, or this Restructuring Support Agreement); (iii) take any actions inconsistent with, or that would delay approval or confirmation of, the Plan, the Disclosure Statement or any related documents; (iv) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral under the First Lien Credit Agreement, Second Lien Credit Agreement or the DIP Credit Agreement, as applicable; or (v) encourage any Person, including, without limitation, the Second Lien Agent or the Tranche B

7

DIP Agent, as applicable to undertake any action set forth in clauses (i), (ii), (iii) and (iv) herein;

(b)     after the occurrence of a 363 Triggering Event (that has not been rescinded) and provided a First Lien 363 Termination Event has not occurred, it shall take all actions reasonably necessary to facilitate the expedient consummation of the Restructuring pursuant to the 363 Sale, including, to the extent applicabe (x) directing the First Lien Agent and the Tranche B Agent to consent to the 363 Sale, (y) directing the First Lien Agent to attend the auction and submit one or more credit bids in an amount equal to all or a portion of the First Lien Claim until the First Lien Agent is selected by the Debtors as having submitted the highest and best bid, and (z) directing the First Lien Agent to implement the terms of the Restructuring, including without limitation the recoveries provided for the Parties as contemplated in the Plan and the Restructuring Term Sheet; and shall not, directly or indirectly: (i) engage in any legal proceeding to object to, or interfere with the implementation of the Restructuring pursuant to the 363 Sale; (ii) pursue or initiate or have initiated on its behalf, any litigation or proceeding of any kind to foreclose on any collateral under the First Lien Credit Agreement, Second Lien Credit Agreement or the DIP Credit Agreement, as applicable; or (iii) encourage any Person, including, without limitation, the First Lien Agent, the Second Lien Agent or the Tranche B Agent, as applicable, to undertake any action set forth in clauses (i) and (ii) herein; and

(d)     it shall not effectuate any Transfer in contravention of the provisions set forth in <u>Section 6</u> hereof.

Nothing in this Restructuring Support Agreement shall, or shall be deemed to, prohibit any Party or its Affiliates, or their respective officers or representatives, from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, including, but not limited to asserting or seeking the allowance of any claims, counterclaims and defenses, solely if such appearance and the positions advocated in connection therewith:  (i) are not inconsistent with this Restructuring Support Agreement, the Restructuring Term Sheet and the Plan (or 363 Sale, if applicable); or (ii) are for the purposes of contesting whether any matter, fact or thing, is a breach of, or inconsistent with the Restructuring Support Agreement (including any of the Exhibits attached hereto).  Notwithstanding section 3.2(b) and 3.3(b), the Majority of Consenting First Lien Lenders may direct the First Lien Agent to not submit a credit bid at the auction that would result in a third party bidder being selected by the Debtors as having submitted the highest and best bid; <u>provided</u>, <u>however</u>, that, in the event of a bid by a third party bidder, if the Majority of Consenting First Lien Lenders determine not to credit bid, any other Consenting First Lien Lender(s) holding 10% or more of the First Lien Claims may purchase the First Lien Claims of the Consenting First Lien Lender(s) who elected not to credit bid at the price which would provide a return to such Consenting First Lien Lender(s) who did not elect to credit bid equal to that offered by the third party bidder; <u>provided</u>, <u>further</u>, <u>however</u>, that an electing Consenting First Lien Lender shall consent to the other Consenting First Lien Lenders credit bidding its First Lien Claims in such auction.

Notwithstanding anything to the contrary herein, this Restructuring Support Agreement shall not, and shall not be deemed to, impair, prohibit, limit or restrict, any Party or its Affiliates, or their respective officers or representatives, from:

(a)    engaging in discussions (or asserting any position of any kind or character in such discussions) with any Person, including third party investors or other financing sources;

(b)    making or withholding any vote, approval, decision, election, determination or other choice as permitted or contemplated by the Restructuring Support Agreement or the documents for, reflecting or relating to, any of: the Tranche A Facility, the Tranche B Facility, the Interim DIP Order or the Final DIP Order (and any documents related to any of the foregoing);

(c)    exercising or asserting through litigation or otherwise any right, power or privilege under, or term or provision of (including any dispute regarding the extent, terms, enforceability or meaning of any such right, term or provision) this Restructuring Support Agreement or the documents for, reflecting, or relating to, any of: the DIP Loans, the Interim Order or the Final Order (and any documents related to any of the foregoing); or

(d)    negotiating or otherwise contesting the terms of the documents to be included in the Plan Supplement (as defined in the Plan), relief requested by the Debtors during the course of the chapter 11 cases, any professional fee applications/requests or otherwise participating in litigation during the course of the chapter 11 cases (so long as such litigation is not inconsistent with this Restructuring Support Agreement, the Plan and the Restructuring Term Sheet), or any discussion with respect to any of the foregoing.

4.    <u>Commitment of the Company</u>.  The Company agrees to use its reasonable best efforts to (i) support and complete the Restructuring and all transactions contemplated under the Plan and the Restructuring Term Sheet, (ii) take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Plan and the Restructuring Term Sheet, (iii) complete the Restructuring and all related transactions contemplated under the Plan and the Restructuring Term Sheet within the time-frame outlined herein, (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring and (v) take no actions inconsistent with this Restructuring Support Agreement, the Plan, or the Restructuring Term Sheet, including the expeditious confirmation and consummation of the Plan (or approval and consummation of a 363 Sale in the event of a 363 Triggering Event).

5.    <u>Triggering Events/Termination</u>

5.1    <u>363 Events</u>.  The occurrence of any of the following events (a "<u>363 Event</u>"):

(a)    The Company fails to commence the Chapter 11 Cases on or before January 21, 2011;

(b)    The Interim DIP Order is not entered by the Bankruptcy Court within five (5) calendar days after the Commencement Date;

(c)    The Company fails to achieve, comply with, or proceed in accordance with, any of the "Milestones" set forth on <u>Exhibit C</u> attached hereto by the dates specified therein,

including any grace periods provided for therein (collectively, the "Milestones"), or such other date as may be consented to by each Consenting First Lien Lender holding 10% or more of the First Lien Claims (which consent shall not be unreasonably withheld), it being understood that the materials contemplated to be filed by the Company in compliance with the Milestones, including each of (i) the sale motion, (ii) the bid procedures, (iii) the bid procedures order and (iv) the sale order shall be in form and substance reasonably acceptable to each Consenting First Lien Lender holding 10% or more of the First Lien Claims;

(d)    The withdrawal, amendment, modification of, or the filing of a pleading by the Debtors seeking to amend or modify, the Plan, the Disclosure Statement, or any other related document in a material manner that is inconsistent with the Restructuring Term Sheet or the Plan;

(e)    A material breach by the Company of any of its obligations under this Restructuring Support Agreement or failure by the Company to satisfy the terms and conditions necessary to consummate the Restructuring in any material respect, and any such breach or failure by the Company is not cured by the earlier of three (3) Business Days after receipt of written notice from a Majority of Consenting First Lien Lenders or, to the extent applicable, any applicable cure period provided for under the agreements governing the Restructuring;

(f)    Any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a way that cannot be reasonably remedied by the Company or the Consenting Lenders;

(g)    The filing of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(h)    The Debtors' exclusive right to file a plan under section 1121 of the Bankruptcy Code is terminated pursuant to a Final Order or expires; or

(i)    The occurrence of an Event of Default as defined under the DIP Credit Agreement which has not been cured by the Debtors within any applicable grace or cure period or waived by each of (i) the Required Lenders and (ii) the Required Tranche B Lenders (each as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement.

    5.2    Company's Obligations after a 363 Triggering Event.  After a 363 Triggering Event, the Company agrees that, unless a Majority of Consenting First Lien Lenders rescind the notice provided in connection therewith, it shall seek the Bankruptcy Court's approval to conduct a sale pursuant to section 363 of the Bankruptcy Code (a "363 Sale").  If, at the time of the 363 Triggering Event, the Bankruptcy Court has already approved bidding procedures for a 363 Sale consistent

10

with the foregoing, the Company shall conduct an auction and seek approval of the results of such auction as soon as permitted under any order approving such procedures and consistent with the time periods set forth in the Milestones.

5.3    Implementation of 363 Sale Upon Occurrence of a 363 Triggering Event.

(a)    Effect of 363 Triggering Event.  Upon the occurrence of a 363 Triggering Event, unless and until any notice of such 363 Triggering Event is rescinded by a Majority of Consenting First Lien Lenders, (x) Consenting First Lien Lenders and (y) ACAS, as Second Lien Lender and HoldCo Note Agent, and (z) HoldCo Noteholder, shall no longer have any obligation to the Company to support the Plan, however, each of the forgoing parties shall remain obligated to support a 363 Sale pursuant to Sections 3.2(b) and 3.3(b), as applicable.

(b)    Agreement Among Lenders in Connection with Certain Events.  So long as the Outside Date has not occurred or the Bankruptcy Court has not entered an order (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing a trustee in any of the Chapter 11 Cases, notwithstanding a First Lien 363 Termination Event, First Lien Plan Termination Event or 363 Triggering Event, the Consenting First Lien Lenders, and ACAS, as Second Lien Lender and HoldCo Note Agent, and HoldCo Noteholder shall remain obligated to each other to support the Restructuring.

(c)    Termination of Obligations.  Notwithstanding anything to the contrary herein, other than as provided in subsection (d) below, unless terminated earlier pursuant to the terms of this Restructuring Support Agreement, the parties' obligations to the Company and each other under this Restructuring Support Agreement shall terminate on the earlier of (i) the Effective Date; (ii) the date an order approving a 363 Sale becomes a final order (the "Sale Order"); (iii) the entry of an order (a) dismissing any of the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (c) appointing a trustee in any of the Chapter 11 Cases; and (iv) 11:59 p.m. (eastern time) on the Outside Date.

(d)    Continuing Obligation.  Notwithstanding the foregoing subsections (a) through (c) of this Section 5.3, subsequent to an order being entered approving a 363 Sale, the Parties shall remain obligated to implement the terms of the Restructuring, including without limitation the creation of a newly formed entity that will acquire the assets of the Company and that will initially be owned 95% by the existing First Lien Lenders and 5% by the existing Second Lien Lenders.

5.4    Company Termination Events.  The Company may terminate this Agreement as to all Parties upon five Business Days' prior written notice, upon the occurrence of any of the following events: (i) the breach by any of the Consenting Lenders of any of the representations, warranties or covenants of such Consenting Lender set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Restructuring, that remains uncured for a period of five Business Days after the receipt by the Consenting Lenders of notice of such breach; (ii) the sole manager of AIH determines based upon the advice of counsel that proceeding with the Restructuring as contemplated in this Restructuring Support Agreement would be a breach of its fiduciary duties; or (iii) the issuance by any governmental authority, including any

11

regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order preventing consummation of a material portion of the Restructuring.

5.5    Waiver of Automatic Stay.  Subject to the terms of the Interim DIP Order, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay (the "Automatic Stay") provided thereunder in connection with the giving of any notice of termination provided for hereunder (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).

6.    Transfer of Lender Claims.  Notwithstanding anything to the contrary herein, each of the Consenting Lenders agree that, for so long as this Restructuring Support Agreement binds such Consenting Lender and has not been terminated in accordance with its terms with respect to such Consenting Lender, it shall not sell, assign, transfer, convey or otherwise dispose of, directly or indirectly (each, a "Transfer"), all or any of its Claims (or any right related thereto and including any voting rights associated with such Party's Claims) under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Holdco Note or the Tranche B Facility, unless the transferee thereof (i) is a Consenting Lender or agrees in an enforceable writing to assume and be bound by the terms of this Restructuring Support Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Consenting Lender under this Restructuring Support Agreement accruing from and after the date of such assignment and (b) promptly delivers such writing to the Company (by email to joshua.sussberg@kirkland.com with a copy to jseery@sidley.com and dmannal@kramerlevin.com) (each such transferee becoming, upon the Transfer, a Consenting Lender hereunder).  The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor.  By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Consenting Lender hereunder shall be deemed to constitute obligations in favor of the relevant transferee.  Any Transfer of any Claim under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Holdco Note or the Tranche B Facility by a Consenting Lender that does not comply with the procedure set forth in the first sentence of this Section 6 shall be deemed void *ab initio*.  This Restructuring Support Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Claims under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Holdco Note or the Tranche B Facility, provided that any such additional Claims shall automatically be deemed to be subject to the terms of this Restructuring Support Agreement. In addition, notwithstanding anything to the contrary herein, for so long as this Restructuring Support Agreement has not been terminated in accordance with its terms, a Consenting Lender may offer, sell or otherwise transfer any or all of its Claims under the First Lien Credit Agreement, the Second Lien Credit Agreement, the Holdco Note or the Tranche B Facility to any Affiliated Transferee, who shall be automatically deemed bound by this Restructuring Support Agreement as a Consenting Lender, without any notice, approval or other requirements.

7.    Effectiveness.  This Restructuring Support Agreement shall become effective and binding upon each of the undersigned Persons as of the date when the Company has executed and delivered signed copies of this Restructuring Support Agreement.  This Restructuring Support Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

KL2 2682700.15

8.    <u>Representations and Warranties</u>.  Each Party hereby represents and warrants to the other Parties that the following statements are true and correct as of the date hereof:

(a)    It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Restructuring Support Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Restructuring Support Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)    The execution, delivery and performance by such Party of this Restructuring Support Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(c)    The execution, delivery and performance by such Party of this Restructuring Support Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or governmental authority or regulatory body.

(d)    This Restructuring Support Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e)    If such Party is a Consenting Lender, such Consenting Lender, as of the date of this Restructuring Support Agreement:

(i)    is the beneficial owner of the principal amount of First Lien Claims, Second Lien Claims and/or HoldCo Note Claims, as applicable, or is the nominee, investment manager or advisor for one or more beneficial holders thereof, and has voting power or authority or discretion with respect to, such claims including, without limitation, to vote, exchange, assign and transfer such claims, as such Consenting Lender has indicated on <u>Exhibit B</u> to this Restructuring Support Agreement;

(ii)    holds its Claim(s) free and clear, other than pursuant to this Restructuring Support Agreement, of any claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind that would adversely affect in any way such Consenting Lender's performance of its obligations contained in this Restructuring Support Agreement at the time such obligations are required to be performed; and

13

(iii)    acknowledges that no representations, express or implied, are being made with respect to the Company, or any securities being acquired in connection with the Plan, or otherwise, other than those expressly set forth herein or in the DIP Credit Agreement, Plan or Plan Supplement.

9.    <u>Cooperation</u>.    The Debtors shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement or related documents) to counsel for the Consenting First Lien Lenders and ACAS as soon as reasonably practicable but not less than two (2) days prior to the date when the Debtors intends to file each such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  The Debtors will use their reasonable best efforts to provide draft copies of all other pleadings the Debtors intend to file with the Bankruptcy Court to counsel for the Consenting First Lien Lenders and ACAS within a reasonable time prior to filing any such pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

10.    <u>Claim Resolution Matters</u>.  Prior to the entry of the Confirmation Order or the Sale Order, as applicable, and the effective date of any transactions contemplated thereby or under the Plan, the Company shall not enter into any agreements with holders of claims (as defined in the Bankruptcy Code), other than the Consenting Parties, relating to the allowance, estimation, validity, extent or priority of such claims, or the treatment and classification of such claims under the Plan, without the prior written consent of a Majority of Consenting First Lien Lenders, except with respect to (i) claims which the Company is authorized to resolve or pay pursuant to any applicable first day orders, or (ii) as otherwise contemplated herein.

11.    <u>Access</u>.  Subject to the terms of the DIP Credit Agreement, the Company will afford the Consenting Lenders and their attorneys, consultants, accountants and other authorized representatives access to all properties, books, contracts, commitments, records, management personnel, lenders and advisors of the Company.

12.    <u>Entire Agreement</u>.    This Restructuring Support Agreement, including any exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this Restructuring Support Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Restructuring Support Agreement.

13.    <u>Reservation of Rights</u>.  Each of the Parties acknowledges and agrees that this Restructuring Support Agreement is being executed in connection with negotiations concerning a possible Restructuring of the Company and in contemplation of possible Chapter 11 Case filings by the Company, and (a) the rights granted in this Restructuring Support Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court, and (b) the Company waives any right to assert that the exercise of such rights by any Consenting Lenders violates the automatic stay provisions of the Bankruptcy Code.  Except as expressly provided in this Restructuring Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Consenting Lender or the First Lien Agent and Second Lien Agent to protect and preserve its rights, remedies and interests, including, without limitation, its claims against the Company and/or its Affiliates.  Nothing herein shall be deemed an admission of any kind.  Nothing

14

contained herein effects a modification of the Consenting Lenders' rights under the First Lien Credit Agreement, Second Lien Credit Agreement or HoldCo Note, as applicable, or other related and unrelated documents and agreements unless and until the Effective Date has occurred. If the transactions contemplated herein are not consummated, or if this Restructuring Support Agreement terminates for any reason prior to the Effective Date, the Parties hereto fully reserve any and all of their rights.

14.     <u>Waiver</u>.  This Restructuring Support Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties.  If the transactions contemplated herein are not consummated, or following the occurrence of the Outside Date, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Restructuring Support Agreement, the Plan, the Restructuring Term Sheet and all related negotiations shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

15.     <u>Representation by Counsel</u>.  Each Party acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Restructuring Support Agreement and the transactions contemplated by this Restructuring Support Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Restructuring Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Restructuring Support Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

16.     <u>Counterparts</u>.  This Restructuring Support Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

17.     <u>Amendments</u>.  Except as otherwise provided herein, this Restructuring Support Agreement, the Plan and the Restructuring Term Sheet may not be materially modified, amended or supplemented, or any provisions herein or therein waived without the prior written consent of each Consenting First Lien Lender holding 10% or more of the First Lien Claims.  Where the consent of a Party is required under this Section 17, such consent shall not be unreasonably withheld by such Party.  Notwithstanding the foregoing, the Parties may modify, amend or supplement the Plan consistent with Article X.A. of the Plan.

18.     <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Restructuring Support Agreement are inserted for convenience only and shall not affect the interpretation hereof.

19.     <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Restructuring Support Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy

KL2 2682700.15

Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

20.    Governing Law.    This Restructuring Support Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Restructuring Support Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Restructuring Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Restructuring Support Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS RESTRUCTURING SUPPORT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Restructuring Support Agreement.

21.    Notices.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by electronic mail transmission with first class mail confirmation to the Parties at the following addresses or email addresses:

If to the Company:

Appleseed's Intermediate Holdings LLC
138 Conant Street
Beverly, Massachusetts 01915
Facsimile:  (978) 998-3934
Attention:  T. Neale Attenborough
E-mail address:  neale@orchardbrands.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Joshua A. Sussberg, Esq.
E-mail address:  joshua.sussberg@kirkland.com

If to the Consenting Lenders:

To the addresses and email addresses set forth on the signature pages hereto.

KL2 2682700.15

with a copy to (which shall not constitute notice):

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Attention:   James P. Seery, Esq.
Facsimile:  (212) 906-2021
E-mail address:  jseery@sidley.com

Kramer Levin Naftalis and Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile:  (212) 715-8000
Attention:  Douglas Mannal, Esq..
E-mail address:  dmannal@kramerlevin.com

22.     <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Restructuring Support Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns (including any Person that becomes a Consenting Lender pursuant to <u>Section 6</u> hereof), and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

23.     <u>References to UBS</u>.  Notwithstanding anything to the contrary herein, references herein to and the obligations of UBS AG, Stamford Branch, as a Consenting First Lien Lender shall mean only the distressed debt trading desk of UBS AG, Stamford Branch, and no other business group. Any reference to an Affiliate of a Consenting First Lien Lender shall not apply to UBS AG, Stamford Branch.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the undersigned have executed this Restructuring Support Agreement as of the date first written above.

Appleseed's Intermediate Holdings LLC
Appleseed's Acquisition, Inc.
Appleseed's Holdings, Inc.
Arizona Mail Order Company, Inc.
Bedford Fair Apparel, Inc.
Blair Credit Services Corporation
Blair Factoring Company
Blair Holdings, Inc.
Blair International Holdings, Inc.
Blair LLC
Blair Payroll, LLC
Draper's & Damon's Acquisition LLC
Draper's & Damon's LLC
Fairview Advertising, LLC
Gold Violin LLC
Haband Acquisition LLC
Haband Company LLC
Haband Oaks, LP
Haband Online, LLC
Haband Operations, LLC
Johnny Appleseed's, Inc.
Linen Source Acquisitions LLC
LM&B Catalog, Inc.
Monterey Bay Clothing Company, Inc.
Norm Thompson Outfitters, Inc.
NTO Acquisition Corporation
Orchard Brands Insurance Agency LLC
Wintersilks, LLC

By: _____

Name: T. Neale Attenborough
Authorized Officer

Highland Crusader Offshore Partners, L.P.
By: Highland Crusader Fund GP, L.P., its general partner
By: Highland Crusader GP, LLC., its general partner
By: Highland Capital Management, L.P. Its sole member
By: Strand Advisors, Inc., its general partner

Institution: _____

January 18, 2011

By: _____

Its:  James D. Dondero, President
      Strand Advisors, Inc., General Partner of
      Highland Capital Management, L.P.

Loan Funding IV LLC
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc., Its General Partner


Institution: _____
January 18, 2011
By: _____

Its:   James D. Dondero, President_____
        Strand Advisors, Inc., General Partner of
        Highland Capital Management, L.P.

Eastland CLO, Ltd.
By: Highland Capital Management, L.P.
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

Institution: _____

January 19 , 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Gleneagles CLO, Ltd.
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January 19 , 2011

By: _____

Its: James D. Dondero, President____
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Grayson CLO, Ltd.
By: Highland Capital Management, L.P.,
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

Institution: _____

January 19, 2011

By: _____

Its: James D. Dondero, President
   Strand Advisors, Inc., General Partner of
   Highland Capital Management, L.P.

Greenbriar CLO, Ltd.
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc.
Its General Partner

Institution: _____

January 19, 2011

By: _____

Its: __James D. Dondero, President__
     Strand Advisors, Inc., General Partner of
     Highland Capital Management, L.P.

Highland Loan Funding V Ltd.
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January 19 , 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Jasper CLO, Ltd.
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January 18 , 2011
By: _____

Its: James D. Dondero, President
_____
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Liberty CLO, Ltd.
By: Highland Capital Management, L.P.
As Collateral Manager
By: Strand Advisors, Inc., its General Partner

Institution: _____

January 18, 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Red River CLO Ltd.
By: Highland Capital Management, L.P.
As Collateral Manager
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January __, 2011
By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Rockwall CDO LTD.
By: Highland Capital Management, L.P.
As Collateral Manager
By: Strand Advisors, Inc., It's General Partner

Institution: _____

January 18 , 2011

By: _____

Its:  James D. Dondero, President _____
      Strand Advisors, Inc., General Partner of
      Highland Capital Management, L.P.

Rockwall CDO II Ltd.
By: Highland Capital Management, L.P.,
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

Institution: _____

January 18, 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Southfork CLO, Ltd.
By: Highland Capital Management, L.P., As Collateral Manager
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January 18 , 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Stratford CLO, Ltd.
By: Highland Capital Management, L.P.,
As Collateral Manager
By: Strand Advisors, Inc.,
Its General Partner

Institution: _____

January 18, 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Westchester CLO, Ltd
By: Highland Capital Management, L.P., As Collateral Servicer
By: Strand Advisors, Inc., Its General Partner

Institution: _____

January 18, 2011

By: _____

Its: James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Institution: <u>CANPARTNERS INVESTMENTS</u>
<u>IV, LLC</u>

January <u>18</u>, 201_

By: <u>Canyon Capital Advisors LLC, its Manager</u>

By: _____

Jonathan M. Kaplan, **Authorized Signatory**

Institution:  Landmark III CDO, Limited

Landmark IV CDO, Limited

Landmark V CDO, Limited

Landmark VIII CLO, Limited

Landmark IX CDO, Limited

By: Aladdin Capital Management LLC

January 19, 2011

By: _____

Pallo Blum-Tucker

Its:  Authorized Signatory_____

Institution: ABLECO LLC

January 19, 2011

By: _____
   Kevin P. Genda

Its: Senior Managing Director

Signature Page – Restructuring Support Agreement

Institution: ABLECO FINANCE LLC

January 19, 2011

By: _____

Kevin P. Genda

Its: Vice Chairman

Institution: A4 Funding L.P.
By: A4 Fund Management, Inc
Its general partner

January 19, 2011

By: _____
Kevin P. Genda

Its: Vice President

A3 Funding L.P.
By. A3 Fund Management LLC

Institution: its general Partner

January 19, 2011

By: _____
Kevin P. Genda

Its: Vice President

Institution: **American Capital, Ltd.**

By: _____

Its: _Senior Vice President_

Institution: **ACAS Business Loan Trust 2005-1**

By: American Capital, Ltd., as servicer

    By: _____

    Its: _Senior Vice President_

Institution: **ACAS Business Loan Trust 2006-1**

By: American Capital, Ltd., as servicer

    By: _____

    Its: _Senior Vice President_

Institution: **ACAS Business Loan Trust 2007-2**

By: American Capital, Ltd., as servicer

    By: _____

    Its: _Senior Vice President_

_Stephen P. Walko_ (signature)

Stephen P. Walko

Institution:  UBS AG STAMFORD BRANCH

By:  UBS Securities LLC, as agent

January 19, 2011

By: _____

Name:

Title:

                                             Stephen Scanapieco
                                             Associate Director
                                             Banking Products

By: _____      Services, US

Name:

Title:    Joselin Fernandes
           Associate Director
           Banking Products
           Services, US

**CONSENTING LENDERS:**

**Institution: McDonnell Bank Loan Select Master Fund, A Class of the McDonnell Bank Loan Select Series Trust I**

**By McDonnell Investment Management, LLC As Investment Manager**

By: _____
     Name:  Kathleen A. Zarn
     Title:    Vice President

Address: in care of:
        McDonnell Investment Management, LLC
        1515 West 22nd Street – 11th Floor
        Oak Brook, IL 60523

**CONSENTING LENDERS:**

**Institution: Illinois State Board of Investment**

**By McDonnell Investment Management, LLC,
As Manager**

By: _____

     Name:  Kathleen A. Zarn
     Title:    Vice President

Address: in care of:
     McDonnell Investment Management, LLC
     1515 West 22nd Street – 11th Floor
     Oak Brook, IL 60523

**Exhibit A**


**Restructuring Term Sheet**

**APPLESEED'S INTERMEDIATE HOLDINGS LLC**
**RESTRUCTURING TERM SHEET**

*JANUARY 19, 2010*

This term sheet (the "***Term Sheet***") sets forth the principal terms of a proposed financial restructuring (the "***Restructuring***") of the existing debt and other obligations of Appleseed's Intermediate Holdings LLC and its 27 domestic subsidiaries (the "***Company***"). Subject in all respects to the terms of the Restructuring Support Agreement to which this Term Sheet will be attached, the Restructuring will be consummated through cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). The Term Sheet has the support of the Consenting Lenders, as set forth in the Restructuring Support Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.

THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND OTHERWISE REASONABLY SATISFACTORY TO EACH CONSENTING FIRST LIEN LENDER HOLDING 10% OR MORE OF THE FIRST LIEN CLAIMS), AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DOCUMENTATION.

| | |
|---|---|
| Overview of Transaction | Subject to the Restructuring Support Agreement, the transaction contemplated in this Term Sheet will be effectuated pursuant to (a) the Plan (in the form attached to the Restructuring Support Agreement as <u>Exhibit B</u>) or (b) a credit bid submitted by the First Lien Agent and, if applicable, the Second Lien Agent, in connection with a 363 Sale following a 363 Triggering Event, which results in the assets of the Company being acquired by a newly formed entity ("***New Appleseed's***") that will initially be owned 95% by the First Lien Lenders and 5% by the Second Lien Lenders (subject to dilution pursuant to the Management Equity Incentive Program (as contemplated under the Plan) and will otherwise have a restructured capital structure that is consistent with the terms herein. |
| DIP Facility | The Company and certain Consenting Lenders will enter into that certain debtor-in-possession credit agreement providing a (i) senior secured, super-priority debtor-in-possession revolving credit financing in the aggregate principal amount of |

| | |
|---|---|
| | $100,000,000, which shall be entered into between the Debtors, UBS AG, Stamford Branch ("**UBS**"), as agent, and certain lenders thereto (the "***Tranche A Facility***") and (ii) senior secured, super-priority last out debtor-in-possession term loan in the aggregate principal amount of $35,000,000 (with an additional $5,000,000 delayed draw available), which shall be entered into by and between the Debtors, Ableco Finance LLC ("**Ableco**") as administrative agent, American Capital, Ltd. ("**ACAS**") as disbursement agent, and the lenders thereto (the "***Tranche B Facility***"). <br><br> The Tranche B Facility will be backstopped by ACAS, Highland Capital Management LP ("**Highland**"), Canyon Capital Advisors LLC ("**Canyon**"), and Ableco (collectively, the "***Backstop Parties***"), with all holders of the First Lien Claims having the right to participate in the Tranche B Facility on a *pro rata* basis based on their holdings of First Lien Claims. To the extent certain First Lien Lenders do not participate in Tranche B Facility, those nonparticipating First Lien Lenders' *pro rata* portion of the Tranche B Facility will be funded by the Backstop Parties on a *pro rata* basis based on their holdings of First Lien Claims. <br><br> The DIP Facility shall be in the form attached to the motion filed with the Bankruptcy Court on the Petition Date. |
| Pro Forma Capital Structure of New Appleseed's | <ul><li>$80mm Amended ABL Facility</li><li>Up to $40 Senior Term Loan</li><li>$200mm First Lien Term Loan</li><li>$43mm Junior Term Loan</li><li>New Common Equity</li></ul> |
| Terms of Amended ABL Facility | To be provided on terms no less favorable to the Debtors than that certain exit commitment letter attached hereto as <u>Exhibit A</u>. |
| Terms of Senior Term Loan (conversion of Tranche B Facility) | <ul><li><u>Amount</u>: $35,000,000 (the Senior Term Loan will increase up to $40,0000,000 to the extent the Tranche B Facility is fully drawn).</li><li><u>Interest</u>: LIBOR + 1050 bps (LIBOR Floor of 350 bps).</li><li><u>Maturity</u>:  5 years.</li><li><u>Amortization</u>: None.</li><li><u>Prepayment</u>: No call protection.</li><li><u>Covenants</u>: Same as First Lien Term Loan.</li></ul> |

| | |
|---|---|
| | • <u>Collateral</u>: Junior (payment and lien subordination) to Amended ABL Facility on all assets. |
| Terms of First Lien Term Loan | • <u>Amount</u>: $200,000,000.<br><br>• <u>Interest</u>: Until such time that the reorganized Debtors achieve a Fixed Charge Coverage Ratio[1] of 1.25x or higher, the interest accruing on the First Lien Term Loan shall be payable in both cash and payment in kind ("***PIK***"), with the cash component priced at LIBOR + 250bps (with a LIBOR floor of 150bps) and the PIK component priced at 250bps (the "***PIK Interest***"); *provided, that* once the EBIDTA Fixed Charge Coverage Ratio of 1.25x or higher is achieved, the PIK Interest shall be payable in Cash.<br><br>• <u>Maturity</u>: 5 years.<br><br>• <u>Amortization</u>: $500,000 quarterly Amortization Payments, however, no Amortization Payments shall be made during the first 18 months.<br><br>• <u>Covenants</u>: Financial Covenants to include: (i) Minimum EBITDA, (ii) Cash Pay Term Loan Leverage, (iii) Total Leverage and (iv) Fixed Charge. Covenants to be tested on a quarterly basis beginning after the first six (6) months of the loan.<br><br>• <u>Collateral</u>: Junior (payment and lien subordination) to Amended ABL Facility and Senior Term Loan on all assets. |
| Terms of Junior Term Loan | • <u>Amount</u>: $43,000,000.<br><br>• <u>Cash Pay Interest</u>: Greater of (i) LIBOR and (ii) 1%, with a 4% cap.<br><br>• <u>PIK Interest</u>: 7%.<br><br>• <u>Maturity</u>: 6 years.<br><br>• <u>Amortization</u>: None.<br><br>• <u>Covenants</u>: None.<br><br>• <u>Collateral</u>: Junior (payment and lien subordination) to Amended ABL Facility, Senior Term Loan and First Lien Term Loan on all assets. |
| New Common Equity | As a result of the Restructuring, all existing equity interests (including common stock, preferred stock and any options, warrants or rights to acquire any equity interests) of the Company shall be cancelled, and the new common stock of New |

---

[1] "***Fixed Charge Coverage Ratio***" shall mean for any LTM period (x) earnings before interest taxes depreciation and amortization minus Cash capital expenditures minus Cash taxes divided by (y) Cash interest plus PIK Interest related to the First Lien Term Loan plus scheduled cash amortization of the First Lien Term Loan.

| | |
|---|---|
| | Appleseed's (the "***New Common Equity***") shall be owned 95% by the existing First Lien Lenders and 5% by the existing Second Lien Lenders (with such 5% of the New Common Equity to be deemed non-voting or otherwise agreed to by each of the Consenting First Lien Lender holding 10% or more of the First Lien Claims in the applicable corporate governance documents) subject in each case to dilution by the shares of New Common Equity reserved under the Management Equity Incentive Program. |
| Additional Provisions | • **Management Equity Incentive Program**. New Appleseed's and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims, shall engage in good faith negotiations to reach agreement on the Management Equity Incentive Program, and include any form thereof and the amounts of any grants thereunder in the supplement to the Plan; *provided, however,* that if New Appleseed's and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims are unable to reach an agreement notwithstanding their good faith efforts to do so, no such program shall be included in the Plan supplement and instead, within 90 days of the Effective Date the New Board shall adopt and implement a Management Equity Incentive Program. <br><br>• **Corporate Governance**. The terms and conditions of the new corporate governance documents of New Appleseed's shall reflect the provisions set forth in the Governance Term Sheet attached as <u>Exhibit B</u> hereto and shall otherwise be in form and substance reasonably satisfactory to each Consenting First Lien Lender holding 10% or more of the First Lien Claims. <br><br>• **Board of Directors**. New Appleseed's shall have a 7 person board of directors (the "***New Board***"), which shall consist of 2 directors appointed by ACAS, 1 director appointed by Ableco, 1 director appointed by Highland, 1 director appointed by Canyon, 1 initial independent director appointed by the First Lien Lenders other than ACAS, Ableco, Highland and Canyon, and the current Chief Executive Officer of Appleseed's. <br><br>• **Bankruptcy**. The transaction contemplated in this Term Sheet will be effectuated through the Plan (attached to the Restructuring Support Agreement as <u>Exhibit B</u>) or pursuant to a credit bid in a 363 Sale that results in the assets of the Company being acquired by a newly formed entity that will initially be owned 95% by the existing First Lien Lenders and 5% by the existing Second Lien Lenders and will otherwise have a capital structure that is consistent with the terms herein. <br><br>• **Tax**. The Company, in consultation with the Consenting |

| | Lenders, will seek to effectuate the terms and conditions outlined herein in a tax efficient manner. |
| --- | --- |
| | • **Professional Fees**. Payment through the effective date of the Restructuring of all reasonable fees and expenses of the professionals to the ABL Agent (including, without limitation, Winston & Strawn, LLP, as counsel, and FTI as financial advisor), the co-collateral agent under the ABL Credit Agreement (including, without limitation, Brown Rudnick LLP, as counsel), the First Lien Agent (including, without limitation, Sidley Austin LLP, as counsel, and Loughlin Meghji + Company as financial advisor), and ACAS (including, without limitation, Kramer Levin Naftalis and Frankel LLP, as counsel, and Miller Buckfire & Co., LLC, as financial advisor), incurred in connection with the negotiation and consummation of the transactions contemplated by this Term Sheet. |
| | • **Releases.** The Restructuring shall provide customary releases for the benefit of the Debtors, ABL Lenders, ABL Agent, First Lien Lenders, First Lien Agent, Second Lien Lenders, Second Lien Agent, the holders of the Holdco note, the Holdco Note Agent and their respective attorneys, financial advisors or other professionals or representatives and with respect to the lenders only their respective agents, principals and affiliates. |

**Exhibit B**
**(to Restructuring Term Sheet)**

**Governance Term Sheet**

<u>TERM SHEET FOR GOVERNANCE DOCUMENTS/EQUITYHOLDERS AGREEMENTS</u>

<u>FOR RESTRUCTURED APPLESEED'S (THE "COMPANY")</u>

**A.**     <u>Structure</u>

1.     Corporation (or LLC that has elected to be taxed as a C corporation).

2.     Contemplated for equity to consist of Class A Common Stock representing 95% of total equity and Class B Common Stock representing 5% of total equity (Class B to have limited voting rights).

**B.**     <u>Board of Directors</u>

1.     The initial Board of Directors shall consist of (i) 2 directors appointed by ACAS, (ii) 1 director appointed by Ableco, (iii) 1 director appointed by Highland, (iv) 1 director appointed by Canyon, (v) 1 independent director appointed by majority vote of the First Lien Lenders other than ACAS, Ableco, Highland and Canyon (the "Other First Lien Lenders") and (vi) the current Chief Executive Officer of Appleseed's.

2.     After the effective date, (i) any stockholder that holds at least 16.67% of the full voting equity issued on the effective date shall have the right to designate one director, (ii) any stockholder that holds at least 33.34% of the full voting equity issued on the effective date shall have the right to designate two directors, (iii) any stockholder that holds at least 50% of the full voting equity issued on the effective date shall have the right to designate 3 directors, (iv) any stockholder that holds at least 66.67% of the full voting equity issued on the effective date shall have the right to designate 4 directors, (v) any stockholder that holds at least 83.34% of the full voting equity issued on the effective date shall have the right to designate 5 directors,  (vi) even if ACAS holds less than 33.34% of the equity issued on the effective date, ACAS shall retain the right to designate 2 directors so long as it continues to hold at least 25% of the full voting equity issued on the effective date; and even if ACAS holds less than 16.67% of the full voting equity issued on the effective date, ACAS shall retain the right to designate 1 director so long as it continues to hold at least 10% of the total full voting equity issued on the effective date, and (vii) even if any of Ableco, Highland or Canyon holds less than 16.67% of the full voting equity issued on the effective date, it will retain the right to designate a director as long as it continues to hold at least 10% of the total full voting equity issued on the effective date.

3.     The initial term of office for directors shall be two years (the "Initial Period"), and each subsequent term of office for directors shall be one year.

4.     During Initial Period, the Other First Lien Lenders shall retain the right to designate 1 independent director so long as they and their respective affiliates continue to hold in the aggregate at least 10% of the total full voting equity issued on the effective date.  After the Initial Period, the Other First Lien Lenders shall not have director designation rights.

5.     If any stockholder (or group of stockholders) loses the right to designate a director or directors, the size of the board will be decreased accordingly.  If any stockholder obtains the right to designate a director (or an additional director, as the case may be), the size of the board will be increased accordingly.

6.	If at any time the board of directors consists of an even number of directors and there is a tie vote on any matter when the votes of all directors are taken into account, then the vote of the CEO on that matter shall be disregarded.

**C.**	**Consent Rights**.  Each of the following actions will require the approval of the holders of 60% of the full voting equity (and neither the Board nor any committee will approve any of such actions absent such approval):

(a)	Sale or other disposition of all or a majority of the assets of the Company and its subsidiaries;

(b)	Any sale, recapitalization, liquidation, dissolution, winding up, bankruptcy event, reorganization, consolidation, or merger of the Company or any of its subsidiaries;

(c)	Authorization of additional equity not authorized by organizational documents;

(d)	Any non-pro rata redemption of equity interests (except for purchases from employees upon termination of employment); and

(e)	Any amendment of the organizational documents of the Company.[1]

In addition, each of the following actions will require the approval of a 2/3 supermajority vote of the Board:

(a)	Any material acquisition of businesses, companies or assets; entrance into joint ventures;

(b)	Transactions with affiliates; and

(c)	Termination or hiring of CEO.

**D.**	**Restrictions on Transfer**

1.	Transferability of shares shall be subject to the following restrictions:

(a)	Equity cannot be transferred to competitors; and

(b)	Equity can be transferred to affiliates of competitors only if the Board of Directors is satisfied that company financials and other company information will be kept confidential and not shared with any competitor.

---

[1]  Amendment provisions will also contain anti-discrimination language that will provide protection against disparate treatment.

KL2 2683467.2

E.        **Tag-Along/Drag-Along Rights**

1.        Drag-along rights.  Holders of at least 60% of full voting equity shall have drag-along rights that will allow them to force a sale of the company to a "qualified buyer", subject to customary qualifications.  The term "qualified buyer" shall mean any third party and any then-current stockholder if the sale transaction is approved by holders of at least 60% of the full voting equity not held by the buyer and its affiliates.

2.        Tag-along rights.  In the event of a transaction or series of related transactions that would result in any person/entity or group of affiliated persons/entities holding greater than 60% of the new full voting equity, each of the equityholders shall have tag along rights to join in any such transfer on the same terms and conditions and on a pro rata basis.


F.        **Preemptive Rights/Registration Rights**

1.        Preemptive Rights.  Holders of new equity shall have preemptive rights on future issuances of equity and debt, subject to customary exceptions.

2.        Registration Rights.  Holders of new equity shall have unlimited piggyback registration rights.  After an IPO, any holder or holders that represent more than 10% of equity may demand up to 3 long-form registrations and an unlimited number of short-form registrations of equity that may not otherwise be freely sold without registration, in each case on customary terms.

G.        **Financial Information**

1.        All holders of new equity shall be entitled to quarterly and annual financial statements, subject to confidentiality provisions to be included in the Equityholders Agreement.

H.        **Management Equity**

1.        Equity incentive documentation to include, among other customary provisions, a claw-back of equity from employees who acquire equity or equity-related securities (x) whose employment is terminated for cause, at lesser of purchase price or fair market value and (y) whose employment terminates other than for cause, at fair market value.

I.        **One Holder**

1.        The interest of a holder and its affiliates will be aggregated for purposes of determining such holder's and its affiliates' rights under the Equityholders Agreement, and an equityholder may allocate the exercise of any equity purchase or other rights under the agreement among it and its affiliates that would be permitted assignees and holders of shares as it shall determine.

KL2 2683467.2

**Exhibit B**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| APPLESEED'S INTERMEDIATE HOLDINGS LLC, *et al.*,[1] | ) Case No. 11-_____ (   ) ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**JOINT PLAN OF REORGANIZATION OF**
**APPLESEED'S INTERMEDIATE HOLDINGS LLC AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Richard M. Cieri (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: January 19, 2011

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688). The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW .................................................................................................................................1

    A.    Defined Terms ..................................................................................................................1
    B.    Rules of Interpretation ...................................................................................................12
    C.    Computation of Time .....................................................................................................13
    D.    Governing Law ...............................................................................................................13
    E.    Reference to Monetary Figures ......................................................................................13
    F.    Reference to the Debtors or the Reorganized Debtors ..................................................13

ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS....................................13

    A.    Administrative Claims ...................................................................................................13
    B.    Priority Tax Claims ........................................................................................................14
    C.    Statutory Fees.................................................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................15

    A.    Classification of Claims and Interests...........................................................................15
    B.    Summary of Classification.............................................................................................15
    C.    Treatment of Claims and Interests ................................................................................16
    D.    Special Provision Governing Claims that are Not Impaired ..........................................20
    E.    Acceptance or Rejection of the Plan .............................................................................20
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................20
    G.    Subordinated Claims .....................................................................................................20

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN........................................................20

    A.    New Loans. .....................................................................................................................20
    B.    Restructuring Transactions ............................................................................................21
    C.    Sources of Consideration for Plan Distributions...........................................................21
    D.    Corporate Existence .......................................................................................................22
    E.    Vesting of Assets in the Reorganized Debtors...............................................................22
    F.    Cancellation of Existing Securities ...............................................................................23
    G.    Corporate Action............................................................................................................23
    H.    New Certificates of Incorporation and New By-Laws ...................................................24
    I.    Directors and Officers of the Reorganized Debtors and Reorganized AIH ..................24
    J.    Effectuating Documents; Further Transactions..............................................................24
    K.    Management Equity Incentive Program.........................................................................24
    L.    New Employment Agreements. ......................................................................................25
    M.    Exemption from Certain Taxes and Fees ......................................................................25
    N.    Existing Benefits Agreements........................................................................................25
    O.    D&O Liability Insurance Policies..................................................................................25
    P.    Preservation of Causes of Action...................................................................................25
    Q.    The Fee Claims Escrow Account ...................................................................................26

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................26

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...................26
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................27
    C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed..................27
    D.    Insurance Policies ..........................................................................................................27
    E.    Modifications, Amendments, Supplements, Restatements or Other Agreements...........27
    F.    Reservation of Rights ....................................................................................................28
    G.    Nonoccurrence of Effective Date ..................................................................................28

H.     Contracts and Leases Entered Into After the Petition Date ..........................................28

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................28

    A.     Timing and Calculation of Amounts to Be Distributed ...................................28
    B.     Disbursing Agent ............................................................................................28
    C.     Rights and Powers of Disbursing Agent .........................................................29
    D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions......................29
    E.     Manner of Payment ........................................................................................30
    F.     Section 1145 Exemption .................................................................................30
    G.     Compliance with Tax Requirements ................................................................31
    H.     Allocations ......................................................................................................31
    I.     No Postpetition Interest on Claims .................................................................31
    J.     Setoffs and Recoupment .................................................................................31
    K.     Claims Paid or Payable by Third Parties ........................................................31

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS .............................................................................................................32

    A.     Allowance of Claims.......................................................................................32
    B.     Claims Administration Responsibilities...........................................................32
    C.     Estimation of Claims.......................................................................................32
    D.     Adjustment to Claims Without Objection........................................................32
    E.     Time to File Objections to Claims ..................................................................32
    F.     Disallowance of Claims ..................................................................................33
    G.     Amendments to Claims ...................................................................................33
    H.     No Distributions Pending Allowance...............................................................33
    I.     Distributions After Allowance ........................................................................33

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ...............................33

    A.     Compromise and Settlement of Claims, Interests and Controversies. .............33
    B.     Discharge of Claims and Termination of Interests...........................................34
    C.     Release of Liens..............................................................................................34
    D.     Releases by the Debtors ..................................................................................34
    E.     Releases by Holders ........................................................................................35
    F.     Liabilities to, and Rights of, Governmental Units...........................................35
    G.     Exculpation .....................................................................................................35
    H.     Injunction .......................................................................................................36
    I.     Subordination Rights Under the Intercreditor Agreement ...............................36
    J.     Term of Injunctions or Stays...........................................................................37

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN.....................................................................................................................................37

    A.     Conditions Precedent to Confirmation.............................................................37
    B.     Conditions Precedent to the Effective Date .....................................................37
    C.     Waiver of Conditions ......................................................................................38
    D.     Effect of Failure of Conditions .......................................................................38

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .......................................38

    A.     Modification and Amendments........................................................................38
    B.     Effect of Confirmation on Modifications.........................................................38
    C.     Revocation or Withdrawal of Plan ..................................................................38

ARTICLE XI. RETENTION OF JURISDICTION ...................................................................................39

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................................40

    A.      Immediate Binding Effect.................................................................................................40
    B.      Additional Documents .....................................................................................................40
    C.      Statutory Committee and Cessation of Fee and Expense Payment ..................................41
    D.      Reservation of Rights.......................................................................................................41
    E.      Successors and Assigns.....................................................................................................41
    F.      Notices .............................................................................................................................41
    G.      Entire Agreement .............................................................................................................42
    H.      Exhibits ............................................................................................................................42
    I.      Severability of Plan Provisions .......................................................................................42
    J.      Votes Solicited in Good Faith .........................................................................................42
    K.      Closing of Chapter 11 Cases............................................................................................43
    L.      Conflicts...........................................................................................................................43
    M.      Filing of Additional Documents......................................................................................43

# INTRODUCTION

Appleseed's Intermediate Holdings LLC ("*AIH*") d/b/a Orchard Brands and its debtor affiliates, as debtors and debtors in possession (each, a "*Debtor*" and, collectively, the "*Debtors*"), propose this joint plan of reorganization (the "*Plan*") for the resolution of the Claims (as such term is defined below) against and Interests (as such term is defined below) in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code (as such term is defined below). Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Holders of Claims and Interests (as such terms are defined below) should refer to the Disclosure Statement (as such term is defined below) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

*A.*     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.     "*ABL Administrative Agent*" means UBS AG, Stamford Branch, in its capacity as administrative agent under the ABL Credit Agreement.

2.     "*ABL Agents*" means, collectively, the ABL Administrative Agent, the ABL Arranger, the ABL Co-Collateral Agents, the ABL Issuing Bank and the ABL Swingline Lender.

3.     "*ABL Arranger*" means UBS Securities LLC, in its capacity as joint lead arranger and joint book runner under the ABL Credit Agreement.

4.     "*ABL Claim*" means any Claim derived from, based upon, relating to or arising from the ABL Credit Agreement.

5.     "*ABL Co-Collateral Agents*" means UBS AG, Stamford Branch and Wells Fargo Bank, N.A., in their respective capacity as collateral agent or co-collateral agent under the ABL Credit Agreement.

6.     "*ABL Credit Agreement*" means the Credit Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as borrowers, each of the other Debtors, as guarantors, the ABL Lenders, the ABL Administrative Agent, the ABL Co-Collateral Agents, the ABL Issuing Bank, the ABL Swingline Lender, American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners, and American Capital Financial Services, Inc., as syndication agent, and any guarantees, security documents and other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

7.     "*ABL Issuing Bank*" means UBS AG, Stamford Branch, in its capacity as issuing bank under the ABL Credit Agreement.

8.     "*ABL Lenders*" means the institutions party from time to time as "Lenders" under the ABL Credit Agreement.

9.     "*ABL Swingline Lender*" means UBS Loan Finance LLC, in its capacity as swingline lender under the ABL Credit Agreement.

10. "*Accrued Professional Compensation*" means, at any given time, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330 or 331 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by Final Order, in each case subject the terms of the DIP Order (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) after applying any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

11. "*Ad Hoc Group of First Lien Lenders*" refers to certain funds managed by Ableco Finance LLC, Highland Capital Management LP and Canyon Capital Advisors LLC, solely in their respective capacities as Holders of First Lien Claims.

12. "*Administrative Claim*" means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; (c) all Claims of the ABL Agents, the ABL Lenders, the DIP Facility Tranche A Agents, the DIP Facility Tranche A Lenders, the DIP Facility Tranche B Agents and the DIP Facility Tranche B Lenders under or granted under the DIP Order; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

13. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

14. "*AIH*" means Appleseed's Intermediate Holdings LLC, the direct or indirect parent of each of the other Debtors.

15. "*AIH Note Agent*" means American Capital Financial Services, Ltd. (successor by merger to American Capital Financial Services, Inc.), in its capacity as administrative agent under the AIH Note Purchase Agreement.

16. "*AIH Note Claims*" means any Claim derived from, based upon, relating to or arising from the AIH Note Purchase Agreement.

17. "*AIH Note Purchasers*" means the institutions party from time to time as "Purchasers" under the AIH Note Purchase Agreement.

18. "*AIH Note Purchase Agreement*" means the Note Purchase Agreement, dated as of July 12, 2007, by and among AIH, as issuer, the AIH Note Purchasers, the AIH Note Agent and American Capital Strategies, Ltd., as sole lead arranger and bookrunner, and any other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

19. "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is scheduled by the Debtors as neither disputed, contingent nor unliquidated; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (e) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline. Except for any Claim that is expressly Allowed herein, any Claim that has been

or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

20. *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

21. *"Bankruptcy Code"* means chapter 11 of title 11 of the United States Code.

22. *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

23. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

24. *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

25. *"Cash"* means the legal tender of the United States of America.

26. *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

27. *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 11-_____ (    ).

28. *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

29. *"Claims Bar Date"* means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

30. "*Claims Objection Deadline*" means, for each Claim, (a) 75 days after the Effective Date or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

31. *"Claims Register"* means the official register of Claims maintained by Kurtzman Carson Consultants LLC, retained as the Debtors' notice, claims and solicitation agent.

32. "*Class*" means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

33.     *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.C.

34.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

35.     *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

36.     *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

37.     *"Consenting First Lien Lenders"* means the Holders of First Lien Claims that are party to the Plan Support Agreement.

38.     *"Consummation"* means the occurrence of the Effective Date.

39.     *"Creditors' Committee"* means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee membership may be amended by the U.S. Trustee from time to time.

40.     *"Cure Claim"* means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

41.     *"Cure Notice"* means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

42.     *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers' and officers' liability maintained by the Debtors as of the Petition Date, including the fiduciary liability coverage (executive risk) provided through Chartis Specialty Insurance Company, which provides coverage from June 1, 2010 through June 1, 2011 (Policy No. 01-880-05-84).

43.     *"Debtor"* means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

44.     *"Debtors"* means, collectively:   (a) AIH; (b) Appleseed's Acquisition, Inc.; (c) Appleseed's Holdings, Inc.; (d) Arizona Mail Order Company, Inc.; (e) Bedford Fair Apparel, Inc.; (f) Blair Credit Services Corporation; (g) Blair Factoring Company; (h) Blair Holdings, Inc.; (i) Blair International Holdings, Inc.; (j) Blair LLC; (k) Blair Payroll, LLC; (l) Draper's & Damon's Acquisition LLC; (m) Draper's & Damon's LLC; (n) Fairview Advertising, LLC; (o) Gold Violin LLC; (p) Haband Acquisition LLC; (q) Haband Company LLC; (r) Haband Oaks, LP; (s) Haband Online, LLC; (t) Haband Operations, LLC; (u) Johnny Appleseed's, Inc.; (v) Linen Source Acquisition LLC; (w) LM&B Catalog, Inc.; (x) Monterey Bay Clothing Company, Inc.; (y) Norm Thompson Outfitters, Inc.; (z) NTO Acquisition Corporation; (aa) Orchard Brands Insurance Agency LLC; and (bb) Wintersilks, LLC.

45.     *"DIP Facility Arranger"* means UBS Securities LLC, in its capacity as sole lead arranger and sole bookrunner under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

46.     *"DIP Facility Co-Collateral Agents"* means UBS AG, Stamford Branch and Wells Fargo Bank, N.A., in their respective capacity as collateral agent or co-collateral agent under the DIP Facility Credit Agreement, together with their respective successors and assigns in such capacity.

47. *"DIP Facility Credit Agreement"* means the agreement governing the 140 million senior secured super-priority debtor in possession credit facility, dated as of January 19, 2011 among the Debtors, the DIP Facility Tranche A Administrative Agent, the DIP Facility Tranche A Lenders, the DIP Facility Arranger, the DIP Facility Issuing Bank, the DIP Facility Swingline Lender, the DIP Facility Co-Collateral Agents, the DIP Facility Tranche B Agents and the DIP Facility Tranche B Lenders (as amended, restated, supplemented or otherwise modified from time to time).

48. *"DIP Facility Issuing Bank"* means UBS AG, Stamford Branch, in its capacity as issuing bank under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

49. *"DIP Facility Swingline Lender"* means UBS Loan Finance LLC, in its capacity as swingline lender under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

50. *"DIP Facility Tranche A"* means the debtor in possession asset-based revolving credit facility with committed availability up to $100 million under the DIP Facility Credit Agreement.

51. *"DIP Facility Tranche A Administrative Agent"* means UBS AG, Stamford Branch, in its capacity as the administrative agent for the DIP Facility Tranche A under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

52. *"DIP Facility Tranche A Agents"* means, collectively, the DIP Facility Arranger, the DIP Facility Co-Collateral Agents, the DIP Facility Issuing Bank, the DIP Facility Swingline Lender and the DIP Facility Tranche A Administrative Agent.

53. *"DIP Facility Tranche A Claim"* means any Claim derived from, based upon, relating to or arising from the DIP Facility Tranche A under the DIP Facility Credit Agreement, including any Claims on account of issued and undrawn letters of credit.

54. *"DIP Facility Tranche A Lender"* means the institutions party from time to time as "Lenders" for the DIP Facility Tranche A under the DIP Facility Credit Agreement.

55. *"DIP Facility Tranche B"* means the debtor in possession term loan in the aggregate principal amount of $40 million under the DIP Facility Credit Agreement.

56. *"DIP Facility Tranche B Administrative Agent"* means Ableco Finance LLC, in its capacity as the administrative agent for the DIP Facility Tranche B under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

57. *"DIP Facility Tranche B Agents"* means the DIP Facility Tranche B Administrative Agent and the DIP Facility Tranche B Disbursement Agent.

58. *"DIP Facility Tranche B Disbursement Agent"* means American Capital, Ltd., in its capacity as the disbursement agent for the DIP Facility Tranche B under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

59. *"DIP Facility Tranche B Lender"* means the institutions party from time to time as "Lenders" for the DIP Facility Tranche B under the DIP Facility Credit Agreement.

60. *"DIP Facility Tranche B Claim"* means any Claim derived from, based upon, relating to or arising from the DIP Facility Tranche B.

61. *"DIP Order"* means any interim order (or orders) and the final order of the Bankruptcy Court, each in form and substance reasonably acceptable to the DIP Facility Tranche A Administrative Agent and the DIP Facility Tranche B Agents, authorizing, *inter alia,* the Debtors to enter into the DIP Facility Credit Agreement and incur postpetition obligations thereunder.

62.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

63.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated January 19, 2011, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

64.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject, or potentially subject, to a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court or (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code.  A Claim or Administrative Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

65.     "*Distribution Date*" means, with respect to a Claim that is Allowed as of the Effective Date, the date that is as soon as practicable after the Effective Date, but no later than ten days after the Effective Date.

66.     "*Distribution Record Date*" means the date that the Confirmation Order is entered by the Bankruptcy Court.

67.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C and (b) no stay of the Confirmation Order is in effect.  Unless otherwise specifically provided in the Plan, anything required to be done by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date shall be done on the Effective Date.

68.     "*Entity*" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

69.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

70.     "*Exculpated Claim*" means any Claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto) or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation and the administration and implementation of the Plan, including (a) the Plan Support Agreement; (b) the issuance of the New Common Stock, (c) the execution, delivery and performance of the New Loan Documents and (d) the distribution of property under the Plan or any other agreement.

71.     "*Exculpated Party*" means each of:  (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Tranche A Agents and DIP Facility Tranche A Lenders; (c) the DIP Facility Tranche B Agents and DIP Facility Tranche B Lenders (d) the ABL Agents and the ABL Lenders; (e) the First Lien Agent and the First Lien Lenders; (f) the Second Lien Note Agent and the Second Lien Note Purchasers; (g) the AIH Note Agent and AIH Note Purchasers; (h) with respect to each of the foregoing entities in clauses (b) through (g), such Entities' predecessors, successors and assigns subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees; and (i) the Debtors' and the Reorganized Debtors' subsidiaries, current and former officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants,

representatives, management companies, fund advisors and other Professionals, and such Persons' respective heirs, executors, estates, servants and nominees.

72.     *"Existing Benefits Agreements"* means the employment, retirement, indemnification and other similar or related agreements or arrangements in existence as of the Petition Date that have been included in the Plan Supplement pursuant to Article IV.N.

73.     *"Executory Contract"* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

74.     *"Federal Judgment Rate"* means [___]%, the federal judgment rate in effect as of the Petition Date.

75.     *"Fee Claim"* means a Claim for Accrued Professional Compensation.

76.     *"Fee Claims Escrow Account"* means the account established pursuant to Article IV.Q.

77.     *"File," "Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

78.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

79.     *"First Lien Agent"* means Wilmington Trust FSB in its capacity as successor administrative agent under the First Lien Credit Agreement.

80.     *"First Lien Claim"* means any Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement.

81.     *"First Lien Credit Agreement"* means the certain Credit Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as borrowers, each of the other Debtors, as guarantors, the First Lien Lenders, the First Lien Agent, American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners and American Capital Financial Services, Inc., as syndication agent, and any guarantees, security documents and other documents in connection therewith (as amended, restated, supplemented or otherwise modified from time to time).

82.     *"First Lien Lenders"* means the institutions party from time to time as "Lenders" under the First Lien Credit Agreement.

83.     *"First Lien Secured Claim"* means any Secured Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement.

84.     *"First Lien Deficiency Claim"* means any Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement, other than a First Lien Secured Claim.

85.     *"General Unsecured Claim"* means any Unsecured Claim, including First Lien Deficiency Claims and Second Lien Note Deficiency Claims, that is not (a) a Qualified Unsecured Trade Claim, (b) an AIH Note Claim or (c) an Intercompany Claim.

86.     *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

87.     *"Holder"* means an Entity holding a Claim or an Interest.

88.     *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

89.     *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

90.     *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. ###].

91.     *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

92.     *"Intercreditor Agreement"* means the Intercreditor Agreement, dated as of April 30, 2007, by and among the ABL Administrative Agent, the First Lien Agent and the Second Lien Agent (as amended, restated, supplemented or otherwise modified from time to time).

93.     *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

94.     *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

95.     *"Lien" me*ans a lien as defined in section 101(37) of the Bankruptcy Code.

96.     *"Management Equity Incentive Program"* means that certain post-Effective Date equity incentive program, which shall consist of restricted stock units, stock options, stock appreciation rights and/or similar rights and interests, with 10% of the New Common Stock issued on the Effective Date reserved for such program.

97.     *"New ABL Facility"* means a committed asset-based revolving credit facility in a face amount of no less than $80 million (including $30 million available in letters of credit) that will be entered into by the Reorganized Debtors on the Effective Date pursuant to the New ABL Facility Credit Agreement.

98.     *"New ABL Facility Credit Agreement"* means the loan agreement, dated as of the Effective Date, which will govern the New ABL Facility, the form of which shall be included in the Plan Supplement.

99.     *"New AIH Board"* means the initial board of directors of Reorganized AIH.

100.    *"New Boards"* mean, collectively, the New AIH Board and the New Subsidiary Boards.

101.    *"New By-Laws"* means the form of the by-laws of each of Reorganized AIH and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

102.    *"New Certificates of Incorporation"* means the form of the certificates of incorporation of Reorganized AIH and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

103.    *"New Common Stock"* means a certain number of common shares in the capital of Reorganized AIH authorized pursuant to the Plan, of which up to 200 million shares shall be initially issued and outstanding as of the Effective Date.  Such shares shall consist of (a) a class of full-voting shares having economic rights as set forth in the New Certificate of Incorporation of Reorganized AIH and the New Stockholders Agreement (the "***Class A Common Stock***") and (b) a class of limited-voting shares having economic rights as set forth in the New Certificate of Incorporation of Reorganized AIH and the New Stockholders Agreement (the "***Class B Common Stock***").

104.    *"New Employment Agreements"* means the employment agreements, if any, between Reorganized AIH and members of the Debtors' management team with any such agreements to be included in the Plan Supplement as provided in Article I.A.122.

105.    *"New First Lien Term Loan"* means a first priority senior secured term loan in the amount of $200 million pursuant to the New First Lien Term Loan Credit Agreement.

106.    *"New First Lien Term Loan Credit Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New First Lien Term Loan, the form of which shall be included in the Plan Supplement.

107.    *"New Intercreditor Agreement"* means the intercreditor agreement, dated as of the Effective Date, governing the New ABL Facility Credit Agreement, the New Senior Term Loan Credit Agreement, the New First Lien Term Loan Credit Agreement and the New Junior Term Loan Credit Agreement, the form of which shall be included in the Plan Supplement.

108.    *"New Junior Term Loan"* means a second priority secured term loan in the amount of $43 million pursuant to the New Junior Term Loan Credit Agreement.

109.    *"New Junior Term Loan Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New Junior Term Loan, the form of which shall be included in the Plan Supplement.

110.    *"New Loan Documents"* means, collectively, the New ABL Facility Credit Agreement, the New Senior Term Loan Credit Agreement, the New First Lien Term Loan Credit Agreement and the New Junior Term Loan Credit Agreement.

111.    *"New Loans*" means, collectively, the New ABL Facility, the New Senior Term Loan, the New First Lien Term Loan and the New Junior Term Loan.

112.    *"New Registration Rights Agreement"* means that certain agreement, by and among Reorganized AIH and the Holders of the New Common Stock, the form of which shall be included in the Plan Supplement.

113.    *"New Senior Term Loan"* means a first priority secured term loan in the amount of $35 million (or $40 million to the extent the DIP Facility Tranche B is fully drawn as of the Effective Date) made pursuant to the New Senior Term Loan Credit Agreement.

114.    *"New Senior Term Loan Credit Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New Senior Term Loan, the form of which shall be included in the Plan Supplement.

115.    *"New Stockholders Agreement"* means that certain agreement, by and among Reorganized AIH and the holders of the New Common Stock, the form of which shall be included in the Plan Supplement.

116.    *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized AIH, the initial board of directors of each such Reorganized Debtor.

117.    *"Ordinary Course Professional Order"* means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. ###].

118.    *"Other Secured Claim"* means any Secured Claim that is not (a) an ABL Claim, (b) a First Lien Secured Claim, (c) a Second Lien Note Claim, (d) a DIP Facility Tranche A Claim or (e) a DIP Facility Tranche B Claim.

119.    *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

120.     *"Petition Date"* means January 19, 2011, the date on which each of the Debtors commenced the Chapter 11 Cases.

121.     *"Plan"* means this *Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference.

122.     *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be Filed by the Debtors no later than five days before the Voting Deadline on notice to parties in interest, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the following:  (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) the Rejected Executory Contract and Unexpired Lease List (d) a list of retained Causes of Action, if any; (e) subject to the terms of Article IV.K, the Management Equity Incentive Program; (f) the New Stockholders Agreement; (g) the New Registration Rights Agreement; (h) the Assumed Executory Contract and Unexpired Lease List; (i) the Qualified Vendor Support Agreement; (j) the identification of any Disbursing Agent other than the Reorganized Debtors; (k) the New Intercreditor Agreement; (l) the New ABL Facility Credit Agreement; (m) the New Senior Term Loan Credit Agreement; (n) the New First Lien Term Loan Credit Agreement; (o) the New Junior Term Loan Credit Agreement; (p) the Existing Benefits Agreements, that have been consented to as provided in Article IV.N; and (q) the New Employment Agreements that have been consented to by each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (q).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article IX.B hereof and the terms set forth herein relating to necessary consent.

123.     *"Plan Support Agreement"* means the agreement, effective as of January 19, 2011, among the Debtors and (a) certain Holders of First Lien Claims holding more than 66 2/3% of the total First Lien Claims, (b) certain Holders of Second Lien Note Claims holding 100% of the total Second Lien Note Claims and (c) certain Holders of AIH Notes Claims holding 100% of the total AIH Note Claims, pursuant to which such Holders agreed (subject to certain conditions specified therein) to support, and vote in favor of, this Plan.

124.     *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

125.     *"Priority Tax Claim"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

126.     *"Professional"* means an Entity:   (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

127.     *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

128.     *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

129.     *"Qualified Unsecured Trade Claims"* means all Unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with, and held by, Entities with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date, which Entities have executed a Qualified Vendor Support Agreement; *provided*, *however*, that Qualified Unsecured Trade Claims shall not include Administrative Claims.

130. *"Qualified Vendor Support Agreement"* means the support agreement entered into by Holders of Qualified Unsecured Trade Claims and the applicable Reorganized Debtor on the Confirmation Date, the form of which will be included in the Plan Supplement, in which such Holder shall agree to provide payment terms no less advantageous (from the perspective of the Reorganized Debtor) than those terms provided as of the Petition Date for at least 18 months following the Effective Date.

131. *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

132. *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

133. *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

134. *"Released Party"* means each of: (a) the Debtors and Reorganized Debtors; (b) the ABL Agents and the ABL Lenders; (c) the First Lien Agent and the First Lien Lenders; (d) the Second Lien Note Agent and the Second Lien Purchasers; (e) the Holders of the AIH Note Claims; (f) the AIH Note Agent; (g) the DIP Facility Tranche A Agents; (h) the DIP Facility Tranche A Lenders; (i) the DIP Facility Tranche B Agents; (j) the DIP Facility Tranche B Lenders; (k) with respect to each of the foregoing Entities in clauses (b) through (j), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; and (l) the Debtors' and the Reorganized Debtors' subsidiaries, current and former officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals, and such Persons' respective heirs, executors, estates, servants and nominees.

135. *"Reorganized AIH"* means AIH, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized AIH shall be a corporation organized under the laws of the state of Delaware.

136. *"Reorganized Debtors"* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

137. *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified or supplemented from time to time.

138. *"Second Lien Note Agent"* means American Capital, Ltd. (successor by merger to American Capital Financial Services, Inc.) in its capacity as administrative agent under the Second Lien Note Purchase Agreement.

139. *"Second Lien Note Claim"* means any Secured Claim derived from, based upon, relating to or arising from the Second Lien Note Purchase Agreement.

140. *"Second Lien Note Deficiency Claim"* means any Claim derived from, based upon, relating to or arising from the Second Lien Note Purchase Agreement, other than a Second Lien Note Claim.

141. *"Second Lien Note Purchasers"* means the institutions party from time to time as "Purchasers" under the Second Lien Note Purchase Agreement.

142. "*Second Lien Note Purchase Agreement*" means the Note Purchase Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as issuers, each of the other Debtors, as guarantors, the Second Lien Note Purchasers, the Second Lien Note Agent and American Capital Strategies, Ltd. as sole lead arranger and bookrunner, and any guarantees, security documents and other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

143. "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

144. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

145. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

146. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

147. "*Unsecured Claim*" means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

148. "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

149. "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on [_____, 2011].

*B.    Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule or exhibit, as it may thereafter be amended, modified or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

*C.*     *Computation of Time*.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

*D.*     *Governing Law*.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or province of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

*E.*     *Reference to Monetary Figures*.

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

*F.*     *Reference to the Debtors or the Reorganized Debtors*.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.*     *Administrative Claims*.

1.     <u>Administrative Claims</u>.

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.  For purposes of this Plan, all Administrative Claims arising or granted under the DIP Order shall be deemed Allowed by Final Order.

2.      Professional Compensation.

        (a)      *Fee Claims.*

Professionals asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date; *provided, however,* that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professional Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 40 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

        (b)      *Post-Confirmation Date Fees and Expenses.*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, subject to the terms of the DIP Order, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

3.      Administrative Claim Bar Date.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 15 days after entry of the Confirmation Order. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

*C.*     *Statutory Fees.*

On the Distribution Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Effective Date, Reorganized AIH shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a final decree in such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.*     *Classification of Claims and Interests.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

*B.*     *Summary of Classification.*

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained herein, the classifications set forth in Classes 1A to 11 shall be deemed to apply to each Debtor, as applicable. Only AIH is obligated under the AIH Note Purchase Agreement and, therefore, AIH is the only Debtor that possesses a Class 7 with respect to the AIH Note Claims. AIH is also the only Debtor that possesses a Class 10 with respect to Interests in AIH.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1A | DIP Facility Tranche A Claims | Not Impaired | Deemed to Accept |
| 1B | DIP Facility Tranche B Claims | Impaired | Entitled to Vote |
| 2 | Priority Non-Tax Claims | Not Impaired | Deemed to Accept |
| 3 | Other Secured Claims | Not Impaired | Deemed to Accept |
| 4 | First Lien Secured Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Note Claims | Impaired | Entitled to Vote |
| 6A | Qualified Unsecured Trade Claims | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims | Impaired | Deemed to Reject |
| 7 | AIH Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Impaired | Deemed to Accept |
| 9 | Intercompany Interests | Not Impaired | Deemed to Accept |
| 10 | Interests in AIH | Impaired | Deemed to Reject |

*C.*     *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.     Class 1A - DIP Facility Tranche A Claims

   (a)     *Classification*:  Class 1A consists of DIP Facility Tranche A Claims.

   (b)     *Allowance*:  The DIP Facility Tranche A Claims shall be Allowed and deemed to be Allowed Claims in Class 1A in the full amount outstanding under the DIP Facility Credit Agreement with respect to the DIP Facility Tranche A as of the Effective Date.

   (c)     *Treatment*:  Except to the extent that a Holder of a DIP Facility Tranche A Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the DIP Facility Tranche A Claims, each Holder of a DIP Facility Tranche A Claim shall receive on the Effective Date payment in full, in Cash (or, with respect to any DIP Facility Tranche A Claims on account of issued and undrawn letters of credit, at the option of the DIP Facility Issuing Bank, cash collateral in the amount of 105% of the aggregate amount of such letters of credit) provided that such payments shall be distributed to the DIP Facility Tranche A Administrative Agent on behalf of Holders of such DIP Facility Tranche A Claims.  In addition to the foregoing, on the Effective Date, the Debtors shall be required to pay all reasonable and documented fees and out-of-pocket costs and expenses of the DIP Facility Tranche A Agents and the DIP Facility Tranche A Lenders as provided in the DIP Order and the DIP Credit Agreement, as applicable.

   (d)     *Voting*:  Class 1A is not Impaired by the Plan, and each Holder of a Class 1A DIP Facility Tranche A Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A DIP Facility Tranche A Claims are not entitled to vote to accept or reject the Plan.

2.     Class 1B - DIP Facility Tranche B Claims

   (a)     *Classification*:  Class 1B consists of DIP Facility Tranche B Claims.

   (b)     *Allowance*:  The DIP Facility Tranche B Claims shall be Allowed and deemed to be Allowed Claims in Class 1B in the full amount outstanding under the DIP Facility Credit Agreement with respect to the DIP Facility Tranche B as of the Effective Date.

   (c)     *Treatment*:  Except to the extent that a Holder of a DIP Facility Tranche B Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the DIP Facility Tranche B Claims, each Holder of a DIP Facility Tranche B Claim shall receive its Pro Rata share of the New Senior Term Loan. In addition to the foregoing, on the Effective Date the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the Tranche B DIP Agents as provided in the DIP Order and the DIP Credit Agreement, as applicable.

   (d)     *Voting*:  Class 1B is Impaired.  Therefore, Holders of Class 1B DIP Facility Tranche B Claims are entitled to vote to accept or reject the Plan.

3.     Class 2 - Priority Non-Tax Claims.

   (a)     *Classification*:  Class 2 consists of Priority Non-Tax Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Class 2 is not Impaired by the Plan, and each Holder of a Class 2 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

4.     Class 3 - Other Secured Claims.

(a)     *Classification:*  Class 3 consists of Other Secured Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered not Impaired.

(c)     *Voting:*  Class 3 is not Impaired by the Plan, and each Holder of a Class 3 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

5.     Class 4 - First Lien Secured Claims.

(a)     *Classification:*  Class 4 consists of First Lien Secured Claims.

(b)     *Allowance:*  The First Lien Secured Claims shall be Allowed.

(c)     *Treatment:*  In exchange for full and final satisfaction, settlement, release and discharge of the First Lien Secured Claims, each Holder of such Allowed First Lien Secured Claim shall receive a Pro Rata distribution of (i) the New First Lien Term Loan, (ii) the New Junior Loan and (iii) 95% of the New Common Stock in the form of Class A Common Stock to be issued on the Effective Date (subject to dilution on account of the Management Equity Incentive Program).  In addition to the foregoing, on the Effective Date, the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the First Lien Agent and the Ad Hoc Group of First Lien Lenders, in each case, as provided in the First Lien Credit Agreement, the DIP Order and the DIP Credit Agreement, as applicable.

(d)     *Voting*:  Class 4 is Impaired by the Plan.  Therefore, Holders of Class 4 First Lien Secured Claims are entitled to vote to accept or reject the Plan.

6.      Class 5 - Second Lien Note Claims.

(a)      *Classification:*  Class 5 consists of Second Lien Note Claims.

(b)      *Allowance*:   The Second Lien Note Claims shall be Allowed.

(c)      *Treatment:*  In exchange for full and final satisfaction, settlement, release and discharge of the Second Lien Note Claims, each Holder of such Allowed Second Lien Note Claim shall receive its Pro Rata share of 5% of the New Common Stock in the form of Class B Common Stock to be issued on the Effective Date (subject to dilution on account of the Management Equity Incentive Program).  In addition to the foregoing, on the Effective Date the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the Second Lien Agent as provided in the Second Lien Note Purchase Agreement, the DIP Order and the DIP Credit Agreement, as applicable.

(d)      *Voting:*  Class 5 is Impaired.  Therefore, Holders of Class 5 Second Lien Note Claims are entitled to vote to accept or reject the Plan.

7.      Class 6A - Qualified Unsecured Trade Claims.

(a)      *Classification:*  Class 6A consists of Qualified Unsecured Trade Claims.

(b)      *Treatment:*  Except to the extent that a Holder of an Allowed Qualified Unsecured Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Qualified Unsecured Trade Claim, and subject to execution of, and continued performance under, a Qualified Vendor Support Agreement, each Holder of an Allowed Qualified Unsecured Trade Claim will be paid in accordance with the terms of the Qualified Vendor Support Agreement between the applicable Debtor and the Holder of an Allowed Qualified Unsecured Trade Claim (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Qualified Unsecured Trade Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Qualified Unsecured Trade Claim to the extent such Allowed Qualified Unsecured Trade Claim is not otherwise satisfied or waived on or before the Effective Date; *provided*, *however*, that Holders of Qualified Unsecured Trade Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims.  Holders of Allowed Qualified Unsecured Trade Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived.

(c)      *Voting:*  Class 6A is Impaired by the Plan.  Therefore, Holders of Class 6A Claims are entitled to vote to accept or reject the Plan.

8.      Class 6B - General Unsecured Claims.

(a)      *Classification:*  Class 6B consists of General Unsecured Claims.

(b)      *Treatment:*  Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims.  On the Effective Date, General Unsecured Claims shall be cancelled and discharged.

(c)      *Voting:*  Class 6B is Impaired and Holders of Class 6B General Unsecured Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code. Therefore, Holders of Class 6B General Unsecured Claims are not entitled to vote to accept or reject the Plan.

9.  Class 7 - AIH Note Claims

    (a)    *Classification:* Class 7 consists of AIH Note Claims.

    (b)    *Treatment:* Holders of AIH Note Claims will not receive any distribution on account of such AIH Note Claims. On the Effective Date, AIH Note Claims shall be cancelled and discharged.

    (c)    *Voting:* Class 7 is Impaired and Holders of Class 7 AIH Note Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 AIH Note Claims are not entitled to vote to accept or reject the Plan.

10. Class 8 - Intercompany Claims.

    (a)    *Classification:* Class 8 consists of Intercompany Claims.

    (b)    *Treatment:* On the Effective Date, or as soon thereafter as is practicable, Intercompany Claims will be paid, adjusted, reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

    (c)    *Voting:* Holders of Class 8 Intercompany Claims are Impaired. Holders of Class 8 Intercompany Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

11. Class 9 - Intercompany Interests.

    (a)    *Classification:* Class 9 consists of Intercompany Interests.

    (b)    *Treatment*: Intercompany Interests shall be Reinstated.

    (c)    *Voting*: Class 9 is not Impaired by the Plan and Holders of Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

12. Class 10 - Interests in AIH.

    (a)    *Classification:* Class 10 consists of Interests in AIH.

    (b)    *Treatment:* Holders of Interests in AIH shall not receive any distribution on account of such Interests. On the Effective Date, Interests in AIH shall be cancelled and discharged.

    (c)    *Voting:* Class 10 is Impaired and Holders of Class 10 Interests in AIH are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Therefore, Holders of Class 10 Interests in AIH are not entitled to vote to accept or reject the Plan.

D.     *Special Provision Governing Claims that are Not Impaired.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.

E.     *Acceptance or Rejection of the Plan.*

1.     <u>Voting Classes</u>.

Classes 1B, 4, 5, and 6A are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.     <u>Presumed Acceptance of the Plan</u>.

Classes 1A, 2, 3 and 9 are not Impaired under the Plan, and the Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Additionally, Holders in Class 8 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all Holders in Class 8 for each of the Debtors are proponents of the Plan.

3.     <u>Presumed Rejection of Plan</u>.

Classes 6B, 7 and 10 are Impaired and shall receive no distribution under the Plan. The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

G.     *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *New Loans.*

The material terms of each of the New Loans shall be as follows:

1.     <u>New ABL Facility</u>.

The New ABL Facility shall (a) have an availability of up to $80 million, (b) have an interest rate of LIBOR plus 350 basis points (with a LIBOR floor of 150 basis points), (c) have a maturity of three years and (d) be secured by a first priority lien on all of the Restructured Debtors' assets.

2. New Senior Term Loan.

The New Senior Term Loan shall (a) be in the principal amount of $35 million (or $40 million to the extent the DIP Facility Tranche B is fully drawn as of the Effective Date), (b) have an interest rate of LIBOR plus 1050 basis points (with a LIBOR floor of 350 basis points), (c) have a maturity of five years and (d) be secured by substantially all of the Reorganized Debtors' assets junior in lien and payment to the New ABL Facility.

3. New First Lien Term Loan.

The New First Lien Term Loan shall (a) be in the principal amount of $200 million, (b) until such time that the Reorganized Debtors achieve a Fixed Charge Coverage Ratio (defined below) of 1.25x or higher, the interest accruing on the New First Lien Term Loan shall be payable in both Cash and payment in kind ("*PIK*"), with the cash component priced at LIBOR plus 250 basis points (with a LIBOR floor of 150 basis points) and the PIK component priced at 250 basis points (the "*PIK Interest*"); *provided, that* once the Fixed Charge Coverage Ratio of 1.25x or higher is achieved, the PIK Interest shall be payable in Cash, (c) have a maturity date of five years (d) have $500,000 in quarterly amortization payments; *provided, however*, that no amortization payments shall be made during the first 18 months after the Effective Date and (e) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New ABL Facility and the New Senior Term Loan.

For purposes of this Article IV.A.3, "*Fixed Charge Coverage Ratio*" shall mean for any twelve-month period (x) earnings before interest, taxes, depreciation and amortization, minus Cash capital expenditures, minus Cash taxes, <u>divided by</u> (y) Cash interest plus PIK Interest related to the New First Lien Term Loan plus scheduled Cash amortization of the New First Lien Term Loan.

4. New Junior Term Loan.

The New Junior Term Loan shall (a) be in the principal amount of $43 million, (b) have cash pay interest that is the greater of (i) LIBOR and (ii) 1%, with a 4% cap and payment-in-kind interest of 700 basis points, (c) a maturity of six years and (d) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New ABL Facility, the New Senior Term Loan and the New First Lien Term Loan.

B. *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. Additionally, Reorganized AIH shall be authorized as of the Effective Date to file a Form 8832 Entity Classification Election with the Internal Revenue Service to be treated as a corporation for United States federal income tax purposes.

C. *Sources of Consideration for Plan Distributions.*

The Reorganized Debtors shall make distributions under the Plan as follows:

1.      The New Loans.

On the Effective Date the Reorganized Debtors shall enter into the New Loans.  Confirmation shall be deemed approval of the New Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith) and Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Loans, including the New Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such New Loans.

2.      Issuance and Distribution of New Common Stock.

The issuance of the New Common Stock by Reorganized AIH, including options, stock appreciation rights or other equity awards, if any, in connection with the Management Equity Incentive Program, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.  300 million common shares shall be authorized under the New Certificate of Incorporation of Reorganized AIH, of which 190 million shall be Class A Common Stock and 10 million shall be Class B Common Stock.

On the Effective Date, an initial number of 200 million shares of New Common Stock shall be issued and distributed as follows:  an aggregate 190 million shares of Class A Common Stock will be issued to Holders of Claims in Class 4 and an aggregate 10 million shares of Class B Common Stock will be issued to the Holders of Claims in Class 5, in each case, subject to dilution with respect to any shares issued pursuant to the Management Equity Incentive Program.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Upon the Effective Date, Reorganized AIH shall enter into the New Stockholders Agreement and the New Registration Rights Agreement with each Entity that is to be a counter-party thereto and the New Stockholders Agreement and the New Registration Rights Agreement shall each be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby.  The Holders of Claims in Class 4 and the Holders of Claims in Class 5 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan.

D.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law).

E.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action and any

property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances, except for Liens securing the New Loans. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Existing Securities.*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under the DIP Facility Credit Agreement, the First Lien Credit Agreement, the Second Lien Note Purchase Agreement, the AIH Note Purchase Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; *provided*, *further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan. On and after the Effective Date, all duties and responsibilities of the ABL Agents under the ABL Credit Agreement, the First Lien Agent under the First Lien Credit Agreement, the Second Lien Note Agent under the Second Lien Note Purchase Agreement and the AIH Agent under the AIH Note Purchase Agreement, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

G.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) execution and entry into the New Loans; (2) the distribution of the New Common Stock; (3) selection of the directors and officers for the Reorganized Debtors; (4) implementation of the restructuring transactions contemplated by this Plan, as applicable; (5) adoption of the Management Equity Incentive Program, if applicable; (6) adoption or assumption, as applicable, of the agreements with existing management, if any; and (7) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Loan Documents and any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law. The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

H.	*New Certificates of Incorporation and New By-Laws.*

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities; *provided, however*, that Reorganized AIH's New Certificate of Incorporation shall authorize the issuance of 10 million shares of Class B Common Stock. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states, provinces or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

I.	*Directors and Officers of the Reorganized Debtors and Reorganized AIH.*

As of the Effective Date, the term of the current members of the board of directors of AIH shall expire, and the initial boards of directors, including the New AIH Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New AIH Board shall consist of seven directors: (a) five directors appointed by certain of the First Lien Lenders, including two directors appointed by American Capital, Ltd., one director appointed by Ableco Finance LLC, one director appointed by Highland Capital Management LP and one director appointed by Canyon Capital Advisors LLC; (b) one independent director appointed by the First Lien Lenders other than American Capital, Ltd., Ableco Finance LLC, Highland Capital Management LP and Canyon Capital Advisors LLC; and (c) the current Chief Executive Officer of AIH.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New AIH Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws and other constituent documents of the Reorganized Debtors.

J.	*Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and Reorganized AIH, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

K.	*Management Equity Incentive Program.*

The Debtors and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims shall engage in good faith negotiations to reach agreement on the Management Equity Incentive Program and include any form thereof and the amounts of any grants thereunder in the Plan Supplement; *provided, however*, that if the Debtors and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims are unable to reach an agreement notwithstanding their good faith efforts to do so, no such program shall be included in the Plan Supplement and instead, within 90 days of the Effective Date the New AIH Board shall adopt and implement the Management Equity Incentive Program.

L.     *New Employment Agreements.*

On the Effective Date, Reorganized AIH shall enter into the New Employment Agreements as consented to by each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims pursuant to Article I.A.122.

M.     *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

N.     *Existing Benefits Agreements.*

The Existing Benefits Agreements for which each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims has consented to assumption by the Reorganized Debtors shall be included in the Plan Supplement and assumed by the Reorganized Debtors. Nothing in the Plan or the Plan Supplement shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

O.     *D&O Liability Insurance Policies.*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtors may obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for such terms or periods of time, and placed with such insurers, to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order.

P.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any

Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

Q.      *The Fee Claims Escrow Account.*

On the Effective Date, subject to any alternative agreement as between the Debtors and any Holder of a Fee Claim, the Debtors shall (1) establish and fund the Fee Claims Escrow Account in an amount equal to all Fee Claims outstanding as of the Effective Date (including unbilled and estimated amounts, if applicable) or (2) enter into an agreement with any relevant Holder of Fee Claims acceptable to such Holder. Amounts held in the Fee Claims Escrow Account shall not constitute property of the Reorganized Debtors. The Fee Claims Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Fee Claims Escrow Account following (1) payment to all Holders of Fee Claims under the Plan and (2) the closing of the Chapter 11 Cases pursuant to Article XII.K, such remaining amount, if any, shall be returned to the Reorganized Debtors.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume Filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases List or Rejected Executory Contract and Unexpired Leases List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.       *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

C.       *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contracts and Unexpired Lease List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.       *Insurance Policies.*

All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

E.       *Modifications, Amendments, Supplements, Restatements or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

*C.      Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

*D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Delivery of Distributions.

(a)      Delivery of Distributions to First Lien Agent.

Except as otherwise provided in the Plan, all distributions to Holders of First Lien Secured Claims shall be governed by the First Lien Credit Agreement and shall be deemed completed when made to the First Lien Agent, who shall be deemed to be the Holder of all First Lien Secured Claims for purposes of distributions to be made hereunder.  The First Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed First Lien Secured Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed First Lien Secured Claims.

(b)      Delivery of Distributions to Second Lien Note Agent.

Except as otherwise provided in the Plan, all distributions to Holders of Second Lien Note Claims shall be governed by the Second Lien Note Purchase Agreement and shall be deemed completed when made to the Second Lien Note Agent, who shall be deemed to be the Holder of Second Lien Note Claims for purposes of distributions to be made hereunder.  The Second Lien Note Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Second Lien Note Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Note Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Second Lien Note Claims.

(c)      Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors and the

Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.   Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

3.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.   *Manner of Payment*.

1.   All distributions of New Common Stock under the Plan shall be made by the Disbursing Agent on behalf of Reorganized AIH.

2.   All distributions with respect to each of the New ABL Loan, New Senior Term Loan, the New First Lien Term Loan and the New Junior Term Loan shall be deemed made as of the Effective Date.

3.   All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor.

4.   At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.   *Section 1145 Exemption*.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock as contemplated by Article IV.C of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to  the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Stockholders Agreement, the New Registration Rights Agreement and Reorganized AIH's New Certificate of Incorporation.

*G.*         *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

*H.*         *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*I.*         *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Order, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

*J.*         *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

*K.*         *Claims Paid or Payable by Third Parties.*

        1.         <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

        2.         <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such

insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

       3.       <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date.

B.      *Claims Administration Responsibilities*.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*.

Any objections to Claims shall be Filed on or before the later of (1) the date that is 90 days after the Effective Date and (2) such later date as may be fixed by the Bankruptcy Court.

*F.     Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

*G.     Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

*H.     No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*I.     Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

**ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

*A.     Compromise and Settlement of Claims, Interests and Controversies.*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders, and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests.*

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Release of Liens.*

        Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan (including the New Loan Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. In addition, the First Lien Agent and the Second Lien Note Agent shall execute and deliver all documents reasonably requested by the administrative agent for the New ABL Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.      *Releases by the Debtors.*

        Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, generally and individually and collectively released, acquitted and discharged by the Debtors, the Reorganized Debtors and the Estates from any and all actions, Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the

Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence, in each case as determined by Final Order of a court of competent jurisdiction.

E.      *Releases by Holders*.

As of the Effective Date of the Plan, to the extent permitted by applicable law, each Holder of a Claim or an Interest shall be deemed to have expressly, unconditionally, generally and individually and collectively, released, acquitted and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that such Entity (whether individually or collectively) ever had, now  has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence in each case as determined by Final Order of a court of competent jurisdiction.

F.      *Liabilities to, and Rights of, Governmental Units*.

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.      *Exculpation*.

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*H.    Injunction.*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

*I.    Subordination Rights Under the Intercreditor Agreement.*

Subject in all respects to the provisions of this Plan, any distributions under the Plan to Holders of Second Lien Note Claims shall be received and retained free from any obligations to hold or transfer the same to any other

creditor, and shall not be subject to levy, garnishment, attachment or other legal process by any Holder by reason of claimed contractual subordination rights. The subordination rights set forth in the Intercreditor Agreement shall be (and deemed to be) waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to property or other interests distributed under the Plan to Holders of Second Lien Note Claims other than as provided in the Plan.

J.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation that all provisions, terms and conditions hereof are approved in the Confirmation Order, which shall be reasonably acceptable to: (a) the Debtors; (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims; (c) the DIP Tranche A Administrative Agent; and (d) the lead arranger for the New ABL Facility.

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Confirmation Order (a) shall have been duly entered and be a Final Order and (b) shall include a finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

2.      Any amendments, modifications or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to: (a) the Debtors; and (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims.

3.      All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

4.      The amount of (a) Allowed Administrative Claims, excluding Fee Claims, shall not exceed and aggregate of $40 million, (b) Allowed Non-Tax Priority Claims shall not exceed an aggregate of $5 million, and (c) Allowed Other Secured Claims shall not exceed an aggregate of $7.5 million.

5.      The Debtors shall enter into the New Loan Documents and the conditions precedent to funding under the New Loan Documents (including the payment in full, in Cash of the DIP Facility Tranche A Claims) shall have been satisfied or waived.

6.      The Debtors shall have satisfied the DIP Facility Tranche A Claims and DIP Facility Tranche B Claims.

7.        Reorganized AIH shall have entered into the New Stockholders Agreement and the New Registration Rights Agreement, each in form and substance reasonably satisfactory to: (a) Reorganized AIH; and (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims.

C.      *Waiver of Conditions.*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.      *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

# ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided, however,* that no such alterations, amendments or modifications shall be made without the consent of each Consenting First Lien Lender holding more than 10% of the First Lien Claims, which consent shall not be unreasonably withheld.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement or the Confirmation Order;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan, including under Article VIII;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

D.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

E.      *Successors and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

F.      *Notices.*

To be effective, all notices, requests and demands to or upon the Debtors, the First Lien Lenders or the Second Lien Note Purchasers shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

**If to the Debtors**:
Appleseed's Intermediate Holdings LLC
138 Conant Street
Beverly, Massachusetts 01915
Facsimile:  (978) 998-3934
Attention:  T. Neale Attenborough
E-mail address:  neale@orchardbrands.com

**With copies to**:
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Joshua A. Sussberg, Esq.
E-mail address:  joshua.sussberg@kirkland.com

- and -

Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Facsimile:  (302) 426-9193
Attention: Domenic E. Pacitti, Esq.
E-mail Address:  dpacitti@klehr.com

**If to the First Lien Lenders**:
Sidley Austin LLP

787 Seventh Avenue
New York, New York 10019
Facsimile:  (212) 839-5599
Attention:  James P. Seery, Jr., Esq.
E-mail address:  jseery@sidley.com

**If to the Second Lien Note Purchasers**:
Kramer Levin Naftalis and Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile:  (212) 715-8000
Attention:  Douglas Mannal, Esq..
E-mail address:  dmannal@kramerlevin.com

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at http://www.kccllc.net/appleseeds or the Bankruptcy Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.      *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) non-severable and mutually dependent.

J.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under

the Plan and any previous plan and, therefore, no such parties, individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan.

K.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

L.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control.

M.      *Filing of Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

*[Remainder of page intentionally left blank.]*

Dated: January 19, 2011
      Wilmington, DE

APPLESEED'S INTERMEDIATE HOLDINGS LLC, on behalf of itself and each of the other Debtors

By:      */s/ T. Neale Attenborough*
Name:    T. Neale Attenborough
Title:     Chief Executive Officer

COUNSEL:

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:      (302) 426-1189
Facsimile:       (302) 426-9193

- and -

Richard M. Cieri (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

*Proposed Counsel to the Debtors and Debtors in Possession*

<u>**Exhibit C**</u>

<u>**Milestones**</u>

<u>**Plan Milestones**</u>[2]

1. File Plan of Reorganization and Disclosure Statement on Petition Date.

2. Objections to Disclosure Statement due 28 days thereafter (or a later date agreed to by the Debtors and any third party, in consultation with each Consenting First Lien Lender holding 10% or more of the First Lien Claims).

3. Disclosure Statement Hearing 7 days thereafter (subject to Bankruptcy Court's availability).

4. Solicitation Period to begin within 5 days after order approving the Disclosure Statement.

5. Voting Deadline/Plan Objection Deadline – 35 days after Solicitation Period begins.

6. Confirmation Hearing – 14 days after the Voting Deadline (subject to Bankruptcy Court's availability).

7. Confirmation Order entered within 90 days of the Petition Date.

8. Effective date of the Plan of Reorganization within 15 days after the entry of the Confirmation Order.

<u>**Sale Milestones**</u>[3]

1. File "naked" bid procedures/sale motion no later than 5 days after the Petition Date.

2. Objections to bid procedures due 28 days thereafter (or a later date agreed to by the Debtors and any third party, in consultation with each Consenting First Lien Lender holding 10% or more of the First Lien Claims).

3. Bid procedures hearing shall be 7 days after the Disclosure Statement hearing (or the first available hearing date thereafter). In advance of the bid procedures hearing, the Debtors will file a supplement to the bid procedures/sale motion attaching a form purchase agreement.

4. Bid procedures order entered within 5 days after hearing (or a later date agreed to by the Debtors and any third party, in consultation with each Consenting First Lien Lender holding 10% or more of the First Lien Claims), which order shall be in form and substance

---

[2]       Plan milestones 3 through 7 shall each be subject to a 5-day grace period.

[3]       Sale milestones 3 through 7 shall each be subject to a 5-day grace period.

satisfactory to each Consenting First Lien Lender holding 10% or more of the First Lien Claims.

5.  If the Disclosure Statement order is not entered, proceed with 30-day marketing process following entry of bid procedures order (such marketing process to include providing such information requested in consultation with each Consenting First Lien Lender holding 10% or more of the First Lien Claims), followed by an auction.

6.  If Confirmation Order is not entered, proceed with 30-day marketing process followed by auction.

7.  Sale hearing to be held within 5 days after auction.

## **Exhibit B**

## **Summary of First Day Pleadings**

## THE DEBTORS' FIRST DAY PLEADINGS

As explained in my declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (each, a "***First Day Pleading***" and, collectively, the "***First Day Pleadings***") to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and to ensure that their restructuring goals can be implemented with limited disruption to operations.[1]  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  In fact, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to obtain postpetition financing, make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.

In my opinion, approval of the relief requested in the First Day Pleadings, each of which is explained herein, will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

## PROCEDURAL MOTION

**A.      Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases**

1.      Appleseed's Intermediate Holdings LLC ("***AIH***") is the direct or indirect parent of each of the other 27 Debtors.  Additionally, except with respect to the $50 million in principal amount of unsecured notes issued by AIH, each of the 28 affiliated Debtor entities is directly liable for, or a guarantor of, the approximately $651.8 million in outstanding secured funded debt

---

[1]   Capitalized terms used in this **Exhibit B** but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Pleadings.

obligations that the Debtors seek to restructure as part of these chapter 11 cases. Thus, each of the motions filed in the chapter 11 cases will implicate many, if not all, of the Debtors

2. The Debtors also share significant debt obligations that will be addressed in these chapter 11 cases. I believe joint administration of the chapter 11 cases will provide significant administrative convenience and that entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow all parties to monitor the chapter 11 cases with greater ease and efficiency.

3. I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates, nor will joint administration adversely affect the Debtors' respective constituencies because this motion requests only administrative, not substantive, consolidation of the Debtors' cases. I do not believe that parties in interest will be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the chapter 11 cases.

## FINANCING MOTIONS

**A.** **Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)**

4. I believe the Debtors require access to liquidity to prevent immediate and irreparable harm to their estates. In that regard, the Debtors have secured a $140 million debtor in possession credit facility (the "*DIP Financing*"), which will ensure that they are able to: (a) continue ongoing business operations; (b) preserve the value of estate assets; (c) maintain favorable relationships with vendors, suppliers and customers; (d) pay employees; and (e) satisfy

other working capital and general corporate needs, all of which are necessary to maintain the value of the Debtors' business and, ultimately, effectuate a successful business reorganization. Thus, to ensure the Debtors' access to sufficient liquidity that will provide the foundation for maximizing value for all stakeholders, I firmly believe that the DIP Financing should be approved.

5.      Specifically, the Debtors are seeking authorization to:

- permit the Borrowers, pursuant to the Interim Order and before entry of the Final Order, to borrow up to $135 million under the DIP Facility, comprised of (i) a senior secured first-out revolving credit tranche in the principal amount of $100 million, which includes (A) a letter of credit subfacility in the amount of up to $30 million to be provided by the Issuing Bank and (B) a swing line subfacility of up to $20 million, to be provided by the Swingline Lender; and (ii) a senior secured term loan tranche in the principal amount of $35 million;

- grant to the DIP Agents, for the benefit of themselves and the respective DIP Lenders, valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon (collectively, the "*DIP Facility Liens*") all prepetition and postpetition assets of the Debtors and Guarantors (collectively, the "*DIP Collateral*"), as provided for by section 364(c) and (d) of the Bankruptcy Code and subject to certain exceptions as specified in the DIP Credit Agreement;

- grant super-priority administrative claims (the "*DIP Facility Superpriority Claim*") to the DIP Lenders pursuant to section 364(c) of the Bankruptcy Code, subject to the Carve-Out and the adequate protection claims the payment of which is secured by the Prepetition ABL Lenders' Replacement Liens;

- use "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) (the "*Cash Collateral*") of the ABL Lenders, First Lien Lenders and the purchasers under the Debtors' prepetition second lien note purchase agreement (the "*Second Lien Purchasers*" and, together

with the ABL Lenders and First Lien Lenders, the "***Secured Lenders***");

- grant adequate protection to the Secured Lenders (the "***Adequate Protection Obligations***");

- vacate the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and the Interim Order and the Final Order;

- waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

- pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

### i. The Debtors' Liquidity Needs

6.      Decreased earnings and revenues have negatively impacted the Debtors' liquidity position, which in turn has translated into a sharp decline in the Debtors' performance and placed significant stress on business operations, including the Debtors' relationships with specialized third-party vendors and suppliers that are crucial to the Debtors' operations.  I am informed that trade vendors and suppliers have begun to impose tightened credit terms on the Debtors, thereby limiting the Debtors' access to key goods and services.

7.      I believe that the commencement of these chapter 11 cases magnifies the Debtors' need for liquidity.  Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, I believe that vendors and suppliers may seek alternative sources of distribution and otherwise interrupt the Debtors' supply chain.  Indeed, with minimal liquidity on hand over the course of the last several months, which has resulted in increased trade liabilities and general concern in the vendor community about the Debtors' ability to operate, access to financing is

critical to demonstrate an ability to satisfy these postpetition obligations as and when they come due. I firmly believe that immediate access to the DIP Facility and use of cash collateral will enable the Debtors to allay these concerns.

8. Absent access to the funds available under the DIP Facility, the Debtors may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest, jeopardizing the success of the Debtors' restructuring and threatening their ability to operate as a going concern. Thus, I believe that the Debtors have an immediate need to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

**ii. Development of the DIP Budget**

9. I am informed that, to best assess the Debtors' funding needs during these chapter 11 cases, the Debtors have, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization. In undertaking this analysis, the Debtors and their advisors have considered the Debtors' near-term projected financial performance, including demand for the Debtors' products and the cost to manufacture such products. The Debtors' management also conferred with key operational divisions to understand essential business metrics in both the near and long-term.

10. As part of the Debtors' financial review and analysis, the Debtors developed a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials and includes all

of the expenditures for which the Borrowers seek authority to pay in various First-Day Pleadings.

11.     Utilizing this cash flow forecast to project their cash needs during these chapter 11 cases, the Debtors believe that $67 million in liquidity availability is necessary for operations during the early stage of these chapter 11 cases.  The proposed DIP Financing will provide the Debtors with immediate access of up to $100 million as part of a revolving credit facility as well as immediate access to a $35 million term loan.

**B.     Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Continue to Operate their Cash Management System; (B) Maintain Existing Business Forms; (C) Grant Administrative Priority for Intercompany Claims and Perform Under Certain Intercompany Arrangements and Historical Practices; and (D) Assume and Assign Certain Account Control Agreements Pursuant to Section 365 of the Bankruptcy Code**

12.     In the ordinary course of business, the Debtors utilize a cash management system that provides well-established mechanisms for the collection, concentration, management and disbursement of funds used in their operations (the "***Cash Management System***").  The Debtors use the Cash Management System to collect, transfer and disburse funds generated from their operations, facilitate cash monitoring, forecasting and reporting and enable the Debtors to maintain control over the bank accounts (collectively, the "***Bank Accounts***") located at the banks (the "***Banks***").

13.     The Cash Management System consists of approximately 82 Bank Accounts with the following financial institutions:  (a) PNC Bank, N.A. ("***PNC Bank***"); (b) Bank of America, N.A. ("***Bank of America***"); (c) Citizens Bank; (d) TD Bank, N.A. ("***TD Bank***"); (e) Sovereign Bank;  (f) JP Morgan  Chase, N.A. ("***Chase  Bank***");  (g) Wachovia  Corporation ("***Wachovia***

Bank"); (h) Wells Fargo Bank, N.A. ("**Wells Fargo Bank**"); (i) Associated Bank, N.A. ("**Associated Bank**"); (j) USAmeriBank; and (k) The People's Bank.[2]

14.     The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds by creating status reports on the location and amount of funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balances.

15.     I believe that these controls are crucial given the significant volume of cash transactions managed through the Cash Management System on a daily basis.  Additionally, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.  I believe that the continued use of the Debtors' Cash Management System outlined below will greatly facilitate their transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts.

i.      **Overview of the Cash Management System**

16.     Before implementing the Cash Management System, the Debtors historically maintained a system in which funds were collected through various depository accounts (the "**Collection Accounts**"), transferred to several main operating accounts (the "**Main Operating**

---

[2]     As of the Petition Date, Citizen's Bank, Wachovia Corporation, Associated Bank, N.A., USAmeriBank and The People's Bank are not designated as authorized depositories (the "**Authorized Depositories**") pursuant to the U.S. Trustee Chapter 11 Guidelines for the District of Delaware ("**U.S. Trustee Guidelines**").  I am informed that, in accordance with the practice in this jurisdiction, the Debtors will make a good faith effort after the Petition Date to cause Banks that are not Authorized Depositories to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee.  To the extent the Debtors need to open a new bank account after the Petition Date, they will only do so either at an Authorized Depository or after consulting with the U.S. Trustee.

*Accounts*") and then disbursed through separate accounts to pay various operating expenses (the "***Disbursement Accounts***"). Under this arrangement, all credit and debit transactions were facilitated through the Main Operating Accounts.

17. In 2007, the Debtors entered into an asset-based credit facility (the "***ABL Facility***") with UBS AG, Stamford Branch ("***UBS***") as the administrative agent and certain lenders. Shortly after entering into the ABL Facility, the Debtors entered into account control agreements (each, a "***Control Agreement***" and collectively, the "***Control Agreements***") with UBS with respect to certain Bank Accounts. Pursuant to the Control Agreements, the Debtors maintained the Cash Management System unless and until UBS, at its discretion, delivered an activation notice (the "***Activation Notice***"), thereby activating the terms of the Control Agreements.

18. In September 2010, due to the Debtors' constrained liquidity situation, UBS delivered an Activation Notice to the Debtors. Pursuant to the Control Agreements, all credit transactions are either facilitated through collection accounts that are subject to the terms of a Control Agreement (collectively, the "***Controlled Collection Accounts***") or directly deposited into Controlled Collection Accounts. Additionally, all Collection Accounts are swept on a daily-basis, or as necessary in the case of low-balance Collection Accounts, through manual bank transfers to Controlled Collection Accounts. Before the Petition Date, any amounts in the Controlled Collection Accounts were wired at the beginning of every business day to UBS to pay down the outstanding balance on the ABL Facility. Pursuant to the terms of the ABL Facility, the Debtors then requested the funds necessary to satisfy all subsequent debit transactions. Most debit transactions were made through a wire transfer or by check to disbursement accounts (collectively, the "***Master Disbursement Accounts***"). These funds were then disbursed through

separate Disbursement Accounts. Certain limited debit transactions, such as letters of credit and payments to UBS, were made directly from the ABL Facility to pay various expenses, including the establishment of letters of credit, interest-related charges and bank fees.

### ii. Relationship Between the Cash Management System and the Debtors' Proposed Postpetition Financing and Restructuring

19.    As described above, the Debtors have also filed a motion (the "***DIP Motion***") seeking authority to enter into a postpetition $140 million financing agreement. As contemplated in the DIP Motion, the Cash Management System will remain largely the same while the DIP Facility is in place, with the DIP Facility Tranche A taking the place of the ABL Facility on a postpetition basis. In particular, the Debtors will continue to transfer any amounts in the Controlled Collection Accounts on a daily basis to pay down the outstanding balance on the DIP Facility Tranche A. To achieve this end, the Debtors seek authorization to assume and assign the Control Agreements entered into with UBS as administrative agent for the ABL Credit Line to UBS as administrative agent under the DIP Facility Tranche A.

### iii. The Debtors' Existing Bank Accounts

20.    Below is a description of the four main types of the Debtors' existing Bank Accounts:

       a.    <u>Collection Accounts</u>. The Collection Accounts fund various Controlled Collection Accounts. Funds in the Collection Accounts are generated from retail, mail order and employee sales. The Collection Accounts are swept daily through manual bank transfers, or as necessary in the case of low-balance Collection Accounts, to the Controlled Collection Accounts. I am informed that the Collection Accounts generally maintain a zero-balance.[3]

---

[3]    Two Collection Accounts (USAmeriBank, account nos. 6385 and 6393) are held in the name of Thompson Group, a non-Debtor entity from which the Debtors acquired the business Linen Source in March 2010. Linen Source Acquisition LLC, a Debtor, will begin operations in 2011. Until that time, I am informed that the Collection Accounts associated with the Thompson Group will fund PNC Bank, account numbers 8845 and 8888.

b.    <u>Controlled Collection Accounts</u>. The Controlled Collection Accounts collect funds generated by the Collection Accounts. The Controlled Collection Accounts are subject to the Control Agreements. Prepetition funds in these accounts were wired to UBS to pay down the ABL Facility at the beginning of every business day; pursuant to the proposed DIP Facility Tranche A, funds in these accounts will be used to pay down the DIP Facility Tranche A on a daily basis postpetition. I am informed that the Controlled Collection Accounts generally maintain a zero-balance.

c.    <u>Master Disbursement Accounts</u>. Before the Petition Date, the Master Disbursement Accounts were funded from the ABL Facility; after the Petition Date, the Master Disbursement Accounts will be funded by the DIP Facility Tranche A. I am informed that the Master Disbursement Accounts generally maintain a zero-balance.

d.    <u>Disbursement Accounts</u>. The Disbursement Accounts are funded by the Master Disbursement Accounts and pay for general operating expenses, such as merchandise, refunds and employee payroll. I am informed that these accounts generally maintain a zero-balance.[4]

### iv.    The Stand-Alone Accounts

21.    In addition to the Bank Accounts described above, certain Debtors maintain stand-alone accounts as described below. Certain of the stand-alone accounts contain nominal balances and I am informed may be closed after the Petition Date.

a.    <u>TD Bank Accounts</u>. Debtor Johnny Appleseed's, Inc. maintains two Collection Accounts with TD Bank (account nos. 6669 and 6955), both of which are used to collect receipts from retail outlet stores. Together these accounts fund a separate TD Bank Account (account no. 6822). I understand that the funds in account number 6822 are used to make payroll disbursements,

---

[4]   In addition to the two Collection Accounts, two Disbursement Accounts (USAmeriBank, account nos. 6427 and 6351) are also held in the name of Thompson Group in connection with the Debtors' March 2010 acquisition of Linen Source. The Debtors have activated two Disbursement Accounts with PNC Bank (account nos. 8853 and 8861) in the name of Linen Source Acquisition LLC, but these accounts are not yet receiving funds. I am informed that through a Master Disbursement Account at PNC Bank (account no. 4399), the Debtors will continue to fund the Disbursement Accounts associated with the Thompson Group until Linen Source Acquisition LLC begins operation in 2011.

when necessary, through a separate zero-balance Disbursement Account with TD Bank (account no. 6947).

b.    <u>Wachovia Bank Accounts</u>.  I am informed that Debtor Arizona Mail Order Company, Inc. maintains an inactive Bank Account with Wachovia Bank (account no. 3198), which generally holds less than $10,000 at any given point in time.  Additionally, Arizona Mail Order Company, Inc. funds an operating Bank Account with Wachovia Bank (account no. 2533) with funds from a Controlled Collection Account with PNC Bank (account no. 6764), which is funded solely for the purpose of paying outstanding refund checks.  I understand that disbursements for presented refund checks are then made through a separate zero-balance Disbursement Account with Wachovia Bank (account no. 0574).

c.    <u>Wells Fargo Bank Account</u>.  Debtor Draper's & Damon's LLC maintains a Bank Account with Wells Fargo Bank (account no. 2158).  I am informed that Draper's & Damon's LLC does not utilize this account.

d.    <u>PNC Bank Accounts</u>.  Debtor Blair Holdings, Inc. maintains a stand-alone Bank Account with PNC Bank (account no. 2093), which I am informed generally holds less than $10,000. Additionally, Blair Holdings, Inc. maintains a money market account with PNC Bank (account no. 1502), which I am informed generally holds less than $20,000.  Debtor Norm Thompson Outfitters, Inc. maintains a Collection Account with PNC Bank (account no. 7649), which, in addition to funding account number 1652 (a Controlled Collection Account) directly funds account number 7614 for the purposes of honoring refund checks.  Additionally, Debtor Blair International Holdings, Inc. holds a stand-alone international account with PNC Bank (account no. 9759).  I am informed that that this Bank Account generally holds less than $10,000.

e.    <u>The People's Bank Account</u>.  Debtor Haband Operations, LLC holds a certificate of deposit (the "***CD***") with The People's Bank (account no. 1969).  I understand that the CD is insured for the full amount by the Federal Deposit Insurance Corporation and serves as collateral for paychecks payable to employees of the Debtor's distribution centers.  I am informed that that the CD is worth approximately $82,000 and is automatically renewed each year.

**v.    The Debtors' Ordinary Course ACH Payments, Bank Fees and Preparation for the Chapter 11 Filing**

22.    In the ordinary course of business, the Debtors conduct transactions by debit, wire or automatic clearing house ("***ACH***") and other similar methods.  In addition, a large percentage of the Debtors' customer credit card payments are received through ACH or wire transfer.  In fact, from discussions with counsel, I am informed that the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties.

23.    Furthermore, in the ordinary course, the Banks (as well as certain credit card processors) charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses (collectively, the "***Bank Fees***").

**vi.    The Debtors' Intercompany Transactions**

24.    In the ordinary course of business, certain of the Debtor entities and business divisions maintain business relationships with each other, resulting in intercompany receivables and payables (collectively, the "***Intercompany Claims***").  These business relationships result in certain Debtors funding shared service costs, including employee benefits and payroll, shipping expenses, inventory and supply costs, customer refunds, insurance premiums and professional fees.  These costs and revenues are then allocated among the legal entities and business divisions (within the legal entities) resulting in Intercompany Claims.  Indeed, as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the DIP Facility on a postpetition basis), there may be, at any given time, Intercompany Claims owed by

one Debtor to another (the "***Intercompany Transactions***") in connection with the disbursement of funds.[5]

26. The Debtors do not transfer funds from one Debtor entity to another; rather, before the Petition Date, all Intercompany Claims were netted against each other and then offset against the ABL Facility. Postpetition, all Intercompany Claims between Debtors will be netted against each other and then offset against the DIP Facility Tranche A. The Debtors maintain records of all Intercompany Transactions and, therefore, are able to ascertain, trace and account for the Intercompany Transactions. I believe that if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted.

### vii. The Debtors' Existing Business Forms and Checks

26. In the ordinary course of business, the Debtors use a variety of checks and business forms. To minimize expenses to their estates, I believe it is appropriate for the Debtors to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

---

[5] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, I am informed from Debtors' counsel that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such Intercompany Transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

<u>**OPERATIONAL MOTIONS PURSUANT TO RULE 6003**</u>

A.  **Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs**

    i.  **Overview of the Debtors' Workforce**

27.     As of the Petition Date, the Debtors employ approximately 4,260 employees (the "***Employees***").   Of the approximately 4,260 Employees, approximately 3,000 are full-time Employees (Employees that work a minimum of 35 hours per week) and approximately 1,260 are part-time Employees (Employees that work less than 35 hours per week).

28.     In addition, the Debtors supplement their business needs and workforce with approximately 70 independent contractors (the "***Independent Contractors***") and approximately 220 temporary employees who are retained through third-party employers and agencies (the "***Temporary Employees***").

29.     The Employees, Independent Contractors and Temporary Employees perform a variety of critical functions, including sales, customer service, purchasing as well as administrative, accounting, legal, finance, management, supervisory and other related tasks.   I believe that their skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' businesses.

30.     Just as the Debtors depend on the Employees, Independent Contractors and Temporary Employees to operate their businesses on a daily basis, these individuals also depend on the Debtors.   Indeed, the vast majority of these individuals rely exclusively on payments received from the Debtors for their basic living necessities.

ii.      **Wages, Payroll and Other Compensation**

a.      Wage Obligations

31.      In the ordinary course of business, the Debtors incur payroll obligations for base wages and overtime compensation owed to their Employees, Independent Contractors and Temporary Employees (collectively, the "***Wage Obligations***").  Depending on an individual's status, Wage Obligations are paid on either a weekly or bi-weekly basis in arrears.  My colleagues in the human resources department have informed me that on a bi-weekly basis, Wage Obligations average a total of approximately $5.6 million.

32.      The Debtors' payroll is administered by Automatic Data Processing, Inc. ("***ADP***"), a third-party service provider, which distributes payroll, either directly to Employees via check or through direct deposits with funds advanced by the Debtors.  I have been informed that the Debtors' payroll for the period ending January 15, 2011, has already been paid to ADP and debited from the Debtors' payroll account.[6]  Nonetheless, I believe that certain limited prepetition payroll amounts may remain unpaid as of the Petition Date because, among other things, wire transfers may not have been effectuated or various checks may not have cleared before the Petition Date.  In addition, I believe that certain individuals may be owed payment in arrears for, among other services, overtime work in the days preceding the commencement of these chapter 11 cases.

33.      Specifically, outstanding prepetition Wage Obligations include the following (collectively, the "***Unpaid Compensation***"):

---

[6]      *See Debtors' Motion for Entry of an Order Authorizing the  Debtors to (A) Continue to Operate their Cash Management System;  (B) Maintain Existing Business Forms;  (C) Grant Administrative Priority for Intercompany Claims and Perform Under Certain Intercompany Arrangements and Historical Practices; and (D) Assume and Assign Certain Account Control Agreements Pursuant to Section 365 of the Bankruptcy Code* at ¶ 16, filed contemporaneously with this declaration.

- Employee Compensation. Employee compensation consists of amounts owed to the Debtors' full and part-time Employees, including prepetition wages, salaries and commissions,[7] but excluding severance, bonuses, relocation expense reimbursements and vacation time. As of the Petition Date, I am informed that the Debtors owe approximately $2,200,000 on account of compensation owed to the Employees in the ordinary course of business.

- Independent Contractor Compensation. The Debtors' aggregate monthly payments to their approximately 229 Independent Contractors total approximately $580,000. As of the Petition Date, I am informed that approximately $45,000 has accrued and remains outstanding on account of prepetition services provided by Independent Contractors, each of whom are individuals.

- Temporary Employee Compensation. The Debtors' compensation to their Temporary Employees includes monthly fees that the Debtors remit to third-party agencies in exchange for the services they provide with respect to Temporary Employees. As of the Petition Date, I am informed that approximately $19,000 has accrued and remains outstanding on account of prepetition services performed by the Temporary Employees, each of whom are individuals.

34. The Debtors seek the authority to pay and honor the Unpaid Compensation in an amount not to exceed $11,725 per eligible Employee, Independent Contractor or Temporary Employee, and continue to honor the Wage Obligations on a postpetition basis in the ordinary course of business.

b. Unpaid Payroll Service Fees

35. The majority of the Debtors' Wage Obligations are made by direct deposit through the electronic transfer of funds from the Debtors' payroll department directly to each

---

[7] The Debtors incentivize certain call center Employees with a commissions program encouraging the cross-selling of products during customer calls. I am informed that Employee compensation includes any unpaid prepetition portion of the Debtors' aggregate monthly payments to their approximately 1,375 eligible call center Employees, totaling approximately $16,000.

Employee's bank account, with the balance of Employees receiving checks. Most of the Debtors outsource this operation to ADP.

36. Specifically, ADP is responsible for serving as the Debtors' payroll and federal W-2 tax form processing vendor, as well as completing the Debtors' payroll tax filings, including federal, state and local tax filings. In addition, for each payroll period, ADP processes direct deposit transfers, or administer payroll checks to Employees, from certain disbursement accounts funded by the Debtors with the amounts necessary to satisfy the Debtors' payroll obligations. I believe that ADP is crucial to providing the Debtors with a payroll system that functions seamlessly.

37. The Debtors incur approximately $350,000 per year in fees for ADP's services. As of the Petition Date, I am informed that approximately $80,000 has accrued and remains outstanding on account of fees owed to ADP for services rendered prepetition (the "***Unpaid Payroll Service Fees***"). The Debtors seek authority to remit the Unpaid Payroll Service Fees and continue to use ADP in the ordinary course of business on a postpetition basis.

### iii. Deductions and Payroll Taxes

38. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees', Independent Contractors' and Temporary Employees' gross pay, including garnishments, child support and similar deductions (collectively, the "***Deductions***"), which either the Debtors or a third-party service provider then forward to the appropriate recipients. On a bi-weekly basis, I am informed that the Deductions total approximately $66,000. As of the Petition Date, I understand that approximately $18,000 in Deductions have been collected but not yet remitted to the appropriate third-party recipients (collectively, the "***Unremitted Deductions***").

39. In addition to the Deductions, the Debtors are required by law to withhold amounts from Employees, Independent Contractors and Temporary Employees' wages that are

related to federal, state, provincial and local income taxes, including social security and Medicare taxes and employment insurance, for remittance to the appropriate taxing authorities (collectively, the **_"Payroll Taxes"_**). As of the Petition Date, I understand that the Debtors estimate that approximately $1,100,000 in Payroll Taxes has been collected but not yet remitted to the appropriate third-party recipients (collectively the "**_Unremitted Payroll Taxes_**").

40.      The Debtors believe that because the Unremitted Deductions and certain Unremitted Payroll Taxes are held for payment to third-parties, they are properly deemed to be held in trust, and thus, do not constitute property of the Debtors' estates. Out of an abundance of caution, however, the Debtors seek authority to remit the Unremitted Deductions and Unremitted Payroll Taxes and continue collecting and remitting the Unremitted Deductions and Unremitted Payroll Taxes in the ordinary course of business on a postpetition basis.

###### iv.     Reimbursable Expenses

41.      In the ordinary course of business, the Debtors reimburse certain Employees for reasonable, customary and approved expenses incurred on behalf of the Debtors in the scope of their employment and service, including travel expenses[8] and credit cards,[9] in accordance with the Debtors' policies (collectively, the "**_Reimbursable Expenses_**").

---

[8]   More specifically, I am informed that the Debtors routinely reimburse certain Employees for expenses such as travel, meals, parking, automobile mileage and other business-related expenses that are incurred in the scope of their employment or service. Although the Debtors ask that Employees promptly submit their reimbursement requests, not all of them are able to do so. In fact, it is likely that Employees will submit requests for prepetition expenses after the Petition Date. Thus, the Debtors are unable to provide a detailed listing of unpaid prepetition travel expenses at this time.

[9]   The Debtors reimburse approximately 240 Employees each month for business-related purchase card expenses (collectively, the "**_Employee Purchasing Cards_**"). I am informed that all participating Employees are personally liable for charges incurred on the Employee Purchasing Cards; however, in some instances, the Debtors may remit a direct payment for the Employee Purchasing Cards. With respect to certain other credit cards, the participating Employees pay directly and are subsequently reimbursed by the Debtors.

42.     As of the Petition Date, I am informed that the total prepetition amount with respect to all Reimbursable Expenses is approximately $23,000 (collectively, the "***Unpaid Reimbursable Expenses***").

43.     To avoid unnecessary disruption, the Debtors seek the authority, solely pursuant to the Final Order, to pay the Unpaid Reimbursable Expenses in an amount not to exceed $3,000 per eligible Employee and continue to honor Reimbursable Expenses in the ordinary course of business on a postpetition basis.

**v.      Employee Bonus Programs**

44.     The Debtors maintain several bonus programs that are utilized to encourage and incentivize Employees and increase the Debtors' revenue (collectively and as discussed herein, the "***Employee Bonus Programs***," and related unpaid amounts, the "***Unpaid Bonuses***"). I believe that the Employee Bonus Programs are an integral part of the Debtors' culture and a fundamental component of the compensation structure for many Employees and are designed to encourage Employees to achieve performance goals and maintain the Debtors' competitive status with industry peers. Notably, at this time the Debtors do not seek to make payments to "insiders" (as defined by the section 101(14) of the Bankruptcy Code) in connection with the continuation of the Employee Bonus Programs.

a.      Key Manager Programs

45.     The Debtors have established a middle-management bonus program (the "***Key Manager Program***") at the brand-level pursuant to which eligible mid-management Employees can earn a flat sum bonus depending upon their respective status based on year-end performance. The amounts of such bonuses generally depend on various factors, including certain preset performance objectives and other metrics within the control of an Employee's respective department. Additionally, the Key Manager Program is based on whether a specific Employee's

brand or the Debtors as a whole have met projected earnings before interest, taxes, depreciation and amortization ("***EBITDA***") expectations. To qualify for the Key Manager Program, the following criteria must be satisfied: (a) an applicable Employee must achieve 80% of their personalized objectives and (b) the applicable Employee's brand (or the Debtors as a whole) must achieve 95% of its objectives. The Key Manager Program year runs parallel to the Debtors' fiscal year (generally calendar year), with bonuses paid in the following fiscal year. I am informed that the estimated cost of the Key Manager Program, if paid out fully at target after the Petition Date, will be approximately $300,000 (or an average of $10,000 per eligible Employee). Because the Key Manager Program will be earned by the affected Employees based upon their postpetition employment with the Debtors in the ordinary course of business,[10] the Debtors believe no prepetition amounts are outstanding under the Key Manager Program.

b.      Retail Bonus Programs

46.     The Debtors maintain 55 retail stores in the United States. To incentivize Employees at these locations, the Debtors have established personnel bonus programs for various Employees (collectively, the "***Retail Bonus Programs***"). The amount of bonuses available under the Retail Bonus Programs generally depends on various factors, including performance objectives and other metrics. I believe that the Retail Bonus Programs are an imperative and necessary motivational and retention tool for the Debtors' high-performing retail Employees. I am informed that approximately 210 Employees will meet the criteria for payouts pursuant to the Retail Bonus Programs, with average payments of approximately $220 per applicable Employee.

---

[10]   The Debtors will provide a list of all recipients under the Key Manager Program to the Office of the United States Trustee for the District of Delaware and any statutory committee, once appointed. Upon request, the Debtors will provide a list of all recipients under the Key Manager Program to the Administrative Agents (as defined in the First Day Declaration).

47.     As of the Petition Date, I understand that the estimated prepetition amounts that are unpaid with respect to the Retail Bonus Programs total approximately $47,000 (collectively, the "***Unpaid Retail Bonuses***").  To continue motivating their retail Employees, the Debtors seek the authority, solely pursuant to the Final Order, to pay the Unpaid Retail Bonuses and continue to offer the Retail Bonus Programs in the ordinary course of business on a postpetition basis.

c.      Distribution Center Bonus Programs

48.     The Debtors maintain three major distribution centers or warehouses to store, manage and distribute their products.  To incentivize their warehouse employees to meet productivity and safety standards, the Debtors established certain incentive programs (collectively, the "***Distribution Center Bonus Programs***").  The amount of the bonuses payable under the Distribution Center Bonus Programs depend on productivity metrics such as "units moved per hour" and certain safety metrics.  I am informed that approximately 730 Employees will meet the criteria for payouts pursuant to the Distribution Center Bonus Programs, with average payments of approximately $133 per applicable Employee.

49.     As of the Petition Date, I am informed that the estimated prepetition amounts that are unpaid with respect to the Distribution Center Bonus Programs total approximately $97,000 (collectively, the "***Unpaid Distribution Center Bonuses***").  To continue motivating their warehouse Employees, the Debtors seek authority, solely pursuant to the Final Order, to pay the Unpaid Distribution Center Bonuses and continue to offer the Distribution Center Bonus Programs in the ordinary course of business on a postpetition basis.

d.      LinenSource™ Transitional Bonuses

50.     In March 2010, the Debtors acquired the LinenSource™ brand and associated businesses.  To facilitate the integration and transition of LinenSource™ into the Debtors' family of businesses, the Debtors implemented certain incentive programs (the "***Implementation***

*Bonuses*") designed to induce certain LinenSource™ Employees to remain with the Debtors and continue to contribute to the business during the transition. I am informed that the Debtors estimate that approximately 15 Employees will meet the criteria for payouts pursuant to the Implementation Bonuses with average payments of approximately $5,000 per applicable Employee.

51. I am informed that as of the Petition Date, the Debtors estimate that the total prepetition amount with respect to the Implementation Bonuses is approximately $75,000 (collectively, the "*Unpaid Implementation Bonuses*").[11] To continue the necessary integration of the LinenSource™ businesses, the Debtors seek the authority, solely pursuant to the Final Order, to pay the Unpaid Implementation Bonuses and continue to offer the Implementation Bonuses in the ordinary course of business on a postpetition basis.

### vi. Employee Severance Obligations

52. The Debtors have historically maintained a severance program pursuant to which each eligible Employee is entitled to a certain number of weeks of severance benefits based on their position and length of service with the Debtors, as well as post-employment medical benefits (the "*Employee Severance Program*"). In certain cases, payments made under the Employee Severance Program are provided to former Employees in exchange for releases entered into with such Employees, whereby the Employees release claims otherwise held against the Debtors and agree to, among other things, not disclose confidential information, solicit employees or disparage the Debtors for a certain period of time. The Debtors do not seek the authority in this motion to pay any obligations under the Employee Severance Program to any

---

[11]  The Unpaid Implementation Bonuses include certain unpaid relocation incentives for applicable Employees.

"insider" (as the term is defined in section 101(14) of the Bankruptcy Code) outside the confines imposed by section 503(c)(2) of the Bankruptcy Code.

53.     As of the Petition Date, I am informed that 19 former Employees receive payments under the Employee Severance Program for services rendered before the Petition Date. I am informed that approximately $53,000 has accrued and remains outstanding on account of the Employee Severance Program ("*Unpaid Severance*").  I am further informed that no one Employee is owed more than $11,725.  The Debtors seek authority to continue the Employee Severance Program and to remit Unpaid Severance pursuant only to the Final Order.

54.     Additionally, the Debtors reimburse former Employees for Consolidated Omnibus Budget Reconciliation Act ("*COBRA*") expenses for the duration of their severance benefits.  As of the Petition Date, I am informed that the estimated prepetition obligations related to COBRA reimbursements total approximately $5,000 (the "*COBRA Reimbursements*").  The Debtors also hold certain COBRA premiums of former Employees in trust and then remit those premiums to the appropriate third-parties.  I am informed that as of the Petition Date, the prepetition obligations related to COBRA premiums held in trust total approximately $2,000 (the "*COBRA Premiums In Trust*").  I am informed that the Debtors' estimate that the maximum exposure on account of prepetition COBRA obligations, including the COBRA Reimbursements and the COBRA Premiums In Trust, is approximately $7,000 ("*Unpaid COBRA*").  The Debtors seek authority to pay Unpaid COBRA immediately pursuant to the Interim Order.

55.     I believe that if the Debtors are unable to continue the Employee Severance Program and pay Unpaid Severance and Unpaid COBRA, current Employees may question the Debtors' commitment to the Employee Severance Program (and Employees generally), which is intended to ease their financial burden in the event they are terminated.  Moreover, I believe that

Employee morale and loyalty will be jeopardized at a time when Employee support is critical. I believe that it is important that the Debtors fulfill their obligations under the Employee Severance Program to reassure all Employees that the Debtors honor their obligations to Employees – both during and after their tenure with the Debtors – including those incurred postpetition under the Employee Severance Program. Additionally, I believe that because the COBRA Premiums In Trust are held for payment to third-parties, they are properly deemed to be held in trust and, therefore, do not constitute property of the Debtors' estates.

**vii.    Employee Benefits Plans**

56.    The Debtors maintain various employee benefit plans and policies, including health care, prescription drug benefits, dental and vision plans and flexible benefits plans (collectively, and as discussed in more detail below, the "***Employee Benefits Plans***").

a.    <u>Health Benefits</u>

57.    All regular, full-time, Employees are eligible to receive the following medical, prescription drug, dental and vision insurance coverage (collectively, the "***Health Benefits***"):

- <u>Medical and Prescription Drug Plans</u>. BlueCross BlueShield of Massachusetts ("***BCBS***") administers the Debtors' domestic medical and prescription drug coverage plans for approximately 2,600 covered Employees (the "***Medical Plan***"). I understand the Debtors' average annual cost to administer the Medical Plan is approximately $16.4 million, net of Employee contributions. I am informed that as of the Petition Date, the Debtors estimate that they owe $2,000,000 of prepetition obligations under the Medical Plan.

- <u>Dental Plan</u>. BCBS administers the Debtors' dental plans for approximately 2,500 covered Employees (the "***Dental Plan***"). I understand that the Debtors' average annual cost to administer the Dental Plans is approximately $1 million. I am informed that as of the Petition Date, the Debtors estimate that they owe a *de minimis* amount of prepetition obligations to BCBS under the Dental Plan.

- <u>Vision Plan</u>.  Vision Service Plan administers the Debtors' vision benefits plan for approximately 2,000 Employees (the "***Vision Plan***").  The Vision Plan is fully funded by the participating Employees.  The Debtors serve as a conduit through which Employee payments are made to the Vision Plan administrator.  I am informed that as of the Petition Date, the Debtors estimate that they owe a *de minimis* amount of prepetition obligations to BCBS under the Vision Plan.  The Debtors seek authority, out of an abundance of caution, to forward the Employee contributions and to continue the Vision Plan in the ordinary course of business.

58.     In addition to the $2,000,000 prepetition obligations owed on account of Health Benefits, I am aware that the Debtors also hold approximately $166,000 of Employee-made Health Benefits payments, collected by the Debtors pursuant to payroll deductions, which funds are held in trust and which the Debtors seek to remit to the appropriate third-party health providers on behalf of the Employees (collectively, the "***Unpaid Health Benefits***").[12] Considering that the Health Benefits are vital to the Debtors' Employees and that the vast majority of the Unpaid Health Benefits are held in trust for the Employees and are not property of the Debtors' estates, the Debtors seek the authority to remit the Unpaid Health Benefits.  The Debtors also seek to continue providing the Health Benefits in the ordinary course of business on a postpetition basis.

       b.     Flexible Benefits Plan

59.     The Debtors offer all of their full-time Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible, out-of-pocket health care and dependent care costs and expenses (the "***Flexible Benefits Plan***").  The

---

[12]  The Unpaid Health Benefits include *de minimis* outstanding prepetition obligations for call center Employee health benefits. .

Flexible Benefits Plan is administered by Benefit Concepts. I am informed that approximately 560 Employees participate in the Flexible Benefits Plan.

60.     The Flexible Benefits Plan is fully funded by Employee contributions. The Debtors forward those contributions, in addition to certain administrative fees, to Benefit Concepts on behalf of the applicable Employees. As of the Petition Date, I am informed that the Debtors hold $30,000 in Employee contributions to the Flexible Benefits Plan and related administrative fees (the "***Flexible Benefits Plan Obligations***"). Thus, amounts contributed pursuant to the Flexible Benefits Plan are not assets of the Debtors' estates; rather, these amounts are held in trust for the participating Employees. The Debtors request the authority to forward the Flexible Benefits Plan Obligations if and when they become due and continue offering the Flexible Benefits Plan in the ordinary course of business on a postpetition basis.

### viii.     Employee Workers' Compensation, Insurance Plans and Disability Benefits

#### a.     Worker's Compensation Programs

61.     The Debtors maintain workers' compensation insurance for their Employees at the mandated level required by each state in the United States in which the Debtors operate (the "***Workers' Compensation Program***"). The Debtors maintain their Workers' Compensation Program with the Liberty Mutual Group (the "***Workers' Compensation Policy***"). I understand that the Worker's Compensation Policy covers the period beginning June 1, 2010 and ending June 1, 2011. The Worker's Compensation Policy generally includes deductibles of $1 million per accident. I am informed that the Debtors pay a total of approximately $1.2 million in annual premiums for the Worker's Compensation Policy, which are paid in monthly installments of approximately $100,000 per month. I am further informed that as of the Petition Date, the Debtors estimate that they do not owe any prepetition Workers' Compensation Policy premiums obligations (the "***Unpaid Workers' Compensation Premiums***"). The Debtors request the

authority to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis.

b. Disability, Life and Accidental Death and Dismemberment Insurance

62. Most of the Debtors provide short-term disability, long-term disability, basic term life and accidental death and dismemberment insurance coverage for their full-time Employees (at no cost to the Employees) (the "***Employee Insurance Coverage***"). Sun Life Insurance Company provides the Employee Insurance Coverage.

63. As of the Petition Date, I am informed that in addition to the Debtors' *de minimus* prepetition obligation owed on account of Employee Insurance Coverage, the Debtors also hold approximately $10,000 in Employees' premiums for supplemental insurance coverage, collected pursuant to payroll deductions, in trust for payment to third-party providers (collectively, the "***Unpaid Employee Insurance Coverage***"). The Debtors seek the authority to remit the Unpaid Employee Insurance Coverage costs and continue offering Employee Insurance Coverage in the ordinary course of business on a postpetition basis.

**ix. Vacation Time, Leaves of Absence and Paid Holidays**

64. The Debtors provide all full-time Employees with vacation time as a paid, time-off benefit ("***Vacation Time***"). The amount of available Vacation Time, and the rate at which such Vacation Time accrues, is generally determined by the Employee's position, length of full-time employment and the location of that Employee's employment. When taking those factors into account, Employees can receive between three to five weeks of Vacation Time per year.

65. I understand that the Debtors generally maintain a "use it or lose it" Vacation Program,[13] Employees who do not use Vacation Time earned during a calendar year, or in

---

[13] I am informed from Debtors' counsel that certain Employees in California are permitted to carryover limited amounts of Vacation Time into a subsequent calendar year as required pursuant to state law.

certain instances, mid-calendar year, lose the ability to use such Vacation Time during the subsequent year. Additionally, upon termination of an Employee, the Employee's final paycheck will include any available, unused Vacation Time. As of the Petition Date, I am informed that the Debtors estimate that they are responsible for Vacation Time totaling approximately $860,000 (the "***Unpaid Vacation Time***"). This amount, however, is not a current cash pay obligation as Employees are only entitled to be paid for accrued and unused Vacation Time upon termination. I am informed that the Debtors currently estimate that they do not owe any outstanding cash obligations on account of Unpaid Vacation Time.

66. The Debtors also provide Employees with certain other leave of absence time as required by law (collectively, the "***Leave of Absence Time***"). Leave of Absence Time includes family medical leave, pregnancy, adoption and foster care leave, military leave, jury duty, voting leave, personal leave and bereavement leave. I am informed that the Debtors do not accrue Leave of Absence Time for their Employees and Leave of Absence Time is not reflected as a liability on the Debtors' balance sheets.

67. Furthermore, the Debtors maintain a policy whereby Employees receive compensation for certain non-working holidays (the "***Paid Holidays***"). Paid Holidays differ slightly among the Debtor entities and can vary between seven to ten days per calendar year. In addition, for non-exempt, hourly Employees who exceed their minimum, weekly work-hour requirement (40 hours per week) and perform work on a Paid Holiday, such Employees receive overtime compensation equal to one and one-half times their respective hourly rate.

68. The Debtors seek the authority, solely upon entry of the Final Order, to remit the Unpaid Vacation Time (if any) when such obligations become due and owing and continue

Vacation Time, Leave of Absence Time and Paid Holidays in the ordinary course of business on a postpetition basis.

### x. 401(k) Employee Savings Plans

69. The Debtors maintain a retirement savings plan for the benefit of all eligible Employees that meets the requirements of section 401(k) of the Internal Revenue Code (the "***401(k) Plan***"). Approximately 2,500 Employees participate in the 401(k) Plan.

70. I understand that the Debtors withhold approximately $1.2 million (in the aggregate) each month from participants' paychecks on account of their 401(k) contributions. As of the Petition Date, I am informed that the Debtors hold in trust approximately $190,000 ("***Unremitted 401(k) Contributions***") in Employee 401(k) Plan contributions. The Debtors seek the authority to release the Unremitted 401(k) Contributions held in trust for their Employees; and continue operating the 401(k) Plan in the ordinary course of business on a postpetition basis.[14]

### xi. Relocation Benefits

71. The Debtors make available certain relocation benefits to eligible Employees who are required to relocate to a new job location (the "***Relocation Benefits***"). The Relocation Benefits generally include closing costs on new homes, costs associated with the sale of existing homes, moving costs, costs of living adjustments, temporary housing costs, reimbursement of travel expenses, the costs of shipping Employees' vehicles to a new location, home-finding costs and certain tax allowances. I understand that the Relocation Benefits are determined on a case-by-case basis, depending on the needs of the individual Employee and his or her circumstances.

---

[14] I am informed that prior to the Petition Date, the Debtors maintained a 401(k) Plan "matching" program (the "***401(k) Matching Program***") for the benefit of eligible Employees. The Debtors do not seek authority at this time to continue the 401(k) Matching Program on a postpetition basis.

The Relocation Benefits are currently contingent obligations. I am informed that approximately eight current Employees may receive Relocation Benefits in the future. Although the costs of the Relocation Benefits vary, I am informed that the Debtors estimate that they will pay an average of approximately $50,000 per eligible Employee on account of the Relocation Benefits. As of the Petition Date, the Debtors estimate that they do not owe any outstanding prepetition amounts on account of the Relocation Benefits. I understand that the Debtors expect to maintain the Relocation Benefits after the Petition Date and request authorization, pursuant to the Final Order, to honor the Relocation benefits for eligible Employees postpetition.

**B.      Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Pay Prepetition Claims of Lien Claimants**

72.      The Debtors require the delivery of goods on a regular basis for the production and distribution of their finished products throughout the United States and the world. The Debtors' pricing policies, marketing strategies and general business operations rely on their ability to receive and distribute finished goods in a timely fashion. To maintain their operations and efficiently transport products, the Debtors employ an extensive distribution network that uses both foreign and domestic third-party carriers who are in current possession of the Debtors' property as of the Petition Date (collectively, and as discussed below, the "***Possessory Lien Claimants***"). I understand from the Debtors' counsel that under the laws of most states, these carriers will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation of the goods. I believe that if the Possessory Lien Claimants' claims are not satisfied, they may refuse to release the Debtors' property, thereby disrupting the Debtors' product flow and operations.

73.      I understand that the Debtors have identified approximately $10 million in prepetition amounts that have accrued and remain unpaid on account of the claims of Lien

Claimants. The Debtors seek the authority, but not the direction, pursuant to the Interim Order, to remit payment on account of the Lien Claimants in amount up to $6 million during the 21-day period after the Petition Date and in an amount up to $10 million pursuant to the Final Order.[15] I believe that this relief is necessary in light of the substantial harm that may befall the Debtors if the Lien Claimants fail to release the goods in their possession or otherwise move to assert their lien rights.

74. The Possessory Lien Claimants[16] fall into the following categories:

- Shippers: I am informed that the Debtors' domestic distribution network depends upon the use of reputable domestic and foreign common carriers, truckers, rail carriers, barge owners and dockers (collectively, the "**Shippers**") to deliver goods to the Debtors' production facilities and distribute finished products to the Debtors' customers. I believe the services provided by the Shippers are essential to the Debtors' ordinary course, day-to-day operations. At any given time, there are numerous shipments of products en route to or from the Debtors' facilities. Thus, I believe it is a certainty that some of the Shippers are currently in possession of the Debtors' property. I believe that the delivery of these goods is vital to maintaining the Debtors' operations during their transition into chapter 11. If the Debtors do not pay the prepetition, ordinary course obligations owed to these Shippers, I believe that they may refuse to deliver or release such property, thereby disrupting the Debtors'

---

[15] The Debtors have also filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Pay or Honor Prepetition Obligations of Certain Critical Vendors and Holders of Certain Administrative Claims Under Section 503(b)(9) of the Bankruptcy Code* (the "***Critical Vendor Motion***"). To the extent the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Pay Prepetition Claims of Lien Claimants* and in the Critical Vendor Motion is granted by the Court, the Debtors have agreed with their secured lenders that the total amount of obligations the Debtors are authorized to pay under such orders shall not exceed an aggregate of $50 million during these chapter 11 cases.

[16] In addition to the Possessory Lien Claimants described above, the Debtors also employ several third-party logistics coordinators to manage the transport of their raw materials and finished products (the "***Logistics Coordinators***"). The Logistics Coordinators work with Possessory Lien Claimants to deliver and store the Debtors' raw materials and finished products. Any interruption in payments to Logistics Coordinators would likely result in a lengthy delay in the Debtors' payments to their Possessory Lien Claimants and a serious risk of the Possessory Lien Claimants withholding delivery or services. As described herein, these delays could have a significant adverse impact on the Debtors' businesses and impede their supply chain.

business operations.

- Landlords:  I am informed that the Debtors store products in the ordinary course of their businesses at facilities owned by other parties and leased by the Debtors (the "**Landlords**").  In the event that the Debtors fail to remit payment owed to the Landlords before the Petition Date and to the extent that the underlying lease is in default or is terminated, I believe that the Landlords may refuse to release the goods they retain pending satisfaction of all or a portion of their claims, thereby disrupting the Debtors' operations.

- Processors:  I am informed that the Debtors also rely on third-party processors to manufacture or finish goods according to the Debtors' detailed specifications (the "**Processors**").  At any given time, the Processors may be performing services on, and therefore be in possession of, the Debtors' goods.  Accordingly, I believe that the Debtors' failure to satisfy payment obligations to the Processors would result in the Processors' refusal to return the Debtors' goods, thereby disrupting the Debtors' business operations.

75.     The Debtors also rely on, and routinely contract with, a number of third parties to obtain machinery and equipment used at their facilities and also have such machinery and equipment maintained and repaired.  I am informed that the Debtors owe money to these third parties as a result of the goods and services they provide.  I understand from discussions with Debtors' counsel that many of these parties have a right to assert and perfect statutory liens, which attach to the Debtors' real and personal property.

76.     Additionally, as reflected in the proposed Interim Order and Final Order, the Debtors have agreed that prepetition amounts to be paid to any single Lien Claimant in an amount above $100,000 in the aggregate will be subject to prior review of counsel to the Consenting Lenders as well as the professionals representing the committee of unsecured creditors in these chapter 11 cases, once appointed.

**C.** **Debtors' Motion for Entry of an Order Confirming Administrative Expense Status of Obligations Arising from Postpetition Delivery of Goods and Services**

77.     In the ordinary course of the Debtors' businesses, Vendors provide the Debtors with products, including supplies, equipment and finished apparel, home and lifestyle goods for resale (collectively, the "***Goods***") and various services, including transportation, maintenance and other necessary services for the Debtors' operations (collectively, the "***Services***").

78.     I believe that, as a result of these chapter 11 cases, certain Vendors may be concerned that payments owed by the Debtors for Goods delivered or Services provided after the Petition Date will result in a general unsecured claim against the Debtors' estates, and therefore, such Vendors would not be paid timely on a postpetition basis.  In addition, I understand that the Debtors use numerous foreign Vendors, many of whom may not be familiar with the Bankruptcy Code, and in particular, the protections provided to them pursuant to section 503(b)(1)(A) thereof with respect to Goods and Services provided to the Debtors after the Petition Date.

79.     I further believe that the Debtors' businesses would be irreparably harmed should their Vendors discontinue shipping Goods and/or providing Services, even on a temporary basis, as it is imperative that delivery of Goods to the Debtors' customers is uninterrupted.

80.     To provide assurance to their Vendors, the Debtors seek an order confirming the administrative expense status granted to obligations arising from Goods delivered and Services provided to the Debtors postpetition.

**D.** **Debtors' Motion for Entry of an Order Authorizing, but Not Directing, the Debtors to Maintain and Administer Customer Programs and Honor Prepetition Obligations Related Thereto**

81.     Over more than six decades of combined experience, the Debtors have created numerous long-standing customer relationships through their different retail brands.  These relationships have, in large part, been sustained by customer programs, which incentivize sales,

develop brand loyalty and establish (and maintain) customer goodwill (the "**Customer Programs**"). I believe that any failure to continue the Customer Programs and honor the obligations incurred thereunder (collectively, and as identified below, the "**Customer Program Obligations**") could erode hard-earned brand loyalty and customer goodwill, substantially reducing sales and jeopardizing the Debtors' ability to effectuate a successful reorganization. Accordingly, the Debtors seek authorization to continue the Customer Programs in the ordinary course of business and to honor the Customer Program Obligations, as discussed below, so that customer relationships are maintained and business operations can continue uninterrupted notwithstanding the restructuring process.

82. The importance of the Customer Programs is underscored by the fact that the Debtors are not seeking interim relief: the Customer Programs and the value they provide to the Debtors' estates are simply too important not to seek relief on a final basis. I believe that the Debtors will lose a significant number of customers and face a surge of cancellations in existing sales, if the Customer Programs are not honored or if there is any doubt about the Debtors' ability to honor the Customer Programs in the ordinary course.

**i.      Gift Cards and Gift Certificates**

83. Before the Petition Date, the Debtors sold gift cards and gift certificates to retail customers for the purchase of merchandise in the Debtors' retail stores, catalog and online retail businesses (collectively, the "**Gift Cards**"). The Gift Cards generally carry no expiration date, and I am informed that as of the Petition Date, certain customers had not yet redeemed certain of the prepetition Gift Cards for merchandise. At the time that the Gift Cards were purchased by customers, customers had every expectation that the Gift Cards would be honored and applied towards purchases. Absent authority to honor the Gift Cards, I understand from discussions with the counsel that the Debtors would be unable to accept the Gift Cards for purchases, which

would negatively impact their sales and their customer relations. I believe this would inevitably lead to dissatisfied customers and negative publicity, which would potentially jeopardize the Debtors' reorganization efforts. Accordingly, I believe that the Debtors' ability to continue to honor the Gift Cards is necessary to their reorganization efforts.

### ii. Returns, Refunds and Exchange Programs

84. If a customer is not satisfied with merchandise purchased from any of the Debtors' brands, the customer generally has the option to return or exchange the goods within 90 days after the purchase date so long as the customer has a receipt or the Debtors' have a record of the sale (collectively, the "*Customer Satisfaction Obligations*").[17] Further, certain of the Debtors' brands, such as Norm Thompson™, Haband!™ and Blair™, provide unconditional lifetime guarantees of customer satisfaction. The unconditional lifetime guarantees provide that if a customer is dissatisfied with a product for any reason, the customer may return the product for a full refund, with certain limited exceptions. This type of Customer Program is not uncommon in the retail apparel and accessories industry and, therefore, I believe it is critical to the Debtors' ability to remain competitive and continue to generate and maintain brand loyalty.

85. As a result of the Debtors' various Customer Satisfaction Obligations, I am informed that certain customers hold, as of the Petition Date, contingent claims against the Debtors for refunds, returns, exchanges and other credit balances relating to goods sold to customers, both at physical stores and online (collectively, the "*Refund Programs*"). The Debtors' outstanding prepetition obligations on account of the Refund Programs generally fall into two categories: obligations where (a) the Debtors have, as of the Petition Date, mailed checks to their customers on account of a Refund that remain uncashed and (b) certain of the

---

[17] Merchandise purchased from the Debtors' online stores may be returned by mail or to one of the Debtors' stores.

Debtors' customers have paid for their purchase by check in an amount that exceeds the total cost of the goods purchased (including related tax and shipping costs), leaving the Debtors with a balance that the Debtors return on a periodic basis to the customer (the "***Current Refund Obligations***").[18]  I understand that the Debtors estimate that, as of the Petition Date, they owe approximately $6 million on account of outstanding Current Refund Obligations, solely on a contingent basis.[19]

86.     In addition to the Current Refund Obligations, the Debtors have various outstanding obligations on account of the Refund Programs that I am informed are contingent and unknown as of the Petition Date (the "***Future Refund Obligations***").  The nature and scope of the Future Refund Obligations vary among the Debtors depending on a number of factors, including the type of good sold and the Debtors' ability to resell a given item of merchandise that has been returned.  In some instances a returned item may simply be exchanged for another good (and/or future credit), thereby not requiring the Debtors to make a cash outlay to a customer.  In other circumstances, the Debtors may refund a cash amount to a customer in exchange for receipt of the returned good, with the intention of reselling the returned item.  Indeed, I am informed that the Debtors typically sell returned items at an amount above cost, but with a discount of up to 50% of the original sale price.  Although it is difficult to state the Debtors' potential cash obligations on account of Future Refund Obligations with specificity, the Debtors estimate that, based on historical trends and taking into account the Debtors' earnings based on their subsequent ability to resell returned goods, Future Refund Obligations total between

---

[18]   I am informed that the Current Refund Obligations also include potential cash reimbursements to the Debtors' credit card servicers on account of amounts that are refunded to customers by the credit card servicer.

[19]   I am informed from Debtors' counsel that the relief requested pursuant to the Refunds does not account for any escheatment claims that may exist.  Moreover, the Debtors reserve the right to dispute any such escheatment claims at the appropriate time.  For the avoidance of doubt, the Debtors are not seeking discretionary authority to honor prepetition claims based on escheatment in the ordinary course of business.

approximately $4 million and approximately $10 million as of the Petition Date.

87.     I believe that the ability to continue to provide the Refund Claims to customers is vital to the Debtors' ongoing relationship with their customers.  I further believe that without the ability to provide and honor the Refund Claims, many customers would be unwilling to purchase merchandise from the Debtors.  Accordingly, the Debtors request the authority to honor the Refund Claims in their discretion and continue to honor the Refund Claims in the ordinary course of business.

### iii.    Loyalty Programs

88.     The Debtors are party to certain "Credit Card Program Agreements" (collectively, the "***Private Label Cards***") with various credit card issuers, under which the Debtors offer a private-label credit card to qualifying customers.  The Private Label Cards may be used for the purchase of goods from the Debtors, and cannot be used at any other non-Debtor merchant.  I am informed that the Debtors estimate that sales through Private Label Cards constitute approximately 12% to 39% of the annual total sales at the applicable brands.  The Private Label Cards reward customers who open an account by providing "points" that can be redeemed for gift cards, free shipping or product discounts (collectively, the "***Loyalty Programs***").  Honoring prepetition obligations on account of the Loyalty Programs is essential for the Debtors to maintain their relationship with existing customers and implement a successful restructuring.

89.     I am informed that as of the Petition Date, and based on historical trends, the Debtors estimate that approximately $200,000 in Customer Program Obligations with respect to the Loyalty Programs has accrued and remains outstanding.  These obligations are non-cash in nature.  The Debtors seek the authority to honor these obligations in their discretion and continue the Loyalty Programs in the ordinary course of business.

90.     Furthermore, while the Debtors do not anticipate owing any prepetition

obligations to the issuers of the Private Label Cards, the Debtors request, out of an abundance of caution, the authority (but not the obligation) to honor any prepetition obligations owed to the issuers of the Private Label Cards.

### iv.    Prepaid Orders

91.    I am informed that before the Petition Date, the Debtors received payment in the form of checks, credit card transactions, cash and other forms of compensation orders and services that remain outstanding as of the Petition Date (the "***Prepaid Orders***").  The Debtors' customers fully expect to receive goods that are subject to Prepaid Orders, notwithstanding the commencement of these chapter 11 cases.  I believe that any failure by the Debtors to fulfill the Prepaid Orders, including payment of any necessary transaction fees or third-party vendors who may direct-ship to the customer, will result in a loss of customer goodwill and a likely wave of negative public opinion.  I am informed that as of the Petition Date, approximately $6.7 million in Customer Program Obligations with respect to the Prepaid Orders has accrued and remains outstanding.  These obligations are generally non-cash in nature.  The Debtors seek the authority to honor these obligations in their discretion and in the ordinary course of business.

### v.    Discounts and Promotions

92.    As I believe is common practice in the industry and expected by the Debtors' consumers, the Debtors routinely offer the following discounts and promotions:  (a) discounts and coupons through mailings, internet promotions, email offers and other formats; (b) gift programs such as "buy one get one free" or "free gift with purchase" offers, "VIP" programs, rewards programs, point cards, free games, sweepstakes, general discounts and complimentary or discounted Gift Cards; and (c) shipping offers, such as free or discounted shipping (collectively, and as discussed herein, the "***Discounts and Promotions***").  I believe that each of the Discounts and Promotions are critical to the Debtors' sales efforts and that the Debtors would lose a

competitive edge if they are unable to honor prepetition commitments on a postpetition basis and continue the Discounts and Promotions.

93.    The Discounts and Promotions vary among the Debtors' different businesses in terms of the type and extent of the Debtors' potential prepetition obligations, but generally fall into the three categories described below.

### a.    Pricing Programs

94.    I am informed that as of the Petition Date, certain of the Debtors have outstanding offers, coupons or promotional programs in place with respect to the purchase of certain of the Debtors' goods (collectively, the "***Pricing Programs***").  The Pricing Programs generally include outstanding coupons and discount offers as well as in-store discounts and promotions.

95.    Because the Debtors' obligations under the Pricing Programs generally do not arise until the time at which a customer takes advantage of an individual Pricing Program at the time of purchase, the Debtors do not have outstanding prepetition obligations to their customers on account of the Pricing Programs.  Additionally, I believe that maintaining the Pricing Programs on a postpetition basis is consistent with the Debtors' typical, ordinary course practice. Out of an abundance of caution, and to provide clarity and comfort to all of their customers, the Debtors request authority to continue the Pricing Programs, in their discretion, consistent with past practice after the Petition Date.

### b.    Gift Programs

96.    Certain of the Debtors periodically offer and, as of the Petition Date, have outstanding obligations with respect to gift programs such as "buy one get one free" or "free gift with purchase" offers, "VIP" programs, rewards programs, sweepstakes, free games, point cards and complimentary or discounted Gift Cards (collectively, the "***Gift Programs***").  I am informed that on average, based on historical trends, the Debtors spend approximately $3 million per

month on Gift Programs.  The Gift Programs vary widely across the Debtors' brands and create various types of obligations, some of which I understand remain outstanding as of the Petition Date.  Most importantly, certain of the Gift Programs require that the Debtors deliver a gift owed when a customer meets certain specified requirements such that certain gifts remain undelivered (or, in very limited instances, where the Debtors purchase a gift from a third party, are yet to be purchased and delivered) as of the Petition Date.  I believe that it is likely that customers will cancel existing orders related to the Gift Programs if the Debtors are unable to honor the Gift Programs.  The vast majority of gifts are delivered at the time of the purchase, and therefore, do not remain outstanding as of the Petition Date.  I am informed that the Debtors estimate that no more than $250,000 remains outstanding as of the Petition Date with respect to the Gift Programs, the majority of which is non-cash in nature.

c.      Shipping Programs

97.     The Discounts and Promotions also cover the Debtors' various shipping offers, such as free or discounted shipping (collectively, the "***Shipping Programs***").  The Shipping Programs vary by brand, promotion and season, but I am informed that on average, the Debtors discount approximately $5 million in monthly customer shipping and handling fees pursuant to the Shipping Programs.  The Debtors effectively discount their products pursuant to the Shipping Programs to remain competitive in the industry while maintaining a higher product price point.  I believe the inability to honor or continue the Shipping Programs would force the Debtors to lower their product prices across the board to maintain their competitive position.  On average, the Debtors process and fulfill orders in two to four days before sending merchandise to third-party shippers for delivery.  Because the prepetition obligations related to the Shipping Programs are due to third-party shippers at the time of shipping, I am informed that as of the Petition Date approximately $500,000 remains outstanding to third-party shippers on account of prepetition

promises to customers to provide free or discounted shipping with respect to purchased goods, which the Debtors' customers expect will be honored. The Debtors expect to continue the Shipping Programs on a postpetition basis in the ordinary course of business.

        **vi.**     **Third-Party Services**

98.      The Debtors also sell services, discounts and rewards (the "***Third-Party Services***") to their customers through certain third-party providers (collectively, the "***Service Providers***"). The Debtors' relationships with the Service Providers are governed by prepetition contracts and, in most instances, the Debtors collect balances from their customers with respect to various goods and services that the Debtors then forward periodically to the Service Provides. The Debtors' customers expect to receive the goods and services promised pursuant to the Third-Party Services. I believe that any failure by the Debtors or the Service Providers to fulfill the Third-Party Services - as will occur if the Debtors are unable to forward customer payments to the Service Providers - will result in a significant loss of goodwill. Importantly, the Debtors serve as a conduit or pass-through for the amounts owed to the Service Providers. I am informed that as of the Petition Date, the Debtors estimate that they have collected approximately $500,000 from customers on account of the Third-Party Services that are owed to the Service Providers. The Debtors request the authority, but not the obligation, to honor these obligations in their discretion and continue offering the Third-Party Services in the ordinary course of business.

**E.**     **Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to Pay Certain Taxes and Fees**

        **i.**     **The Debtors' Tax Obligations**

99.      I understand that in the ordinary course of business, the Debtors (a) collect sales Taxes from their customers in the operation of their businesses, (b) incur Fees necessary to operate their businesses, including license Fees, annual reporting Fees and other similar

assessments and (c) remit such Taxes and Fees to various taxing, licensing and other governmental authorities throughout the United States (collectively, the "*Authorities*"). I understand from discussions with counsel that the Debtors pay the Taxes and Fees monthly, quarterly, semi-annually or annually to the respective Authorities, as required by applicable laws and regulations.

100.     I believe any delinquency or failure to make timely payments that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. The Authorities could initiate audits of the Debtors or prevent the Debtors from operating their businesses, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process. The Debtors may also incur substantial, irreversible tax penalties from governmental authorities. I am also informed that certain directors and officers might be subject to personal liability which would undoubtedly distract these key employees from their duties related to the Debtors' restructuring.

### ii.     Sales and Use Taxes

101.     The vast majority of the Debtors' products are sold directly to consumers through catalog orders and, as a result, the sales Taxes collected by the Debtors vary from state to state. The Debtors generally remit these sales Taxes monthly to the Authorities (around the 15th-20th of each month). I am informed that the majority of the Debtors' sales and use Taxes accrue on a regular schedule.

102.     I am informed that the Debtors incur the bulk of their sales and use Taxes in California, Florida, Georgia, New Jersey, Pennsylvania, Texas and Virginia. Although the Debtors believe they are current with respect to sales and use Taxes, I understand that the Debtors estimate that approximately $750,000 of sales and use Taxes have accrued prepetition

and are due within the first 21 days after the Petition Date.  If the Debtors do not pay the prepetition sales and use Taxes to the applicable Authorities when due, I understand from discussions with counsel that these Authorities will assess immediate, irreversible penalties for failure to make a timely payment, which, pursuant to section 507(a)(8)(G) of the Bankruptcy Code, may be entitled to priority treatment in these chapter 11 cases.

### iii.    Franchise Taxes and Other Similar Taxes

103.    The Debtors also pay franchise and other similar Taxes to certain Authorities to operate their businesses in numerous states.  The Debtors incur the bulk of these Taxes in California, Georgia, Massachusetts and Pennsylvania and Texas.  I am informed that on an annual basis, the Debtors remit approximately $150,000 in franchise and other similar Taxes for their businesses.  The Debtors' franchise and similar Taxes are due at different times during 2010 and 2011.  Although I understand that the Debtors believe they are current with respect to payment of franchise and other similar Taxes and no franchise and other similar Taxes are due and owing within the first 21 days of these chapter 11 cases, the Debtors have included this description out of an abundance of caution.

### iv.    Personal Property and Real Estate Taxes

104.    Authorities impose Taxes on the Debtors relating to property that the Debtors own for the operation of their businesses.  I am informed that as of the Petition Date, the Debtors estimate that all of their personal property and real estate Taxes have been paid.

### v.    Business License and United States Customs Fees

105.    State and local laws require the Debtors to pay Fees to obtain a wide range of business licenses from a number of Authorities.  The method for calculating amounts due for such licenses and the deadlines for paying such amounts varies by jurisdiction.  Further, certain states require the Debtors to (a) pay annual reporting Fees to state governments to remain in

good standing for purposes of conducting business within the state and (b) pay various business Taxes or Fees based on gross receipts or other bases, as determined by the taxing jurisdiction. Additionally, I am informed that the Debtors estimate they pay, on a monthly basis, approximately $1.5 million for United States customs fees. As of the Petition Date, I am informed that the Debtors estimate approximately $750,000 in Fees accrued and remain unpaid for the prepetition period. I am informed by Debtors' counsel that the Debtors' failure to pay the prepetition Fees when due may result in the imposition of penalties by the applicable Authorities and potential revocation of the Debtors' business licenses or permits.

**F.      Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, the Debtors to (A) Continue Prepetition Insurance Coverage and (B) Maintain Financing of Insurance Premiums**

106.     In the ordinary course of business, the Debtors maintain a number of Insurance Policies. The Insurance Policies provide coverage for errors and omissions, crime, kidnap and ransom, fiduciary liability, commercial automobile, marine, property, general liability, commercial umbrella liability, commercial excess liability and foreign liability. I believe that the Insurance Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets. In many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities.

The Debtors generally are current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid. As of the Petition Date, I am informed that the Debtors estimate that a total of approximately $258,600 in prepetition amounts are outstanding under the Insurance Policies. Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition.

### i. Self-Paid Insurance Policies

107.    The Debtors maintain several Insurance Policies for which the Debtors pay the insurer directly, either through an up-front sum or periodic payments (collectively, the "***Self-Paid Insurance Policies***").  The Self-Paid Insurance Policies include policies covering losses with respect to errors and omissions, crime, kidnap and ransom, fiduciary liability and commercial automobile liability.  I am informed that the Debtors have paid in full the annual premiums for all of the Self-Paid Insurance Policies.

### ii. Financed Insurance Policies

108.    Certain of the Debtors' insurance policies require payment of the entire premium at inception.  Because it is not always economically advantageous for the Debtors to pay premiums in full up front, the Debtors have financed the premiums for these policies (collectively, the "***Financed Insurance Policies***") under the Financing Agreements with PAC and PFS.  The Financed Insurance Policies benefit the Debtors by spreading out the cost of the Insurance Policies over the applicable coverage period.  The Financed Insurance Policies include marine, property, general liability, commercial umbrella liability, commercial excess liability, foreign liability and broker's commissions.  I am informed that as of the Petition Date, the Debtors owe a total of approximately $258,600 on account of the Financing Agreements.  I am informed that approximately $152,000 will come due on account of the Financed Insured Policies within the first 21 days of these chapter 11 cases.

### a. PAC Financing Agreement

109.    Under the Financing Agreement with Premium Assignment Corporation ("***PAC***"), the Debtors finance the marine and property policies as well as the commission due to their broker, AON.  The total amount subject to financing is $695,230.  The Debtors made a down payment of $174,183 in June 2010, and the remaining $521,047 was financed over a ten-month

period at $52,845 per month. To date, I am informed that the Debtors have made seven payments and have approximately $158,500 outstanding.

b.       The PFS Financing Agreement

110. Under the Financing Agreement with Premium Financing Specialists, Inc. ("**PFS**"), the Debtors finance the general liability, commercial umbrella liability, commercial excess liability and foreign liability policies. I am informed that the total amount subject to financing is $1,043,042. I am further informed that the Debtors made a down payment of $260,758 in June 2010, and the remaining $782,284 was financed over an eight-month period at $99,128 per month. To date, the Debtors have made seven payments and have approximately $99,000 outstanding as of the Petition Date.

**G.     Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services**

111. In the ordinary course of business, the Debtors obtain gas, water, sewer, electric, telephone and other similar utility services from various Utility Providers. Approximately 100 Utility Providers render these services to the Debtors. On average, the Debtors spend a total of approximately $300,000 every two weeks for utility services.

112. I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. I further believe that any interruption in utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, thereby seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. Thus, it is critical that utility services continue uninterrupted during these chapter 11 cases.

## PROFESSIONAL RETENTION AND COMPENSATION MOTIONS

**A.**     **Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent**

113.     The Debtors believe that they may have more than 30,000 potential creditors.  To alleviate the heavy administrative burden on the clerk of the court, the Debtors seek to retain Kurtzman Carson Consultants LLC ("***KCC***") as notice, claims and balloting agent in these chapter 11 cases.  KKC has substantial experience in matters of this size and complexity and has acted as the official notice, claims and balloting agent in many large bankruptcy cases.

**B.**     **Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date**

114.     The Debtors will seek to retain Kirkland and Ellis LLP ("***K&E***") as their attorneys.  K&E has extensive expertise in the field of debtors' protections and creditors' rights, and business reorganizations under chapter 11 of the Bankruptcy Code.  Moreover, K&E is extremely familiar with the Debtors' businesses and management team, having represented the Debtors in restructuring matters since July 2010.

**C.**     **Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Klehr Harrison Harvey Branzburg LLP as Co-Counsel to the Debtors *Nunc Pro Tunc* to the Petition Date**

115.     The Debtors will seek to retain Klehr Harrison Harvey Branzburg LLP ("***Klehr Harrison***") as the Debtors' co-counsel in these chapter 11 cases.   Klehr Harrison has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

**D.**     **Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Alvarez & Marsal North America, LLC as Restructuring Advisor to the Debtors** *Nunc Pro Tunc* **to the Petition Date**

116.     The Debtors will seek to retain Alvarez & Marsal North America, LLC ("***A&M***") as the Debtors' Restructuring Advisor in these chapter 11 cases.    A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high quality, specialized management and restructuring advisory services to debtors and distressed companies.    Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management and creditor and risk management advisory services.

**E.**     **Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Moelis & Company LLC as Financial Advisor and Capital Markets Advisor to the Debtors** *Nunc Pro Tunc* **to the Petition Date**

117.     The Debtors will seek to retain Moelis & Company LLC ("***Moelis***") as the Debtors' financial and capital markets advisor.    Moelis provides a broad range of corporate advice to its clients, including, with respect to:    (a) general corporate finance; (b) mergers, acquisitions and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising.    Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

**F.**     **Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

118.     After the commencement of these chapter 11 cases, the Debtors intend to file the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business*.    In the ordinary course of their businesses, the Debtors utilize various professionals and service providers in a variety of matters

unrelated to these chapter 11 cases. The Debtors will seek authority to retain and compensate certain of these professionals and service providers without the need for such professionals and service providers to file a formal application for retention and compensation.

G.   **Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals**

119.    After the commencement of these chapter 11 cases, the Debtors intend to file the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals*. It is my understanding that establishing procedures for payment of professionals retained in these chapter 11 cases (collectively, the "***Professionals***") will streamline the administration of these chapter 11 cases by facilitating efficient review of the Professionals' fees and expenses.

# Exhibit C

## Debtors' Organizational Structure


Non-Debtor Entities



## Exhibit D

## 13-Week DIP Budget

**Appleseed's Intermediate Holdings LLC,** *et al*
**Weekly Cash Flow Forecast**

| (in $000s) | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | Fiscal Month: | Jan 11 | Feb11 | Feb11 | Feb11 | Feb11 | Mar11 | Mar11 | Mar11 | Mar11 | Mar11 | Apr11 | Apr11 | Apr11 |
| | Fiscal Week: | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 |
| | Week Ended: | 1/21 | 1/28 | 2/4 | 2/11 | 2/18 | 2/25 | 3/4 | 3/11 | 3/18 | 3/25 | 4/1 | 4/8 | 4/15 |
| **Total Cash Receipts** | $ | 16,734.1 $ | 15,034.6 $ | 9,265.9 $ | 13,051.1 $ | 19,161.8 $ | 18,215.3 $ | 14,932.3 $ | 17,788.9 $ | 20,219.1 $ | 30,883.5 $ | 20,469.6 $ | 16,820.2 $ | 19,678.1 |
| LY Cash Receipts | | 17,567.4 | 19,967.6 | 15,654.2 | 20,801.6 | 17,547.7 | 21,645.5 | 17,009.6 | 28,807.2 | 23,332.7 | 30,019.3 | 23,221.2 | 19,691.3 | 26,082.0 |
| *% Change - TY vs. LY* | | *-4.7%* | *-24.7%* | *-40.8%* | *-37.3%* | *9.2%* | *-15.8%* | *-12.2%* | *-38.2%* | *-13.3%* | *2.9%* | *-11.8%* | *-14.6%* | *-24.6%* |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Postage | | 1,445.9 | 2,161.8 | 2,750.2 | 2,267.1 | 1,769.6 | 1,776.8 | 2,761.6 | 3,324.3 | 2,583.2 | 1,833.8 | 2,901.2 | 2,940.5 | 1,739.7 |
| Payroll and Payroll Taxes | | - | 4,223.8 | 1,285.6 | 4,163.8 | 1,252.0 | 4,080.1 | 1,324.0 | 4,144.9 | 1,319.5 | 4,142.9 | 1,327.3 | 4,948.6 | 2,365.0 |
| Customs / Duty | | 304.0 | 118.6 | 708.9 | 118.6 | 276.5 | 1,152.8 | 91.6 | 117.3 | 117.3 | 1,335.2 | 118.9 | 128.5 | 138.0 |
| Tax Payments | | 506.0 | - | 5.0 | - | 490.5 | 20.0 | 6.0 | - | 35.0 | 771.1 | - | 5.0 | - |
| Health Insurance | | 741.0 | 341.0 | 341.0 | 341.0 | 741.0 | 341.0 | 341.0 | 341.0 | 341.0 | 741.0 | 341.0 | 341.0 | 341.0 |
| Rent / Utilities | | 325.4 | 971.6 | 1,820.6 | 96.6 | 96.6 | 1,347.6 | 193.1 | 119.1 | 119.1 | 645.1 | 871.9 | 97.9 | 97.9 |
| Freight / Logistics / Transportation | | 4,965.3 | 1,084.7 | 1,173.1 | 974.9 | 1,530.8 | 998.4 | 1,115.1 | 1,302.7 | 1,312.2 | 1,690.6 | 1,114.7 | 1,310.7 | 1,430.9 |
| Advertising | | 1,879.3 | 1,526.5 | 1,632.4 | 1,184.3 | 1,459.4 | 1,443.4 | 1,768.5 | 1,034.0 | 1,348.1 | 1,423.3 | 2,642.3 | 2,465.7 | 2,070.4 |
| Merchandise | | 2,953.1 | 5,060.1 | 9,324.1 | 8,242.2 | 7,421.1 | 5,397.3 | 7,279.6 | 3,600.0 | 4,654.8 | 3,310.4 | 5,165.6 | 5,297.2 | 4,170.3 |
| Other | | 2,059.6 | 1,840.1 | 4,482.7 | 4,494.8 | 4,626.4 | 2,931.5 | 4,853.1 | 2,400.0 | 3,103.2 | 2,392.9 | 4,777.1 | 4,198.1 | 2,780.2 |
| **Total Operating Disbursements** | | 15,179.7 | 17,328.3 | 23,523.7 | 21,883.3 | 19,664.9 | 19,489.0 | 19,733.6 | 16,383.3 | 14,933.3 | 18,286.4 | 19,260.1 | 21,733.3 | 15,133.3 |
| **Restructuring Disbursements:** | | | | | | | | | | | | | | |
| DIP Interest / Fees | | 1,200.0 | 169.3 | - | - | - | 544.6 | - | - | - | - | 724.9 | - | - |
| Professional Fees | | 2,140.0 | - | - | 780.0 | 1,325.0 | - | 200.0 | 1,520.0 | - | 1,806.3 | - | - | 1,050.0 |
| **Total Restructuring Disbursements** | | 3,340.0 | 169.3 | - | 780.0 | 1,325.0 | 544.6 | 200.0 | 1,520.0 | - | 1,806.3 | 724.9 | - | 1,050.0 |
| **Total Disbursements** | | 18,519.7 | 17,497.6 | 23,523.7 | 22,663.3 | 20,989.9 | 20,033.6 | 19,933.6 | 17,903.3 | 14,933.3 | 20,092.6 | 19,985.0 | 21,733.3 | 16,183.3 |
| **Total Net Cash Flow  (Book Basis)** | $ | (1,785.6) $ | (2,463.0) $ | (14,257.8) $ | (9,612.2) $ | (1,828.1) $ | (1,818.3) $ | (5,001.3) $ | (114.4) $ | 5,285.8 $ | 10,790.9 $ | 484.6 $ | (4,913.1) $ | 3,494.8 |

**Note:**
[1] All estate professional fees referred to in the budget shall be subject the Bankruptcy Court's retention approval and fee application process, and as to which all lenders reserve their rights to object.

