## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| APPLESEED'S INTERMEDIATE | ) | Case No. 11-10160 (KG) |
| HOLDINGS LLC, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM; (B) MAINTAIN EXISTING BUSINESS FORMS; (C) GRANT ADMINISTRATIVE PRIORITY FOR INTERCOMPANY CLAIMS AND PERFORM UNDER CERTAIN INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES; AND (D) ASSUME AND ASSIGN CERTAIN ACCOUNT CONTROL AGREEMENTS PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE

Appleseed's Intermediate Holdings LLC d/b/a Orchard Brands and its debtor affiliates, as

debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"***Debtors***"),[2] respectfully represent:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688). The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

[2]  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of T. Neale Attenborough, Chief Executive Officer of Appleseed's Intermediate Holdings LLC, in Support of First Day Pleadings (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), on January 19, 2011 (the "***Petition Date***").

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 363, 364, 365, 503, 507, 1107(a) and 1108 of the Bankruptcy Code, Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") and Rules 2015-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

### Relief Requested

4.      As described in the First Day Declaration, the Debtors utilize a cash management system that provides well-established mechanisms for the collection, concentration, management and disbursement of funds used in their operations (the "*Cash Management System*").  The Debtors use the Cash Management System to collect, transfer and disburse funds generated from their operations, facilitate cash monitoring, forecasting and reporting, and enable the Debtors to maintain control over the bank accounts (collectively, the "*Bank Accounts*") located at the banks (the "*Banks*") identified on the list annexed as **Exhibit 1** to **Exhibit A** attached hereto.[3]

5.      By this motion, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to (a) continue to operate the Cash Management System, (b) maintain existing business forms, (c) grant administrative priority for

---

[3]    For purposes of confidentiality, the Debtors have only provided the last four digits of the Bank Accounts described in this motion.  The Debtors will share a list of the complete account numbers associated with each Bank Account with the United States Trustee for the District of Delaware (the "*U.S. Trustee*"), counsel to the Debtors' prepetition and postpetition secured lenders, and any statutory committee of creditors appointed in these chapter 11 cases.

2

intercompany claims and continue to perform under intercompany arrangements and historical practices and (d) assume and assign certain account control agreements pursuant to section 365 of the Bankruptcy Code to the extent such agreements are executory.

6.      The Debtors further request that the Court authorize the Banks to (a) continue to maintain, service and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

7.      Absent being afforded the relief requested herein, the Debtors would be unable to effectively maintain their financial operations, which would cause significant harm to the Debtors, their estates, creditors and all parties in interest.

**Basis for Relief**

**A.      Description of the Debtors' Cash Management System**

**i.      Overview**

8.      The Cash Management System consists of approximately 82 Bank Accounts with the following financial institutions:

- PNC Bank, N.A. ("***PNC Bank***");

- Bank of America, N.A. ("***Bank of America***");

- Citizens Bank;

- TD Bank, N.A. ("***TD Bank***");

3

- Sovereign Bank;

- JP Morgan Chase, N.A. ("*Chase Bank*");

- Wachovia Corporation ("*Wachovia Bank*");

- Wells Fargo Bank, N.A. ("*Wells Fargo Bank*");

- Associated Bank, N.A. ("*Associated Bank*");

- USAmeriBank; and

- The People's Bank.[4]

9.     The Debtors' financial personnel manage the Cash Management System from the

Debtors' principal executive office located in Beverly, Massachusetts.

10.     The Debtors have designed the Cash Management System to meet their operating

needs; enable management to control and monitor corporate funds by creating status reports on

the location and amount of funds, ensure cash availability and liquidity, comply with the

requirements of their financing agreements, reduce administrative expenses by facilitating the

movement of funds and enhance the development of accurate account balances.

11.     These controls are crucial given the significant volume of cash transactions

managed through the Cash Management System on a daily basis.    Additionally, with the

assistance of their advisors, the Debtors have implemented internal control procedures that

prohibit payments on account of prepetition debts without the prior approval of the Debtors'

---

[4]    As of the Petition Date, Citizen's Bank, Wachovia Corporation, Associated Bank, N.A., USAmeriBank and The People's Bank are not designated as authorized depositories (the "*Authorized Depositories*") pursuant to the U.S. Trustee Chapter 11 Guidelines for the District of Delaware ("*U.S. Trustee Guidelines*").  In accordance with the practice in this jurisdiction, the Debtors will make a good faith effort after the Petition Date to cause those Banks that are not Authorized Depositories to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee.  To the extent the Debtors need to open a new bank account after the Petition Date, they will only do so either at an Authorized Depository or after consulting with the U.S. Trustee.

finance department.  The chart annexed as **Exhibit 2** to **Exhibit A** attached hereto summarizes the structure of the Cash Management System and each of the Bank Accounts.

12.    Before implementing the Cash Management System, the Debtors historically maintained a system in which funds were collected through various depository accounts (the "*Collection Accounts*"), transferred to several main operating accounts (the "*Main Operating Accounts*") and then disbursed through separate accounts to pay various operating expenses (the "*Disbursement Accounts*").    Under this arrangement, all credit and debit transactions were facilitated through the Main Operating Accounts.

13.    As detailed in the First Day Declaration, in 2007, the Debtors entered into an asset-based credit facility (the "*ABL Facility*") with UBS AG, Stamford Branch ("*UBS*") as the administrative agent and certain lenders.[5]  Shortly after entering into the ABL Facility, the Debtors entered into account control agreements (each, a "*Control Agreement*" and collectively, the "*Control Agreements*") with UBS with respect to certain Bank Accounts.  Pursuant to the Control Agreements, the Debtors maintained the Cash Management System unless and until UBS, at its discretion, delivered an activation notice (the "*Activation Notice*"), thereby activating the terms of the Control Agreements.

14.    In September 2010, due to the Debtors' constrained liquidity situation, UBS delivered an Activation Notice to the Debtors.  Pursuant to the Control Agreements, all credit transactions are either facilitated through collection accounts that are subject to the terms of a Control Agreement (collectively, the "*Controlled Collection Accounts*") or directly deposited into Controlled Collection Accounts.  Additionally, all Collection Accounts are swept on a daily-

---

[5]    Additional information with respect to the ABL Facility and the Debtors' prepetition capital structure is provided in the First Day Declaration.

5

basis, or as necessary in the case of low-balance Collection Accounts, through manual bank transfers to Controlled Collection Accounts. Before the Petition Date, any amounts in the Controlled Collection Accounts were wired at the beginning of every business day to UBS to pay down the outstanding balance on the ABL Facility. Pursuant to the terms of the ABL Facility, the Debtors then requested the funds necessary to satisfy all subsequent debit transactions. Most debit transactions were made through a wire transfer or by check to disbursement accounts (collectively, the "*Master Disbursement Accounts*"). These funds were then disbursed through separate Disbursement Accounts. Certain limited debit transactions, such as letters of credit and payments to UBS, were made directly from the ABL Facility to pay various expenses, including the establishment of letters of credit, interest-related charges and bank fees. The chart annexed as **Exhibit 2** to **Exhibit A** attached hereto provides an overview of the Controlled Collection Accounts and the Master Disbursement Accounts.

ii.     **Relationship Between the Cash Management System and the Debtors' Proposed Postpetition Financing and Restructuring**

15.     Contemporaneously herewith, the Debtors have filed a motion (the "*DIP Motion*") seeking authority to enter into a $140 million postpetition financing agreement consisting of (a) $100 million in a senior secured first-out revolving credit tranche, a portion of which will be used upon approval to pay in full amounts outstanding under the ABL Faciltiy as of the Petition Date (the "*DIP Facility Tranche A*") and (b) $35 million in a senior secured term loan tranche, with a delayed draw amount of $5 available under certain circumstances (the "*DIP Facility Tranche B*") and, together with the DIP Facility Tranche A, the "*DIP Facility*").

16.     As contemplated in the DIP Motion, the Cash Management System will remain largely the same while the DIP Facility is in place, with the DIP Facility Tranche A taking the place of the ABL Facility on a postpetition basis. In particular, the Debtors will continue to

6

transfer any amounts in the Controlled Collection Accounts on a daily basis to pay down the outstanding balance on the DIP Facility Tranche A.   To achieve this end, the Debtors seek authority to assume and assign the Control Agreements entered into with UBS as administrative agent for the ABL Credit Line to UBS as administrative agent under the DIP Facility Tranche A.

### iii.   The Debtors' Existing Bank Accounts

17.   Below is a description of the four main types of the Debtors' existing Bank Accounts.  A list of the Debtors' Bank Accounts is annexed as **Exhibit 1** to **Exhibit A** attached hereto.

a.   Collection Accounts.   The Collection Accounts fund various Controlled Collection Accounts.  Funds in the Collection Accounts are generated from retail, mail order and employee sales.  The Collection Accounts are swept daily through manual bank transfers, or as necessary in the case of low-balance Collection Accounts, to the Controlled Collection Accounts.  The Collection Accounts generally maintain a zero-balance.[6]

b.   Controlled Collection Accounts.   The Controlled Collection Accounts collect funds generated by the Collection Accounts.  The Controlled Collection Accounts are subject to the Control Agreements.  Prepetition funds in these accounts were wired to UBS to pay down the ABL Facility at the beginning of every business day; pursuant to the proposed DIP Facility Tranche A, funds in these accounts will be used to pay down the DIP Facility Tranche A on a daily basis postpetition.  The Controlled Collection Accounts generally maintain a zero-balance.

c.   Master Disbursement Accounts.   Before the Petition Date, the Master Disbursement Accounts were funded from the ABL Facility; after the Petition Date, the Master Disbursement Accounts will be funded by the DIP Facility Tranche A.   The Master Disbursement Accounts generally maintain a zero-balance.

---

[6]   Two Collection Accounts (USAmeriBank, account nos. 6385 and 6393) are held in the name of Thompson Group, a non-Debtor entity from which the Debtors acquired the business Linen Source in March 2010.  Linen Source Acquisition LLC, a Debtor, will begin operations in 2011.  Until that time, the Collection Accounts associated with the Thompson Group will fund PNC Bank, account numbers 8845 and 8888.

      d.     <u>Disbursement Accounts</u>.  The Disbursement Accounts are funded by the Master Disbursement Accounts and pay for general operating expenses, such as merchandise, refunds and employee payroll.  These accounts generally maintain a zero-balance.[7]

**iv.**     **The Stand-Alone Accounts**

18.    In addition to the Bank Accounts described above, certain Debtors maintain stand-alone accounts as described below.  Certain of the stand-alone accounts contain nominal balances and may be closed after the Petition Date.

      a.     <u>TD Bank Accounts</u>.  Debtor Johnny Appleseed's, Inc. maintains two Collection Accounts with TD Bank (account nos. 6669 and 6955), both of which are used to collect receipts from retail outlet stores.  Together these accounts fund a separate TD Bank Account (account no. 6822).  The funds in account number 6822 are used to make payroll disbursements, when necessary, through a separate zero-balance Disbursement Account with TD Bank (account no. 6947).

      b.     <u>Wachovia Bank Accounts</u>.  Debtor Arizona Mail Order Company, Inc. maintains an inactive Bank Account with Wachovia Bank (account no. 3198), which generally holds less than $10,000 at any given point in time.  Additionally, Arizona Mail Order Company, Inc. funds an operating Bank Account with Wachovia Bank (account no. 2533) with funds from a Controlled Collection Account with PNC Bank (account no. 6764), which is funded solely for the purpose of paying outstanding refund checks.[8]  The disbursements for presented refund checks are then made through a separate zero-balance Disbursement Account with Wachovia Bank (account no. 0574).

---

[7]    In addition to the two Collection Accounts, two Disbursement Accounts (USAmeriBank, account nos. 6427 and 6351) are also held in the name of Thompson Group in connection with the Debtors' March 2010 acquisition of Linen Source.  The Debtors have activated two Disbursement Accounts with PNC Bank (account nos. 8853 and 8861) in the name of Linen Source Acquisition LLC, but these accounts are not yet receiving funds.  Through a Master Disbursement Account at PNC Bank (account no. 4399), the Debtors will continue to fund the Disbursement Accounts associated with the Thompson Group until Linen Source Acquisition LLC begins operation in 2011.

[8]    Account nos. 3198 and 2533 with Wachovia Bank are also subject to Control Agreements.

c.    <u>Wells Fargo Bank Account</u>.  Debtor Draper's & Damon's LLC maintains a Bank Account with Wells Fargo Bank (account no. 2158), which it does not utilize.

d.    <u>PNC Bank Accounts</u>.  Debtor Blair Holdings, Inc. maintains a stand-alone Bank Account with PNC Bank (account no. 2093), which generally holds less than $10,000.  Additionally, Blair Holdings, Inc. maintains a money market account with PNC Bank (account no. 1502), which generally holds less than $20,000. Debtor Norm Thompson Outfitters, Inc. maintains a Collection Account with PNC Bank (account no. 7649), which, in addition to funding account number 1652 (a Controlled Collection Account) directly funds account number 7614 for the purposes of honoring refund checks.  Additionally, Debtor Blair International Holdings, Inc. holds a stand-alone international account with PNC Bank (account no. 9759), which generally holds less than $10,000.

e.    <u>The People's Bank Account</u>.  Debtor Haband Operations, LLC holds a certificate of deposit (the "*CD*") with The People's Bank (account no. 1969).  The CD is insured for the full amount by the Federal Deposit Insurance Corporation and serves as collateral for paychecks payable to employees of the Debtor's distribution centers.   The CD is worth approximately $82,000 and is automatically renewed each year.

**B.    The Debtors' Ordinary Course ACH Payments, Bank Fees and Preparation for the Chapter 11 Filing**

19.    In the ordinary course of business, the Debtors conduct transactions by debit, wire or automatic clearing house ("*ACH*") and other similar methods.  In addition, a large percentage of the Debtors' customer credit card payments are received through ACH or wire transfer.  In fact, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties.

20.    Thus, the Debtors respectfully request that the Court authorize and direct the Banks to continue to maintain service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Debtors request the Banks be authorized and directed to receive, process, honor

9

and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft or other notification that the Debtors advised the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

21.    Furthermore, in the ordinary course, the Banks (as well as certain credit card processors) charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses (collectively, the *"Bank Fees"*). The Debtors respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on or subsequent to the Petition Date. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective Bank at which the Bank Account is located.

## C.    The Debtors' Intercompany Transactions

22.    In the ordinary course of business, certain of the Debtor entities and business divisions maintain business relationships with each other, resulting in intercompany receivables and payables (collectively, the *"Intercompany Claims"*). These business relationships result in certain Debtors funding shared service costs, including employee benefits and payroll, shipping expenses, inventory and supply costs, customer refunds, insurance premiums and professional fees. These costs and revenues are then allocated among the legal entities and business divisions (within the legal entities) resulting in Intercompany Claims. Indeed, as funds are disbursed throughout the Cash Management System (for example, as funds are disbursed from the DIP Facility on a postpetition basis), there may be, at any given time, Intercompany Claims owed by

10

one Debtor to another (the "***Intercompany Transactions***") in connection with the disbursement of funds.[9]

23.     The Debtors do not transfer funds from one Debtor entity to another; rather, before the Petition Date, all Intercompany Claims were netted against each other and then offset against the ABL Facility.  Postpetition, all Intercompany Claims between Debtors will be netted against each other and then offset against the DIP Facility Tranche A.  The Debtors maintain records of all Intercompany Transactions and, therefore, are able to ascertain, trace and account for the Intercompany Transactions.  At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted.

24.     To ensure each individual Debtor will not permanently fund the operations of any affiliated entity, the Debtors respectfully request that, pursuant to sections 364(b), 503(b)(1) and 507(a)(2) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor, arising after the Petition Date as a result of ordinary course Intercompany Transactions, be accorded administrative expense priority.  If Intercompany Claims are accorded administrative expense priority, each entity utilizing funds flowing through the Cash Management System should continue to bear the ultimate repayment responsibility for such ordinary course transactions.

---

[9]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such Intercompany Transactions on a postpetition basis.  The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

**D.      The Debtors' Existing Business Forms and Checks**

25.      In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates, the Debtors believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

26.      Nonetheless, as soon as practicable after the Petition Date, the Debtors will include "debtor in possession" on the checks they print electronically.  Further, upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors in possession.

### Supporting Authority

**A.      The Court Should Approve the Postpetition Use of the Debtors' Cash Management System**

**i.      The Continued Use of the Debtors' Cash Management System is Essential to the Debtors' Operations and Restructuring Efforts**

27.      Absent the relief sought in this motion, the Debtors would be unable to continue to operate their Cash Management System after the Petition Date.  For example, the U.S Trustee Guidelines require, among other things, that a debtor:  (a) establish one debtor in possession account for all estate funds required solely for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor in possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account.

28.      As discussed above, however, the Debtors' business and financial affairs are

12

complex, requiring the Debtors to collect, disburse and move funds through numerous Bank Accounts. Given the Debtors' corporate and financial structure, the Debtors believe that it would be difficult and unduly burdensome to establish an entirely new cash management system for each Debtor entity. To comply with the U.S. Trustee Guidelines, the Debtors would also need to execute new signatory cards and depository agreements, and create a new system for manually issuing checks and paying postpetition obligations.[10] The delays that would result from opening these accounts, revising cash management procedures and instructing customers to redirect payments would significantly disrupt the Debtors' business at this critical time.

29. In addition, requiring the Debtors to maintain separate accounts would decentralize their Cash Management System. Courts in this and other districts have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

---

[10] Notwithstanding anything herein to the contrary, the Debtors reserve the right to close their prepetition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment. The Debtors will give prompt notice of such actions, however, to the U.S. Trustee and any statutory committee appointed in these chapter 11 cases.

13

ii.     **Maintaining the Existing Cash Management System Will Not Harm Parties in Interest**

30.     The Debtors' continued use of their Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

31.     Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

iii.     **The Court Should Authorize the Debtors to Continue Using Debit, Wire and Automatic Clearing House Payments**

32.     The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH and other similar methods. In addition, a certain percentage of the Debtors' customer receipts are received through wire transfer payments. In fact, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties. If the Debtors' ability to conduct

14

transactions by debit, wire, ACH or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted and their estates will incur additional costs.

iv.     **The Court Should Authorize the Banks to Continue to Maintain, Service and Administer the Debtors' Bank Accounts in the Ordinary Course of Business**

33.     The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business. The Debtors strongly believe that replacing the Bank Accounts with new accounts pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

34.     Thus, the Debtors respectfully request that the Court authorize and direct the Banks to continue to maintain service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption. In this regard, the Banks should be authorized and directed to receive, process, honor and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; *provided*, *however*, that any check, advise, draft or other notification that the Debtors advised the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

35.     The Debtors further request that the Court authorize and direct the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires or ACH should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires or ACH are dated before or subsequent to the Petition Date. The Debtors also request that, to the extent a Bank honors a prepetition check or other item

15

drawn on any account that is the subject of the motion either (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored or (c) as a result of an innocent mistake made despite the above-described protective measures, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

36.    Moreover, the Debtors request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective Bank at which the Bank Account is located.

37.    In similar large chapter 11 cases, courts in this district have regularly waived the U.S. Trustee Guidelines on the grounds that they are potentially detrimental to a debtor's postpetition business operations and restructuring effort. *See, e.g.*, *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC Holdings Corp.*, Case No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*, Case No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharmaceuticals, Inc.*, Case No. 10-

16

11485 (Bankr. D. Del. May 4, 2010); *In re Atrium Corp.*, Case No. 10-10150 (Bankr. D. Del.

Jan. 21, 2010); *In re Int'l Aluminum Corp.*, Case No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).[11]

38.    Lastly, section 345(a) of the Bankruptcy Code authorizes deposit or investment of

the money of the estate, such as cash, as "will yield the maximum reasonable net return on such

money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). The

CD in the amount of approximately $82,000 held by the Debtors serves as collateral for

paychecks cashed by employees of the Debtor's distribution centers, is insured for the full

amount by the Federal Deposit Insurance Corporation and, accordingly, is a relatively protected

investment and is not otherwise subject to the requirements of section 345(b) of the Bankruptcy

Code.

**B.    The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms**

39.    The Debtors submit that parties in interest will not be prejudiced if the Debtors

are authorized to continue to use their business forms substantially in the forms existing

immediately before the Petition Date. Parties doing business with the Debtors undoubtedly will

be aware of their status as debtors in possession and, thus, changing business forms is

unnecessary and unduly burdensome.

40.    In other large chapter 11 cases, courts in this district have allowed debtors to use

their prepetition business forms without the "debtor in possession" label. *See, e.g.*, *In re Local

Insight Media Holdings, Inc.*, Case No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC

Holdings Corp.*, Case No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*,

---

[11]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

Case No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharmaceuticals, Inc.,*

Case No. 10-11485 (Bankr. D. Del. May 4, 2010); *In re Atrium Corp.,* Case No. 10-10150

(Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.,* Case No. 10-10003 (Bankr. D. Del.

Jan. 6, 2010).[12]

41.    The Debtors represent that if the relief requested herein is granted, they will

implement appropriate mechanisms to ensure that no payments will be made on account of debts

incurred before the Petition Date (other than those authorized by the Court).  To prevent the

inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the

Banks to ensure that appropriate procedures are in place to prevent checks that were issued

prepetition from being honored without the Court's approval.

**C.    Granting Administrative Expense Priority Status to Postpetition Intercompany Claims is Necessary to Preserve Accurate Allocation of Costs Among the Debtors**

42.    The Debtors can ascertain, trace and account for all Intercompany Transactions

previously described.    Moreover, the Debtors will continue to maintain records of such

Intercompany Transactions postpetition.  To ensure that each individual Debtor will not fund, at

the expense of its creditors, the operations of another entity, the Debtors respectfully request that,

pursuant to sections 364(b), 503(b) and 507(a)(2) of the Bankruptcy Code, all Intercompany

Claims against the Debtor by another Debtor arising after the Petition Date, as a result of

ordinary course Intercompany Transactions through the Cash Management System, be accorded

administrative expense priority status.  If Intercompany Claims are accorded administrative

priority expense status, each entity utilizing funds flowing through the Cash Management

---

[12]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request to the Debtors' counsel.

System will continue to bear ultimate repayments responsibility for such ordinary course transactions.

43.    In addition, as described above, the Debtors enter into certain Intercompany Transactions in the ordinary course of business, including centrally-billed expenses, intercompany sales and other intercompany transactions (*e.g.*, the payment for inventory, supplies, shipping costs and receivable collections on behalf of their Debtor and non-Debtor affiliates).  Discontinuing the Intercompany Transactions could impact the Debtors' ability to fund payroll accounts, pay benefits to their employees and make timely payments to vendors. Accordingly, the Debtors believe that continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and creditors, and seek the authority to enter into such Intercompany Transactions in the ordinary course of business.

44.    At any given time, there may be balances due and owing between and among the Debtors and non-Debtor affiliates.  The Debtors maintain records of, and are able to ascertain, trace and account for, the Intercompany Transactions.  Moreover, the Debtors will continue to maintain such records, including records of all current intercompany accounts receivables and payables, in the postpetition period.

45.    Courts in this jurisdiction have approved relief similar to the relief requested in this motion.  *See*, *e.g.*, *In re Local Insight Media Holdings, Inc.*, Case No. 10-13677 (Bankr. D. Del. Nov. 19, 2010); *In re OTC Holdings Corp.*, Case No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); *In re NEC Holdings Corp.*, Case No. 10-11890 (Bankr. D. Del. July 13, 2010); *In re MiddleBrook Pharmaceuticals, Inc.*, Case No. 10-11485 (Bankr. D. Del. May 4, 2010); *In re*

19

*Atrium Corp.*, Case No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); *In re Int'l Aluminum Corp.*,

Case No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).[13]

### D.    The Court Should Authorize the Debtors to Assume and Assign the Control Agreements to the Extent Such Agreements are Executory

46.    Additionally, the Debtors seek to assume the Control Agreements entered into

with UBS as the administrative agent under the ABL Facility and assign such agreements to

UBS as administrative agent under the DIP Facility Tranche A to the extent such agreements are

executory.

47.    To the extent that an agreement is executory, section 365(a) of the Bankruptcy

Code authorizes debtors to assume or reject any executory contract subject to the court's

approval. 11 U.S.C. § 365(a). The decision to assume or reject an executory contract is a matter

within the "business judgment" of the debtor. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S.

513, 523 (1984); *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3rd

Cir. 1989); *In re III Enter., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted),

*aff'd*, 169 B.R. 551 (E.D. Pa. 1994); *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126

(Bankr. D. Del. 2003); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003).

48.    Upon a finding that the debtor has exercised its sound business judgment in

determining to assume or reject an executory contract, its creditors and all parties in interest, the

court should approve such assumption or rejection under section 365(a) of the Bankruptcy Code.

*See Federal Mogul Global*, 293 B.R. at 126 (Bankr. D. Del. 2003) ("The business judgment test

dictates that a court should approve a debtor's decision to reject a contract unless that decision is

---

[13]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

PHIL1 1356841-1

the product of bad faith or gross abuse of discretion."); *see also In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006) ("To the extent that sound business reasons justify the debtor's rejection of a particular lease or contract, rejection should be approved."); *HQ Global Holdings*, 290 B.R. at 511 (Bankr. D. Del. 2003) ("A debtor's determination to reject an executory contract can only be overturned if the decision was the product of bad faith, whim or caprice."). Thus, if the debtor's business judgment has been exercised reasonably, a court should approve the assumption of an executory contract.

49.     Here, the Debtors have a vital business purpose to continue the Control Agreements with UBS under the DIP Facility Tranche A. The continued implementation of the Control Agreements will allow the Debtors to operate their Cash Management System and conduct their business in the ordinary course without undue disruption, thereby allowing for a smooth transition into and throughout these chapter 11 cases.

50.     Additionally, assuming and assigning the Control Agreements will benefit the Debtors because maintaining the Control Agreements will preserve the value of the Debtors' estates by avoiding the administrative costs associated with implementing a new Cash Management System that meets the requirements of the lenders under the DIP Facility Tranche A. Furthermore, there will not be any cure costs or adequate assurance associated with the assumption and assignment of the Control Agreements.

51.     In light of the foregoing, the Debtors' assumption of the Control Agreements, to the extent the Control Agreements are executory, is an exercise of the Debtors' sound business judgment and should be approved.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

52.     As described above, the Debtors are seeking authority pursuant to the order to continue to operate the Cash Management System and assume and assign the Control

Agreements to the extent they are executory during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, this Court may authorize the relief requested herein within the 21-day period after the Petition Date because such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. Proc. 6003 (b) and (c). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

53.     Because of the complexity of the Debtors' operations, any disruption to the Cash Management System would seriously harm the Debtors and their estates. Without the Cash Management System, the Debtors would be unable to track incoming receipts and make on-time payments, thereby precluding the Debtors from determining their current liquidity. This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors failed to remit payment, could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest. As a result, immediate and irreparable harm would result without the relief requested herein being granted on an interim basis. Accordingly, the Debtors respectively submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b) and (c) and seek authority to continue to operate the Cash Management System and assume and assign the Control Agreements to the extent they are executory pursuant to the order.

### Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

54.     To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

22

## Notice

55.     The Debtors have provided notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents for the Debtors' proposed debtor in possession lenders; (d) counsel to the agent for the Debtors' prepetition asset-based revolving lending facility; (e) counsel to the agent for the Debtors' prepetition first lien term loan; (f) counsel to the agent for the Debtors' prepetition second lien notes and unsecured notes; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Delaware State Attorney General; (j) the Office of the United States Attorney General for the State of Delaware; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; and (m) the Banks identified on the chart annexed as **Exhibit 1** to **Exhibit A** attached hereto.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

56.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

23

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to (i) continue to operate the Cash Management System, (ii) maintain existing business forms, (iii) grant administrative priority for Intercompany Claims and perform under certain intercompany arrangements and historical practices and (iv) assume and assign certain account Control Agreements pursuant to section 365 of the Bankruptcy Code to the extent they are executory and (b) granting such other and further relief as may be appropriate.

Dated:   January 19, 2011
         Wilmington, Delaware

/s/ Domenic E. Pacitti
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

- and -

Richard M. Cieri (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022–4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

24