**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| APPLESEED'S INTERMEDIATE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-10160 (KG) |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: February 11, 2011 at 3 :00 p.m. (ET)** |
| | ) | **Objection Date: February 4, 2011 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO AN EXIT FINANCING COMMITMENT LETTER AND RELATED FEE LETTER, (B) INCUR AND PAY CERTAIN FEES AND COSTS IN CONNECTION THEREWITH AND (C) FILE THE FEE LETTER UNDER SEAL**

Appleseed's Intermediate Holdings LLC d/b/a Orchard Brands and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"),[2] respectfully represent:

## Jurisdiction

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688). The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of T. Neale Attenborough, Chief Executive Officer of Appleseed's Intermediate Holdings LLC, in Support of First Day Pleadings [Docket No. 3] (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), on January 19, 2011 (the "***Petition Date***").

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 107(b), 363(b) and 503(b) of the Bankruptcy Code, Rules 6004 and 9018 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## Introduction

4. After several months of intense negotiations with their secured lenders, the Debtors commenced these chapter 11 cases with near unanimous support for a going concern restructuring.[3] Recognizing the risks and costs associated with an extended chapter 11 case, the Consenting Lenders' support for the Debtors' restructuring is contingent on moving quickly through the reorganization process. In fact, the Debtors' debtor in possession financing agreement (the "***DIP Credit Agreement***")[4] requires consummation of a standalone restructuring or going concern sale of substantially all of the Debtors' assets no later than May 21, 2011.[5]

---

[3] On the Petition Date, the Debtors entered into the Restructuring Support Agreement, a copy of which is attached to the First Day Declaration as **Exhibit A** (the "***Support Agreement***"). Pursuant to the Support Agreement, lenders holding more than 80% of the Debtors' first lien secured obligations and the sole holder of outstanding obligations under the second lien purchase agreement (collectively, the "***Consenting Lenders***") have agreed to support the Debtors' restructuring.

[4] *See Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P.4001(B) and (C) and (B)* [Docket No. 34] (the "***Interim DIP Order***"). A copy of the DIP Credit Agreement is attached to the Interim DIP Order as **Exhibit 1**.

[5] Specifically, the Debtors are required to adhere to certain Plan and Sale-related milestones (each capitalized term as defined below) (collectively, the "***Restructuring Milestones***"). The Restructuring Milestones are set forth in **Exhibit C** to the Support Agreement and in the DIP Credit Agreement. Additionally, consistent with these Restructuring Milestones set forth in the Support Agreement, Section 8.01(o)(xii) of the DIP Credit

5. To ensure their restructuring is effectuated in accordance with the heavily negotiated and agreed-upon terms with the Consenting Lenders, the Debtors filed the *Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket. No. 17] (the "***Plan***")[6] and related disclosure statement [Docket No. 18] (the "***Disclosure Statement***") on the Petition Date. Consistent with the terms of the Support Agreement, a hearing on the Disclosure Statement is scheduled for March 1, 2011 [Docket No. 58]. The Debtors intend to move through the Plan process swiftly to satisfy the Restructuring Milestones.

6. If the Plan process is in any way delayed, however, the Debtors and the Consenting Lenders have agreed that — as a "back-stop" to the Plan — the Debtors will seek Court authority to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "***Sale***").[7] As reflected in the Support Agreement, the Sale would likely include a credit bid from the Consenting Lenders under section 363(k) of the Bankruptcy Code pursuant to the terms set forth on **Exhibit B** to the Support Agreement.

7. Whether the restructuring of the Debtors' businesses is consummated through a plan of reorganization or a sale of substantially all of the Debtors' assets, the Debtors and the Consenting Lenders believed it was important to secure exit financing that could be utilized to

---

Agreement provides that it is an event of default if the Debtors fail to achieve, comply with or proceed in accordance with, any of the Restructuring Milestones set forth in Schedule 8.01(o) to the DIP Credit Agreement by the dates specified therein.

6 All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

7 Contemporaneously herewith, the Debtors filed the *Debtors' Motion for Entry of (I) an Order Approving (A) Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) the Form and Manner of a Form Asset Purchase Agreement, the Auction Notice, the Publication Notice and the Contract Notice and (C) Procedures for Determining Cure Amounts and Assumption of Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free And Clear of All Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith And (C) Granting Related Relief.*

facilitate the swift emergence and timeline contemplated under the DIP Credit Agreement and Support Agreement. The Debtors were successful: moments before the commencement of these chapter 11 cases, the Debtors and the Exit Lenders (defined below) entered into the Exit Financing Documents (defined below) thereby securing — subject to the Court's approval — a commitment to provide $80 million in exit financing. The exit financing will be used to satisfy the claims of the lenders of "Tranche A" of the DIP Credit Agreement and provide go-forward working capital upon consummation of the Plan or approval of the Sale.

8. Securing exit financing at such an early stage of these chapter 11 cases has had an extremely positive impact on the Debtors' stabilization efforts. And, approval of the exit financing commitment will provide employees, vendors and suppliers with even greater confidence in the Debtors' restructuring process and will further ensure that the Debtors' goal of emerging from chapter 11 on an expedited basis can be accomplished.

**Relief Requested**

9. By this motion (the "***Motion***"), the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to:

(a) enter into the commitment letter attached hereto as **Exhibit B** (the "***Commitment Letter***")[8] and the related fee letter (the "***Fee Letter***,"[9] and together with the Commitment Letter, the "***Exit Financing Documents***") with respect to exit financing to be provided by UBS Loan Finance LLC (collectively with UBS Securities LLC, "***UBS***"), Wells Fargo Bank, National Association ("***Wells Fargo***") and Ally Commercial Finance LLC ("***Ally***" and together with UBS and Wells Fargo, the "***Exit Lenders***");

(b) incur and pay fees, costs and indemnities in connection with the Exit Financing Documents; and

---

8 A copy of the Commitment Letter is attached hereto as **Exhibit B**.

9 Due to the confidential nature of the Fee Letter, the Debtors are seeking to file the Fee Letter under seal, as discussed and requested herein.

(c) file the Fee Letter under seal.

## Basis for Relief

### A. The Exit Financing

10. As part of the negotiations with the Debtors' prepetition asset-backed revolving credit facility lenders concerning potential debtor in possession financing, the Debtors and their first and second lien lenders also believed it was prudent to explore the possibility of securing exit financing to facilitate the ultimate disposition of these chapter 11 cases. In fact, and to ensure that a comprehensive restructuring could be accomplished on an expedited basis, the Debtors and their secured lenders believed a complete solution — which included committed exit financing — was critical to not only appropriately convey the Debtors' restructuring goals, but actually be able to deliver on the promises of a pre-negotiated restructuring.

11. Thus, following extensive arm's length negotiations involving not only the proposed Exit Lenders but also the Consenting Lenders, who together will hold more than 80% of the new common stock in the Debtors' reorganized businesses under the Plan, the Debtors reached agreement and entered into the Exit Financing Documents. While the Debtors and Moelis & Company LLC, the Debtors' proposed financial advisor and investment banker, intend to canvass the financing market during the course of these chapter 11 cases to determine if alternative exit financing can be procured on more favorable terms, the Debtors, with the support of the Consenting Lenders, believe it is appropriate to enter into the Exit Financing Documents now to ensure that committed financing is available to consummate the Debtors' restructuring.

12. The Exit Facility itself will be the subject of negotiation and separate approval by the Court. At this time, the Debtors solely seek authorization to enter into the Commitment Letter and related Fee Letter and incur and pay related fees, costs and indemnity obligations referenced herein in order to secure the commitment to provide exit financing to facilitate the

Plan or the Sale. Thus, the Debtors are not seeking authority to enter into the Exit Facility at this time or incur borrowing obligations before consummation of the Plan or the Sale.

## B. The Exit Financing Documents

13. On January 19, 2011, the Debtors and the Exit Lenders entered into the Commitment Letter and related Fee Letter. Pursuant to the Commitment Letter, the Exit Lenders have committed to provide the Debtors with an asset-based revolving credit facility in an aggregate principal amount of $80 million (the "***Exit Facility***"). Importantly, pursuant to the terms of the Commitment Letter and subject to the conditions set forth therein, the Exit Facility will be available to either (a) the Debtors in connection with confirmation and consummation of the Plan or (b) an entity (if any) owned and organized by the Consenting Lenders in connection with a potential credit bid under section 363(k) of the Bankruptcy Code if the Sale is effectuated.

14. What follows is a summary of the key terms of the Commitment Letter and proposed Exit Facility.[10]

| Overview of Exit Facility | |
|---|---|
| **Provision** | **Summary of Provision** |
| **Borrower:** | Reorganized Appleseed's Intermediate Holdings LLC and certain of its direct and indirect subsidiaries or an entity (if any) owned and organized by the Consenting Lenders that will own substantially all of the assets of Appleseed's Intermediate Holdings LLC and certain of its direct and indirect subsidiaries. |
| **Sole Arranger, Sole Syndication Agent and Sole Bookmanager:** | UBS Securities LLC. |
| **Administrative Agent:** | UBS AG, Stamford Branch. |
| **Collateral Agent:** | UBS AG, Stamford Branch and Wells Fargo Bank, National Association. |
| **Lenders:** | UBS Loan Finance LLC ($30 million commitment), Wells Fargo Bank, National |

10 This summary of the Commitment Letter is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Commitment Letter, the terms of the Commitment Letter shall govern. Capitalized terms used in this summary and not otherwise defined shall have the meanings set forth for such terms in the Commitment Letter.

| | |
|---|---|
| | Association ($30 million commitment) and Ally Commercial Finance LLC ($20 million commitment). |
| **Guarantors** | All of the existing and future direct and indirect subsidiaries of Appleseed's Intermediate Holdings LLC other than the Borrowers, with the exception of certain foreign subsidiaries. |
| **Swingline Lender:** | UBS Loan Finance LLC. |
| **Facility:** | $80 million asset-based revolving loan facility, with $20 million available as swing line loans and $30 million available for the issuance of standby letters of credit. |
| **Maturity:** | Three years from the Closing Date. |
| **Security:** | Perfected first priority security interest in any and all of the following Collateral: (a) all equity interests of the Borrowers and each of Appleseed's Intermediate Holdings LLC's direct and indirect subsidiaries, and (b) all tangible and intangible assets of the Borrowers and Guarantors, wherever located, now or hereafter owned, except for certain foreign subsidiaries. |
| **Interest:** | At the Borrower's election, the ABL Facility will bear interest at one of the following rates:<br>• Base Rate Option: interest rate equal to (a) the higher of (i) the Federal Funds Rate published by the Federal Reserve Bank of New York from time to time plus 0.5% and (ii) the rate that UBS AG, Stamford Branch announces from time to time as its prime commercial lending rate, but in any event, not less than 3.5% plus (b) the applicable interest margin, initially set at 2.5%.<br>• LIBOR Option: interest rate equal to (a) the London Interbank Offering Rate for the applicable period, but in any event, not less than 1.5% plus (b) the applicable interest margin, initially set at 3.5%. |
| **Default Interest:** | Upon the occurrence and during the continuance of a default, default interest shall be applied at 2% above the rate otherwise applicable. |
| **Commitment Fee:** | Fee will accrue on unused amounts of the commitment under the ABL Facility ranging from 0.5% to 0.625%, depending on the total unused commitment. |
| **Letters of Credit Fees:** | Fees equal to the Interest Margin for LIBOR Loans then in effect for the ABL Facility on the undrawn amount of all outstanding letters of credit. In addition, a fronting fee equal to 0.125% will be payable to the Issuing Bank, as well as certain customary fees of the Issuing Bank. |
| **Events of Default:** | Usual and customary events of default, including failure to pay principal, interest or unused commitment and letter of credit fees or any other amount when due, after any applicable grace period. |
| **Covenants** | Customary affirmative and negative covenants. No financial covenants if unused borrowing availability under the ABL Facility is greater than or equal to $10 million. |

## C. Fees, Costs and Indemnity Obligations.

15. Entry into the Exit Financing Documents obligates the Debtors to incur and pay certain fees, costs and indemnity obligations. More specifically, the Debtors seek authority to incur and pay the following obligations as and when they come due (the "***Pre-Emergence Exit Facility Obligations***"):[11]

(a) Arrangement Fee: The Debtors are required to pay an arrangement fee in connection with entry into the Exit Facility Documents. This fee is earned upon execution of the Exit Financing Documents and payable in cash to UBS upon termination of, or closing under, the Exit Facility.

(b) Initial Upfront Fee: The Debtors are required to pay an initial upfront fee in connection with entry into the Exit Facility Documents. This fee is earned upon execution of the Exit Financing Documents and payable to the Exit Lenders upon termination of, or closing under, the Exit Facility.

(c) Reimbursement of Costs and Expenses: The Debtors are required to pay or reimburse UBS and Wells Fargo from time to time upon demand for all reasonable and documented out-of-pocket costs and expenses (including reasonable legal fees and expenses of each of UBS and Wells Fargo, appraisal, consulting and audit fees and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the execution of the ABL Facility and the preparation, review, negotiation, execution and delivery of the Commitment Letter, the ABL Term Sheet, the Conditions Annex, the Fee Letter and the ABL Facility Documentation, whether or not the Closing Date occurs or any ABL Facility Documentation is executed and delivered.

(d) Indemnification: The Debtors are required to indemnify, reimburse and hold harmless the Commitment Parties and their respective affiliates from and against any and all losses, claims, costs, expenses, damages or liabilities that arise out of or in connection with providing the Exit Facility.

16. In addition to the obligations noted above, the Debtors have agreed to pay certain fees upon closing of the Exit Facility, including certain arrangement, administrative agent,

---

11 This summary of the Pre-Emergence Exit Facility Obligations is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Exit Financing Documents, the terms of the Exit Financing Documents shall govern. Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the Exit Financing Documents. Moreover, and as discussed herein, due to the confidential nature of the Fee Letter, the Debtors seek to file the Fee Letter under seal.

collateral agent and upfront fees with respect to the Exit Facility as set forth in the Fee Letter (collectively, the "***Exit Facility Fees***"). While certain of the Exit Facility Fees, including the arrangement and initial upfront fees (as described above) are earned upon execution of the Commitment Letter, these fees are not payable until "the earliest to occur of (i) the Closing Date [of the Exit Facility]; (ii) the closing of any alternative exit credit facility in connection with the Chapter 11 Cases; or (iii) the termination of the Commitment Letter for any reason." Fee Letter, at 1-2. Absent termination of the Commitment Letter, the Exit Facility Fees will be paid by the Debtors in connection with consummation of the Plan or closing of the Sale.

**D. Confidentiality of the Fee Letter**

17. The terms of the Fee Letter contain sensitive commercial information, the public disclosure of which would negatively affect the Exit Lenders. Furthermore, the confidentiality provisions of the Commitment Letter require that the Debtors maintain the confidentiality of the Fee Letter and "use commercially reasonable efforts to obtain from the Bankruptcy Court an order for authority to file the Fee Letter under seal."[12] Thus, the Debtors have not attached the Fee Letter to the motion and instead seek authority to file the Fee Letter under seal.

18. To provide the Court and key parties in interest with full disclosure with respect to the Exit Financing Documents and the related fees, the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to file an unredacted version of the Fee Letter under seal pursuant to section 107(b) of the Bankruptcy Code; (b) directing that the Fee Letter remain under seal and confidential and not be made available to anyone, without the written

---

12 *See* Commitment Letter, at 5 ("[T]he Fee Letter is delivered to you upon the condition that its contents shall not be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such may be disclosed to your directors, officers, employees, legal counsel and accountants, the United States Trustee for the District of Delaware and counsel to the [Creditors'] Committee, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby.").

consent of the Debtors and the Exit Lenders, other than to (i) the Court, (ii) counsel to the statutory committee of unsecured creditors (the "***Creditors' Committee***") (once the Creditors' Committee is constituted) and (iii) the United States Trustee for the District of Delaware (collectively, the "***Limited Notice Parties***"); and (c) finding that service of this motion and the exhibits hereto, without transmittal of the Fee Letter to parties entitled to receive notice in these chapter 11 cases (other than the Limited Notice Parties), constitutes sufficient notice under the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

## Supporting Authority

### A. Entering into the Exit Financing Documents and Incurring and Paying Fees, Costs and Indemnities Thereunder Is a Sound Exercise of the Debtors' Business Judgment.

19. The Debtors' determination to enter into the Exit Financing Documents, including incurring and paying the fees, costs and indemnities contemplated thereunder represents a sound exercise of the Debtors' business judgment and should be approved.

20. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b)(1) of the Bankruptcy Code, a court generally should approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (same).

21. Once the debtor has articulated a valid business purpose for use of estate property,

a presumption arises that the debtor's decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity.") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

22. Here, there is ample justification for the Debtors' entry into, and performance under, the Exit Financing Documents.

23. *First*, the Debtors, with the assistance of their professionals, have performed an in-depth review of their post-emergence capital needs and have determined that a sizable exit facility is necessary for the Debtors to restructure through the Plan or the Sale. Indeed, over the course of several months of negotiations, the Debtors have determined and agreed upon a revised capital structure that will require a post-restructuring asset-backed revolving credit facility of at least $80 million.

24. *Second*, given the volatility of the credit markets, securing such exit financing on reasonable terms is prudent and necessary to effectuate the Debtors' reorganization. Indeed, and as reflected in the Support Agreement, the Debtors and the Consenting Lenders believed a complete solution — which included committed exit financing — was critical to convey that the Debtors are able to deliver on the promises of a pre-negotiated restructuring.

25. *Third*, the Exit Financing Documents were the subject of extensive arm's length

negotiations involving the Debtors, the Exit Lenders and the Consenting Lenders, who together will hold more than 80% of the new common stock in the Debtors' reorganized businesses under the Plan.

26. Moreover, the Debtors believe the Exit Facility Fees and the Pre-Emergence Exit Facility Obligations are reasonable and customary. Nonetheless, the Debtors still intend to canvass the financing market during the course of these chapter 11 cases to determine if alternative exit financing can be procured on more favorable terms.

27. Absent authorization to satisfy their obligations under the Exit Financing Documents, the Debtors' prospects with respect to consummation of the Plan or the Sale are uncertain. Thus, the Debtors respectfully submit that it is in the best interest of their estates, their creditors and other parties in interest to enter into the Exit Financing Documents and ensure committed financing is available to consummate either the Plan or the Sale.

**B. The Pre-Emergence Exit Facility Obligations Should Constitute Allowed Administrative Expenses Pursuant to Section 503(b) of the Bankruptcy Code.**

28. As noted above, the Exit Financing Documents obligate the Debtors to incur and pay the Pre-Emergence Exit Facility Obligations, consisting of: (a) arrangement and initial upfront fees, (b) reimbursement of UBS and Wells Fargo for reasonable, documented out-of-pocket costs in connection with finalizing the Exit Facility and (c) certain customary indemnities. These Pre-Emergence Exit Facility Obligations constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

29. Absent authorization to treat the Pre-Emergence Exit Facility Obligations as administrative obligations, the Exit Lenders have advised the Debtors that they would not be willing to commit to providing the Exit Facility. This could jeopardize the Debtors' ability to consummate the Plan or the Sale on an expedited basis, thereby impairing the value of the

Debtors' businesses to the detriment of all stakeholders. The Pre-Emergence Exit Facility Obligations, therefore, should be awarded administrative expense status under section 503(b)(1) of the Bankruptcy Code.

**C. Ample Authority Exists to Allow the Debtors to File the Fee Letter Under Seal.**

30. Section 107(b) of the Bankruptcy Code provides bankruptcy courts with authority to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may: (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b). Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018. Additionally, Local Rule 9018-1(b) provides, in relevant part, that "[a]ny party who seeks to file documents under seal must file a motion to that effect with the Clerk." Del. Bankr. L.R. 9018 1(b).

31. Confidential commercial information is information that, if disclosed, would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.*), 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information, however, need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. *Orion Pictures*, 21

F.3d at 28 (holding that a license agreement authorizing a licensee to "reproduce, manufacture, distribute, and sell videocassettes of three films" contained confidential commercial information and that protection of such information under section 107(b) was justified); *In re Barney's, Inc.*, 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential commercial "information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with suppliers").

32. Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." *See, e.g.*, *Orion Pictures*, 21 F.3d at 28; *Phar Mor, Inc. v. Defendants Named Under Seal (In re Phar Mor, Inc.)*, 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, once the bankruptcy court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." *Orion Pictures*, 21 F.3d at 27.

33. Under the plain language of section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," the Debtors seek authorization to file the Fee Letter under seal. The Fee Letter contains detailed proprietary information with respect to calculation of the Exit Facility Fees and other commercial terms that are considered by the Exit Lenders and other similarly-situated banks to be highly sensitive, confidential information not typically disclosed to the public or made available to competing financial institutions. Given the highly competitive nature of the investment banking and finance lending industries, it is of the utmost

importance to the Exit Lenders that the details of the Fee Letter remain confidential, so that their competitors may not use the information contained in the Fee Letter to gain a strategic advantage in the marketplace.

34. Thus, as required under the Commitment Letter, the Debtors respectfully request that the Court allow the Debtors to file the Fee Letter under seal and limit its disclosure to the Court and the Limited Notice Parties. The Limited Notice Parties have the greatest interest in the Fee Letter, so limiting notice and disclosure to these entities will subject the Fee Letter to sufficient scrutiny while, at the same time, minimizing the impact of disclosure on the Exit Lenders.

35. Courts in this jurisdiction have approved relief similar to the Debtors' request to enter into the Exit Financing Documents, incur and pay certain fees, costs and indemnities related thereto and file the Fee Letter under seal. *See, e.g., In re Visteon Corp.,* Case No. 09-11786 (Bankr. D. Del. Aug. 31, 2010) (authorizing debtors to enter into exit financing commitment letter and related fee letters, incur and pay certain fees and costs in connection therewith and file fee letter under seal); *In re Smurfit-Stone Container Corp.*, Case No. 09-10235 (Bankr. D. Del. Feb. 16, 2010) (same); *In re W.R. Grace & Co.*, Case No. 01-1139 (Bankr. D. Del. Feb. 16, 2010) (same); *In re Muzak Holdings LLC*, Case No. 09-10422 (Bankr. D. Del. Dec. 21, 2009) (same).[13]

36. For all of the foregoing reasons, the Debtors submit that the relief requested in this motion is critical to ensuring the success of the Debtors' restructuring and is in the best interest of the Debtors' estates, creditors and all parties in interest.

---

13 Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

37. To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

**Notice**

38. The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents for the Debtors' debtor in possession lenders; (d) counsel to the agent for the Debtors' prepetition asset-based revolving lending facility; (e) counsel to the agent for the Debtors' prepetition first lien term loan; (f) counsel to the agent for the Debtors' prepetition second lien notes and unsecured notes; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Delaware State Attorney General; (j) the Office of the United States Attorney General for the State of Delaware; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission and (m) counsel to the Exit Lenders. In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

39. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**: (a) authorizing the Debtors to (i) enter into the Exit Financing Documents, (ii) incur and pay fees, costs and indemnities in connection therewith and (iii) file the Fee Letter under seal; and (b) granting such other and further relief as is just and proper.

Dated: January 24, 2011
Wilmington, Delaware

*/s/ Domenic E. Pacitti*


Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

- and -

Richard M. Cieri (*pro hac vice* admission pending)
Joshua A. Sussberg (*pro hac vice* admission pending)
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022–4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*