# <u>Exhibit B</u>

## Commitment Letter

UBS LOAN FINANCE LLC
677 Washington Boulevard
Stamford, Connecticut 06901

WELLS FARGO BANK, NATIONAL ASSOCIATION
One Boston Place
Boston, Massachusetts 02108

UBS SECURITIES LLC
299 Park Avenue
New York, New York 10171

ALLY COMMERCIAL FINANCE LLC
1290 Avenue of the Americas
New York, New York 10104

January 19, 2011

Appleseed's Intermediate Holdings LLC
138 Conant Street
Beverly, MA 01915

Attention: Chief Executive Officer

Exit ABL Facility Commitment Letter

Ladies and Gentlemen:

You have advised UBS Loan Finance LLC ("UBS"), Wells Fargo Bank, National Association ("Wells Fargo") and Ally Commercial Finance LLC ("Ally" and, together with UBS and Wells Fargo, the "Commitment Parties") that Appleseed's Intermediate Holdings LLC ("you" and either as reorganized pursuant to the Plan (as defined in Annex II hereto) or, if the Sale Option (as defined below) is used to effectuate the Exit, the entity that will own substantially all of the assets of Borrowers, "Holdings") and certain of your direct and indirect subsidiaries (as reorganized pursuant to the Plan or, if the Sale Option (as defined below) is used to effectuate the Exit, the entities that shall be the buyers of the assets of Holdings and such subsidiaries, collectively, "Borrowers") are seeking to obtain financing in connection with the exit (the "Exit") of you and your subsidiaries from your respective chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases") to be filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). You have also advised that the Exit shall be effectuated either through (a) confirmation of the Plan subject to the satisfaction of the applicable conditions set forth in Annex II hereto (the "Plan Option") or (b) a sale of all or substantially all of your and your subsidiaries' assets to a newly formed entity that would be owned by the same entities as would be the equity owners under the Plan Option subject to the satisfaction of the applicable conditions set forth in Annex II hereto (the "Sale Option"). In connection with the Chapter 11 Cases, the Commitment Parties shall provide financing to you and your subsidiaries under a debtor-in-possession credit facility (the "DIP Facility") pursuant to which the Commitment Parties shall be the lenders under Tranche A of the DIP Facility. All references to "dollars" or "$" in this agreement and the attachments hereto (collectively, this "Commitment Letter") are references to United States dollars.

In connection with the foregoing, and subject to the confirmation and effectiveness of the Plan or, if the Sale Option is used to effectuate the Exit, the closing of the applicable asset sales, the Borrowers are seeking to obtain exit financing (funding under which will be made available to the Borrowers upon the effective date of the Plan or, if the Sale Option is used to effectuate the Exit, the closing date of the applicable asset sales) comprised of the following:

- a senior secured asset-based revolving credit facility to Borrowers in the amount of $80 million (the "ABL Facility"), as described in the Summary of Principal Terms and Conditions attached hereto as Annex I (the "ABL Term Sheet");

- a senior secured term loan facility to Borrowers in the amount of up to $40 million (the "Senior Term Loan Facility");

- a first lien term loan facility to Borrowers in the amount of $200 million (the "First Lien Term Loan Facility");

- a junior term loan facility to Borrowers in the amount of $43 million (the "Junior Term Loan Facility"); and

- the issuance of common equity by Holdings (the "Equity Issuance").

No other financing will be required for the uses described above. Immediately following the Transactions, neither Holdings, Borrowers nor any of their subsidiaries will have any indebtedness or preferred equity other than the ABL Facility, the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility. As used herein, the term "Transactions" means the Exit, the repayment in full and termination of the DIP Facility (the "Refinancing"), the initial borrowings under the ABL Facility, the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility, the Equity Issuance, and the payments of fees, commissions and expenses in connection with each of the foregoing.

Commitments.

UBS is pleased to advise you of its several commitment to provide $30 million of the ABL Facility, Wells Fargo is pleased to advise you of its several commitment to provide $30 million of the ABL Facility, and Ally is pleased to advise you of its several commitment to provide $20 million of the ABL Facility, in each case, upon the terms and subject to the conditions set forth or referred to in this Commitment Letter. The commitment of each Commitment Party hereunder is subject to the negotiation, execution and delivery of definitive documentation (the "ABL Facility Documentation") with respect to the ABL Facility reasonably satisfactory to the Commitment Parties reflecting, among other things, the terms and conditions set forth in the ABL Term Sheet, in Annex II hereto (the "Conditions Annex") and in the letter of even date herewith addressed to you providing, among other things, for certain fees relating to the ABL Facility (the "Fee Letter"). The commitment of each Commitment Party hereunder is several, and not joint, and no Commitment Party shall be responsible for the commitment of any other Commitment Party. You agree that the closing date of the Transactions (the "Closing Date") shall be a date mutually agreed upon between you and the Commitment Parties, but in any event shall not occur until the terms and conditions hereof and in the ABL Term Sheet and the Conditions Annex (including the conditions to initial funding) have been satisfied.

Syndication.

It is agreed that UBS Securities LLC ("UBSS") will act as the sole and exclusive advisor, arranger and bookmanager for the ABL Facility, and, in consultation with you, will exclusively manage the syndication of the ABL Facility, and will, in such capacities, exclusively perform the duties and exercise the authority customarily associated with such roles. It is further agreed that no additional advisors, agents, co-agents, arrangers or bookmanagers will be appointed and no Lender (as defined below) will receive compensation with respect to the ABL Facility outside the terms contained herein and

in the Fee Letter in order to obtain its commitment to participate in the ABL Facility, in each case unless you and we so agree.

UBSS reserves the right, prior to or after execution of the ABL Facility Documentation, in consultation with you, to syndicate all or a portion of the commitments under the ABL Facility to one or more institutions that will become parties to the ABL Facility Documentation (the Commitment Parties and the institutions becoming parties to the ABL Facility Documentation with respect to all or a portion of the ABL Facility, the "Lenders"); provided, that any syndication by UBSS shall be allocated pro rata to the commitments of each of the Commitment Parties. Notwithstanding UBSS' right to syndicate the ABL Facility and receive commitments with respect thereto, the Commitment Parties will not be relieved of all or any portion of their respective commitments hereunder prior to the initial funding under the ABL Facility. Without limiting your obligations to assist with syndication efforts as set forth herein, the Commitment Parties agree that completion of such syndications is not a condition to their respective commitments hereunder.

UBSS will exclusively manage all aspects of the syndication of the ABL Facility, including selection of additional Lenders, determination of when UBSS will approach potential additional Lenders, awarding of any naming rights and the final allocations of the commitments in respect of the ABL Facility among the additional Lenders. You agree to, and to cause Borrowers to, actively assist UBSS in achieving a timely syndication of the ABL Facility that is reasonably satisfactory to UBSS and the Lenders participating in the ABL Facility. To assist UBSS in its syndication efforts, you agree that you will, and will cause Borrowers and your and their representatives and advisors to, at reasonable times following entry of the Interim Order, (a) promptly following request therefor prepare and provide all reasonable financial and other reasonable information as UBSS may reasonably request with respect to you, Borrowers, and the Transactions, including but not limited to financial projections (the "Projections") relating to the foregoing, (b) provide copies of any due diligence reports or memoranda prepared at the direction of Holdings or any of its affiliates by legal, accounting, tax or other advisors in connection with the Transactions (subject to the delivery of customary non-disclosure agreements reasonably acceptable to UBSS) other than such reports or memoranda which are subject to confidentiality restrictions, (c) make reasonably available to prospective Lenders senior management and advisors of Holdings, the Borrowers and their respective subsidiaries, (d) host, with UBSS, one or more meetings either in New York City or telephonically with prospective Lenders under the ABL Facility, and (e) assist UBSS in the preparation of one or more confidential information memoranda reasonably satisfactory to UBSS and other marketing materials to be used in connection with the syndication of the ABL Facility.

Information.

You hereby represent and covenant that (a) to the best of your knowledge, all information (other than financial projections (the "Projections")) that has been or will be made available to the Commitment Parties by you, Borrowers or any of your or their respective representatives in connection with the transactions contemplated hereby (the "Information"), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in the light of the circumstances under which such statements are made, not misleading and (b) the Projections that have been or will be made available to the Commitment Parties by you, Borrowers, or any of your or the Borrowers' respective representatives in connection with the transactions contemplated hereby have been and will be prepared in good faith based upon assumptions believed by you to be reasonable (it being understood that projections by their nature are inherently uncertain and no assurances are being given that the results reflected in the Projections will be achieved). You agree to supplement the Information and the Projections from time to time and agree to promptly advise the Commitment Parties of all developments materially affecting Holdings, Borrowers, any of their respective subsidiaries or

affiliates or the transactions contemplated hereby or the accuracy of Information and Projections previously furnished to the Commitment Parties.

Compensation.

As consideration for the commitments of the Commitment Parties hereunder with respect to the ABL Facility, you agree to pay, or cause to be paid, the fees set forth in the ABL Term Sheet and in the Fee Letter. Once paid, such fees shall not be refundable under any circumstances.

Conditions.

The commitment of the Commitment Parties hereunder with respect to the ABL Facility may be terminated by the Commitment Parties if (i) any information submitted to the Commitment Parties by or on behalf of Holdings, Borrowers, or any of their respective subsidiaries or affiliates is inaccurate, incomplete or misleading in any respect determined by the Commitment Parties to be material; (ii) any change shall occur since the commencement of the Chapter 11 Cases, or any additional information shall be disclosed to or discovered by the Commitment Parties (including, without limitation, information contained in any review or report required to be provided to them in connection herewith), which the Commitment Parties determine has had or could reasonably be expected to have a Material Adverse Effect (as defined herein); or (iii) any condition set forth in the ABL Term Sheet or the Conditions Annex is not satisfied or any covenant or agreement in this Commitment Letter or the Fee Letter is not complied with. "Material Adverse Effect" means an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or property of Holdings, Borrowers, and their respective subsidiaries, taken as a whole, other than the effect of events leading up to and following the commencement of the Chapter 11 Cases and the effect of filing the Chapter 11 Cases; (b) the ability of Borrowers to perform their respective obligations under the ABL Facility Documentation; and (c) the validity or enforceability of any of the ABL Facility Documentation. In addition, Holdings and/or the Borrowers shall file a motion within 5 days after the commencement of the Chapter 11 Cases for the Bankruptcy Court to approve the Authorization Order (as defined herein).

Indemnity and Expenses.

By your acceptance below, you hereby agree to indemnify and hold harmless the Commitment Parties and their respective affiliates (including, without limitation, controlling persons) and the directors, officers, employees, advisors, attorneys and agents of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, costs, expenses, damages or liabilities (or actions or other proceedings commenced or threatened in respect thereof) that arise out of or in connection with this Commitment Letter, the ABL Term Sheet, the Conditions Annex, the Fee Letter, the ABL Facility or any of the transactions contemplated hereby or thereby or the providing of the ABL Facility (or the actual or proposed use of the proceeds thereof), and to reimburse each Indemnified Person promptly upon its written demand for any legal or other expenses incurred in connection with investigating, preparing to defend or defending against, or participating in, any such loss, claim, cost, expense, damage, liability or action or other proceeding (whether or not such Indemnified Person is a party to any action or proceeding); *provided* that any such obligation to indemnify, hold harmless and reimburse an Indemnified Person shall not be applicable to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Indemnified Person. You shall not be liable for any settlement of any such proceeding effected without your written consent, but if settled with such consent or if there shall be a final judgment against an Indemnified Person, you shall, subject to the proviso in the preceding sentence, indemnify such Indemnified Person from and against any loss or liability by reason of such settlement or judgment. You

shall not, without the prior written consent of any Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement (i) includes an unconditional release of such Indemnified Person from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of such Indemnified Person. No Commitment Party (or any of their respective affiliates) shall be responsible or liable to Holdings, Borrowers, or any of their respective subsidiaries, affiliates or stockholders or any other person or entity for any indirect, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the ABL Term Sheet, the Conditions Annex, the Fee Letter, the ABL Facility or the transactions contemplated hereby or thereby. In addition, you hereby agree to reimburse each of UBS and Wells Fargo from time to time upon demand for all reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable legal fees and expenses of each of UBS and Wells Fargo, appraisal, consulting and audit fees, and printing, reproduction, document delivery, travel, communication and publicity costs) incurred in connection with the execution of the ABL Facility, and the preparation, review, negotiation, execution and delivery of this Commitment Letter, the ABL Term Sheet, the Conditions Annex, the Fee Letter, the ABL Facility Documentation, whether or not the Closing Date occurs or any ABL Facility Documentation is executed and delivered or any extensions of credit are made under the ABL Facility.

Confidentiality.

This Commitment Letter is delivered to you upon the condition that neither the existence of this Commitment Letter, the ABL Term Sheet or the Conditions Annex nor any of their contents shall be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such existence and contents may be disclosed (i) as may be required hereunder or by the Bankruptcy Court in the Chapter 11 Cases or as otherwise may be compelled in a judicial or administrative proceeding or as otherwise required by law, (ii) to your directors, officers, employees, legal counsel and accountants, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby and (iii) counsel to the official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"). In addition, this Commitment Letter, the ABL Term Sheet and the Conditions Annex may be disclosed to the parties to that certain Restructuring Support Agreement, dated as of January 19, 2011 (the "Restructuring Support Agreement") which are providing the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility and their respective directors, officers, employees, advisors and agents, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. Moreover, the Fee Letter is delivered to you upon the condition that its contents shall not be disclosed by you or any of your affiliates, directly or indirectly, to any other person, except that such may be disclosed to your directors, officers, employees, legal counsel and accountants, the United States Trustee for the District of Delaware and counsel to the Committee, in each case on a confidential and "need-to-know" basis and only in connection with the transactions contemplated hereby. In addition, you agree that, prior to any filing of the Fee Letter with the Bankruptcy Court in the Chapter 11 Cases, you shall use commercially reasonable efforts to obtain from the Bankruptcy Court an order for authority to file the Fee Letter under seal.

Other Services.

You acknowledge and agree that each of the Commitment Parties and/or their affiliates may be requested to provide additional services with respect to Holdings, Borrowers, and/or their respective affiliates or other matters contemplated hereby. Any such services will be set out in and governed by a separate agreement(s) (containing terms relating, without limitation, to services, fees and indemnification) in form and substance satisfactory to the parties thereto. Nothing in this Commitment

Letter is intended to obligate or commit any of the Commitment Parties or any of their affiliates to provide any services other than as set out herein.

No Fiduciary Relationship.

You hereby acknowledge that the Commitment Parties and UBSS are acting solely as agents, lenders, bookrunner or arranger, as applicable, in connection with the ABL Facility. You further acknowledge that the Commitment Parties and UBSS are acting pursuant to a contractual relationship created by this Commitment Letter that was entered into on an arm's length basis and in no event do the parties intend that any of us act or be responsible as a fiduciary to you or any of your subsidiaries, your stockholders or creditors or any other person in connection with any activity that we may undertake or have undertaken in furtherance of the ABL Facility, either before or after the date hereof. The Commitment Parties and UBSS hereby expressly disclaim any fiduciary or similar obligations to any such person, either in connection with the ABL Facility or this Commitment Letter or any matters leading up to either, and you hereby confirm your understanding and agreement to that effect. Each of you and we agree that you and we are each responsible for making our own independent judgments with respect to the ABL Facility, and that any opinions or views expressed by us to you regarding such transactions, including but not limited to any opinions or views with respect to the price or market for your or your subsidiaries' debt, do not constitute advice or recommendations to you or any of your subsidiaries. You, on behalf of yourself and your subsidiaries, hereby waive and release, to the fullest extent permitted by law, any claims that you or any of your subsidiaries may have against the Commitment Parties and UBSS with respect to any breach or alleged breach of any fiduciary or similar duty in connection with the transactions contemplated by this Commitment Letter or any matters leading up to the execution of this Commitment Letter or the ABL Facility Documentation.

Governing Law, Etc.

This Commitment Letter and the commitment of the Commitment Parties shall not be assignable by you without the prior written consent of the Commitment Parties, and any purported assignment without such consent shall be void. Each of the Commitment Parties reserves the right to employ the services of its affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to its affiliates certain fees in such manner as such Commitment Party and its affiliates may agree in its sole discretion. You also agree that each of the Commitment Parties may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You further acknowledge that each of the Commitment Parties may share with any of its affiliates, and such affiliates may share with such Commitment Party, any information related to Holdings, Borrowers, or any of their respective subsidiaries or affiliates (including, without limitation, information relating to creditworthiness) and the transactions contemplated hereby. Each of the Commitment Parties agrees to treat, and cause any such affiliate to treat, all non-public information provided by you as confidential information in accordance with customary banking industry practices.

This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Commitment Parties and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. This Commitment Letter is intended to be for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, and may not be relied on by, any persons other than the parties hereto and, (i) with respect to the indemnification provided under

the heading "Indemnity and Expenses," each Indemnified Person and (ii) if the Sale Option is used to effectuate the Exit, the entity that will own substantially all of the assets of Borrowers.

**This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby.** Any right to trial by jury with respect to any claim or action arising out of this Commitment Letter is hereby waived. You hereby submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (and any appellate courts thereof) in connection with any dispute related to this Commitment Letter or any of the matters contemplated hereby, and agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute. You irrevocably and unconditionally waive any objection to the laying of such venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment.

Patriot Act.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Patriot Act"), the Commitment Parties may be required to obtain, verify and record information that identifies Holdings and Borrowers, which information includes the name, address and tax identification number and other information regarding them that will allow the Commitment Parties to identify them in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to each of the Commitment Parties.

Please indicate your acceptance of the terms hereof and of the ABL Term Sheet, the Conditions Annex and the Fee Letter by returning to us executed counterparts of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on January 19, 2011 (the "Deadline"). This Commitment Letter and the commitments of the Commitment Parties hereunder and the agreement of UBSS to provide the services described herein are also conditioned upon your acceptance hereof and of the Fee Letter, and our receipt of executed counterparts hereof and thereof on or prior to the Deadline. Upon the earliest to occur of (A) the execution and delivery of the ABL Facility Documentation by all of the parties thereto, (B) the later of (i) the date which is 4 months after the commencement of the Chapter 11 Cases and (ii) the maturity date under the DIP Facility, (C) the occurrence of any event of default under the DIP Facility (after any applicable grace or similar period under the DIP Facility) unless such event of default is waived within three business days after the occurrence thereof, (D) the occurrence of any of the following events in the Chapter 11 Cases: (1) the dismissal of any of the Chapter 11 Cases, (2) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (3) the appointment in any of the Chapter 11 Cases of any trustee, (E) the (i) termination (whether in accordance with its terms or otherwise) of, or any default or material breach (which default or material breach is not cured by the deadline (if any)) under the Restructuring Support Agreement; or (ii) modification or amendment of the Restructuring Support Agreement without the prior written consent of UBS, (F) the filing of a Plan that contains terms other than those embodied in the Plan attached as Exhibit B to the Restructuring Support Agreement and which is not consented to by the Commitment Parties, (G) 45 days after the date hereof unless an order approving the Disclosure Statement in form and substance satisfactory to the Commitment Parties has been entered by the Bankruptcy Court, (H) 105 days after the date hereof unless an order confirming the Plan or approving the Sale Option in form and substance satisfactory to the Commitment Parties has been entered by the Bankruptcy Court, (I) 35 days after the date hereof unless Borrowers and Guarantors shall have obtained an order (the "Authorization Order"), in

form and substance reasonably acceptable to the Commitment Parties, (i) authorizing Borrowers' and Guarantors' performance of their pre-closing obligations and undertakings under the Commitment Letter, and (ii) providing that the rights of the Commitment Parties to payment of all costs, fees and expenses and to indemnification (including indemnification rights of Lenders) under the ABL Facility Documentation shall be entitled to priority as administrative expense claims under section 503(b)(1) of the Bankruptcy Code whether or not the ABL Facility closes, (J) the exercise by the Tranche B Lenders (as such term is defined in the DIP Facility) of their option to purchase all (but not less than all) of the Obligations in respect of the Tranche A Revolving Loans, Swingline Loans and Letters of Credit (as each such term is defined in the DIP Facility), and (K) the occurrence of a Material Adverse Effect, this Commitment Letter and the commitments of the Commitment Parties hereunder shall automatically terminate unless each of the Commitment Parties shall, in their individual discretion, agree to an extension. The compensation, expense reimbursement, confidentiality, indemnification and governing law and forum provisions hereof and in the ABL Term Sheet and the Fee Letter shall survive termination of (i) this Commitment Letter (or any portion hereof) and (ii) any or all of the commitments of the Commitment Parties hereunder.

[Signature Page Follows]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: ______________________
Name: Alfred J. Scoyni
Title: Director

By: ______________________
Name: Kristine Shryock
Title: Director and Counsel
Region Americas Legal

UBS SECURITIES LLC

By: ______________________
Name: Alfred J. Scoyni
Title: Director

By: ______________________
Name: Kristine Shryock
Title: Director and Counsel
Region Americas Legal

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: ______________________
Name:
Title:

ALLY COMMERCIAL FINANCE LLC

By: ______________________
Name:
Title:

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

UBS SECURITIES LLC

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: Robert C Chakarian
Name: Robert C Chakarian
Title: Vice President

ALLY COMMERCIAL FINANCE LLC

By: ______________________________
Name:
Title:

[Signature Page – Exit Commitment Letter]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

UBS LOAN FINANCE LLC

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

UBS SECURITIES LLC

By: ______________________________
Name:
Title:

By: ______________________________
Name:
Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: ______________________________
Name:
Title:

ALLY COMMERCIAL FINANCE LLC

By: W. Wakefield Smith
Name: W. Wakefield Smith
Title: Senior Director

Accepted and agreed to as of
the date first written above:

APPLESEED'S INTERMEDIATE HOLDINGS LLC

By: /s/ Neale Attenborough

Name: T. Neale Attenborough
Title: Chief Executive Officer

ANNEX I

## ABL FACILITY

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS[1]

| | |
|---|---|
| Borrowers: | The debtor-in-possession borrowers under the DIP Facility. |
| Lenders: | UBS Loan Finance LLC, Wells Fargo Bank, National Association and Ally Commercial Finance LLC. |
| Administrative Agent: | UBS AG, Stamford Branch. |
| Collateral Agents: | UBS AG, Stamford Branch and Wells Fargo Bank, National Association. |
| Issuing Banks: | UBS AG, Stamford Branch and Wells Fargo Bank, National Association |
| Swingline Lender: | UBS Loan Finance LLC. |
| ABL Facility: | An asset-based revolving credit facility (the "ABL Facility") in an aggregate principal amount of $80 million (the "Revolving Loan Cap"). |
| Purpose: | On the Closing Date, proceeds of the ABL Facility will be used, together with cash on hand of the Borrowers and their subsidiaries to satisfy the claims against the Borrowers and their subsidiaries pursuant to the Plan or any order approving the Sale Option, including payment in full in cash of obligations under Tranche A of the DIP Facility and to pay fees, commissions and expenses in connection therewith and, on and following the Closing Date, the ABL Facility will be used for working capital and general corporate purposes. |
| Maturity Date: | 3 years from the Closing Date. |
| Availability: | Upon satisfaction or waiver of conditions precedent to drawing to be specified in the ABL Facility Documentation, borrowings may be made at any time on or after the Closing Date to but excluding the business day preceding the maturity date of the ABL Facility. The aggregate amount of the loans and letters of credit outstanding under the ABL Facility shall not exceed the lesser of (a) the Borrowing Base (as defined below) and (b) the Revolving Loan Cap. |

---

1 All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this summary is attached.

Borrowing Base shall mean: (i) 85% of the book value of eligible accounts receivable; plus (ii) 90% of the net orderly liquidation value of eligible inventory (other than in-transit inventory); plus (iii) 20% of the net orderly liquidation value of eligible in-transit inventory; minus (iv) an availability block equal to the greater of (A) 10% of the lesser of (x) the aggregate ABL Facility commitments and (y) the Borrowing Base (prior to taking into account this availability block), and (B) $7.5 million; minus (v) reserves as determined by the Collateral Agents in their Permitted Discretion (as defined below). Eligibility criteria shall be determined by the Collateral Agents, in their Permitted Discretion. To the extent that Borrowers do not deliver, within 45 days following the Closing Date, third party waiver agreements (including, without limitation, agreements from landlords, bailees, mortgagees or other lienholders) with respect to the collateral in form and substance acceptable to the Administrative Agent, the Collateral Agents may establish applicable reserves in their Permitted Discretion.

Permitted Discretion shall mean a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender in the retail industry) business judgment.

Letters of Credit:

Up to $30 million of the ABL Facility will be available for letters of credit, on terms and conditions to be set forth in the ABL Facility Documentation. Each letter of credit shall expire not later than the earlier of (i) 12 months after its date of issuance and (ii) the fifteenth day prior to the Maturity Date of the ABL Facility (the "Letter of Credit Expiration Date"); *provided* that, subject to the terms of the ABL Facility Documentation, a letter of credit may provide that it shall automatically renew for additional periods but in any event not beyond the Letter of Credit Expiration Date.

Drawings under any letter of credit shall be reimbursed by Borrowers on the same business day. To the extent that Borrowers do not reimburse the Issuing Bank on the same business day, the Lenders shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective commitments.

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

Swingline Facility:

Up to $20 million of the ABL Facility will be available for swingline borrowings, on terms and conditions to be set forth in the ABL Facility Documentation.

Except for purposes of calculating the commitment fee described

below, any swingline borrowings will reduce availability under the ABL Facility on a dollar-for-dollar basis.

Interest:

At Borrowers' option, loans will bear interest based on the Base Rate or LIBOR, as described below (except that all swingline borrowings will accrue interest based on the Base Rate):

A. Base Rate Option

Interest will be at the Base Rate plus the applicable Interest Margin, calculated on the basis of the actual number of days elapsed in a year of 365 days and payable quarterly in arrears. The Base Rate is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of UBS AG, as established from time to time at its Stamford Branch, but in any event, not less than 3.50%.

Base Rate borrowings will be in minimum amounts to be agreed upon and (other than swingline borrowings) will require one business day's prior notice.

B. LIBOR Option

Interest will be determined for periods to be selected by Borrowers ("Interest Periods") of one, two, three or six months and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period, but in any event, not less than 1.50%. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

Default Interest and Fees:

Upon the occurrence and during the continuance of a payment default, interest will accrue (i) in the case of principal, interest or premium (if any) on any loan at a rate of 2.0% per annum plus the rate otherwise applicable to such loan and (ii) in the case of any other amount, at a rate of 2.0% per annum plus the non-default interest rate then applicable to Base Rate loans under the ABL Facility, and will be payable on demand.

Interest Margins:

The applicable Interest Margins for the ABL Facility will initially be 3.50% for LIBOR loans and 2.50% for Base Rate loans; *provided* that after the date on which Borrowers shall have delivered a borrowing base certificate for the first month ending at least six months after the Closing Date, the Interest Margins with respect to the ABL Facility will be determined based on the average daily total liquidity (which shall be defined as the sum of availability under the ABL Facility and unrestricted cash) for the immediately preceding month in accordance with the following grid:

| Average Daily Total Liquidity | LIBOR Loans | Base Rate Loans |
|---|---|---|
| Greater than $35 million | 3.00% | 2.00% |
| Greater than $15 million, less than or equal to $35 million | 3.25% | 2.25% |
| Less than or equal to $15 million | 3.50% | 2.50% |

Commitment Fee:

A Commitment Fee shall accrue on the unused amounts of the commitments under the ABL Facility. Such Commitment Fee will be 0.625% when the aggregate amount of loans and letters of credit outstanding is less than or equal to 50% of the commitments under the ABL Facility and 0.500% per annum when the aggregate amount of loans and letters of credit outstanding is greater than 50% of the commitments under the ABL Facility. Accrued Commitment Fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date.

Letter of Credit Fees:

Borrowers will pay (i) the Issuing Bank a fronting fee equal to 12.5 basis points per annum and (ii) the Lenders under the ABL Facility letter of credit participation fees equal to the Interest Margin for LIBOR Loans under the ABL Facility, in each case, on the undrawn amount of all outstanding letters of credit. In addition, Borrowers will pay the Issuing Bank customary issuance fees.

Mandatory Prepayments:

Loans shall be prepaid in an amount equal to (a) 100% of the net proceeds received from the sale or other disposition of all or any part of the assets of Holdings or any of its subsidiaries after the Closing Date other than sales of inventory in the ordinary course of business (subject to exceptions to be mutually agreed),
(b) 100% of the net proceeds received by Holdings or any of its

subsidiaries from the issuance of debt or preferred stock after the Closing Date (subject to exceptions to be mutually agreed), (c) 50% of the net proceeds received from the issuance of common equity (including, but not limited to, upon the exercise of warrants and options) by, or equity contributions to, Holdings after the Closing Date (subject to exceptions to be mutually agreed), and (d) 100% of all casualty and condemnation proceeds received by Holdings or any of its subsidiaries (subject to exceptions to be mutually agreed), subject to reinvestment rights to be agreed.

In addition, at any time that the aggregate principal amount of the outstanding loans and letters of credit under the ABL Facility exceeds the Borrowing Base then in effect, then the loans thereunder shall be prepaid immediately or, if no such loans are outstanding, letters of credit shall be cash collateralized in an amount equal to 105% of the face amount thereof, in each case in an amount equal to such excess.

There will be no prepayment penalties (except LIBOR breakage costs) for mandatory prepayments.

| | |
|---|---|
| Optional Prepayments: | Permitted in whole or in part, with prior notice but without premium or penalty (except LIBOR breakage costs) and including accrued and unpaid interest, subject to limitations as to minimum amounts of prepayments. |
| Application of Prepayments: | Mandatory and optional prepayments will be applied to any outstanding loans under the ABL Facility without any reduction in the commitments under the ABL Facility. |
| Guarantees: | The ABL Facility will be fully and unconditionally guaranteed on a joint and several basis by Holdings and all of the existing and future direct and indirect subsidiaries of Holdings other than the Borrowers (collectively, the "Guarantors"), subject to exceptions for foreign subsidiaries to the extent such guarantees would be prohibited by applicable law or would result in materially adverse tax consequences. |
| Security: | The ABL Facility and any hedging or treasury management obligations to which a Lender or an affiliate of a Lender is a counterparty will be secured by perfected first priority pledges of all of the equity interests of Borrowers and each of Holdings' direct and indirect subsidiaries, and perfected first priority security interests in and mortgages on all tangible and intangible assets (including, without limitation, accounts receivable, inventory, equipment, general intangibles, intercompany notes, insurance policies, investment property, intellectual property, real property, cash and proceeds of the foregoing) of Borrowers and the Guarantors, wherever located, now or hereafter owned, |

except, in the case of any foreign subsidiary, to the extent such pledge would be prohibited by applicable law or would result in materially adverse tax consequences, and subject to such other exceptions as are agreed.

| | |
|---|---|
| Conditions to Initial Borrowings: | Conditions precedent to initial borrowings under the ABL Facility will include (without limitation) those set forth in the Commitment Letter and in Annex II to the Commitment Letter. |
| Conditions to Each Borrowing: | Conditions precedent to each borrowing or issuance under the ABL Facility will be those customary for a transaction of this type and others determined by UBS to be appropriate, including, (1) the absence of any continuing default or event of default, (2) the accuracy of all representations and warranties, (3) receipt of a customary borrowing notice or letter of credit request, as applicable, (4) there being no legal bar to the lenders making the loan or the issuance and (5) compliance with Borrowing Base. |
| Representations and Warranties: | Representations and warranties will apply to Holdings and its subsidiaries and will include (without limitation):<br><br>Accuracy and completeness of financial statements (including pro forma financial statements); absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of the ABL Facility Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; no burdensome restrictions; title to the collateral and other collateral representations and warranties customary for a transaction of this type; taxes; Federal Reserve regulations; ERISA; Investment Company Act; subsidiaries; environmental matters; solvency; accuracy and completeness of disclosure; Patriot Act and anti-terrorism law compliance; and creation and perfection of security interests. |
| Affirmative Covenants: | Affirmative covenants will apply to Holdings and its subsidiaries and will include (without limitation):<br><br>Delivery of certified monthly and quarterly financial statements and audited annual financial statements, borrowing base certificates twice monthly, periodic collateral reporting, field examinations and appraisals (provided that no more than three field examinations and three inventory appraisals per year may be conducted at the Borrowers' expense if no default or event of default shall have occurred and be continuing and unused borrowing availability under the ABL Facility is greater than the Covenant Testing Threshold), monthly management reports, reports to shareholders, notices of defaults, litigation and other material events, budgets and other information customarily |

supplied in a transaction of this type; payment of other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with all applicable laws and regulations (including, without limitation, environmental matters, taxation and ERISA) and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; agreement to hold annual meetings of Lenders; further assurances (including, without limitation, with respect to security interests in after-acquired property); and establishment and maintenance of a cash management system as set forth below.

Negative Covenants:

Negative covenants will apply to Holdings and its subsidiaries and will include (without limitation):

1. Limitation on dispositions of assets and changes of business and ownership.

2. Limitation on mergers and acquisitions.

3. Limitations on dividends, stock repurchases and redemptions and other restricted payments.

4. Limitation on indebtedness (including guarantees and other contingent obligations) and preferred stock and prepayment, amendment and redemption thereof.

5. Limitation on loans and investments.

6. Limitation on liens and further negative pledges.

7. Limitation on transactions with affiliates.

8. Limitation on sale and leaseback transactions.

9. Limitation on capital expenditures.

10. Limitation on operating leases.

11. Maintenance of holding companies and/or any inactive subsidiaries as passive, non-operating enterprises.

12. No modification or waiver of material documents (including, without limitation, charter documents of Holdings and its subsidiaries) in any manner materially adverse to the Lenders.

13. No change to fiscal year.

| | |
|---|---|
| Cash Management: | Borrowers and the Guarantors will establish and maintain a cash management system reasonably acceptable to the Administrative Agent providing for full cash dominion and control of the deposit accounts of Borrowers and the Guarantors in favor of the Administrative Agent. |
| Financial Covenants: | None, so long as unused borrowing availability under the ABL Facility is greater than or equal to $10 million (the "Covenant Testing Threshold"). If at any time unused borrowing availability under the ABL Facility is less than the Covenant Testing Threshold, then financial covenants will apply to Borrowers and the Guarantors until such time as unused borrowing availability is greater than or equal to Covenant Testing Threshold for a period of at least 60 consecutive days and will be limited to a minimum fixed charge coverage ratio of 1.1:1.0. |
| Events of Default: | Events of default will include (without limitation) the following: nonpayment, breach of representations and covenants, cross-defaults, loss of lien on collateral, invalidity of guarantees, bankruptcy and insolvency events, ERISA events, judgments and change of ownership or control (to be defined). |
| Assignments and Participations: | Each Lender may assign all or, subject to minimum amounts to be agreed, a portion of its loans and commitments under one or more of the ABL Facility. Assignments will require payment of an administrative fee to the Administrative Agent and the consents of the Administrative Agent and Borrowers, which consents shall not be unreasonably withheld; *provided* that (i) no consents shall be required for an assignment to an existing Lender or an affiliate of an existing Lender and (ii) no consent of Borrowers shall be required during an event of default. In addition, each Lender may sell participations in all or a portion of its loans and commitments under the ABL Facility; *provided* that no purchaser of a participation shall have the right to exercise or to cause the selling Lender to exercise voting rights in respect of the ABL Facility (except as to certain basic issues). Notwithstanding the foregoing, assignments and participations to the Borrowers or any affiliates or related parties shall be prohibited. |
| Expenses and Indemnification: | All reasonable out-of-pocket expenses (including but not limited to reasonable legal fees and expenses and expenses incurred in connection with due diligence and travel, courier, reproduction, printing and delivery expenses) of UBS, Wells Fargo, the Administrative Agent, the Collateral Agents and the Issuing Banks associated with the preparation, execution and delivery, and of the Administrative Agent associated with the administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the |

documentation contemplated hereby are to be paid by Borrowers. In addition, all out-of-pocket expenses (including but not limited to reasonable legal fees and expenses) of the Lenders, the Administrative Agent and the Collateral Agents for workout proceedings, enforcement costs and documentary taxes associated with the ABL Facility are to be paid by Borrowers.

Borrowers will indemnify the Lenders, UBS, UBSS, the Administrative Agent, the Collateral Agents and the Issuing Banks and their respective affiliates, and hold them harmless from and against all reasonable out-of-pocket costs, expenses (including but not limited to reasonable legal fees and expenses) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the ABL Facility; *provided, however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the gross negligence or willful misconduct of such person.

Yield Protection, Taxes and <u>Other Deductions</u>:

The ABL Facility Documentation will contain yield protection provisions, customary for facilities of this nature, protecting the Lenders in the event of unavailability of LIBOR, breakage losses, reserve and capital adequacy requirements.

All payments are to be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than income taxes in the jurisdiction of any Lender's applicable lending office). The Lenders will use commercially reasonable efforts to minimize to the extent possible any applicable taxes and Borrowers will indemnify the Lenders and the Administrative Agent for such taxes paid by the Lenders and the Administrative Agent, as the case may be.

<u>Required Lenders</u>:

Lenders holding at least a majority of total loans and commitments under the ABL Facility, with certain amendments requiring the consent of Lenders holding a greater percentage (or all) of the total loans and commitments under the ABL Facility; provided that amendments to the Borrowing Base that would result in an increase in availability shall require the approval of Lenders holding at least 66-2/3% of the loans and commitments under the ABL Facility.

<u>Governing Law and Forum</u>:

The laws of the State of New York. Each party to the ABL Facility Documentation will waive the right to trial by jury and will consent to jurisdiction of the state and federal courts located in The City of New York.

| | |
|---|---|
| Counsel to UBS and <u>the Administrative Agent</u>: | Winston & Strawn LLP. |
| Counsel to Wells Fargo and <u>co-Collateral Agent</u>: | Brown Rudnick LLP. |

ANNEX II

# CONDITIONS TO CLOSING[1]

The commitment of the Commitment Parties under the Commitment Letter with respect to the ABL Facility, the consummation of the Transactions and the funding of the ABL Facility are subject to the conditions set forth in the Commitment Letter and satisfaction of each of the conditions precedent set forth below.

1. Exit from Chapter 11 Cases:

(i) The Authorization Order, in form and substance reasonably satisfactory to each Commitment Party, shall have been entered by the Bankruptcy Court and shall not have been vacated, stayed, reversed, modified or amended in any respect except with the prior written consent of each Commitment Party (x) in its sole discretion with respect to any such vacatur, stay, or reversal, and (y) in the case of any such amendment or modification, if in the sole judgment of each Commitment Party, such modification or amendment is adverse to the rights or interests of any or all of the Administrative Agent, the Commitment Parties and the Lenders.

(ii) If the Plan Option is used to effectuate the Exit, (A) unless waived by each Commitment Party, in their sole discretion, each Commitment Party shall be satisfied, in its sole discretion, with the terms and conditions of the plan of reorganization of the Borrowers and Guarantors (such plan of reorganization, together with all exhibits, supplements, annexes, schedules and any other attachments thereto, and including the terms described in this paragraph, the "Plan"), (B) the Plan and related disclosure statement and other solicitation materials, the Confirmation Order (as defined below) and all documents to be executed and/or delivered in connection with implementation of the Plan shall be on terms and conditions substantially the same as Exhibit B to the Restructuring Support Agreement, and no amendment, modification, supplement or waiver shall have been made to any or all of the Restructuring Support Agreement, the Plan, the related disclosure statement and other solicitation materials, the Confirmation Order and all documents to be executed and/or delivered in connection with the implementation of the Plan, in each case, without the prior written consent of each Commitment Party, that, in the sole judgment of each Commitment Party, is materially adverse to the rights or interests of any or all of the Administrative Agent, the Commitment Parties and the Lenders, (C) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to each Commitment Party (the "Confirmation Order"), confirming the Plan and approving the Plan-related solicitation procedures and (x) the time to appeal the Confirmation Order or to seek review, rehearing or certiorari with respect to the Confirmation Order shall have expired, unless waived by each Commitment Party, in their sole discretion, (y) with respect to the Confirmation Order, unless otherwise waived by each Commitment Party in their sole discretion, no appeal or petition for review, rehearing or certiorari with respect to the Confirmation Order may be pending, and (z) the Confirmation Order shall be in full force and effect, and shall not have been stayed, vacated, reversed or modified by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, unless waived by each Commitment Party, in their sole discretion, (D) the Plan shall have become effective in accordance with its terms, and all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (with the prior written consent of each Commitment Party if in the sole judgment of each Commitment Party, any such waiver is materially adverse to the rights or interests of any or all of the Administrative Agent, the Commitment Parties and

[1] All capitalized terms used but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex II is attached.

the Lenders), and (E) all of the transactions contemplated by the Plan and the Confirmation Order to occur on the effective date of the Plan shall have been consummated on or before the Closing Date.

(iii) If the Sale Option is used to effectuate the Exit, (A) the assets conveyed pursuant to the Sale Option shall be the same assets as would have been conveyed under the Plan Option and, after giving effect to the asset sales under the Sale Option, the resulting capital and ownership structure and equity owners (directly or indirectly) of Holdings and Borrowers shall be the same capital and ownership structure and equity owners as would have resulted under the Plan Option, (B) the Sale Option shall not result in any material adverse tax or other consequences than those that would have resulted under the Plan Option, (C) the entities that shall constitute Holdings and Borrowers under the Sale Option shall have assumed all of the obligations of Appleseed's Intermediate Holdings LLC under the Commitment Letter and the Fee Letter, (D) the asset sale agreements and related disclosure schedules and other solicitation materials, the Sale Order (as defined below) and all documents to be executed and/or delivered in connection with implementation of the Sale Option shall be on terms and conditions substantially the same as those under the Plan Option, and no amendment, modification, supplement or waiver shall have been made to any or all of the Restructuring Support Agreement, the asset sale agreements and related disclosure schedules and other solicitation materials, the Sale Order and all documents to be executed and/or delivered in connection with the implementation of the Sale Option, in each case, without the prior written consent of each Commitment Party, that, in the sole judgment of each Commitment Party, is materially adverse to the rights or interests of any or all of the Administrative Agent, the Commitment Parties and the Lenders, (E) the Bankruptcy Court shall have entered an order, in form and substance satisfactory to each Commitment Party (the "Sale Order"), approving the Sale Option and (x) the time to appeal the Sale Order or to seek review, rehearing or certiorari with respect to the Sale Order shall have expired, unless waived by each Commitment Party, in their sole discretion, (y) with respect to the Sale Order, unless otherwise waived by each Commitment Party in their sole discretion, no appeal or petition for review, rehearing or certiorari with respect to the Sale Order may be pending, and (z) the Sale Order shall be in full force and effect, and shall not have been stayed, vacated, reversed or modified by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay, unless waived by each Commitment Party, in their sole discretion, and (F) all of the transactions contemplated by the Sale Option and the Sale Order to occur on the closing date of the Sale Option shall have been consummated on or before the Closing Date.

2. Concurrent Transactions: Each Commitment Party shall be satisfied in its reasonable judgment that (a) concurrently with consummation of the Plan or the closing of the Sale Option (as applicable), all pre-existing indebtedness of the Borrowers and their subsidiaries shall have been satisfied, discharged or otherwise treated as specified in the Plan or the Sale Order (as applicable), including, without limitation, in each case, the repayment in full in cash of Tranche A of the DIP Facility, (b) there will not exist (after giving pro forma effect for confirmation of the Plan or the Sale Option (as applicable) and the financing thereof) any default or event of default under any of the Loan Documents, or under any other material indebtedness of Holdings and its subsidiaries from and after the effective date of the Plan or the closing of the Sale Option (as applicable), (c) all terms and conditions of the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility shall be acceptable to each of the Commitment Parties and (d) the new equity issued by Holdings shall be entirely in the form of common equity (the "New Common Equity") and shall be distributed in accordance with the Plan or upon closing of the Sale Option (as applicable) as follows: 95% of the New Common Equity shall be distributed to the First Lien Lenders (as defined in the Restructuring Support Agreement) and 5% of the New Common Equity shall be distributed to the Second Lien Lenders (as defined in the Restructuring Support Agreement), in each case, subject to dilution by up to 10% of the shares of Holdings to be reserved for a management incentive plan.

3. The Commitment Parties shall be satisfied with the ownership, corporate, governance, legal, tax, management and capital structure of Holdings and its subsidiaries (after giving effect to the Transactions) and any securities issued, and any indemnities, employment and other arrangements entered into, in connection with the Transactions.

4. The Commitment Parties shall have received, reviewed, and be satisfied with, (i) a pro forma consolidated and consolidating balance sheet and related statements of income and cash flows for Holdings and its subsidiaries (the "Pro Forma Financial Statements"), in each case after giving effect to the Transactions (including, but not limited to, those contemplated by the Plan Option or the Sale Option (as applicable) and payment or other satisfaction or treatment of all prepetition indebtedness as contemplated by the Plan Option or the Sale Option (as applicable)) and (ii) a business plan and forecasts (updated, as necessary, within 10 days prior to the Closing Date) (the "Business Plan") of the financial performance of Holdings and its subsidiaries (x) on an annual basis, through 2015 and (y) on a monthly basis, through the first twelve-month period following the Closing Date. The Pro Forma Financial Statements shall be consistent in all material respects with the sources and uses described in the Commitment Letter and the forecasts provided to the Commitment Parties prior to the date of the Commitment Letter. Each of the Commitment Parties shall be satisfied in its discretion that the Business Plan demonstrates that the Borrowers and Guarantors shall be able to satisfy the minimum unused borrowing availability condition in paragraph 11 of this Conditions Annex and maintain sufficient levels of liquidity and availability following the Exit without the likelihood of further reorganization proceedings.

5. Holdings and its subsidiaries and the transactions contemplated by the Commitment Letter shall be in compliance, in all material respects, with all applicable foreign and U.S. federal, state and local laws and regulations, including all applicable environmental laws and regulations. All necessary governmental and material third party approvals in connection with the Transactions shall have been obtained and shall be in effect.

6. The Lenders shall have received all opinions, certificates and closing documentation as the Commitment Parties shall reasonably request, in form and substance reasonably satisfactory to the Commitment Parties.

7. Borrowers and each of the Guarantors shall have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

8. All costs, fees, expenses (including, without limitation, legal fees and expenses and the fees and expenses of appraisers, consultants and other advisors) and other compensation payable to the Lenders, UBSS, UBS, the Administrative Agent or the Collateral Agents shall have been paid to the extent due pursuant to the terms of this Commitment Letter or the Fee Letter.

9. The Administrative Agent shall have a perfected, first priority lien on and security interest in all assets as required in the ABL Term Sheet under the heading "Security." The Administrative Agent shall have entered into intercreditor agreements, in form and substance satisfactory to the Commitment Parties, with the lenders (or an agent on their behalf) under the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility with respect to their respective relative rights with respect to the Collateral, which intercreditor agreements shall provide that all obligations under the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility shall be subordinated in right of payment to the ABL Facility and all liens securing

such obligations under the Senior Term Loan Facility, the First Lien Term Loan Facility and the Junior Term Loan Facility shall be junior to the liens securing the obligations under the ABL Facility.

10. The Collateral Agents shall have received, reviewed and be satisfied with an appraisal of the Borrowers' inventory (which appraisal shall have been performed, at Borrowers' expense, by an appraiser satisfactory to the Collateral Agents) and a field examination of the collateral (which field examination shall have been performed, at Borrowers' expense, by a field examiner satisfactory to the Collateral Agents).

11. On the Closing Date, before and after giving effect to the Transactions and all those contemplated by the Plan Option or the Sale Option (as applicable) and the financing therefor, including, but not limited to, payment or other satisfaction or treatment of all postpetition indebtedness as contemplated by the Plan Option or the Sale Option (as applicable) and with account payables being paid on a current basis and inventory and purchase orders being at customary levels in the ordinary course of business, Borrowers shall have unused borrowing availability under the ABL Facility of at least $20 million.

12. Borrowers and the Guarantors shall have obtained account control agreements, all in form and substance satisfactory to the Administrative Agent, in respect of their respective deposit accounts in favor of the Administrative Agent, providing for full dominion and control of such deposit accounts, including daily sweeps of the funds therein to be applied against the then outstanding balance of the ABL Facility.

13. The entry of all orders described or referred to herein or in the Commitment Letter or ABL Term Sheet shall have been upon proper notice as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any applicable bankruptcy rules and all time periods within which to appeal any such orders shall have expired.

14. The deadline for investigations as to any prepetition indebtedness or the DIP Facility shall have expired and there shall be no pending challenges or litigation against the prepetition debt or the lenders under the DIP Facility.

15. Other than the Chapter 11 Cases, there shall be no pending or threatened litigation or other proceedings (private or governmental) with respect to the Transactions.