**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| APPLESEED'S INTERMEDIATE HOLDINGS LLC, *et al.*,[1] | ) | Case No. 11-10160 (KG) |
| Debtors. | ) | Jointly Administered |
| | ) | **Hearing Date: March 8, 2011 at 11:30 a.m. (ET)** |
| | ) | **Objection Date: February 22, 2011 at 4:00 p.m. (ET)** |

# DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER APPROVING (A) BIDDING PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) THE FORM ASSET PURCHASE AGREEMENT, AUCTION NOTICE, PUBLICATION NOTICE AND CONTRACT ASSUMPTION NOTICE AND (C) PROCEDURES FOR DETERMINING CURE AMOUNTS AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND (C) GRANTING RELATED RELIEF

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688). The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

Appleseed's Intermediate Holdings LLC d/b/a Orchard Brands and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"),[2] respectfully represent:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 363(b), (f) and (m), 365, 503 and 507 of the Bankruptcy Code, Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 7004, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## Introduction

4. After several months of intense negotiations with their secured lenders, the Debtors commenced these chapter 11 cases with near unanimous support for a going concern restructuring.[3] Recognizing the risks and costs associated with an extended chapter 11 case, the Consenting Lenders' support for the Debtors' restructuring is contingent on moving quickly

---

2 A detailed description of the Debtors and their businesses, and the facts and circumstances relating to the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of T. Neale Attenborough, Chief Executive Officer of Appleseed's Intermediate Holdings LLC, in Support of First Day Pleadings [Docket No. 3] (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), on January 19, 2011 (the "***Petition Date***").

3 On the Petition Date, the Debtors entered into the Restructuring Support Agreement, a copy of which is attached to the First Day Declaration as **Exhibit A** (the "***Support Agreement***"). Pursuant to the Support Agreement, lenders holding more than 80% of the Debtors' first lien secured obligations and the sole holder of outstanding obligations under the second lien purchase agreement (collectively, the "***Consenting Lenders***") have agreed to support the Debtors' restructuring.

through the restructuring process. In fact, the Debtors' debtor in possession financing agreement (the "***DIP Credit Agreement***")[4] requires consummation of a standalone restructuring or going concern sale of substantially all of the Debtors' assets no later than May 21, 2010.[5]

5. To ensure their restructuring is effectuated in accordance with the heavily negotiated and agreed-upon terms with the Consenting Lenders, the Debtors filed the *Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket. No. 17] (as may be amended, supplemented or modified, the "***Plan***")[6] and related disclosure statement [Docket No. 18] (the "***Disclosure Statement***") on the Petition Date. Consistent with the terms of the Support Agreement, a hearing on the Disclosure Statement is scheduled for March 1, 2011 [Docket No. 58]. The Debtors intend to move through the Plan process swiftly to satisfy the Restructuring Milestones.

6. If the Plan process is in any way delayed, however, the Debtors and the Consenting Lenders have agreed that — as a "back-stop" to the Plan — the Debtors will move forward with a sale of substantially all of their assets under section 363 of the Bankruptcy Code (the "***Sale***"). As reflected in the Support Agreement, the Sale would likely include a credit bid

---

4 *See Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(B) and (C) and (B)* [Docket No. 34] (the "***Interim DIP Order***"). A copy of the DIP Credit Agreement is attached to the Interim DIP Order as **Exhibit 1**.

5 Specifically, the Debtors are required to adhere to certain Plan and Sale-related (each capitalized term as defined below) (collectively, the "***Restructuring Milestones***"). The Restructuring Milestones are set forth in **Exhibit C** to the Support Agreement and in the DIP Credit Agreement. Additionally, consistent with the Restructuring Milestones included in the Support Agreement, Section 8.01(o)(xii) of the DIP Credit Agreement provides that it is an event of default if the Debtors fail to achieve, comply with or proceed in accordance with, any of the milestones set forth in Schedule 8.01(o) to the DIP Credit Agreement by the dates specified therein.

6 All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Plan.

from the Consenting Lenders under section 363(k) of the Bankruptcy Code pursuant to the terms set forth on **Exhibit B** to the Support Agreement.

7. Thus, to ensure compliance with the terms of the DIP Credit Agreement and the Support Agreement, the Debtors file this motion to effectuate the Sale in the event the Plan process cannot be completed in accordance with the Restructuring Milestones specified in the DIP Credit Agreement and the Support Agreement.[7]

## Relief Requested

8. By this motion, the Debtors request entry of:

a. an order, substantially in the form attached hereto as **Exhibit A** (the "***Bidding Procedures Order***"):

(i) establishing bidding procedures (substantially in the form annexed as **Exhibit 1** to **Exhibit A** attached hereto) (the "***Bidding Procedures***") in connection with the potential Sale of substantially all of the Debtors' assets (collectively, the "***Acquired Assets***");

(ii) approving the form of an asset purchase agreement (as may be modified pursuant to the Bidding Procedures Order, the "***APA***") to be entered into between the Debtors and the purchaser of the Acquired Assets (the "***Purchaser***"), substantially in a form that will be filed with the Court and served in accordance with the Bankruptcy Rules no later than 14 days before the hearing with respect to the relief sought in the Bidding Procedures Order (the "***Bidding Procedures Hearing***");[8]

(iii) approving the form and manner of notice of an auction (the "***Auction***") with respect to the Sale,

---

[7] Contemporaneously herewith, the Debtors have filed a motion seeking authority to enter into a commitment letter with respect to exit financing that can be used to facilitate either the Plan or the Sale.

[8] Specifically, the Debtors intend to file a supplement to this motion that attaches the form APA and identifies any provisions required to be highlighted by the Local Rules no later than 14 days before the hearing to consider the Bidding Procedures.

substantially in the form annexed as **Exhibit 2** to **Exhibit A** attached hereto (the "***Auction Notice***") and in a similar form modified for publication (the "***Publication Notice***");

(iv) establishing certain procedures (the "***Assumption Procedures***") relating to executory contracts and unexpired leases to be assumed (and, where applicable, assigned) (the "***Assumed Contracts***") in connection with the Sale, substantially in the form annexed as **Exhibit 3** to **Exhibit A** attached hereto (the "***Contract Notice***");

(v) scheduling (pursuant to the Bidding Procedures Order) a hearing to consider approval of the Sale (the "***Sale Hearing***"); and

(vi) granting certain related relief.

b. an order, solely to the extent that the Debtors pursue the Sale, (the "***Sale Order***"):[9]

(i) authorizing the Debtors to enter into and perform under the APA;

(ii) authorizing the Sale of the Acquired Assets by the Purchaser free and clear of all liens, claims, encumbrances and other interests (collectively, the "***Encumbrances***");

(iii) authorizing the assumption and assignment to the Purchaser of the Assumed Contracts to be identified on a list filed with the Court no later than 14 days before the Sale Hearing (in accordance with the Assumption Procedures); and

(iv) granting certain related relief.

## Background

### A. Overview of the Debtors' Businesses

9. The Debtors are a leading, multi-channel marketer of apparel and home products focused on serving the needs of the growing market segment of women and men over the age of

[9] The Debtors will file the proposed Sale Order in advance of the Sale Hearing.

55. Through a portfolio of 17 brands, the Debtors offer apparel, accessories and shoes, as well as home, garden and health products. The Debtors, who employ approximately 4,260 employees, manage their businesses from headquarters located in Beverly, Massachusetts. In addition, the Debtors maintain seven brand headquarters located throughout the United States.[10]

10. According to internal estimates, the Debtors command a 21% share of the over-60 direct apparel and accessories market, a segment that is expected to grow as "baby boomers" (ages 44 through 64) mature. Indeed, the Debtors are well positioned to serve a growing demographic, as the aging "baby boomer" population is expected to grow from approximately 57 million in 2010 to approximately 76 million in 2020.

11. The Debtors' collection of specialty clothing, footwear, household and health brands for women and men includes Bedford Fair Lifestyles™, Blair™, Draper's & Damon's™, Haband!™, Monterey Bay™ and Norm Thompson™. Over the last five years, the Debtors have selectively acquired businesses and brands that strategically add distribution channels and vertical integration opportunities through new product offerings and entry into new markets. The Debtors have also built their businesses through market share gains, new product development and operational improvements that have resulted from vertical integration, operational efficiencies and savings from increased scale. The Debtors had approximately $881 million in net sales in 2010, and approximately $954 million in net sales in 2009.[11]

---

[10] Specifically, the Debtors' seven brand headquarters are located at the following locations: (a) Arizona Mail Order Company, Inc., Tucson, Arizona; (b) Blair LLC, Warren, Pennsylvania; (c) Draper's & Damon's LLC, Irvine, California; (d) Haband Company, LLC, Oakland, New Jersey; (e) Johnny Appleseed's Inc., Beverly, Massachusetts; (f) Norm Thompson Outfitters, Inc., Hillsboro, Oregon; and (g) Wintersilks, LLC, Madison, Wisconsin.

[11] References to financial information contained in this motion are based on the Debtors' consistently maintained internal reporting practices and not in accordance with generally accepted accounting principles used in the United States.

12. The Debtors market seventeen brands in three operating segments. The "**Premium Group**" of brands includes Appleseed's™, The TOG Shop™, Monterey Bay™, Sahalie™, Draper's & Damon's™, LinenSource™, Norm Thompson™ and Wintersilks™, targeting consumers searching for classic apparel and home products. These brands appeal to a diverse range of tastes through differing product line themes, including classic New England attire, mature conservative classic apparel, unique and casual dress, upscale fashion, quality bedding and lifestyle solutions and active and outdoors attire for baby boomers.

13. The Debtors' "**Value Group**" of brands includes Blair™, Haband!™ and A•M•O™, targeting consumers searching for high-value, low-price products. The Value Group focuses on marketing quality apparel and home products to older cost-conscious purchasers.

14. The Debtors' also market lifestyle products under their "**Solutions Group**" of brands, which includes Solutions™ and Gold Violin™. The Gold Violin™ brand focuses on practical products targeted at women over the age of 50 who manage a household designed to make everyday activities easier. The Solutions™ brand markets products that help seniors and "baby boomers" to remain active, independent and living comfortably in their own home.

15. The Debtors market their products through multiple channels. In 2010, the Debtors estimate that they circulated more than 450 million catalogs and letter mailers. In addition, the Debtors maintain websites for each product brand to allow for online purchasing. The Debtors also maintain 55 retail stores, four call centers and three distribution centers (all located in the United States).

**B. Adverse Market Conditions and Business Decline**

16. The Debtors operate in a competitive industry that is in the midst of a sustained recession causing business fundamentals to deteriorate. Moreover, adverse economic conditions

and increased levels of unemployment have led to a decrease in consumer confidence and a decline in consumer spending.

17. The current market difficulties facing the retail industry have been widely recognized. For example, the University of Michigan Index of Consumer Sentiment, a survey that has estimated the future course of the national economy since 1946, indicated in November 2010 that consumer confidence dropped from 96.9 (out of 100) in January 2007 to 56.4 in June 2008, representing a 42% decline in just 18 months. Consumer confidence remained in the mid-60s in 2009 (down 33% from 2007) and slightly increased to the low-70s in first quarter of 2010.[12] Additionally, the U.S. Census Bureau's retail trade figures show combined men's and women's retail clothing store sales fell by more than 15%, from $49.3 billion in 2007 to an estimated $41.8 billion in 2010.[13] The Debtors' customer base — which is largely comprised of individuals who are retired and rely on investment income for consumption — has been adversely affected by declines in investment securities in the United States and around the world.[14]

18. Notwithstanding poor market conditions, the Debtors fared relatively well during the early part of the current economic recession, through strategic initiatives and synergies implemented across their various brands. In fact, company-wide EBITDA improved from approximately $78 million in 2008, to approximately $87.4 million in 2009.

---

12 *See* Thomson Reuters/University of Michigan, 2010 Annual Table 1. The Index of Consumer Sentiment, http://www.sca.isr.umich.edu/documents.php?c=tr.

13 *See* U.S. Census Bureau, August 2010 Monthly Retail Trade and Food Services Report, http://www.census.gov/retail/ (follow "Retail and Food Services Sales: Excel (1992-present)" hyperlink).

14 Many of the Debtors' customers also rely on income from federal Social Security, which remained relatively flat during 2010, and from certificates of deposit, the current rate for which is nominal.

19. Nonetheless, following the Debtor's strong performance in 2008 and 2009, the Debtors suffered a steep decline in their overall operations during 2010. In particular, the Debtors experienced weakness in the Value Group, which markets to the value-oriented, lower income customer in the 55-year old segment and is traditionally the largest of the Debtors' business groups. Specifically, the Debtors' Value Group experienced (a) decreased net sales from $615.6 million in 2009 to $520.2 million in 2010, which represents a 15.5% decline and (b) decreased EBITDA from $65.9 million in 2009 to $22.3 million in 2010, which represents a 66.2% decline.[15] In addition to weakness in the Value Group, the Debtors' operations overall experienced a significant decline in income received in connection with third-party business initiatives.

20. Conversely, and demonstrating the continued viability and value inherent in the Debtors' businesses, the Premium Group, which markets to the more fashion-conscious customer within the segment, experienced (a) increased net sales from $338.7 million in 2009 to $361.3 million in 2010, which represents a 6.7% improvement and (b) increased EBITDA from $21.5 million in 2009 to $25.2 million in 2010, which represents a 17.2% improvement.

21. As illustrated in the charts below, the Debtors estimate that combined EBITDA for 2010 will be approximately $47.5 million, down approximately 45.7% when compared to the previous year.

---

[15] The Debtors' research and data reveal that households representative of the Value Group customer base are generally more pessimistic with respect to the economy than customers in the Debtors' other businesses. Additionally, average household income across the customers that are representative of the Debtors' three business groups has been most pronounced in the Value Group, which experienced a decline in average household income of approximately 4.1% for the period beginning in April 2009 and ending October 2010. By way of comparison, the Debtors estimate that during the same period average household incomes for the customers that are representative of the Solutions Group and the Premium Group have declined by 1.3% and 2.4%, respectively.







## C. The Debtors' Restructuring Support Agreement and Dual-Track Process

22. Before the Petition Date, the Debtors took significant steps to reduce costs and improve efficiencies. These initiatives have included exiting certain brick-and-mortar retail operations, downsizing unproductive physical locations, reducing work forces and shutting down and consolidating distribution centers as part of an ongoing effort to consolidate legacy brand information technology systems and brand operations into a single streamlined platform.[16] For example, in October/November 2010, the Debtors terminated approximately 23 employees from their A•M•O™ business line and 16 information technology employees.

23. As a result of the decline of the Debtors' growth, the Debtors experienced constrained liquidity and have been unable to comply with the terms of (a) the $125 million credit agreement dated as of April 30, 2007 (as amended, the "***ABL Credit Agreement***"), (b) the $335 million credit agreement dated as of April 30, 2007 (as amended, the "***First Lien Credit Agreement***") and (c) the $250 million note purchase agreement dated as of April 30, 2007 (the "***Second Lien Purchase Agreement***" and, together with the ABL Credit Agreement and the First Lien Credit Agreement, the "***Secured Agreements***").

24. Consequently, in the third quarter of 2010, the Debtors entered into a series of

16 In particular, the Debtors have previously consolidated and decreased their distribution centers to three from eleven to three and their call centers to four from twelve.

forbearance agreements (collectively, the "***Forbearance Agreements***") with the administrative agents (collectively, the "***Administrative Agents***") and the secured lenders (collectively, the "***Secured Lenders***") under each of the Secured Agreements. Following entry into the Forbearance Agreements, the Debtors worked closely with the Administrative Agents, the Secured Lenders and their respective advisors to explore strategic options to restructure the Debtors' prepetition obligations. During this time, the Debtors and their advisors engaged in ongoing negotiations with counsel and the advisors to the Administrative Agents and the Secured Lenders.

25. Additionally, in October and November 2010, the Debtors' management and Moelis & Company LLC ("***Moelis***"), the Debtors' financial advisor, marketed the Debtors' assets to potential third-party purchasers. Although the Debtors and Moelis contacted over 25 potential purchasers, only a handful of indicative offers were received and none presented a clear path forward in the time frame needed to facilitate a comprehensive restructuring.

26. As noted above, over the course of the last several months, the Debtors and the Secured Lenders have engaged in extensive restructuring discussions. These discussions have culminated in an agreement and entry into the Support Agreement among the Debtors and the Consenting Lenders, which include as signatories lenders holding more than 80% of outstanding claims under the First Lien Credit Agreement and the sole holder of the Debtors' secured obligations under the Second Lien Purchase Agreement.

27. The Support Agreement provides a roadmap for the restructuring of the Debtors' busiensses as a going concern — either on a stand-alone basis through the Plan, or in the event the Plan cannot be confirmed in accordance with the Restructuring Milestones, through the Sale. The Support Agreement requires that the Debtors move forward with the dual-track process as

expeditiously as possible. The Support Agreement also binds the Consenting Lenders to support the Plan if the Debtors are successful in meeting the Restructuring Milestone deadlines included therein.

28. The Restructuring Milestones with respect to the Plan include the following (collectively, the "***Plan Milestones***"):

a. objections to approval of the Disclosure Statement are due 28 days after the Petition Date (or a later date agreed to by the Debtors and any third party, in consultation with the parties specified in the DIP Credit Agreement and the Support Agreement) (the "***Disclosure Statement Objection Deadline***"). The Disclosure Statement Objection Deadline has been set for February 16, 2011, at 4:00 p.m. prevailing Eastern Time [Docket No. 58];

b. the hearing to approve the Disclosure Statement (the "***Disclosure Statement Hearing***") is to be held seven days after the Disclosure Statement Objection Deadline (subject to the Court's availability). The Disclosure Statement Hearing has been set for March 1, 2011, at 3:30 p.m. [Docket No. 58];

c. the solicitation period with respect to votes to accept or reject the Plan (the "***Solicitation Period***") is to begin within five days after entry of an order approving the Disclosure Statement (the "***Disclosure Statement Order***");

d. deadlines to vote on the Plan and to object to confirmation of the Plan are to be no later than 35 days after the commencement of the Solicitation Period;

e. the confirmation hearing is to be held 14 days after the Voting Deadline (subject to the Court's availability);

f. the order confirming the Plan (the "***Confirmation Order***") is to be entered no later than 90 days after the Petition Date; and

g. the Effective Date (as defined in the Plan) must occur within 15 days after the entry of the Confirmation Order.[17]

29. In addition to the Plan Milestones set forth above, the Support Agreement also includes the "back-stop" concept of the Sale and requires the Debtors to comply with the following timeline (collectively, the "***Sale Milestones***"):

a. objections to entry of the Bidding Procedures Order are due 28 days after the date on which the Debtors file the Sale Motion (or a later date agreed to by the Debtors and a third party, in consultation with the parties specified in the DIP Credit Agreement and the Support Agreement). The Debtors have set the deadline by which parties must object to entry of the Bidding Procedures Order as February 22, 2011, at 4:00 p.m.;

b. the hearing to approve the Bidding Procedures (the "***Bidding Procedures Hearing***") is to be held seven days after the deadline set forth above for the Disclosure Statement Hearing (or the first available date thereafter);

c. the Bidding Procedures Order is to be entered within five days after the Bidding Procedures Hearing (or such later date agreed to by the Debtors and the parties specified in the DIP Credit Agreement and the Support Agreement);

d. the Debtors are to proceed with at least a 30-day marketing process (with such marking process to include providing information to prospective buyers, as requested by the parties in the DIP Credit Agreement and the Support Agreement) (the "***Marketing Process***"), followed by an auction (the "***Auction***") on notice in accordance with the Auction Notice; and

e. the hearing to approve the Sale is to occur within five days after the Auction.[18]

---

17 The Plan Milestones identified in sub-paragraphs (b) through (f) are subject to a five-day grace period.

18 Additionally, the Sale Milestones identified in sub-paragraphs (b) through (e) are subject to a five-day grace period.

30. Although the Debtors will begin marketing the Company immediately after entry of the Bidding Procedures Order, the Debtors will only proceed with the Sale in accordance with the Sale Milestones to the extent necessary to comply with the milestones referred to in Schedule 8.01(o) to the DIP Credit Agreement (a "***Triggering Event***").

31. Following the occurrence of a Triggering Event, the Debtors have agreed that they will no longer pursue the Plan and will instead proceed with approval of the Sale in accordance with the proposed Bidding Procedures.

32. Additionally, the Debtors anticipate that, consistent with the Support Agreement, the Administrative Agents will submit credit bids on behalf of the respective Secured Lenders pursuant to section 363(k) of the Bankruptcy Code.

33. To the extent the Debtors move forward with the Sale, the Debtors firmly believe that the proposed Bidding Procedures and the Auction will provide an opportunity for bidding and will generate the highest or otherwise best bid for the Acquired Assets.

**Proposed Bidding Procedures**

34. To optimally and expeditiously solicit, receive and evaluate Bids (as defined in the Bidding Procedures) in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures annexed as **Exhibit 1** to **Exhibit A** attached hereto to govern the Auction and Sale. As will be disclosed in the supplement to this motion to be filed 14 days in advance of the Bidding Procedures Hearing, the APA will be consistent with the terms of the Bidding Procedures and Support Agreement. The table below identifies the material terms of the

Bidding Procedures, as well as those provisions that the Debtors are required to highlight pursuant to Local Rule 6004-1(c).[19]

| Local Rule 6004-1(c) Requirement | Description of Provision |
|---|---|
| **Delivery of Financial Information**<br><br>6004-1(c)(i)(A)(1)<br>6004-1(c)(i)(A)(2) | To participate in the process with respect to the Acquired Assets, any interested party must deliver (unless previously delivered) to counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Joshua A Sussberg, Esq.), an executed confidentiality agreement in form and substance reasonably acceptable to the Debtors. Following delivery of that executed confidentiality agreement, such party will be provided a confidential memorandum/presentation regarding the Acquired Assets. If the party is interested in proceeding further, it must deliver, among other things, evidence, including audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtors) sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner or other sponsor (each, a "Sponsor"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support. |
| **Confidentiality of Debtor Information**<br><br>6004-1(c)(i)(A)(3) | Each interested party shall include as part of its Potential Bid Package an executed confidentiality agreement in a form and substance reasonably acceptable to the Debtors. |
| **Non-Binding Indication of Interest**<br><br>6004-1(c)(i)(A)(4) | Each interested party shall include as part of its Potential Bid Package an executed non-binding indication of interest. |
| **Good Faith Deposit**<br><br>6004-1(c)(i)(B)(3) | For a Potential Bidder to be deemed as a Qualified Bidder (other than with respect to any credit bid submitted by the Administrative Agents, which bid shall be deemed to be a Qualified Bid), its Bid must be accompanied by a cash deposit in the amount of 10% of the Potential Bidder's respective Bid. |

[19] The following summary of the Bidding Procedures is provided for the convenience of the Court and parties in interest. To the extent that there are any discrepancies between this summary of the Bidding Procedures and the Bidding Procedures, the terms and language of the Bidding Procedures shall govern. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| Local Rule 6004-1(c) Requirement | Description of Provision |
|---|---|
| **Qualified Bids and Qualified Bidders**<br><br>6004-1(c)(i)(B)(4) | In addition to the Good Faith Deposit, each Qualified Bid must also (other than with respect to any credit submitted by Administrative Agents):<br>• be in writing;<br>• state that such Potential Bidder offers to purchase the Acquired Assets (or a subset thereof) upon the terms and conditions substantially as set forth in the APA or pursuant to an alternative structure that the Debtors determine is no less favorable than the terms and conditions of the APA;<br>• state such Potential Bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Acquired Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the APA (as determined by the Debtors in their reasonable business judgment), including the purchase of the Acquired Assets and assumption of the Assumed Contracts;<br>• be accompanied by a clean and duly executed Modified APA and a marked Modified APA reflecting the variations from the form of the APA;<br>• state such Potential Bidder is financially capable of consummating the transactions contemplated by the Modified APA;<br>• state such Potential Bidder's offer is irrevocable until the closing of the purchase of the Acquired Assets if such Potential Bidder is determined to be the Purchaser or the Alternate Bidder;<br>• contain such audited financial and/or other information that will allow the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transaction contemplated by the Modified APA, including such financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtors to allow the Debtors to serve (within one business day after receipt of such information) on counter-parties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;<br><br>*(cont'd)* |

| Local Rule 6004-1(c) Requirement | Description of Provision |
|---|---|
| **Qualified Bids and Qualified Bidders** ***(cont'd)***<br><br>6004-1(c)(i)(B)(4) | • identify with particularity the Assumed Contracts, the assumption and assignment of which is a condition to closing;<br><br>• not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;<br><br>• not include a credit bid by the holder of a lien on equipment and related property of any Debtor (other than the Administrative Agents as provided for in the Bidding Procedures) such that the offer would make the sale of the remainder of property reasonably impractical at what would otherwise be the highest or best terms, as the case may be, available to the Debtors' estates;<br><br>• fully disclose the identity of each legal entity or person that will be bidding for the Acquired Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation;<br><br>• (a) not contain any due diligence or financing contingencies of any kind and (b) contain evidence that the Potential Bidder has received debt and/or equity funding commitments or has financial resources readily available and sufficient in the aggregate to finance the purchase of the Acquired Assets, which evidence is reasonably satisfactory to the Debtors;<br><br>• include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA;<br><br>• include an acknowledgement and representation that the Potential Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets before making its Bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its Bid, (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the APA or the Modified APA and (d) agrees that any non-disclosure agreement or confidentiality agreement entered into with the Debtors shall be enforceable by the Purchaser;<br><br>*(cont'd)* |

| Local Rule 6004-1(c) Requirement | Description of Provision |
|---|---|
| **Qualified Bids and Qualified Bidders** ***(cont'd)***<br><br>6004-1(c)(i)(B)(4) | • be in an amount that the Debtors deem, in their sole discretion, to be a sufficient offer for the Acquired Assets; and<br><br>• be actually received by the Debtors on the Bid Deadline. |
| **Modification of the Bidding Procedures**<br><br>6004-1(c)(i)(D) | The Debtors reserve their rights after consultation with the Consenting Lenders, the Committee, the DIP Facility Tranche A Administrative Agent and the DIP Facility Tranche A Lenders to modify the Bidding Procedures or impose, at or before the Auction, additional customary terms and conditions on the Sale, including extending the deadlines set forth in the Bidding Procedures, modifying the overbid increment of $500,000, adjourning the Auction and/or adjourning the Sale Hearing in open court without further notice, withdrawing from the Auction any or all of the Acquired Assets at any time prior to or during the Auction or canceling the Auction. |
| **Closing with Alternative Backup Bidders**<br><br>6004-1(c)(i)(E) | The Alternate Bidder will be required to keep its Bid open, binding and irrevocable until the closing of the Sale. If for any reason the Purchaser fails to consummate the Sale within the time permitted under the Modified APA, the Alternate Bidder will automatically be deemed to have submitted the highest or otherwise best Bid and the Debtors will be authorized, but not required, to consummate the Sale with the Alternate Bidder absent further order of the Court. At the Sale Hearing, the Debtors will seek approval to sell the Acquired Assets to the Alternate Bidder on the terms of its Bid without further notice or order of the Court. |

35. The Debtors believe that the Bidding Procedures will provide an appropriate framework for selling the Acquired Assets. Moreover, the Debtors believe that the Bidding Procedures will enable the Debtors to realize the highest or otherwise best offer for the Acquired Assets.

## Proposed Marketing Process

36. To ensure that the Debtors have sufficient time to market the Acquired Assets, conduct the Auction and close on the Sale before the maturity under the DIP Credit Agreement, the Debtors intend to market the Acquired Assets following entry of the Bidding Procedures

Order. In particular, the Debtors intend to prepare and circulate information regarding the Sale process and the Debtors' businesses to potential buyers and, in connection therewith, enter into confidentiality agreements with interested parties. The Debtors believe that conducting the marketing process following entry of the Bidding Procedures Order will ensure that the Debtors maximize the value of their assets through the Sale if it becomes necessary. In addition, the Debtors will conduct the marketing process in accordance with the provisions of the DIP Credit Agreement (including the "Sale Milestones" set forth therein).

**Proposed Notice of the Sale and the APA**

37. In accordance with the Bankruptcy Rules, the Debtors have provided notice of this motion to the following parties: (a) the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee***"); (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents for the Debtors' debtor in possession lenders; (d) counsel to the agent under the ABL Credit Agreement; (e) counsel to the agent under the First Lien Credit Agreement (f) counsel to the agent under the Second Lien Purchase Agreement; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Delaware State Attorney General; (j) the Office of the United States Attorney General for the State of Delaware; (k) the Internal Revenue Service; and (l) the Securities and Exchange Commission (collectively, the "***Notice Parties***").

38. As described above, the Debtors will only move forward with the Sale if one or more Triggering Events occurs. To the extent the Debtors seek to consummate the Sale pursuant to the terms of the Bidding Procedures Order, the Debtors will contact the Court to establish a date for the Sale Hearing.

39. Following the scheduling of the Sale Hearing, and no later than seven days after the occurrence of a Triggering Event, the Debtors propose that they will (a) file the Auction

Notice on the Court's docket (the date such notice is filed, the "***Auction Notice Date***") and (b) serve the Auction Notice upon each of the Notice Parties and the following parties: (i) counsel to the statutory committee of unsecured creditors appointed in these chapter 11 cases; (the "***Committee***"); (ii) counterparties to the Assumed Contracts; and (iii) all persons or entities know or reasonably believed to have asserted an interest in the Acquired Assets.

40. In compliance with Bankruptcy Rule 2002(a)(2), the Auction Notice will set forth the time, date and place of the Auction and the Sale Hearing, as well as the deadline for filing objections to the relief requested pursuant to this motion.

41. Additionally, and concurrently with service of the Auction Notice, the Debtors propose to publish the Publication Notice, substantially in a form similar to the Auction Notice, but modified for publication, in the National Edition of *The Wall Street Journal* no later than three days after the Auction Notice Date.

**Proposed Assumption Procedures and Notice of the Assumed Contracts**

42. To facilitate and effectuate the Sale to the extent a Triggering Event occurs, the Debtors seek approval of the following Contract Notice and the Assumption Procedures:

a. Contract Notice. Concurrent with the service of the Auction Notice, but in no event later than seven days after the Auction Notice Date, the Debtors will serve the Contract Notice to provide notice of the proposed assumption of the Assumed Contracts on the counterparties to the Assumed Contracts, the U.S. Trustee and the Committee.

b. Content of Contract Notice. The Contract Notice will be substantially in the form annexed as **Exhibit 3** to **Exhibit A** attached hereto and contain the following information: (i) the title of the Assumed Contract to be assumed; (ii) the name of the counterparty to the Assumed Contract; (iii) any applicable cure costs; (iv) the identity of the proposed assignee; and (v) the deadline by which any such Assumed Contract counterparty must object to the proposed assumption.

c. <u>Objections</u>. Objections to the proposed cure costs and adequate assurance of future performance must: (i) be in writing; (ii) set forth the nature of the objector's claims against or interests in the Debtors' estates and the basis for the objection and the specific grounds therefore; (iii) comply with the Bankruptcy Rules, the Local Rules and orders of this Court; and (iv) be filed with the Court and served upon the Debtors, the Purchaser, the U.S. Trustee and the Committee so as to be **<u>actually</u> <u>received</u>** by the objection deadline set forth in the Contract Notice (which date shall be no later than 14 days before the Sale Hearing).

d. <u>Effects of Filing an Objection to a Contract Notice</u>. A properly filed and served objection to a Contract Notice will reserve such objecting party's rights against the Debtors with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in this motion.

e. <u>Effects of Failing to File an Objection to a Contract Notice</u>. Any counterparty to an Assumed Contract who does not file an objection to the assumption and assignment of such Assumed Contract will be deemed to have waived and released any right to assert an objection to the assumption and assignment of any Assumed Contract and to have otherwise consented to such assumption and assignment and will be forever barred and estopped from asserting or claiming against the Debtors, their estates or the Purchaser (or any other assignee of the relevant Assumed Contract) or any member, shareholder or partner of the Purchaser that any additional amounts are due or conditions to assumption and assignment must be satisfied under such Assumed Contract for the period before the date of the Sale Hearing, absent any subsequent defaults by the Purchaser.

## <u>Supporting Authority</u>

### A. The Relief Sought in the Bidding Procedures Order is in the Bests Interests of the Debtors' Estates and Should be Approved

#### i. The Bidding Procedures are Appropriate and Will Maximize the Value Received for the Acquired Assets

43. The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the estate. *See*, *e.g.*, *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339

(3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc*. (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-5 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Prod., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

44. Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. *See In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-01563 (Bankr. D. Del. Jan. 31, 1997); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) (as amended) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for an [sic] fair and efficient resolution of bankrupt estates"); *In re O'Brien Entl. Energy*, 181 F.3d at 537; *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate").

45. The Debtors believe that the proposed Bidding Procedures will establish the parameters under which the value of the Acquired Assets may be tested at the Auction and

approved at the Sale Hearing. The Bidding Procedures will increase the likelihood that the Debtors receive the most consideration for the Acquired Assets because they encourage competitive and fair bidding. The Bidding Procedures will also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maximizing the value to their estates and overall enterprise.

46. Specifically, the proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bidding Procedures will encourage active bidding from interested parties and thus dispel any doubts as to the highest or best offer available for the Acquired Assets. The Bidding Procedures are consistent with other procedures previously approved by this Court, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re O'Brien Envtl. Energy*, 181 F.3d at 537; *In re Palm Harbor Homes, Inc.*, Case No. 10-13850 (Bankr. D. Del. Jan. 6, 2011) [Docket No. 187]; *In re Ultimate Escapes Holdings, LLC*, Case No. 10-12915 (Bankr. D. Del. Oct. 8, 2010) [Docket No. 133]; *In re PTC Alliance Corp.,* Case No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) [Docket No. 226]; *In re Hayes Lemmerz Intl, Inc.*, Case No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) [Docket No. 644]; *In re VeraSun Energy Corp.*, Case No. 08-12606 (Bankr. D. Del. Feb. 19, 2009) [Docket No. 699]; *In re Hines Horticulture, Inc.*, Case No. 08-11922 (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355].[20]

---

[20] Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request to the Debtors' counsel.

### ii. Reservation of the Administrative Agents' Right to Credit Bid is Appropriate

47. As discussed above, the Support Agreement contemplates that the Administrative Agent under the First Lien Credit Agreement will attend the Auction and may submit one or more credit bids in an amount equal to all or a portion of the total claims under the First Lien Credit Agreement.[21] Additionally, the Interim DIP Order provides that, upon entry of a final order approving the DIP Credit Agreement, the Administrative Agents under the First Lien Credit Agreement and the Second Lien Purchase Agreement will have the right to credit bid up to the full amount of the respective claims under the First Lien Credit Agreement and the Second Lien Purchase Agreement.[22]

48. The right to credit bid is set forth in section 363(k) of the Bankruptcy Code, which provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise, the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

49. In this district, absent cause for restricting an administrative agent to credit bid, courts have consistently ruled in favor of reserving an administrative agent's right to credit bid its claim in the face amount of the debtor's obligation in the context of a sale completed outside of a plan of reorganization. *See In re PTC Alliance Corp.,* Case No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) [Docket No. 226] (order authorizing, but not directing, the administrative agent to

---

21 *See* Support Agreement at §§ 3.2(b), 3.3(b).

22 *See* Interim DIP Order at ¶¶ 23, 24.

credit bid); *In re Hayes Lemmerz Intl, Inc.*, Case No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) [Docket No. 644] (order authorizing any interested party to exercise its right under Bankruptcy Code section 363(k) to make a credit bid); *In re Foamex Int'l Inc.*, Case No. 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *In re GWLS Holdings, Inc.,* 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) (order approving the sale of substantially all of the debtor's assets, free and clear, through a credit bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006) (citation omitted).

50. The Debtors do not believe cause exists to restrict the Administrative Agents' right to credit bid and, accordingly, the Debtors submit that the Administrative Agents' right to credit bid pursuant to the Bidding Procedures (and as contemplated in connection with the DIP Credit Agreement)[23] is appropriate and should be approved.

**iii. The Overbid Increment Requirements in the Bidding Procedures are Appropriate**

51. One important component of the Bidding Procedures is the "overbid" provision, which provides that Bids submitted at the Auction must be in increments of at least $500,000 higher than the previous Bid (the "***Overbid Increment***"). The Overbid Increment is reasonable under the circumstances and will enable the Debtors to maximize the value for the Acquired

---

[23] *See* Interim DIP Order at ¶ D(x) ("As of the Petition Date and immediately prior to giving effect to [the Interim DIP Order], (a) the Prepetition ABL Loan Documents, Prepetition First Lien Term Loan Documents, and Prepetition Second Lien Term Loan Documents are valid and binding agreements and obligations of the Debtors, and the Liens (as defined in the Intercreditor Agreement) granted pursuant to the Prepetition ABL Loan Documents, Prepetition First Lien Term Loan Documents, and the Prepetition Second Lien Term Loan Documents (i) constitute valid, binding, enforceable and perfected security interests and Liens, subject only to the Liens permitted under the Prepetition Credit Documents, but only to the extent such permitted Liens are valid, enforceable, non-avoidable Liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Liens of the Prepetition ABL Loan Secured Parties in the ABL Priority Collateral as of the Petition Date.").

Assets while limiting any chilling effect on the Sale process. The Overbid Increment is also consistent with such increments previously approved by this Court. *See In re Flying J Inc.*, Case No. 08-13384 (Bankr. D. Del. July 7, 2009) [Docket No. 1460] (approving $1 million increment); *In re Nortel Networks Inc.*, Case No. 09-10138 (Bankr. D. Del. Feb. 29, 2009) [Docket No. 386] (approving $500,000 increment); *In re Hines Horticulture, Inc.*, Case No. 08-11922 (Bankr. D. Del. Dec. 9, 2008) [Docket No. 355] (approving $500,000 increment); *In re Uni-Marts, LLC*, Case No. 08-11037 (Bankr. D. Del. July 10, 2008) [Docket No. 207] (approving $100,000 increment); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (Bankr. D. Del. July 24, 2007) [Docket No. 1486] (approving $750,000 increment).

**B. The Proposed Notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing is Appropriate**

52. Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed Sale. Fed. R. Bankr. P. 2002(a), (c). Additionally, Bankruptcy Rules 6004, 7004 and 9014 provide specific requirements with respect to providing notice of a sale of assets free and clear of claims, liens and encumbrances. Fed. R. Bankr. P. 6004, 7004, 9014.

53. To comply with these various requirements, and in light of the Debtors' dual-track process, the Debtors propose to provide notice of the Sale, the Auction, the Sale Hearing and the list of the Assumed Contracts only after the occurrence of a Triggering Event and the filing of the Auction Notice. The Debtors will also serve the Auction Notice by first class mail, postage prepaid, with copies of the Bidding Procedures Order and the Bidding Procedures to the Notice Parties and all other parties in interest.

54. The Auction Notice will be substantially in the form annexed as **Exhibit 2** to **Exhibit A** attached hereto and will note the following:

- the Debtors' intent to hold an Auction with respect to the Sale;

- the date, time and location of the Auction;
- the date of the Auction Notice Date and the designation of the Auction Notice Date as the commencement day that the Debtors will begin accepting bids;
- the deadline before which interested parties must submit their Bids (to be no earlier than 15 days from the Auction Notice Date) (the "***Bid Deadline***");
- the form and address in which bids should be submitted (in a manner consistent with those described in the Bidding Procedures); and
- the date, time and location of the Sale Hearing.

55. Furthermore, the Debtors also propose to provide notice of the Sale through the publication of the Publication Notice, substantially in the form of the Auction Notice (with minor modifications for publication purposes) in the National Edition of *The Wall Street Journal*, no later than three days after the Auction Notice Date. This notice will provide an opportunity to reach as many interested parties as possible and thereby ensure a fair and accessible bidding process. The Debtors believe that they will obtain the maximum recovery for all stakeholders if the Acquired Assets are sold through a well-advertised Auction. The Debtors expect that the Auction, subject to this Court's approval, will result in a bidding process where any party that has any interest in purchasing the Acquired Assets will have the opportunity to participate in the Auction.

56. The Debtors submit that the Auction Notice and the Publication Notice comply fully with Bankruptcy Rules 2002, 6004, 7004 and 9014, and are reasonably calculated to provide timely and adequate notice of the Sale and should be approved.

### C. The Proposed Sale is Appropriate Outside of a Plan of Reorganization and is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

57. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). It is well-established in this jurisdiction that a debtor may sell assets outside of a plan of reorganization pursuant to section 363(b) of the Bankruptcy Code if there is a good business reason for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3rd Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175 (Bankr. D. Del. 1991); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

58. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys., Inc.*, No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997). The *Delaware & Hudson Railway* court further held that:

> [O]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the or [proposed] purchaser is proceeding in good faith.

*In re Delaware & Hudson Ry.*, 124 B.R. at 176.

59. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets

for the estate, its creditors or interest holders. *See*, *e.g.*, *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3rd Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re Integrated Res.*, 147 B.R. at 659.

60. Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.)*, 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

61. To the extent it goes forward, the Sale is appropriate because the Debtors' decision to move forward with the Sale will come only after pursuing and failing to achieve confirmation of the Plan. Additionally, the proposed Sale will preserve the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. Accordingly, the Debtors

submit that they have satisfied the requirements of section 363(b) of the Bankruptcy Code to proceed with the Sale and should be permitted to proceed with the Sale contemplated by the Bidding Procedures to the extent a Triggering Event occurs.

### D. Assumption and Assignment of the Assumed Contracts are Authorized by Section 365 of the Bankruptcy Code

#### i. Assumption and Assignment of the Assumed Contracts is a Sound Exercise of the Debtors' Business Judgment

62. Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession may, subject to the court's approval, "assume . . . any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, including the requirement that a debtor "cure" all defaults in an executory contract or unexpired lease. 11 U.S.C. § 365(b)(1).[24]

---

[24] Specifically, section 365(b)(1) provides, in relevant part, as follows:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (a) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;
>
> (b) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (c) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

(Continued…)

63. The Third Circuit applies the "business judgment" test, which requires a debtor to determine whether a requested assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code would be beneficial to its estate. *See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3rd Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code.") (quoting *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 898 (Bankr.E.D.Pa.1987)); *In re III Enterprises, Inc. V,* 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

64. It is well established that the court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its "business judgment." *See In re Decora Industries, Inc.*, 2002 WL 32332749, at *8 (D. Del. 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard.").

65. To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate."). Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *In*

*re Network Access Solutions Corp.*, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. *See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003); *Lubrizol Enters. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

66. In this case, and as will be demonstrated at the Sale Hearing, if necessary, the Debtors' decision to assume and assign the Assumed Contracts pursuant to the terms of the APA (and pursuant to the Assumption Procedures) will satisfy the requirements of the Bankruptcy Code and is supported by the Debtors' reasonable business judgment. Specifically, because the Acquired Assets will comprise substantially all of the Debtors' assets, retaining and performing under the Assumed Contracts does not make business sense.

67. Conversely, rejection of the Assumed Contracts would in many cases result in rejection damage claims against the Debtors. Moreover, the Assumed Contracts will be necessary for the Purchaser to conduct the businesses and, since it is unlikely that a purchaser would pay full value for the Acquired Assets without the benefit of the Assumed Contracts, the assumption and assignment of the executory contracts and unexpired leases related to the Debtors' businesses will be essential to inducing the highest or otherwise best offer for the Acquired Assets.

68. Further, by assuming and assigning the Assumed Contracts, the Debtors will achieve the positive result of eliminating the Debtors' future performance obligations and, at the same time, avoid the incurrence of rejection damage claims. *See* 11 U.S.C. § 365(k) ("Assignment by the [debtor] to an entity of a . . . lease assumed under [section 365] relieves [the debtor] from any liability for any breach of such contract or lease occurring after such

assignment.”). Because the Debtors cannot otherwise obtain the benefits of the APA, the assumption of the Assumed Contracts is undoubtedly a sound exercise of the Debtors’ business judgment. Finally, by way of the competitive bidding process promulgated under the Bidding Procedures, the Sale will maximize the value of the Assumed Contracts for the Debtors’ estates. Accordingly, to the extent that the Debtors can sell any related executory contracts and unexpired leases in connection with entry into the APA, they may be able generate cash to the benefit of their estates.

69. To the extent the Assumed Contracts are assumed by the Debtors and assigned to the Purchaser, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of such Assumed Contracts will be satisfied at the Sale Hearing. As described in the Bidding Procedures, the Debtors require bidders to declare the willingness and financial ability to perform under the Assumed Contracts in order to be considered as Qualified Bidders. Specifically, the Debtors will consider the financial credibility, willingness and ability of the Bidder to perform under the Assumed Contracts. Moreover, counterparties will have adequate time and opportunity to object to the assumption or proposed cure amount, as described in the Assumption Procedures.

**ii. Assignment of the Assumed Contracts is Appropriate Notwithstanding Any Anti-Assignment Provisions in Such Contracts**

70. To assist in the assumption and assignment of the Assumed Contracts, the Debtors also request that the Sale Order provide that certain anti-assignment provisions in the Assumed Contracts not restrict, limit or prohibit the assumption, assignment and sale of the Assumed Contracts and that such provisions are deemed and found to be unenforceable within the meaning of section 365(f) of the Bankruptcy Code.

71. Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

72. Section 365(f)(l) of the Bankruptcy Code thus invalidates provisions that prohibit, restrict or condition assignment of an executory contract or unexpired lease. *See*, *e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.)*, 127 F. 3d 904, 910-11 (9th Cir. 1997) ("[n]o principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365."). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.

73. Accordingly, the Debtors request that any anti-assignment provision in an Assumed Contract be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assumed Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

**E. The Sale of the Acquired Assets Free and Clear of Liens is Authorized by Section 363(f)**

74. The Debtors further submit that it is appropriate to sell the Acquired Assets free and clear of Encumbrances (other than any assumed liabilities that the Purchaser agrees to assume in connection with the Sale as will be further described in the APA) pursuant to section

363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net sale proceeds of the Acquired Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> a. applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> b. such entity consents;
>
> c. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> d. such interest is in *bona fide* dispute; or
>
> e. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

75. This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a).[25]

76. Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests. *See In re Thompson Publiching Holding Co., Inc.,* Case No. 10-13070 (Bankr. D. Del. Nov. 19, 2010) [Docket No. 178] ("[t]he [d]ebtors may sell the [p]urchased [a]ssets free and clear of all [l]iens of any kind or nature whatsoever" as long as "one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been

---

25 Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that Bankruptcy Code section 105(a) of the Bankruptcy Code provides such authority. *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

satisfied.”); *In re Advanta Corp.*, Case No. 09-13931 (Bankr. D. Del. June 1, 2010) [Docket No. 602] (“[P]ursuant to section 363(f) of the Bankruptcy Code, the [s]ale shall be free and clear of any and all liens, claims and encumbrances against the [a]ssets, with such liens, claims and encumbrances, if any, to attach to the proceeds of the [s]ale with the same force, effect and priority as such liens, claims and encumbrances have on the [a]ssets…”); *In re Aegis Mortgage Corp.*, Case No. 07-11119 (Bankr. D. Del. Aug. 17, 2010) [Docket No. 5447] (same); *In re Foamex International Inc.*, Case No. 09-10560 (Bankr. D. Del. May 27, 2009) [Docket No. 483] ([t]he [p]urchaser would not have entered into the [f]inal APA . . . if the sale of the [p]urchased [a]ssets . . . were not free and clear of all [l]iens and [c]laims . . .); *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) (“[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.”); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1998) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale “free and clear” provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

77. Here, to the extent the Sale is implemented, the Debtors will demonstrate at the Sale Hearing (to the extent necessary) that one or more of the tests of section 363(f) are satisfied with respect to the Sale. In the first instance, the Debtors have no reason to believe that holders of Encumbrances would not consent to the terms of the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, the Debtors believe that all holders of Encumbrances could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code, to the extent that such interests are

sought to be discharged in the order approving the relief sought in this motion. Accordingly, the Debtors submit that any Encumbrances will attach to the net proceeds (if any) recognized at the Sale.

78. Based upon the foregoing, the Debtors submit that the Sale, free and clear of Encumbrances, should be approved by the Court upon the terms requested at the Sale Hearing under section 363(f) of the Bankruptcy Code.

**The Debtors' Reservation of Rights to Supplement this Motion**

79. The Debtors hereby expressly reserve their rights to supplement this motion with respect to any of the relief sought herein, including with respect to the following:

- providing a copy of the proposed form APA, as required by Local Rule 6004-1(b)(i);
- amending the proposed form of the Sale Order, as required by Local Rule 6004-1(b)(ii);
- providing any supporting legal and factual justification supporting those provisions that the Debtors are required to highlight pursuant to Local Rule 6004-1, including any provisions that may have the effect of limiting successor liability or requesting relief from Bankruptcy Rule 6004(h); and
- providing any supporting legal or factual justification to support a finding that the ultimate Purchaser is a "good faith" purchaser and is entitled to the full protection of section 363(m) of the Bankruptcy Code.

**Notice**

80. The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents for the Debtors' debtor in possession lenders; (d) counsel to the agent

for the Debtors' prepetition asset-based revolving lending facility; (e) counsel to the agent for the Debtors' prepetition first lien term loan; (f) counsel to the agent for the Debtors' prepetition second lien notes and unsecured notes; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Delaware State Attorney General; (j) the Office of the United States Attorney General for the State of Delaware; (k) the Internal Revenue Service; and (l) the Securities and Exchange Commission. In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

81. No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the Bidding Procedures Order and (following the Sale Hearing), the Sale Order, (a) granting the relief requested herein and (b) granting such other and further relief as may be appropriate.

Dated: January 24, 2011
Wilmington, Delaware

*/s/ Domenic E. Pacitti*


Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

- and -

Richard M. Cieri (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022–4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*