# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| APPLESEED'S INTERMEDIATE | ) Case No. 11-10160 (KG) |
| HOLDINGS LLC, *et al.*,[1] | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## JOINT PLAN OF REORGANIZATION OF
## APPLESEED'S INTERMEDIATE HOLDINGS LLC AND ITS DEBTOR
## AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Richard M. Cieri (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated:  April 14, 2011

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:     Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688).     The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW .................................................................................................................................1

    Defined Terms ...................................................................................................................1
    Rules of Interpretation .....................................................................................................16
    Computation of Time .......................................................................................................16
    Governing Law ................................................................................................................16
    Reference to Monetary Figures .......................................................................................17
    Reference to the Debtors or the Reorganized Debtors ....................................................17

ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS ....................17

    Administrative Claims .....................................................................................................17
    Priority Tax Claims .........................................................................................................18
    Statutory Fees ..................................................................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................18

    Classification of Claims and Interests .............................................................................18
    Summary of Classification ...............................................................................................19
    Treatment of Claims and Interests ..................................................................................19
    Special Provision Governing Claims that are Not Impaired .............................................24
    Acceptance or Rejection of the Plan ................................................................................24
    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................24
    Subordinated Claims .......................................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................25

  A.    New Loans. .....................................................................................................................25
    Restructuring Transactions .............................................................................................25
    Sources of Consideration for Plan Distributions .............................................................26
    Corporate Existence ........................................................................................................27
    Vesting of Assets in the Reorganized Debtors .................................................................27
    Cancellation of Existing Securities ..................................................................................27
    Corporate Action .............................................................................................................27
    New Certificates of Incorporation and New By-Laws ......................................................28
    Directors and Officers of the Reorganized Debtors and Reorganized AIH .......................28
    Effectuating Documents; Further Transactions ...............................................................28
  K.    Management Equity Incentive Program ...........................................................................29
  L.    New Employment Agreements .........................................................................................29
    Exemption from Certain Taxes and Fees .........................................................................29
  N.    Existing Benefits Agreements ..........................................................................................29
  O.    D&O Liability Insurance Policies. ..................................................................................29
    Preservation of Causes of Action ....................................................................................30
    The Fee Claims Escrow Account .....................................................................................31
  R.    Litigation Trust. ..............................................................................................................31

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............37

    Assumption and Rejection of Executory Contracts and Unexpired Leases ......................37
    Claims Based on Rejection of Executory Contracts or Unexpired Leases ........................38
    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed .....................38
    Insurance Policies ...........................................................................................................38
    Modifications, Amendments, Supplements, Restatements or Other Agreements ............38
    Reservation of Rights ......................................................................................................39

Nonoccurrence of Effective Date ........................................................................................... 39
Contracts and Leases Entered Into After the Petition Date ................................................... 39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................... 39

Timing and Calculation of Amounts to Be Distributed ........................................................ 39
Disbursing Agent .................................................................................................................. 39
Rights and Powers of Disbursing Agent .............................................................................. 40
Delivery of Distributions and Undeliverable or Unclaimed Distributions ........................... 40
Manner of Payment ............................................................................................................... 41
Section 1145 Exemption ....................................................................................................... 41
Compliance with Tax Requirements ..................................................................................... 42
Allocations ............................................................................................................................ 42
No Postpetition Interest on Claims ....................................................................................... 42
Setoffs and Recoupment ....................................................................................................... 42
Claims Paid or Payable by Third Parties .............................................................................. 42

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS ...................................................................................................................... 43

Allowance of Claims ............................................................................................................. 43
Claims Administration Responsibilities ............................................................................... 43
Estimation of Claims ............................................................................................................ 43
Adjustment to Claims Without Objection ............................................................................. 44
Time to File Objections to Claims ........................................................................................ 44
Disallowance of Claims ........................................................................................................ 44
Amendments to Claims ......................................................................................................... 44
No Distributions Pending Allowance .................................................................................... 44
Distributions After Allowance .............................................................................................. 45

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ............ 45

A.      Compromise and Settlement of Claims, Interests and Controversies. ..................... 45
        Discharge of Claims and Termination of Interests ................................................... 45
        Release of Liens ....................................................................................................... 45
        Releases by the Debtors ........................................................................................... 46
        Releases by Holders ................................................................................................. 46
        Liabilities to, and Rights of, Governmental Units ................................................... 47
        Exculpation ............................................................................................................... 47
        Injunction ................................................................................................................. 47
        Subordination Rights Under the Intercreditor Agreement ....................................... 48
        Term of Injunctions or Stays .................................................................................... 48
K.      Bar Order. ................................................................................................................ 48
L.      Litigation Neutrality. ............................................................................................... 49

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ............................................................................................................................................. 50

Conditions Precedent to Confirmation .................................................................................. 50
Conditions Precedent to the Effective Date .......................................................................... 50
Waiver of Conditions ............................................................................................................ 51
Effect of Failure of Conditions ............................................................................................ 51

ARTICLE X. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..................... 51

Modification and Amendments .............................................................................................. 51
Effect of Confirmation on Modifications .............................................................................. 51
Revocation or Withdrawal of Plan ........................................................................................ 51

ARTICLE XI. RETENTION OF JURISDICTION ....................................................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...............................................................................53
    Immediate Binding Effect ..............................................................................................................53
    Additional Documents ...................................................................................................................53
    Statutory Committee and Cessation of Fee and Expense Payment; Oversight Committee.............54
    Reservation of Rights.....................................................................................................................54
    Successors and Assigns..................................................................................................................55
    Notices ..........................................................................................................................................55
    Entire Agreement ..........................................................................................................................56
    Exhibits .........................................................................................................................................56
    Severability of Plan Provisions......................................................................................................57
    Votes Solicited in Good Faith ........................................................................................................57
    Closing of Chapter 11 Cases..........................................................................................................57
    Conflicts........................................................................................................................................57
    Filing of Additional Documents.....................................................................................................57

# INTRODUCTION

Appleseed's Intermediate Holdings LLC ("**AIH**") d/b/a Orchard Brands and its debtor affiliates, as debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**"), propose this joint plan of reorganization (the "**Plan**") for the resolution of the Claims (as such term is defined below) against and Interests (as such term is defined below) in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code (as such term is defined below). Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Holders of Claims and Interests (as such terms are defined below) should refer to the Disclosure Statement (as such term is defined below) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

*A.*      *Defined Terms*.

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.      *"ABL Administrative Agent"* means UBS AG, Stamford Branch, in its capacity as administrative agent under the ABL Credit Agreement.

2.      *"ABL Agents"* means, collectively, the ABL Administrative Agent, the ABL Arranger, the ABL Co-Collateral Agents, the ABL Issuing Bank and the ABL Swingline Lender.

3.      *"ABL Arranger"* means UBS Securities LLC, in its capacity as joint lead arranger and joint book runner under the ABL Credit Agreement.

4.      *"ABL Claim"* means any Claim derived from, based upon, relating to or arising from the ABL Credit Agreement.

5.      *"ABL Co-Collateral Agents"* means UBS AG, Stamford Branch and Wells Fargo Bank, N.A., in their respective capacity as collateral agent or co-collateral agent under the ABL Credit Agreement.

6.      *"ABL Credit Agreement"* means the Credit Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as borrowers, each of the other Debtors, as guarantors, the ABL Lenders, the ABL Administrative Agent, the ABL Co-Collateral Agents, the ABL Issuing Bank, the ABL Swingline Lender, American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners, and American Capital Financial Services, Inc., as syndication agent, and any guarantees, security documents and other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

7.      *"ABL Issuing Bank"* means UBS AG, Stamford Branch, in its capacity as issuing bank under the ABL Credit Agreement.

8.      *"ABL Lenders"* means the institutions party from time to time as "Lenders" under the ABL Credit Agreement.

9.      *"ABL Swingline Lender"* means UBS Loan Finance LLC, in its capacity as swingline lender under the ABL Credit Agreement.

10. *"ACAS"* means American Capital, Ltd. American Capital Equity I, LLC, and any of their respective, parents, subsidiaries, successors, predecessors, attorneys, professionals, former and current officers, former and current directors, former and current employees, and any investment funds and securitization vehicles under either of their respective control or common control (and with respect to the current and former officers, directors and employees, only in their capacity as officers, directors and employees of ACAS).

11. *"Accrued Professional Compensation"* means, at any given time, all accrued, contingent and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330 or 331 of the Bankruptcy Code or otherwise rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by Final Order, in each case subject the terms of the DIP Order (a) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (b) after applying any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

12. *"Additional Investigation Budget"* has the meaning set forth in the DIP Order.

13. *"Ad Hoc Group of First Lien Lenders"* refers to certain funds managed by Ableco Finance LLC, Highland Capital Management LP and Canyon Capital Advisors LLC, solely in their respective capacities as Holders of First Lien Claims.

14. *"Administrative Claim"* means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; (c) all Claims of the ABL Agents, the ABL Lenders, the DIP Facility Tranche A Agents, the DIP Facility Tranche A Lenders, the DIP Facility Tranche B Agents and the DIP Facility Tranche B Lenders under or granted under the DIP Order; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

15. *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

16. *"AIH"* means Appleseed's Intermediate Holdings LLC, the direct or indirect parent of each of the other Debtors.

17. *"AIH Note Agent"* means American Capital Financial Services, Ltd. (successor by merger to American Capital Financial Services, Inc.), in its capacity as administrative agent under the AIH Note Purchase Agreement.

18. *"AIH Note Claims"* means any Claim derived from, based upon, relating to or arising from the AIH Note Purchase Agreement.

19. *"AIH Note Purchasers"* means the institutions party from time to time as "Purchasers" under the AIH Note Purchase Agreement.

20. *"AIH Note Purchase Agreement"* means the Note Purchase Agreement, dated as of July 12, 2007, by and among AIH, as issuer, the AIH Note Purchasers, the AIH Note Agent and American Capital Strategies, Ltd., as sole lead arranger and bookrunner, and any other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

21.    *"Allowed"* means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent nor unliquidated; (b) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (e) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline.  Except for any Claim that is expressly Allowed herein, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

22.    *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V and which shall be included in the Plan Supplement.

23.    *"Bankruptcy Code"* means chapter 11 of title 11 of the United States Code.

24.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

25.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

26.    *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

27.    *"Cash"* means the legal tender of the United States of America.

28.    *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

29.    *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 11-10160 (KG).

30.    *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

31.    *"Claims Bar Date"* means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

32.    *"Claims Objection Deadline"* means, for each Claim, (a) 75 days after the Effective Date (or, in the case of the Litigation Trustee with respect to General Unsecured Claims, 180 days after the Effective Date) or

(b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

33. *"Claims Register"* means the official register of Claims maintained by Kurtzman Carson Consultants LLC, retained as the Debtors' notice, claims and solicitation agent.

34. *"Competitor"* means a Person that derives a material portion of its revenue from the sale of products or services that are in direct competition with products or services that are produced, marketed or otherwise commercially exploited by the Debtors.

35. *"Class"* means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

36. *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.C.

37. *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

38. *"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

39. *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

40. *"Consenting First Lien Lenders"* means the Holders of First Lien Claims that are party to the Plan Support Agreement.

41. *"Consummation"* means the occurrence of the Effective Date.

42. *"Creditors' Committee"* means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on January 28, 2011 [Docket No. 105], as such committee membership may be amended by the U.S. Trustee from time to time.

43. *"Critical Vendor Order"* means the interim order entered by the Bankruptcy Court on January 20, 2011 [Docket No. 43] and any final order with respect thereto.

44. *"Cure Claim"* means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

45. *"Cure Notice"* means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

46. *"Current Debtor Director"* means any director of any of the Debtors or the Debtors' Affiliates (other than the Golden Gate Parties) as of both the date of entry of the DIP Order and the Effective Date.

47. *"Current Debtor Employee"* means any Employee of any of the Debtors as of both the date of entry of the DIP Order and the Effective Date in whatever capacity, including any Employee that serves or previously served as a director or officer of any of the Debtors or the Debtors' Affiliates (other than the Golden Gate Parties) and/or is or previously was a shareholder of any of the Debtors or the Debtors' Affiliates (other than the

Golden Gate Parties), in each case, whether in such Employee's capacity as such or as a director, officer, shareholder or otherwise of any of the Debtors or any Affiliates of the Debtors (other than the Golden Gate Parties).

48.    *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers' and officers' liability maintained by the Debtors as of the Petition Date, including the fiduciary liability coverage (executive risk) provided through Chartis Specialty Insurance Company for the policy period from June 1, 2010 through June 1, 2011 (Policy No. 01-880-05-84).

49.    *"Debtor"* means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

50.    *"Debtors"* means, collectively:    (a) AIH; (b) Appleseed's Acquisition, Inc.; (c) Appleseed's Holdings, Inc.; (d) Arizona Mail Order Company, Inc.; (e) Bedford Fair Apparel, Inc.; (f) Blair Credit Services Corporation; (g) Blair Factoring Company; (h) Blair Holdings, Inc.; (i) Blair International Holdings, Inc.; (j) Blair LLC; (k) Blair Payroll, LLC; (l) Draper's & Damon's Acquisition LLC; (m) Draper's & Damon's LLC; (n) Fairview Advertising, LLC; (o) Gold Violin LLC; (p) Haband Acquisition LLC; (q) Haband Company LLC; (r) Haband Oaks, LP; (s) Haband Online, LLC; (t) Haband Operations, LLC; (u) Johnny Appleseed's, Inc.; (v) Linen Source Acquisition LLC; (w) LM&B Catalog, Inc.; (x) Monterey Bay Clothing Company, Inc.; (y) Norm Thompson Outfitters, Inc.; (z) NTO Acquisition Corporation; (aa) Orchard Brands Insurance Agency LLC; and (bb) Wintersilks, LLC.

51.    *"Designated Affiliate"* of any specified Person means any other Person that is not a Competitor and that is directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, *"control"* when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms *"controlling"* and *"controlled"* have means correlative to the foregoing.

52.    *"DIP Facility Arranger"* means UBS Securities LLC, in its capacity as sole lead arranger and sole bookrunner under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

53.    *"DIP Facility Co-Collateral Agents"* means UBS AG, Stamford Branch and Wells Fargo Bank, N.A., in their respective capacity as collateral agent or co-collateral agent under the DIP Facility Credit Agreement, together with their respective successors and assigns in such capacity.

54.    *"DIP Facility Credit Agreement"* means the agreement governing the $140 million senior secured super-priority debtor in possession credit facility, dated as of January 20-, 2011 among the Debtors, the DIP Facility Tranche A Administrative Agent, the DIP Facility Tranche A Lenders, the DIP Facility Arranger, the DIP Facility Issuing Bank, the DIP Facility Swingline Lender, the DIP Facility Co-Collateral Agents, the DIP Facility Tranche B Agents and the DIP Facility Tranche B Lenders (as amended, restated, supplemented or otherwise modified from time to time).

55.    *"DIP Facility Issuing Bank"* means UBS AG, Stamford Branch and Wells Fargo, National Association, each in its capacity as issuing bank under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

56.    *"DIP Facility Swingline Lender"* means UBS Loan Finance LLC, in its capacity as swingline lender under the DIP Facility Credit Agreement, together with its successors and assigns in such capacity.

57.    *"DIP Facility Tranche A"* means the debtor in possession asset-based revolving credit facility with committed availability up to $100 million under the DIP Facility Credit Agreement.

58.    *"DIP Facility Tranche A Administrative Agent"* means UBS AG, Stamford Branch, in its capacity as the administrative agent for the DIP Facility Tranche A under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

59.     *"DIP Facility Tranche A Agents"* means, collectively, the DIP Facility Arranger, the DIP Facility Co-Collateral Agents, the DIP Facility Issuing Bank, the DIP Facility Swingline Lender and the DIP Facility Tranche A Administrative Agent.

60.     *"DIP Facility Tranche A Claim"* means any Claim derived from, based upon, relating to or arising from the DIP Facility Tranche A under the DIP Facility Credit Agreement, including any Claims on account of issued and undrawn letters of credit.

61.     *"DIP Facility Tranche A Lender"* means the institutions party from time to time as "Lenders" for the DIP Facility Tranche A under the DIP Facility Credit Agreement.

62.     *"DIP Facility Tranche B"* means the debtor in possession term loan in the aggregate principal amount of up to $40 million under the DIP Facility Credit Agreement.

63.     *"DIP Facility Tranche B Administrative Agent"* means Ableco Finance LLC, in its capacity as the administrative agent for the DIP Facility Tranche B under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

64.     *"DIP Facility Tranche B Agents"* means the DIP Facility Tranche B Administrative Agent and the DIP Facility Tranche B Disbursement Agent.

65.     *"DIP Facility Tranche B Disbursement Agent"* means American Capital, Ltd., in its capacity as the disbursement agent for the DIP Facility Tranche B under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

66.     *"DIP Facility Tranche B Lender"* means the institutions party from time to time as "Lenders" for the DIP Facility Tranche B under the DIP Facility Credit Agreement.

67.     *"DIP Facility Tranche B Claim"* means any Claim derived from, based upon, relating to or arising from the DIP Facility Tranche B.

68.     *"DIP Order"* means the final order of the Bankruptcy Court entered on February 23, 2011 [Docket No. 315], in form and substance reasonably acceptable to the DIP Facility Tranche A Administrative Agent and the DIP Facility Tranche B Agents, authorizing, *inter alia,* the Debtors to enter into the DIP Facility Credit Agreement and incur postpetition obligations thereunder.

69.     "*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan; *provided, however,* that with respect to distributions to the Litigation Trust Beneficiaries, the Litigation Trustee shall distribute the Litigation Trustee Distributable Proceeds as and when provided for in the Litigation Trust Agreement.

70.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 1, 2011 [Docket No. 362], as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

71.     *"Disputed"* means, with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject, or potentially subject, to a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court, (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code (except as otherwise agreed to by the Litigation Trustee with respect to General Unsecured Claims) or (d) in the case of General Unsecured Claims, that is disputed in a filing in

the Bankruptcy Court by the Litigation Trustee. A Claim or Administrative Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

72. *"Distribution Date"* means, with respect to a Claim that is Allowed as of the Effective Date, the date that is as soon as practicable after the Effective Date, but no later than ten days after the Effective Date.

73. *"Distribution Record Date"* means the date that the Confirmation Order is entered by the Bankruptcy Court.

74. *"Effective Date"* means the date selected by the Debtors that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C and (b) no stay of the Confirmation Order is in effect. Unless otherwise specifically provided in the Plan, anything required to be done by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date shall be done on the Effective Date.

75. *"Employee"* means an individual that is an employee, manager or officer of any of the Debtors employed by the Debtors on a salary or hourly basis who serves in such capacity.

76. *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

77. *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

78. *"Exculpated Claim"* means any Claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Plan (including any term sheets related thereto) or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation and the administration and implementation of the Plan, including (a) the Plan Support Agreement; (b) the issuance of the New Common Stock, (c) the execution, delivery and performance of the New Loan Documents and (d) the distribution of property under the Plan or any other agreement.

79. *"Exculpated Party"* means each of: (a) the Debtors and the Reorganized Debtors; (b) the DIP Facility Tranche A Agents and DIP Facility Tranche A Lenders; (c) the DIP Facility Tranche B Agents and DIP Facility Tranche B Lenders (d) the ABL Agents and the ABL Lenders; (e) the First Lien Agent and the First Lien Lenders; (f) the Second Lien Note Agent and the Second Lien Note Purchasers; (g) the AIH Note Agent and AIH Note Purchasers; (h) the Creditors' Committee; (i) the members of the Creditors' Committee, in their capacity as such; (j) ACAS; (k) with respect to each of the foregoing entities in clauses (b) through (j), such Entities' predecessors, successors and assigns subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants and nominees; and (l) the Debtors' and the Reorganized Debtors' subsidiaries, Current Debtor Employees and Current Debtor Directors, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, and such Persons' respective heirs, executors, estates, servants and nominees (for purposes of the definition of Exculpated Party, the words "former," "managed accounts or funds," "management companies," "fund advisors," and "advisory board members" contained herein shall mean any Person or Entity that ever had, now has or hereafter can, shall or may have any involvement with, in any manner, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan.)

80. "*Existing Benefits Agreements*" means the employment, retirement, indemnification and other similar or related agreements or arrangements in existence as of the Petition Date that have been included in the Plan Supplement pursuant to Article IV.N.

81. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

82. "*Federal Judgment Rate*" means 0.27%, the federal judgment rate in effect as of the Petition Date.

83. "*Fee Claim*" means a Claim for Accrued Professional Compensation.

84. "*Fee Claims Escrow Account*" means the account established pursuant to Article IV.Q.

85. "*File," "Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

86. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

87. "*First Lien Agent*" means Wilmington Trust FSB in its capacity as successor administrative agent under the First Lien Credit Agreement.

88. "*First Lien Claim*" means any Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement.

89. "*First Lien Credit Agreement*" means the certain Credit Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as borrowers, each of the other Debtors, as guarantors, the First Lien Lenders, the First Lien Agent, American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners and American Capital Financial Services, Inc., as syndication agent, and any guarantees, security documents and other documents in connection therewith (as amended, restated, supplemented or otherwise modified from time to time).

90. "*First Lien Lenders*" means the institutions party from time to time as "Lenders" under the First Lien Credit Agreement.

91. "*First Lien Secured Claim*" means any Secured Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement.

92. "*First Lien Deficiency Claim*" means any Claim derived from, based upon, relating to or arising from the First Lien Credit Agreement, other than a First Lien Secured Claim.

93. "*General Unsecured Claim*" means any Unsecured Claim that is not (a) a Qualified Unsecured Trade Claim, (b) an AIH Note Claim, (c) an Intercompany Claim, (d) a First Lien Deficiency Claim or (e) a Second Lien Note Deficiency Claim.

94. "*Golden Gate Parties*" means any of the following: (a) Golden Gate Private Equity, Inc., and all of its Affiliates, parents, subsidiaries and funds (other than the Debtors and their subsidiaries, including Orchard Brands Global Sourcing Limited, the Debtors' Hong Kong subsidiary), (b) any other party (other than the Debtors and their subsidiaries) to the Golden Gate Transaction, (c) any Potential Defendant or (d) any direct, indirect or

mediate transferee of any interest of any Debtor in property provided for in the Golden Gate Transaction, or any Person or Entity for whose benefit any such transfer was made, in each case, including such Person's or Entity's respective present or former shareholders, directors, officers, employees, attorneys, advisors, insurers, investment bankers, consultants, managers, members, partners, agents, accountants, and other professionals, and their predecessors, successors, assigns, and present and former affiliates (whether by operation of law or otherwise); *provided*, *however*, that the term "Golden Gate Party" or "Golden Gate Parties" shall exclude (and, for the avoidance of doubt, the Persons and Entities identified in sub-clauses (w), (x), (y) and (z) of Article I.A.161 shall not include) (v) any Released Party, (w) any Exculpated Party, (x) any Current Debtor Employee, (y) any Current Debtor Director and (z) any of the Debtors' and their subsidiaries' attorneys, advisors or professionals.

95.     *"Golden Gate Transaction"* means (a) the merger of BLR Acquisition Corp. and Blair Corporation with Blair Corporation as the surviving entity in 2007, together with all other transactions provided for and/or contemplated under that certain Agreement and Plan of Merger by and among Blair Corporation, BLR Acquisition Corp., and Appleseed's Topco, Inc., dated as of January 23, 2007, (b) any other transaction at any time between Golden Gate Private Equity, Inc. and or any of its Affiliates (other than the Debtors and the subsidiaries of the Debtors), on the one hand, and one or more of the Debtors, on the other hand, and (c) all other agreements and instruments executed and delivered in connection with the transactions described in (a) and (b), including, without limitation, (i) all payments provided for thereunder, (ii) all redemptions of any class of equity of any of the parties to any such transaction and (iii) any transfer of any property of any Debtor (or interest of any Debtor therein) in connection with any such transaction.

96.     *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

97.     *"Holder"* means an Entity holding a Claim or an Interest.

98.     *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

99.     *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

100.    *"Interim Compensation Order"* means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 275].

101.    *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

102.    *"Intercreditor Agreement"* means the Intercreditor Agreement, dated as of April 30, 2007, by and among the ABL Administrative Agent, the First Lien Agent and the Second Lien Agent (as amended, restated, supplemented or otherwise modified from time to time).

103.    *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

104.    *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

105.    *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

106.    *"Lien" me*ans a lien as defined in section 101(37) of the Bankruptcy Code.

107.    *"Litigation Trust"* means the trust established for the benefit of the Litigation Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Litigation Trust Agreement.

108. *"Litigation Trust Agreement"* means the trust agreement that, among other things, establishes the Litigation Trust, and describes the powers, duties and responsibilities of the Litigation Trustee, which trust agreement shall be substantially in the form included in the Plan Supplement, in form and substance reasonably acceptable to the Debtors, the Creditors' Committee and each Consenting First Lien Lender holding more than 10% of the First Lien Claims.

109. *"Litigation Trust Assets"* means the Litigation Trust Payment, the Litigation Trust Loan, the Litigation Trust Discretionary Financing (if any), the Other Litigation Trust Financing (if any), the Litigation Trust Causes of Action and all proceeds of the foregoing.

110. *"Litigation Trust Beneficiaries"* means, collectively, (a) the Holders of Litigation Trust Interests and (b) the Debtors or Reorganized Debtors (as applicable) subject to, and to the extent provided for herein, including Article IV.R.12 and Article IV.R.14.

111. *"Litigation Trust Causes of Action"* means (a) all Claims by or on behalf of any Debtor (or any assignee of any Debtor) against any Golden Gate Party concerning, or on account of, the Golden Gate Transaction and/or any transfer of an interest of any Debtor in property provided for thereunder, including any Claims to recover the value of such transferred property, Claims arising under the Bankruptcy Code, state fraudulent transfer statutes and claims arising under state law based upon negligence, breach of fiduciary duty, lender liability, and/or other similar Claims and (b) all Claims of the Debtors and the Reorganized Debtors under any D&O Liability Insurance Policy related to any of the Claims described in sub-section (a) to the extent assignable to the Litigation Trust pursuant to the terms of the applicable D&O Liability Insurance Policy, all to the extent such Claims are not otherwise released or waived under the terms hereof; *provided, however,* that the amount of such Claims shall not in any way be limited by the agreement of the First Lien Lenders and Second Lien Lenders to not receive a distribution on account of First Lien Deficiency Claims and the Second Lien Deficiency Claims pursuant to this Plan.

112. *"Litigation Trust Discretionary Financing"* means any discretionary amounts other than the Litigation Trust Payment and the Litigation Trust Loan provided by the Reorganized Debtors for the purposes of providing additional funding for the Litigation Trust, with such amounts to be repaid to the Reorganized Debtors as described in Article IV.R.12.

113. *"Litigation Trust Distributable Proceeds"* means all actual proceeds of the Litigation Trust Causes of Action.

114. *"Litigation Trust Expenses"* means all reasonable legal and other reasonable professional fees, costs and expenses incurred by the Creditors' Committee (or any designee thereof, including the Litigation Trustee), including any reasonable administrative fees and expenses, reasonable attorney's fees and expenses, reasonable insurance fees, taxes and reasonable escrow expenses.

115. *"Litigation Trust Interests"* means the non-transferable interests in the Litigation Trust, distributions of which will be made to Holders of Allowed General Unsecured Claims in accordance with Article III.C.8.

116. *"Litigation Trust Loan"* means a loan of up to $1,500,000 to be provided by the Reorganized Debtors to the Litigation Trust on the Effective Date to provide funding in connection with the investigation and/or prosecution of the Litigation Trust Causes of Action, with any such amount to be repaid to the Reorganized Debtors if, as and when provided for in Article IV.R.12; *provided, however,* that the amount of the Litigation Trust Loan shall be reduced on a dollar-for-dollar basis (up to $750,000) for any amounts actually paid to the Creditors' Committee under the Additional Investigation Budget before the Effective Date to fund the investigation and prosecution of the Litigation Trust Causes of Action pursuant to the DIP Order.

117. *"Litigation Trust Payment"* means a one-time, non-refundable payment of $1,000,000 in Cash to be provided by the Debtors to the Litigation Trust on the Effective Date, which payment shall be used either to fund a distribution to Holders of Litigation Trust Interests, to provide funding in connection with the investigation and/or

prosecution of the Litigation Trust Causes of Action and/or for such other purposes determined by the Litigation Trustee in its sole discretion and consistent with the Litigation Trust Agreement and applicable law.

118. *"Litigation Trustee"* means the Person selected by the Creditors' Committee in consultation with the Tranche B Agents and identified in the Plan Supplement to serve as the trustee of the Litigation Trust and any successor thereto appointed pursuant to the Litigation Trust Agreement.

119. *"Management Equity Incentive Program"* means that certain post-Effective Date equity incentive program, which shall consist of restricted stock units, stock options, stock appreciation rights and/or similar rights and interests, with 10% of the New Common Stock issued on the Effective Date reserved for such program.

120. *"New ABL Facility"* means a committed asset-based revolving credit facility in a face amount of no less than $90 million (including $30 million available in letters of credit) that will be entered into by the Reorganized Debtors on the Effective Date pursuant to the New ABL Facility Credit Agreement.

121. *"New ABL Facility Credit Agreement"* means the loan agreement, dated as of the Effective Date, which will govern the New ABL Facility, the form of which shall be included in the Plan Supplement.

122. *"New AIH Board"* means the initial board of directors of Reorganized AIH.

123. *"New Boards"* mean, collectively, the New AIH Board and the New Subsidiary Boards.

124. *"New By-Laws"* means the form of the by-laws of each of Reorganized AIH and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

125. *"New Certificates of Incorporation"* means the form of the certificates of incorporation of Reorganized AIH and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

126. *"New Common Stock"* means a certain number of common shares in the capital of Reorganized AIH authorized pursuant to the Plan, of which up to 200,000 shares shall be initially issued and outstanding as of the Effective Date. Such authorized shares shall consist of (a) a class of full-voting shares having economic rights as set forth in the New Certificate of Incorporation of Reorganized AIH and the New Stockholders Agreement (the "**Class A Common Stock**"), (b) a class of limited-voting shares having economic rights as set forth in the New Certificate of Incorporation of Reorganized AIH and the New Stockholders Agreement (the "**Class B Common Stock**") and (c) a class of limited-voting shares having economic rights as set forth in the New Certificate of Incorporation of Reorganized AIH.

127. *"New Employment Agreements"* means the employment agreements, if any, between Reorganized AIH and members of the Debtors' management team with any such agreements to be included in the Plan Supplement as provided in Article I.A.148.

128. *"New First Lien Term Loan"* means a first priority senior secured term loan in the amount of $200 million pursuant to the New First Lien Term Loan Credit Agreement.

129. *"New First Lien Term Loan Credit Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New First Lien Term Loan, the form of which shall be included in the Plan Supplement.

130. *"New Intercreditor Agreement"* means the intercreditor agreement, dated as of the Effective Date, governing the New ABL Facility Credit Agreement, the New Senior Term Loan Credit Agreement, the New First Lien Term Loan Credit Agreement and the New Junior Term Loan Credit Agreement, the form of which shall be included in the Plan Supplement.

131. *"New Junior Term Loan"* means a second priority secured term loan in the amount of $43 million pursuant to the New Junior Term Loan Credit Agreement.

132.     *"New Junior Term Loan Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New Junior Term Loan, the form of which shall be included in the Plan Supplement.

133.     *"New Loan Documents"* means, collectively, the New ABL Facility Credit Agreement, the New Senior Term Loan Credit Agreement, the New First Lien Term Loan Credit Agreement and the New Junior Term Loan Credit Agreement.

134.     *"New Loans*" means, collectively, the New ABL Facility, the New Senior Term Loan, the New First Lien Term Loan and the New Junior Term Loan.

135.     *"New Registration Rights Agreement"* means that certain agreement, by and among Reorganized AIH and the Holders of the New Common Stock, the form of which shall be included in the Plan Supplement.

136.     *"New Senior Term Loan"* means a first priority secured term loan in the amount of $35 million (or $40 million to the extent the DIP Facility Tranche B is fully drawn as of the Effective Date) made pursuant to the New Senior Term Loan Credit Agreement.

137.     *"New Senior Term Loan Credit Agreement"* means the loan agreement, to be dated as of the Effective Date that will govern the New Senior Term Loan, the form of which shall be included in the Plan Supplement.

138.     *"New Stockholders Agreement"* means that certain agreement, by and among Reorganized AIH and the holders of the New Common Stock, the form of which shall be included in the Plan Supplement.

139.     *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized AIH, the initial board of directors of each such Reorganized Debtor.

140.     *"Non-Litigation Trust Causes of Action"* means any Cause of Action other than a Litigation Trust Cause of Action.

141.     *"Ordinary Course Professional Order"* means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 285].

142.     *"Other Litigation Trust Financing"* means any financing provided to the Litigation Trust by a third-party other than the Reorganized Debtors, which, for purposes of this definition, may include any obligation to share any portion of litigation proceeds with any third party under any contingency or other similar agreement or arrangement with legal counsel.

143.     *"Other Secured Claim"* means any Secured Claim that is not (a) an ABL Claim, (b) a First Lien Secured Claim, (c) a Second Lien Note Claim, (d) a DIP Facility Tranche A Claim or (e) a DIP Facility Tranche B Claim.

144.     *"Oversight Committee"* means the committee to be appointed pursuant to Article XII.C of the Plan.

145.     *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

146.     *"Petition Date"* means January 19, 2011, the date on which each of the Debtors commenced the Chapter 11 Cases.

147.     *"Plan"* means this *Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code,* including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference.

148. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be Filed by the Debtors no later than five days before the Voting Deadline on notice to parties in interest, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, including the following: (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) the Rejected Executory Contract and Unexpired Lease List (d) a list of retained Non-Litigation Trust Causes of Action, if any; (e) subject to the terms of Article IV.K, the Management Equity Incentive Program; (f) the New Stockholders Agreement; (g) the New Registration Rights Agreement; (h) the Assumed Executory Contract and Unexpired Lease List; (i) the Qualified Vendor Support Agreement; (j) the identification of any Disbursing Agent other than the Reorganized Debtors; (k) the New Intercreditor Agreement; (l) the New ABL Facility Credit Agreement; (m) the New Senior Term Loan Credit Agreement; (n) the New First Lien Term Loan Credit Agreement; (o) the New Junior Term Loan Credit Agreement; (p) the Existing Benefits Agreements, that have been consented to as provided in Article IV.N; (q) the New Employment Agreements that have been consented to by each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims; (r) the Litigation Trust Agreement; (s) the identity of the Litigation Trustee; (t) a description of the Litigation Trust Causes of Action; and (u) the identity of the initial members of the Oversight Committee. Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (u). The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article IX.B hereof and the terms set forth herein relating to necessary consent.

149. *"Plan Support Agreement"* means the agreement, effective as of January 19, 2011 and amended and restated as of February 23, 2011, among the Debtors and (a) certain Holders of First Lien Claims holding more than 66 2/3% of the total First Lien Claims, (b) certain Holders of Second Lien Note Claims holding 100% of the total Second Lien Note Claims, (c) certain Holders of AIH Notes Claims holding 100% of the total AIH Note Claims, pursuant to which such Holders agreed (subject to certain conditions specified therein) and (d) the Creditors' Committee, to support, and (as applicable) vote in favor of, this Plan.

150. *"Potential Defendant"* means (i) Golden Gate Private Equity, Inc.; (ii) Golden Gate Capital Management II, L.L.C.; (iii) GGC Administration, LLC; (iv) Orchard Brands Corporation (formerly known as Appleseed's TopCo Inc.); (v) Orchard Brands Topco LLC; (vi) Catalog Holdings, LLC; (vii) Golden Gate Capital Investment Fund II, L.P.; (viii) Golden Gate Capital Investment Fund II (AI), L.P.; (ix) Golden Gate Capital Associates II-QP, L.L.C. ; (x) Golden Gate Capital Associates II-AI, L.L.C.; (xi) CCG AV, L.L.C.; (xii) Webster Capital Founders' Fund, L.P.; (xiii) Webster III, L.L.C.; (xiv) Webster II, L.L.C.; (xv) Jeffrey D. Farmer; (xvi) Bradford J. Farmer; (xvii) Brent Bostwick; (xviii) Karinn Kelly; (xix) John Civali; (xx) Vito Kowalchuk; (xxi) Charles Slaughter; (xxii) Geralynn Madonna; (xxiii) Jim Brewster; (xxiv) Bain & Company; (xxv) CCG AV, L.L.C. – Series I (Bain); (xxvi) CCG AV, L.L.C. – Series C (GGC Co-Invest); (xxvii) CCG AV, L.L.C. – Series K (K&E); (xxviii) CCG AV, L.L.C. – Series K; and (xxix) The Charles Lewis Slaughter Trust dated December 9, 2003.

151. *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, but excluding in each case all Litigation Trust Causes of Action.

152. *"Priority Tax Claim"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

153. *"Professional"* means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

154. *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

155. *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

156. *"Qualified Unsecured Trade Claims"* means (a) all Unsecured Claims directly relating to and arising solely from the receipt of goods and services by the Debtors arising with, and held by, Entities with whom the Debtors are conducting, and will continue to conduct, business as of the Effective Date, which Entities have executed a Qualified Vendor Support Agreement and (b) all Claims designated by the Debtors as a "Qualified Unsecured Trade Claim" for purposes of the Plan by an order of the Bankruptcy Court (including the Critical Vendor Order) or agreement of the applicable parties; *provided*, *however*, that Qualified Unsecured Trade Claims shall not include Administrative Claims.

157. *"Qualified Vendor Support Agreement"* means the support agreement entered into by Holders of Qualified Unsecured Trade Claims and the applicable Reorganized Debtor on the Confirmation Date, the form of which will be included in the Plan Supplement, in which such Holder shall agree to provide payment terms no less advantageous (from the perspective of the Reorganized Debtor) than those terms provided as of the Petition Date for at least 18 months following the Effective Date.

158. *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

159. *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

160. *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

161. *"Released Party"* means each of: (a) the Debtors and Reorganized Debtors; (b) the ABL Agents and the ABL Lenders; (c) the First Lien Agent and the First Lien Lenders; (d) the Second Lien Note Agent and the Second Lien Note Purchasers; (e) the Holder of the AIH Note Claims; (f) the AIH Note Agent; (g) the DIP Facility Tranche A Agents; (h) the DIP Facility Tranche A Lenders; (i) the DIP Facility Tranche B Agents; (j) the DIP Facility Tranche B Lenders; (k) the Creditors' Committee; (l) the members of the Creditors' Committee, in their capacity as such; (m) ACAS; (n) with respect to each of the foregoing Entities in clauses (b) through (m), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals; and (o) the Debtors' and the Reorganized Debtors' subsidiaries, Current Debtor Employees, Current Debtor Directors, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and such Persons' respective heirs, executors, estates, servants and nominees; *provided*, *however*, that in no event shall any Released Party include (w) any non-Debtor Affiliate or parent of any of the Debtors (for the avoidance of doubt, ACAS shall be deemed not to be a non-Debtor or parent of any of the Debtors), (x) any Golden Gate Party (for the avoidance of doubt, no Released Party in sub-clauses (b) through (n) of this Article I.A.161, shall constitute a Golden Gate Party), (y) any Potential Defendant or (z) any of the respective funds, Affiliates (other than the Debtors), parents, subsidiaries (other than the Debtors and subsidiaries of the Debtors), successors, predecessors (other than the Debtors and subsidiaries of the Debtors), agents, attorneys (other than attorneys of the Released Parties, or attorneys otherwise excluded from the definition of "Golden Gate Parties"), advisors (other than advisors of the Released Parties, or advisors otherwise excluded from the definition of "Golden Gate Parties"), professionals (other than professionals that are Released Parties or professionals otherwise excluded from the definition of "Golden Gate Parties"), officers, directors, employees or managers (other than, in the case of any of the foregoing, Current Debtor Employees and/or Current Debtor Directors) of the Persons or Entities specified in sub-clauses (w), (x) and (y) of this Article I.A.161. (for purposes of the definition of Released Party, the words "former," "managed accounts or funds," "management companies," and "fund advisors" contained herein shall mean any Person or Entity that ever had, now has or hereafter can, shall or may have any involvement with, in any manner, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or

preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan.)

162.    *"Released Preference Action"* means any and all claims or defenses of the Debtors or the Reorganized Debtors arising under section 547 of the Bankruptcy Code against a trade creditor, excluding, for the avoidance of doubt, the Litigation Trust Causes of Action.

163.    *"Reorganized AIH"* means AIH, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized AIH shall be a corporation organized under the laws of the state of Delaware.

164.    *"Reorganized Debtors"* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

165.    *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified or supplemented from time to time.

166.    *"Second Lien Note Agent"* means American Capital, Ltd. (successor by merger to American Capital Financial Services, Inc.) in its capacity as administrative agent under the Second Lien Note Purchase Agreement.

167.    *"Second Lien Note Claim"* means any Secured Claim derived from, based upon, relating to or arising from the Second Lien Note Purchase Agreement.

168.    *"Second Lien Note Deficiency Claim"* means any Claim derived from, based upon, relating to or arising from the Second Lien Note Purchase Agreement, other than a Second Lien Note Claim.

169.    *"Second Lien Note Purchasers"* means the institutions party from time to time as "Purchasers" under the Second Lien Note Purchase Agreement.

170.    *"Second Lien Note Purchase Agreement"* means the Note Purchase Agreement, dated as of April 30, 2007, among Blair Corporation, Haband Company, Inc., Johnny Appleseed's, Inc., Norm Thompson Outfitters, Inc. and Draper's & Damon's, Inc., as issuers, each of the other Debtors, as guarantors, the Second Lien Note Purchasers, the Second Lien Note Agent and American Capital Strategies, Ltd. as sole lead arranger and bookrunner, and any guarantees, security documents and other documents related thereto (as amended, restated, supplemented or otherwise modified from time to time).

171.    *"Secured"* means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

172.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

173.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

174.    *"Treasury Regulations"* means regulations (including temporary and proposed) promulgated under the Internal Revenue Code.

175.     *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

176.     *"Unsecured Claim"* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

177.     *"U.S. Trustee"* means the United States Trustee for the District of Delaware.

178.     *"Voting Deadline"* means 4:00 p.m. (prevailing Eastern Time) on April 7, 2011.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule or exhibit, as it may thereafter be amended, modified or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or province of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

*E.*     *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

*F.*     *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.*     *Administrative Claims.*

1.     <u>Administrative Claims.</u>

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.  For purposes of this Plan, all Administrative Claims arising or granted under the DIP Order shall be deemed Allowed by Final Order.

2.     <u>Professional Compensation.</u>

(a)     *Fee Claims.*

Professionals asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date; *provided*, *however*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professional Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order. Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 40 days after the Effective Date.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

(b)     *Post-Confirmation Date Fees and Expenses.*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, subject to the terms of the DIP Order, pay in Cash the reasonable legal,

professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.

       3.    <u>Administrative Claim Bar Date</u>.

Except as otherwise provided in this Article II.A, and except with respect to requests for payment of Claims arising under section 503(b)(9) of the Bankruptcy Code, which Claims are subject to the *Order (A) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. § 503(b)(9); (B) Approving the Form and Manner for Filing Proofs of Claim; and (C) Approving Notice Thereof* [Docket No. 280], requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 15 days after entry of the Confirmation Order. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.

B.    *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

C.    *Statutory Fees*.

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. On and after the Effective Date, Reorganized AIH shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a final decree in each such Debtor's Chapter 11 Case or until each such Chapter 11 Case is converted or dismissed.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

B.    *Summary of Classification*.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained herein, the classifications set forth in Classes 1A to 11 shall be deemed to apply to each Debtor, as applicable. Only AIH is obligated under the AIH Note Purchase Agreement and, therefore, AIH is the only Debtor that possesses a Class 7 with respect to the AIH Note Claims. AIH is also the only Debtor that possesses a Class 10 with respect to Interests in AIH.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim/Interest | Status | Voting Rights |
|-------|---------------|--------|---------------|
| 1A | DIP Facility Tranche A Claims | Not Impaired | Deemed to Accept |
| 1B | DIP Facility Tranche B Claims | Impaired | Entitled to Vote |
| 2 | Priority Non-Tax Claims | Not Impaired | Deemed to Accept |
| 3 | Other Secured Claims | Not Impaired | Deemed to Accept |
| 4 | First Lien Secured Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Note Claims | Impaired | Entitled to Vote |
| 6A | Qualified Unsecured Trade Claims | Impaired | Entitled to Vote |
| 6B | General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | First Lien Deficiency Claims | Impaired | Deemed to Reject |
| 6D | Second Lien Note Deficiency Claims | Impaired | Deemed to Reject |
| 7 | AIH Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Impaired | Deemed to Accept |
| 9 | Intercompany Interests | Not Impaired | Deemed to Accept |
| 10 | Interests in AIH | Impaired | Deemed to Reject |

C.    *Treatment of Claims and Interests*.

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.    <u>Class 1A - DIP Facility Tranche A Claims</u>

(a)    *Classification*: Class 1A consists of DIP Facility Tranche A Claims.

(b)    *Allowance*: The DIP Facility Tranche A Claims shall be Allowed and deemed to be Allowed Claims in Class 1A in the full amount outstanding under the DIP Facility Credit Agreement with respect to the DIP Facility Tranche A as of the Effective Date.

(c)    *Treatment*: Except to the extent that a Holder of a DIP Facility Tranche A Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the DIP Facility Tranche A Claims, each Holder of a DIP Facility Tranche A Claim shall receive on the Effective Date payment in full, in Cash (or, with respect to any DIP Facility Tranche A Claims on account of issued and undrawn letters of credit, at the option of the DIP Facility Issuing Bank, cash collateral in the amount of 105% of the aggregate amount of such letters of credit) provided that such payments shall be distributed to the DIP Facility Tranche A Administrative Agent on behalf of Holders of such DIP Facility Tranche A Claims. In addition to the foregoing, on the Effective Date, the Debtors shall be required to pay all reasonable and documented fees and out-of-pocket costs and expenses of the DIP Facility Tranche A Agents and the DIP Facility Tranche A Lenders as provided in the DIP Order and the DIP Credit Agreement, as applicable.

(d) *Voting*:  Class 1A is not Impaired by the Plan, and each Holder of a Class 1A DIP Facility Tranche A Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A DIP Facility Tranche A Claims are not entitled to vote to accept or reject the Plan.

2.  <u>Class 1B - DIP Facility Tranche B Claims</u>

(a) *Classification*:  Class 1B consists of DIP Facility Tranche B Claims.

(b) *Allowance*:  The DIP Facility Tranche B Claims shall be Allowed and deemed to be Allowed Claims in Class 1B in the full amount outstanding under the DIP Facility Credit Agreement with respect to the DIP Facility Tranche B as of the Effective Date.

(c) *Treatment*:  Except to the extent that a Holder of a DIP Facility Tranche B Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of the DIP Facility Tranche B Claims, each Holder of a DIP Facility Tranche B Claim shall receive its Pro Rata share of the New Senior Term Loan.  In addition to the foregoing, on the Effective Date the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the Tranche B DIP Agents as provided in the DIP Order and the DIP Credit Agreement, as applicable.

(d) *Voting*:  Class 1B is Impaired.  Therefore, Holders of Class 1B DIP Facility Tranche B Claims are entitled to vote to accept or reject the Plan.

3.  <u>Class 2 - Priority Non-Tax Claims</u>.

(a) *Classification*:  Class 2 consists of Priority Non-Tax Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court.

(c) *Voting*:  Class 2 is not Impaired by the Plan, and each Holder of a Class 2 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

4.  <u>Class 3 - Other Secured Claims</u>.

(a) *Classification:*  Class 3 consists of Other Secured Claims.

(b) *Treatment:*  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered not Impaired.

(c)     *Voting:*  Class 3 is not Impaired by the Plan, and each Holder of a Class 3 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Other Secured Claims are not entitled to vote to accept or reject the Plan.

5.      <u>Class 4 - First Lien Secured Claims</u>.

(a)     *Classification:*  Class 4 consists of First Lien Secured Claims.

(b)     *Allowance:*  The First Lien Secured Claims shall be Allowed.

(c)     *Treatment:*  In exchange for full and final satisfaction, settlement, release and discharge of the First Lien Secured Claims, each Holder of such Allowed First Lien Secured Claim shall receive a Pro Rata distribution of (i) the New First Lien Term Loan, (ii) the New Junior Loan and (iii) 95% of the New Common Stock (subject to dilution on account of the Management Equity Incentive Program) in the form of Class A Common Stock to be issued on the Effective Date; *provided, however*, that each Holder of an Allowed First Lien Secured Claim may designate a Designated Affiliate to receive the shares of New Common Stock to which it would otherwise be entitled.  In addition to the foregoing, on the Effective Date, the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the First Lien Agent and the Ad Hoc Group of First Lien Lenders, in each case, as provided in the First Lien Credit Agreement, the DIP Order and the DIP Credit Agreement, as applicable.

(d)     *Voting*:  Class 4 is Impaired by the Plan.  Therefore, Holders of Class 4 First Lien Secured Claims are entitled to vote to accept or reject the Plan.

6.      <u>Class 5 - Second Lien Note Claims</u>.

(a)     *Classification:*  Class 5 consists of Second Lien Note Claims.

(b)     *Allowance*:   The Second Lien Note Claims shall be Allowed.

(c)     *Treatment:*  In exchange for full and final satisfaction, settlement, release and discharge of the Second Lien Note Claims, each Holder of such Allowed Second Lien Note Claim shall receive its Pro Rata share of 5% of the New Common Stock (subject to dilution on account of the Management Equity Incentive Program) in the form of Class B Common Stock to be issued on the Effective Date.  In addition to the foregoing, on the Effective Date the Debtors shall be required to pay all reasonable and documented fees, out-of-pocket costs and expenses of the Second Lien Agent as provided in the Second Lien Note Purchase Agreement, the DIP Order and the DIP Credit Agreement, as applicable.

(d)     *Voting:*  Class 5 is Impaired.  Therefore, Holders of Class 5 Second Lien Note Claims are entitled to vote to accept or reject the Plan.

7.      <u>Class 6A - Qualified Unsecured Trade Claims</u>.

(a)     *Classification:*  Class 6A consists of Qualified Unsecured Trade Claims.

(b)     *Treatment:*  Except to the extent that a Holder of an Allowed Qualified Unsecured Trade Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Qualified Unsecured Trade Claim, and subject to execution of, and continued performance under, a Qualified Vendor Support Agreement, each Holder of an Allowed Qualified Unsecured Trade Claim will be paid in accordance with the terms of the Qualified Vendor Support Agreement between the

applicable Debtor and the Holder of an Allowed Qualified Unsecured Trade Claim (i) on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Qualified Unsecured Trade Claim or in accordance with the course of practice between the Debtors and such Holder with respect to such Allowed Qualified Unsecured Trade Claim to the extent such Allowed Qualified Unsecured Trade Claim is not otherwise satisfied or waived on or before the Effective Date; *provided*, *however*, that Holders of Qualified Unsecured Trade Claims are not entitled to postpetition interest, late fees or penalties on account of such Claims; *provided further*, that the total amount of the payments to be made to Holders of Qualified Unsecured Trade Claims shall not exceed the following: the total amount that the Debtors are authorized to pay to certain "critical" vendors pursuant to the Critical Vendor Order *minus* the total amount that the Debtors' actually disbursed pursuant to the Critical Vendor Order before the Effective Date. Holders of Allowed Qualified Unsecured Trade Claims who received any payments from the Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under the Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Debtors or otherwise waived.

(c)     *Voting:* Class 6A is Impaired by the Plan. Therefore, Holders of Class 6A Qualified Unsecured Trade Claims are entitled to vote to accept or reject the Plan.

8.     Class 6B - General Unsecured Claims.

(a)     *Classification:* Class 6B consists of General Unsecured Claims.

(b)     *Treatment:* In exchange for full and final satisfaction, settlement, release and discharge of the General Unsecured Claims, each Holder of such Allowed General Unsecured Claim shall receive its Pro Rata share (calculated with reference to all Allowed General Unsecured Claims) of the Litigation Trust Interests.

(c)     *Voting:* Class 6B is Impaired by the Plan. Therefore, Holders of Class 6B General Unsecured Claims are entitled to vote to accept or reject the Plan.

9.     Class 6C - First Lien Deficiency Claims.

(a)     *Classification:* Class 6C consists of First Lien Deficiency Claims.

(b)     *Treatment:* Holders of First Lien Deficiency Claims will not receive any distribution on account of such First Lien Deficiency Claims. On the Effective Date, First Lien Deficiency Claims shall be cancelled and discharged.

(c)     *Voting:* Class 6C is Impaired and Holders of Class 6C First Lien Deficiency Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6C First Lien Deficiency Claims are not entitled to vote to accept or reject the Plan.

10.     Class 6D - Second Lien Note Deficiency Claims.

(a)     *Classification:* Class 6D consists of Second Lien Note Deficiency Claims.

(b)     *Treatment:* Holders of Second Lien Note Deficiency Claims will not receive any distribution on account of such Second Lien Note Deficiency Claims. On the Effective Date, Second Lien Note Deficiency Claims shall be cancelled and discharged.

(c)    *Voting:*  Class 6D is Impaired and Holders of Class 6D Second Lien Note Deficiency Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6D Second Lien Note Deficiency Claims are not entitled to vote to accept or reject the Plan.

11.    <u>Class 7 - AIH Note Claims</u>.

(a)    *Classification:*  Class 7 consists of AIH Note Claims.

(b)    *Treatment:*  Holders of AIH Note Claims will not receive any distribution on account of such AIH Note Claims.  On the Effective Date, AIH Note Claims shall be cancelled and discharged.

(c)    *Voting:*  Class 7 is Impaired and Holders of Class 7 AIH Note Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 AIH Note Claims are not entitled to vote to accept or reject the Plan.

12.    <u>Class 8 - Intercompany Claims</u>.

(a)    *Classification:*  Class 8 consists of Intercompany Claims.

(b)    *Treatment:*  On the Effective Date, or as soon thereafter as is practicable, Intercompany Claims will be paid, adjusted, reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors.  The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices.

(c)    *Voting:*  Holders of Class 8 Intercompany Claims are Impaired.  Holders of Class 8 Intercompany Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

13.    <u>Class 9 - Intercompany Interests</u>.

(a)    *Classification:*  Class 9 consists of Intercompany Interests.

(b)    *Treatment*:  Intercompany Interests shall be Reinstated.

(c)    *Voting*:  Class 9 is not Impaired by the Plan and Holders of Class 9 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Intercompany Interests are not entitled to vote to accept or reject the Plan.

14.    <u>Class 10 - Interests in AIH</u>.

(a)    *Classification:*  Class 10 consists of Interests in AIH.

(b)    *Treatment:*  Holders of Interests in AIH shall not receive any distribution on account of such Interests.  On the Effective Date, Interests in AIH shall be cancelled and discharged.

(c)     *Voting:*  Class 10 is Impaired and Holders of Class 10 Interests in AIH are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 10 Interests in AIH are not entitled to vote to accept or reject the Plan.

D.      *Special Provision Governing Claims that are Not Impaired.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.

E.      *Acceptance or Rejection of the Plan.*

1.      <u>Voting Classes</u>.

Classes 1B, 4, 5, 6A and 6B are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.      <u>Presumed Acceptance of the Plan</u>.

Classes 1A, 2, 3 and 9 are not Impaired under the Plan, and the Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  Additionally, Holders in Class 8 are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code because all Holders in Class 8 for each of the Debtors are proponents of the Plan.

3.      <u>Presumed Rejection of Plan</u>.

Classes 6C, 6D, 7 and 10 are Impaired and shall receive no distribution under the Plan.  The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

F.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

G.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.       *New Loans*.

The material terms of each of the New Loans shall be as follows:

1.       New ABL Facility.

The New ABL Facility shall (a) have an availability of up to $90 million, (b) have an interest rate of LIBOR plus 350 basis points (with a LIBOR floor of 150 basis points), (c) have a maturity of three years and (d) be secured by a first priority lien on all of the Reorganized Debtors' assets.

2.       New Senior Term Loan.

The New Senior Term Loan shall (a) be in the principal amount of $35 million (or $40 million to the extent the DIP Facility Tranche B is fully drawn as of the Effective Date), (b) have an interest rate of LIBOR plus 1050 basis points (with a LIBOR floor of 350 basis points), (c) have a maturity of five years and (d) be secured by substantially all of the Reorganized Debtors' assets junior in lien and payment to the New ABL Facility.

3.       New First Lien Term Loan.

The New First Lien Term Loan shall (a) be in the principal amount of $200 million, (b) until such time that the Reorganized Debtors achieve a Fixed Charge Coverage Ratio (defined below) of 1.25x or higher, the interest accruing on the New First Lien Term Loan shall be payable in both Cash and payment in kind ("***PIK***"), with the cash component priced at LIBOR plus 250 basis points (with a LIBOR floor of 150 basis points) and the PIK component priced at 250 basis points (the "***PIK Interest***"); *provided, that* once the Fixed Charge Coverage Ratio of 1.25x or higher is achieved, the PIK Interest shall be payable in Cash, (c) have a maturity date of five years (d) have $500,000 in quarterly amortization payments; *provided, however,* that no amortization payments shall be made during the first 18 months after the Effective Date and (e) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New ABL Facility and the New Senior Term Loan.

For purposes of this Article IV.A.3, "***Fixed Charge Coverage Ratio***" shall mean for any twelve-month period (x) earnings before interest, taxes, depreciation and amortization, minus Cash capital expenditures, minus Cash taxes, minus dividends (excluding distributions of funds received form the Litigation Trust) divided by (y) Cash interest plus PIK Interest related to the New First Lien Term Loan plus scheduled Cash amortization of the New First Lien Term Loan plus recurring fees, commissions and charges on the New ABL Facility, New First Lien Term Loan, New Senior Term Loan and New Junior Term Loan plus capitalized lease payments plus scheduled principal payments for other debt for borrowed money.

4.       New Junior Term Loan.

The New Junior Term Loan shall (a) be in the principal amount of $43 million, (b) have cash pay interest that is the greater of (i) LIBOR and (ii) 1%, with a 4% cap and payment-in-kind interest of 700 basis points, (c) a maturity of six years and (d) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New ABL Facility, the New Senior Term Loan and the New First Lien Term Loan.

B.       *Restructuring Transactions*.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of

appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. Additionally, (i) Reorganized AIH shall be authorized as of the Effective Date to file a Form 8832 Entity Classification Election with the Internal Revenue Service to be treated as a corporation for United States federal income tax purposes, it being understood that any such election may be made retroactively effective up to the maximum amount of time allowed under applicable tax law and (ii) within sixty (60) days of the Effective Date, the non-Debtor Entity Orchard Brands Corporation shall take any and all actions necessary to convert to a Delaware limited liability company (without making an election on Internal Revenue Service Form 8832 Entity Classification Election for such limited liability company to be treated as a corporation for United States income tax purposes).

C.      *Sources of Consideration for Plan Distributions*.

The Reorganized Debtors shall make distributions under the Plan as follows:

1.      <u>The New Loans</u>.

On the Effective Date the Reorganized Debtors shall enter into the New Loans. Confirmation shall be deemed approval of the New Loans (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith) and Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Loans, including the New Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization or approval of any Person, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such New Loans.

2.      <u>Issuance and Distribution of New Common Stock</u>.

The issuance of the New Common Stock by Reorganized AIH, including options, stock appreciation rights or other equity awards, if any, in connection with the Management Equity Incentive Program, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, an initial number of 200,000 shares of New Common Stock shall be issued and distributed as follows: an aggregate 190,000 shares of Class A Common Stock will be issued to Holders of Claims in Class 4 (or their Designated Affiliates) and an aggregate 10,000 shares of Class B Common Stock will be issued to the Holders of Claims in Class 5, in each case, subject to dilution with respect to any shares issued pursuant to the Management Equity Incentive Program.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Upon the Effective Date, Reorganized AIH shall enter into the New Stockholders Agreement and the New Registration Rights Agreement with each Entity that is to be a counter-party thereto and the New Stockholders Agreement and the New Registration Rights Agreement shall each be deemed to be valid, binding and enforceable in accordance with its terms, and each holder of New Common Stock shall be bound thereby. The Holders of Claims in Class 4 (or their Designated Affiliates) and the Holders of Claims in Class 5 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Common Stock under the Plan.

D.      *Corporate Existence*.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law).

E.      *Vesting of Assets in the Reorganized Debtors*.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Non-Litigation Trust Causes of Action and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances, except for Liens securing the New Loans.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Non-Litigation Trust Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Existing Securities*.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the ABL Credit Agreement, DIP Facility Credit Agreement, the First Lien Credit Agreement, the Second Lien Note Purchase Agreement, the AIH Note Purchase Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; *provided*, *further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  On and after the Effective Date, all duties and responsibilities of the ABL Agents under the ABL Credit Agreement, the First Lien Agent under the First Lien Credit Agreement, the Second Lien Note Agent under the Second Lien Note Purchase Agreement and the AIH Agent under the AIH Note Purchase Agreement, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

G.      *Corporate Action*.

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (1) execution and entry into the New Loans; (2) the distribution of the New Common Stock; (3) selection of the directors and officers for the Reorganized Debtors; (4) implementation of the restructuring transactions contemplated by this Plan, as applicable; (5) adoption

of the Management Equity Incentive Program, if applicable; (6) adoption or assumption, as applicable, of the agreements with existing management, if any; and (7) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Loan Documents and any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law. The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

H.      *New Certificates of Incorporation and New By-Laws.*

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities; *provided*, *however*, that Reorganized AIH's New Certificate of Incorporation shall authorize the issuance of 10 million shares of Class B Common Stock. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states, provinces or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

I.      *Directors and Officers of the Reorganized Debtors and Reorganized AIH.*

As of the Effective Date, the term of the current members of the board of directors of AIH shall expire, and the initial boards of directors, including the New AIH Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New AIH Board shall consist of seven directors: (a) five directors appointed by certain of the First Lien Lenders, including two directors appointed by American Capital, Ltd., one director appointed by Ableco Finance LLC, one director appointed by Highland Capital Management LP and one director appointed by Canyon Capital Advisors LLC; (b) one independent director appointed by the First Lien Lenders other than American Capital, Ltd., Ableco Finance LLC, Highland Capital Management LP and Canyon Capital Advisors LLC; and (c) the current Chief Executive Officer of AIH.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New AIH Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws and other constituent documents of the Reorganized Debtors.

J.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and Reorganized AIH, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or

appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

K.    *Management Equity Incentive Program.*

The Debtors and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims shall engage in good faith negotiations to reach agreement on the Management Equity Incentive Program and include any form thereof and the amounts of any grants thereunder in the Plan Supplement; *provided*, *however*, that if the Debtors and each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims are unable to reach an agreement notwithstanding their good faith efforts to do so, no such program shall be included in the Plan Supplement and instead, within 90 days of the Effective Date the New AIH Board shall adopt and implement the Management Equity Incentive Program.

L.    *New Employment Agreements.*

On the Effective Date, Reorganized AIH shall enter into the New Employment Agreements as consented to by each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims pursuant to Article I.A.148.

M.    *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

N.    *Existing Benefits Agreements.*

The Existing Benefits Agreements for which each of the Consenting First Lien Lenders holding more than 10% of the First Lien Claims has consented to assumption by the Reorganized Debtors shall be included in the Plan Supplement and be assumed by the Reorganized Debtors. Nothing in the Plan or the Plan Supplement shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Non-Litigation Trust Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

O.    *D&O Liability Insurance Policies.*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by

the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtors may obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers and managers for such terms or periods of time, and placed with such insurers, to be reasonable under the circumstances or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order and to the extent such tail coverage is obtained on or before the Effective Date, such policies shall be considered D&O Liability Insurance Policies and shall be assumed by the Reorganized Debtors. To the extent one or more of the D&O Policies provide potential coverage related to one or more Litigation Trust Causes of Action the Reorganized Debtors shall, to the extent permissible under each D&O Liability Insurance Policy, assign all of their respective rights thereunder with respect to the Litigation Trust Causes of Action to the Litigation Trust and, the Reorganized Debtors and the Litigation Trustee shall otherwise reasonably cooperate in diligently pursuing such recoveries, and the Reorganized Debtors shall promptly transfer any recovery received by them to the Litigation Trust, all net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of D&O Liability Insurance Policies received by the Litigation Trust shall be treated as proceeds of the Litigation Trust Causes of Action for all purposes under the Plan; *provided*, *however*, that the defendants in the Litigation Trust Causes of Action shall maintain the ability to access the D&O Liability Insurance Policies for coverage of defense costs, if any, incurred in connection with defense of the Litigation Trust Causes of Action from the D&O Liability Insurance Policies to the extent permitted under the terms thereof. The Debtors shall take no action to or otherwise impair the D&O Liability Insurance Policies.

P.      *Preservation of Causes of Action.*

1.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IV.P.2 and Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Litigation Trust Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Non-Litigation Trust Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Non-Litigation Trust Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Litigation Trust Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Litigation Trustee, as applicable, expressly reserves all Litigation Trust Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the applicable Non-Litigation Trust Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Litigation Trust Causes of Action that a Debtor may hold against any Entity shall vest in the Litigation Trustee. The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Non-Litigation Trust Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Non-Litigation Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

2.   Released Preference Actions.

The Reorganized Debtors and the Litigation Trustee shall not bring, and as of the Effective Date, shall each discharge, waive and release all Released Preference Actions.

Q.   *The Fee Claims Escrow Account.*

On the Effective Date, subject to any alternative agreement as between the Debtors and any Holder of a Fee Claim, the Debtors shall (1) establish and fund the Fee Claims Escrow Account in an amount equal to all Fee Claims outstanding as of the Effective Date (including unbilled and estimated amounts, if applicable) or (2) enter into an agreement with any relevant Holder of Fee Claims acceptable to such Holder. Amounts held in the Fee Claims Escrow Account shall not constitute property of the Reorganized Debtors. The Fee Claims Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Fee Claims Escrow Account following (1) payment to all Holders of Fee Claims under the Plan and (2) the closing of the Chapter 11 Cases pursuant to Article XII.K, such remaining amount, if any, shall be returned to the Reorganized Debtors.

R.   *Litigation Trust.*

1.   Creation and Governance of the Litigation Trust.

On the Effective Date, the Debtors shall transfer the Litigation Trust Payment to the Litigation Trust and the Debtors and the Litigation Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the Litigation Trust Beneficiaries. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, except to the extent any such Litigation Trust Assets were transferred by the Debtors before the Effective Date to any Person (including any Litigation Trust Assets transferred to the Creditors' Committee pursuant to the DIP Order or transferred by the Creditors' Committee to one or more designees consistent with the terms of the Plan), in which case such transferred assets are, and shall be deemed, transferred to the Litigation Trust, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances or Interests subject only to (a) Litigation Trust Interests, (b) the rights, if any, of the Debtors and the Reorganized Debtors (as applicable) to the Litigation Trust Distributable Proceeds as set forth in Article IV.R.12 and Article IV.R.14 and (c) the expenses of the Litigation Trust as provided for in the Litigation Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Litigation Trustee shall be the exclusive trustee of the assets of the Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representatives of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee. The powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article IV.R. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement. After the Effective Date, the Debtors and the Reorganized Debtors shall have no interest in the Litigation Trust Assets except as set forth in the Litigation Trust Agreement and with respect to distributions, if any, to the Reorganized Debtors from the Litigation Trust that are required by the terms hereof, including Article IV.R.12 and Article IV.R.14. In connection with the vesting and transfer of the Litigation Trust Assets (including any Litigation Trust Causes of Action) to the Litigation Trust, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust. The Debtors and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

2. Purpose of the Litigation Trust.

The Litigation Trust shall be established for the purpose of liquidating the Litigation Trust Assets, distributing the Litigation Trust Distributable Proceeds, if any, reconciling (and, if appropriate, objecting to) General Unsecured Claims as provided for in the Plan and, if, as and to the extent determined by the Litigation Trustee pursuant to the Litigation Trust Agreement, distributing the Litigation Trust Payment to the Litigation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

3. Litigation Trustee and Litigation Trust Agreement.

The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the Litigation Trust Expenses; (b) the payment of other reasonable expenses of the Litigation Trust, including the cost of pursuing the Litigation Trust Causes of Action; (c) the retention of counsel, accountants, financial advisors or other professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Litigation Trust Assets; and (f) litigation of any Litigation Trust Causes of Action, which may include the prosecution, settlement, abandonment or dismissal of any such Litigation Trust Causes of Action.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses shall be paid from the Litigation Trust Assets in accordance with the Plan and Litigation Trust Agreement.

The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including Professionals previously retained by the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement; *provided*, *however*, that the Litigation Trustee shall provide ten Business Days' notice to the Reorganized Debtors before the payment of any such professional fees and expenses.

The Litigation Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Litigation Trust. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee, for the benefit of the Litigation Trust, shall (a) hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries, (b) make distributions of Litigation Trust Distributable Proceeds as provided herein and in the Litigation Trust Agreement and (c) have the power and authority to prosecute and resolve any Litigation Trust Causes of Action. The Litigation Trustee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets, except as otherwise provided in the Litigation Trust Agreement. In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries.

4. Compensation and Duties of the Litigation Trustee.

The salient terms of the Litigation Trustee's employment, including the Litigation Trustee's duties and compensation (which compensation shall be negotiated by the Litigation Trustee and the Oversight Committee, in consultation with the Reorganized Debtors), shall be set forth in the Litigation Trust Agreement. The Litigation Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

5. Cooperation of Reorganized Debtors.

The Reorganized Debtors, upon reasonable notice, shall be required to provide information and access to pertinent documents, to the extent the Reorganized Debtors have such information and/or documents, to the Litigation Trustee sufficient to enable the Litigation Trustee to perform its duties hereunder. The Reorganized Debtors shall reasonably cooperate with the Litigation Trustee in the administration of the Litigation Trust, including, in providing documentation, witness testimony and other evidence in support of the prosecution of the Litigation Trust Causes of Action, at no cost or expense of the Litigation Trust other than out of pocket expenses for copying or similar expenses.

The First Lien Agent, the Second Lien Agent, the First Lien Lenders and the Second Lien Note Purchasers, upon reasonable notice, shall be required to provide information and access to pertinent documents, to the extent the First Lien Agent, the Second Lien Agent, the First Lien Lenders and the Second Lien Note Purchasers, as applicable, have such information and/or documents, to the Litigation Trustee sufficient to enable the Litigation Trustee to perform its duties hereunder. The First Lien Agent, the Second Lien Agent, the First Lien Lenders and the Second Lien Note Purchasers shall reasonably cooperate with the Litigation Trustee in the administration of the Litigation Trust, including, without limitation, in providing documentation, witness testimony and other evidence in support of the prosecution of the Litigation Trust Causes of Action, at no cost or expense of the Litigation Trust other than out of pocket expenses for copying or similar expenses.

6. <u>United States Federal Income Tax Treatment of the Litigation Trust</u>.

For all United States federal income tax purposes, the parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as (a) a transfer of a portion of the Litigation Trust Assets directly to the Holders of Class 6B Allowed General Unsecured Claims, followed by (b) (i) the transfer by the Holders of Class 6B Allowed General Unsecured Claims to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests and (ii) the transfer by the Reorganized Debtors of the remaining portion of the Litigation Trust Assets; *provided*, *however*, that the Litigation Trust Assets will be subject to any post-Effective Date obligations incurred by the Litigation Trust relating to the pursuit of Litigation Trust Assets. Accordingly, the Litigation Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7. <u>Tax Reporting</u>.

(a) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

(b) Except to the extent definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Litigation Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as reasonably practicable after the Litigation Trust Assets are transferred to the Litigation Trust, the Litigation Trustee shall make a good faith valuation of the Litigation Trust Assets. Such valuation shall be made available from time to time to all parties to the Litigation Trust Agreement, to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(c) Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), allocations of Litigation Trust taxable income or loss shall be allocated by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(d) The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or its assets.

(e)      The Litigation Trustee shall distribute such notices to the Litigation Trust Beneficiaries as the Litigation Trustee determines are necessary or desirable.

8.   <u>Litigation Trust Assets</u>.

The Litigation Trustee shall, in consultation with the Reorganized Debtors (solely to the extent the Reorganized Debtors are entitled or potentially entitled to share in any distribution pursuant to Article IV.R.12(c), (d) or (e) or Article IV.R.14), have the exclusive right on behalf of the Litigation Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release or withdraw any and all Litigation Trust Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Litigation Trust Agreement; *provided*, *however*, that such consultation shall be subject to the execution and delivery of one or more joint interest, common interest or other similar agreements in form and substance reasonably acceptable to the Litigation Trustee and the Reorganized Debtors. From and after the Effective Date, the Litigation Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Litigation Trust, shall serve as a representative of the Estates and shall, in consultation with the Reorganized Debtors, retain and possess the right to commence, pursue, settle, compromise or abandon, as appropriate, any and all Causes of Action constituting Litigation Trust Causes of Action in any court or other tribunal. In connection with the investigation, prosecution and/or compromise of the Litigation Trust Causes of Action, the Litigation Trustee may expend such portion of the Litigation Trust Assets as the Litigation Trustee deems necessary. Further, the Litigation Trustee shall provide the Reorganized Debtors periodic reporting relating to the status of the Litigation Trust Causes of Action.

9.   <u>Litigation Trust Fees and Expenses</u>.

From and after the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Litigation Trust and any professionals retained by the Litigation Trust from the Litigation Trust Assets, except as otherwise provided in the Litigation Trust Agreement; *provided*, *however*, that the Litigation Trustee shall provide five Business Days notice to the Reorganized Debtors before the payment of any such professional fees and professional expenses; *provided further, however,* that any budgeted fees and expenses incurred by the Creditors' Committee's professionals before the Effective Date shall not be reimbursed by the Litigation Trust, but shall instead be paid from the proceeds of the DIP Facility Credit Agreement as and to the extent provided for in the DIP Order.

10.   <u>Distribution of Unrestricted Cash</u>.

The Litigation Trustee shall distribute to the Litigation Trust Beneficiaries on account of their interests in the Litigation Trust, at least annually, its net income plus all net proceeds from the sale of assets, except that the Litigation Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Litigation Trust Assets or to meet claims and contingent liabilities. Such distributions, if any, shall be made by the Litigation Trustee according to the priorities listed under Article IV.R.12 for distributions from the Litigation Trust of the Litigation Trust Distributable Proceeds.

11.   <u>Litigation Trust Funding</u>.

(a)      <u>Litigation Trust Loan.</u>  On the Effective Date, the Debtors shall deposit an amount equal to the Litigation Trust Loan (as determined on the Effective Date) into an account designated by the Creditors' Committee.

(b)      <u>Litigation Trust Discretionary Funding</u>.  In the event the Litigation Trust requires litigation funding (comprised of reasonable legal and other reasonable professional fees, costs and expenses) in excess of the Litigation Trust Loan, the Litigation Trustee shall provide the Reorganized Debtors with the opportunity to fund such additional amounts on commercially reasonable terms within 30 days of delivery of a written request for such funding by the Litigation Trustee, before seeking financing from any third party and in connection therewith provide the Reorganized Debtors all information reasonably

requested by the Reorganized Debtors related to the Litigation Trust Causes of Action for the Reorganized Debtors to determine whether to provide such additional financing; *provided*, *however*, that the Reorganized Debtors shall have no obligation to provide such additional funding. Such funding, if provided, shall constitute the Litigation Trust Discretionary Financing. Any amounts comprising the Litigation Trust Loan and the Litigation Trust Discretionary Financing (if any) shall be subject to repayment if, as and to the extent provided for in Article IV.R.12 hereof.

(c)     <u>Approval of Litigation Trust Funding</u>. The funding by the Debtors and/or Reorganized Debtors as applicable of the Litigation Trust Loan and the Litigation Trust Payment shall be authorized and approved, as of the Effective Date, in all respects, without need for the consent of or notice to any Person, notwithstanding any contrary provision in any financing and/or other agreement between any Debtor or Reorganized Debtor and any other Person, and any such contrary provision shall be deemed null and void to the extent necessary to permit such funding.

12.     <u>Distributions to Litigation Trust Beneficiaries</u>.

The Litigation Trustee may, in its discretion, distribute any portion of the Litigation Trust Payment to the Holders of Litigation Trust Interests at any time and/or use such funds for any purpose permitted under the Plan, the Trust Agreement and applicable law.

Distributions from the Litigation Trust of the Litigation Trust Distributable Proceeds, if any, shall be made by the Litigation Trustee according to the following priorities:

(a)     *First*, to the Debtors or the Reorganized Debtors, as applicable, to repay any and all amounts comprising the Litigation Trust Loan, all amounts actually funded to the Creditors' Committee under the Additional Investigation Budget and the Litigation Trust Discretionary Financing (if any).

(b)     *Second*, to repay any and all amounts comprising Other Litigation Trust Financing (if any), or as otherwise agreed to with any party providing Other Litigation Trust Financing.

(c)     *Third*, with respect to Litigation Trust Distributable Proceeds in the total amount of $1 to $30,000,000, 50% to the Litigation Trust (for the ratable benefit of the Holders of the Litigation Trust Interests) and 50% to the Reorganized Debtors.

(d)     *Fourth*, with respect to Litigation Trust Distributable Proceeds in the total amount of $30,000,001 and up to a total of $130,000,000, 40% to the Litigation Trust (for the ratable benefit of the Holders of the Litigation Trust Interests) and 60% to the Reorganized Debtors.

(e)     *Fifth*, with respect to Litigation Trust Distributable Proceeds in the total amount above $130,000,001, 25% to the Litigation Trust (for the ratable benefit of the Holders of the Litigation Trust Interests) and 75% to the Reorganized Debtors.

*provided*, *however*, that in the event the Reorganized Debtors are given a reasonable opportunity to provide Litigation Trust Discretionary Financing and do not do so in accordance with Article IV.R.11(b), including the 30-day notice period for thereunder, the Reorganized Debtors shall not share in the recoveries identified in sub-clauses (c), (d) and (e) above obtained after the Reorganized Debtors decline to provide such funding, which proceeds shall vest solely in the Litigation Trust and the Reorganized Debtors shall not be Litigation Trust Beneficiaries except to the extent required by Article IV.R.14; *provided further*, that the Reorganized Debtors shall share in the recoveries, if any, identified in sub-clauses (c), (d) and (e) above to the extent Litigation Trust Distributable Proceeds are obtained by the Litigation Trust before the funding of the Litigation Trust Payment or the funding of the Litigation

Trust Discretionary Financing (if any), as applicable (provided such funding has not yet been requested by the Litigation Trustee in accordance with Article IV.R.11(b)); *provided further* that notwithstanding the foregoing, in no event shall any "insider" (as defined in section 101 of the Bankruptcy Code) of the Debtors receive any distribution from the Litigation Trust Distributable Proceeds unless and only to the extent such Claim of any insider (the "***Insider General Unsecured Claim***") becomes an Allowed General Unsecured Claim which entitles such Allowed General Unsecured Claim to the treatment set forth in Article III.C.8.

Each Insider General Unsecured Claim shall be deemed Disputed as of the Effective Date, notwithstanding whether a written objection has been Filed as of the Effective Date with respect to any such Insider General Unsecured Claim. The Litigation Trustee shall File a written objection (whether by motion or adversary proceeding complaint) to each Insider General Unsecured Claim on or before the date that is 60 days after the Effective Date unless the 60-day period is extended (i) by agreement between the Litigation Trustee and the applicable Holder of an Insider General Unsecured Claim, or (ii) by order of the Bankruptcy Court (the "*Insider Claim Objection Period*"). In the event a written objection to an Insider General Unsecured Claim is timely Filed, such Insider General Unsecured Claim shall continue to be Disputed until and only to the extent Allowed as determined by Final Order of the Bankruptcy Court. In the event that the Insider Claim Objection Period Expires without a written objection to an Insider General Unsecured Claim being Filed, then such Insider General Unsecured Claim shall be deemed Allowed and shall receive the treatment set forth in Article III.C.8.

No portion of the Litigation Trust Payment shall be subject to distribution and/or allocation to the Reorganized Debtors pursuant to Article IV.R.12. The Litigation Trust Loan and the Litigation Trust Discretionary Financing shall be repaid out of the proceeds, if any, of the Litigation Trust Distributable Proceeds as, and to the extent, provided for herein. The amounts of Litigation Trust Distributable Proceeds specified in sub-clauses (c), (d) and (e) above shall be calculated after giving effect to the payments provided for in sub-clauses (a) and (b) above.

13. Cash Investments.

The Litigation Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, *however*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. Single Satisfaction of Allowed General Unsecured Claims.

Notwithstanding anything to the contrary herein, and regardless of whether the Reorganized Debtors provide the Litigation Trust Discretionary Financing, in no event shall Holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the Litigation Trust Distributable Proceeds, if any, and the Litigation Trust Payment. To the extent a Holder of an Allowed General Unsecured Claim receives payment in full on the principal amount of its Allowed Claim, such Holder shall be entitled to payment of interest on its Allowed Claim at the Federal Judgment Rate, with the amount of such interest calculated between the Petition Date and the Effective Date. In the event any portion of the Litigation Trust Distributable Proceeds remains after payment in full to all Holders of Allowed General Unsecured Claims (inclusive of the interest provided for in the immediately preceding sentence), such remaining amount (if any) shall be distributed to the Reorganized Debtors.

15. Dissolution of the Litigation Trust.

The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Trustee determines that the pursuit of additional Litigation Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (b) all distributions of Litigation Trust Distributable Proceeds required to be made by the Litigation Trustee to the Reorganized Debtors under the Plan have been made, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or

complete the recovery on, and liquidation of, the Litigation Trust Assets. Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets shall be distributed to all Litigation Trust Beneficiaries in accordance with the Plan and the Litigation Trust Agreement as appropriate; *provided*, *however*, that if the Litigation Trustee reasonably determines that such remaining Litigation Trust Assets (in an amount not to exceed $35,000) are insufficient to render a further distribution practicable, the Litigation Trustee may transfer such remaining funds to a charitable institution qualified as a not-for-profit corporation under applicable federal and state laws selected by the Litigation Trustee in consultation with the Oversight Committee.

      16. Collections by Litigation Trustee.

Notwithstanding any provision to the contrary herein, the Litigation Trustee shall not collect or seek to collect: (i) any amounts from any defendant in any Litigation Trust Cause of Action that were transferred to a Released Party contemporaneously or subsequently to a Golden Gate Transaction, or (ii) damages from any such defendant to the extent such damages have been determined by a court of competent jurisdiction to represent either a Released Party's pro rata share of the fault or culpability of, or are otherwise legally or equitably attributable to a Released Party or the Litigation Trust in respect of a Released Party, or (iii) damages from any such defendant to the extent a court of competent jurisdiction determines that, but for the Bar Order, such defendant would be entitled to damages from any Released Party on account of any Barred Claims; moreover, and for the avoidance of doubt, any award of damages that includes any of the amounts specified in (i), (ii) and (iii) above shall be reduced to eliminate same. Nothing herein shall prejudice or operate to preclude the right of any defendant in such Litigation Trust Cause of Action to (a) provide notice of this Bar Order to the court or tribunal hearing the Litigation Trust Cause of Action at any point, or (b) raise any issues, claims or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal hearing the Litigation Trust Cause of Action at any point in accordance with applicable law or procedure and the Bar Order. For the avoidance of doubt, nothing herein shall (x) be deemed to permit the plaintiff to recover more than a single satisfaction with respect to any Litigation Trust Cause of Action, or (y) limit, impair, preclude, condition or qualify the rights of the Litigation Trust and the Litigation Trustee to investigate and prosecute the Litigation Trust Causes of Action, and to seek and obtain one or more judgments in connection therewith for the fullest amount permissible under applicable law and in accordance with this paragraph.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*     *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume Filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Leases List or Rejected Executory Contract and Unexpired Leases List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease as reflected on the Assumed Executory Contracts and Unexpired Lease List shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.      *Insurance Policies.*

All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents and instruments related thereto.

E.      *Modifications, Amendments, Supplements, Restatements or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date*.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date*.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*.

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim (or their Designated Affiliates) shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Voting Deadline.

B.      *Disbursing Agent*.

Except as otherwise provided in the Plan and in the Litigation Trust Agreement, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Notwithstanding

anything herein to the contrary, distributions to the Litigation Trust Beneficiaries shall be made by the Litigation Trustee as and when provided for in the Litigation Trust Agreement.

C.  *Rights and Powers of Disbursing Agent*.

    1.  <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.  <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.  *Delivery of Distributions and Undeliverable or Unclaimed Distributions*.

    1.  <u>Delivery of Distributions</u>.

        (a)  <u>Delivery of Distributions to First Lien Agent</u>.

Except as otherwise provided in the Plan, all distributions to Holders of First Lien Secured Claims shall be governed by the First Lien Credit Agreement and shall be deemed completed when made to the First Lien Agent, who shall be deemed to be the Holder of all First Lien Secured Claims for purposes of distributions to be made hereunder.  The First Lien Agent shall hold or direct such distributions for the benefit of the Holders of Allowed First Lien Secured Claims (or their Designated Affiliates), as applicable.  As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed First Lien Secured Claims.

        (b)  <u>Delivery of Distributions to Second Lien Note Agent</u>.

Except as otherwise provided in the Plan, all distributions to Holders of Second Lien Note Claims shall be deemed completed when made to the Second Lien Note Agent, who shall be deemed to be the Holder of Second Lien Note Claims for purposes of distributions to be made hereunder.  The Second Lien Note Agent shall hold or direct such distributions for the benefit of the Holders of Allowed Second Lien Note Claims. in accordance with section 8.04 of the Second Lien Note Purchase Agreement.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Note Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Second Lien Note Claims.  For the avoidance of doubt, the 5% of New Common Stock to be distributed on account of the Second Lien Note Claims under Article III of this Plan shall be distributed solely on account of the Term A Notes (as defined in the Second Lien Note Purchase Agreement), no distribution shall be made on account of the Term B Notes, Term C Notes, Term D Notes and Term E Notes (each as defined in the Second Lien Note Purchase Agreement), and the Term B Notes, Term C Notes, Term D Notes and Term E Notes (each as defined in the Second Lien Note Purchase Agreement) shall be cancelled and discharged.

        (c)  <u>Delivery of Distributions in General</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate: (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have

been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, has not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2. <u>Minimum Distributions</u>.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3. <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder (or their Designated Affiliates) is returned as undeliverable, no distribution to such Holder (or their Designated Affiliates) shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder (or their Designated Affiliates), at which time such distribution shall be made to such Holder (or their Designated Affiliates) without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from (i) the Effective Date and (ii) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E. *Manner of Payment*.

1. All distributions of New Common Stock under the Plan shall be made by the Disbursing Agent on behalf of Reorganized AIH.

2. All distributions with respect to each of the New ABL Loan, New Senior Term Loan, the New First Lien Term Loan and the New Junior Term Loan shall be deemed made as of the Effective Date.

3. All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors).

4. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F. *Section 1145 Exemption*.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the New Common Stock as contemplated by Article IV.C of the Plan and the Litigation Trust Interests shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities. In addition, under section

1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Stockholders Agreement, the New Registration Rights Agreement and Reorganized AIH's New Certificate of Incorporation.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Order, the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment.*

The Debtors, the Reorganized Debtors or the Litigation Trustee may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors, the Reorganized Debtor or the Litigation Trustee may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Litigation Trustee of any such Claim it may have against the Holder of such Claim.

K.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties.</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.   The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the

Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED AND DISPUTED CLAIMS

*A.    Allowance of Claims.*

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date and, in connection with the reconciliation and adjudication of all General Unsecured Claims, the Litigation Trustee shall retain and be entitled to assert all such rights and defenses on behalf of the Debtors and the Reorganized Debtors, as applicable.

*B.    Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court; *provided, however*, that the Litigation Trustee shall have the sole authority to take the actions specified in sub-clauses (1), (2) and (3) hereof with respect to Holders of General Unsecured Claims.

*C.    Estimation of Claims.*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or

Interest. The provisions of this Article VII.C. shall apply to the same extent to the Litigation Trustee with respect to its reconciliation and adjudication of General Unsecured Claims.

D. *Adjustment to Claims Without Objection*.

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors (or, in the case of General Unsecured Claims only, by the Litigation Trustee) without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*.

Any objections to Claims shall be Filed by the Claims Objection Deadline.

F. *Disallowance of Claims*.

Except to the extent otherwise agreed to by the Litigation Trustee in the case of General Unsecured Claims, any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

G. *Amendments to Claims*.

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors (or, solely in the case of General Unsecured Claims, the Litigation Trustee). Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H. *No Distributions Pending Allowance*.

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

*I.*     *Distributions After Allowance.*

Subject to Article VI.B, to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

*A.*     *Compromise and Settlement of Claims, Interests and Controversies.*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders, and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Non-Litigation Trust Causes of Action against other Entities. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Litigation Trustee may compromise and settle Litigation Trust Causes of Action in accordance with the terms hereof and the Litigation Trust Agreement, as applicable.

*B.*     *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

*C.*     *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan (including the New Loan Documents), on the Effective Date and concurrently

with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. In addition, the First Lien Agent and the Second Lien Note Agent shall execute and deliver all documents reasonably requested by the administrative agent for the New ABL Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.     *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally and individually and collectively released, acquitted and discharged by the Debtors, the Reorganized Debtors. the Estates, the Current Debtor Employees and the Current Debtor Directors from any and all actions, Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, the Estates, the Current Debtor Employees and the Current Debtor Directors or each of their respective Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors, the Current Debtor Employees and/or the Current Debtor Directors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence, in each case as determined by Final Order of a court of competent jurisdiction; *provided, however,* that this Article VIII.D shall not apply in any way to limit, enjoin, impair, abridge, diminish, waive, release or affect the rights (if any) of any Golden Gate Party, or of any other party against whom the Litigation Trust pursues any cause of action, to assert, in connection with the Litigation Trust Causes of Action, any Claims against the Debtors, including, without limitation, any legal or equitable defenses and/or counterclaims.

E.     *Releases by Holders.*

As of the Effective Date of the Plan, to the extent permitted by applicable law, each Holder of a Claim or an Interest shall be deemed to have expressly, unconditionally, irrevocably, generally and individually and collectively, released, acquitted and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that such Entity (whether individually or collectively) ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases,  the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Plan Support Agreement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the

Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct or gross negligence in each case as determined by Final Order of a court of competent jurisdiction *provided, however,* that this Article VIII.E shall not apply to (i) the Golden Gate Parties, or (ii) any other party that either objected to the Plan or submitted a ballot and opted out of the releases contained in this Article VIII.E, except to the extent provided for in Article VIII.K of the Plan.

F.      *Liabilities to, and Rights of, Governmental Units.*

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.      *Exculpation.*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any (1) Exculpated Claim and (2) any obligation, Cause of Action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan;  *provided, however,* that nothing in this Article VIII.G. shall be construed as a waiver or release of any Litigation Trust Causes of Action.

H.      *Injunction.*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF

OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

I.      *Subordination Rights Under the Intercreditor Agreement*.

Subject in all respects to the provisions of this Plan, any distributions under the Plan to Holders of Second Lien Note Claims shall be received and retained free from any obligations to hold or transfer the same to any other creditor, and shall not be subject to levy, garnishment, attachment or other legal process by any Holder by reason of claimed contractual subordination rights. The subordination rights set forth in the Intercreditor Agreement shall be (and deemed to be) waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to property or other interests distributed under the Plan to Holders of Second Lien Note Claims other than as provided in the Plan.

J.      *Term of Injunctions or Stays*.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.      *Bar Order*.

The Confirmation Order shall provide, among other things, and such language shall be incorporated herein by reference (and the inclusion of such language, or language substantially similar to the following, shall be a condition to the Effective Date):

ORDERED that (i) the Golden Gate Parties are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting (except to reduce any award of damages from any Action (as defined below)) in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or

elsewhere any claim against any Released Party, arising out of or relating to the Litigation Trust Causes of Action (the "***Barred Claims***"), and (ii) other than the Litigation Trust Causes of Action brought by the Litigation Trustee, the Released Parties are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim against any of the Golden Gate Parties, arising out of or relating to the Litigation Trust Causes of Action (the above (i) and (ii) hereinafter referred to as the "***Bar Order***"); and it is further

ORDERED that in the event a Litigation Trust Cause of Action is asserted against any Golden Gate Party (the "***Action***"), then, prior to entry of any judgment or arbitration award in the Action, the applicable defendant(s) shall provide notice of this Bar Order to the court or tribunal hearing the Action. The Litigation Trustee shall not collect or seek to collect: (i) any amounts from any defendant in the Action that were transferred to a Released Party contemporaneously or subsequently to a Golden Gate Transaction, or (ii) damages from any such defendant to the extent such damages have been determined by a court of competent jurisdiction to represent either a Released Party's pro rata share of the fault or culpability, or are otherwise legally or equitably attributable to a Released Party or the Litigation Trust in respect of a Released Party, or (iii) damages from any such defendant to the extent a court of competent jurisdiction determines that, but for the Bar Order, such defendant would be entitled to damages from any Released Party on account of any Barred Claims; moreover, and for the avoidance of doubt, any award of damages that includes any of the amounts specified in (i), (ii) and (iii) above shall be reduced to eliminate same. Nothing herein shall prejudice or operate to preclude the right of any defendant in such Action to (a) provide notice of this Bar Order to the court or tribunal hearing the Action at any point, or (b) raise any issues, claims or defenses regarding judgment reduction or proportionate share of fault in the court or tribunal hearing the Action at any point in accordance with applicable law or procedure and this Bar Order. For the avoidance of doubt, nothing herein shall (x) be deemed to permit the plaintiff to recover more than a single satisfaction with respect to any Litigation Trust Cause of Action, or (y) limit, impair, preclude, condition or qualify the rights of the Litigation Trust and the Litigation Trustee to investigate and prosecute the Litigation Trust Causes of Action, and to seek and obtain one or more judgments in connection therewith for the fullest amount permissible under applicable law and in accordance with this paragraph; and it is further

ORDERED that the Released Parties shall (x) be subject to discovery and witness production requests in connection with the Action and (y) reserve and retain all rights to object to, contest and/or defend against requests for discovery or witness production, in both instances as if actual parties to the Action with respect to the Barred Claims; and it is further

ORDERED that, notwithstanding Confirmation of the Plan, the occurrence of the Effective Date, or the entry of a final decree, this Court shall retain continuing jurisdiction with respect to all matters concerning this Bar Order, including, without limitation, to interpret and enforce the Bar Order and issue any orders respecting same upon any motion by any of the Golden Gate Parties, the Litigation Trustee or the Released Parties.

L.      *Litigation Neutrality.*

Except as otherwise specifically set forth in Articles VIII.B and VIII.K of the Plan, nothing in the Plan or the Confirmation Order shall have the effect of impairing, enhancing, or altering either (i) the legal or equitable rights, remedies or defenses (or the enforceability thereof) of any Golden Gate Party or of any other party against whom the Litigation Trustee pursues any cause of action with respect to any rights, remedies, claims, causes of action (or interests therein) that are transferred to the Litigation Trust, or (ii) the rights, remedies, claims or causes of action (or interests therein) of any Debtor that are so transferred, it being understood that the effect of the Plan and the Confirmation Order are to be "litigation neutral" with respect to all such rights, remedies or defenses.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to Confirmation*.

It shall be a condition to Confirmation that all provisions, terms and conditions hereof are approved in the Confirmation Order, which shall be reasonably acceptable to: (a) the Debtors; (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims; (c) the DIP Tranche A Administrative Agent; (d) the lead arranger for the New ABL Facility; and (e) the Creditors' Committee.

B.      *Conditions Precedent to the Effective Date*.

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Confirmation Order (a) shall have been duly entered and be a Final Order and (b) shall include a finding by the Bankruptcy Court that the New Common Stock to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

2.      The Confirmation Order shall contain language substantially similar to that provided in Article VIII.K hereof.

3.      Any amendments, modifications or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to: (a) the Debtors; (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims; and (c) with respect to the Litigation Trust Agreement, the Creditors' Committee.

4.      All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

5.      The amount of (a) Allowed Administrative Claims, excluding Fee Claims, shall not exceed and aggregate of $40 million, (b) Allowed Non-Tax Priority Claims shall not exceed an aggregate of $5 million, and (c) Allowed Other Secured Claims shall not exceed an aggregate of $7.5 million.

6.      The Debtors shall enter into the New Loan Documents and the conditions precedent to funding under the New Loan Documents (including the payment in full, in Cash of the DIP Facility Tranche A Claims) shall have been satisfied or waived.

7.      The Debtors shall have satisfied the DIP Facility Tranche A Claims and DIP Facility Tranche B Claims.

8.      Reorganized AIH shall have entered into the New Stockholders Agreement and the New Registration Rights Agreement, each in form and substance reasonably satisfactory to: (a) Reorganized AIH; and (b) each Consenting First Lien Lender holding more than 10% of the First Lien Claims.

9.      The Debtors and the Litigation Trustee shall have entered into the Litigation Trust Agreement and the Debtors shall have made the Litigation Trust Payment to the Litigation Trust.

10.     An amount equal to the Litigation Trust Loan shall have been deposited into an account designated by the Creditors' Committee as provided in Article IV.R.11(a).

C.       *Waiver of Conditions*.

The conditions to Confirmation and to Consummation set forth in Article IX may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.       *Effect of Failure of Conditions*.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.       *Modification and Amendments*.

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), each of the Debtors expressly reserves its respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided, however,* that no such alterations, amendments or modifications shall be made without the consent of each Consenting First Lien Lender holding more than 10% of the First Lien Claims, which consent shall not be unreasonably withheld, and, with respect to provisions concerning the Litigation Trust, the Litigation Trustee, Qualified Unsecured Trade Claims or General Unsecured Claims, the Creditors' Committee, which consent shall not be unreasonably withheld.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X.

B.       *Effect of Confirmation on Modifications*.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of Plan*.

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization.   If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

4.  ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.  adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.  enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13.     resolve any cases, controversies, suits, disputes related to the Litigation Trust, the Litigation Trustee, the Litigation Trust Causes of Action and/or the Oversight Committee;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement or the Confirmation Order;

16.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (including the Litigation Trust Agreement);

21.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in connection with and under the Plan, including under Article VIII;

23.     enforce all orders previously entered by the Bankruptcy Court, resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Litigation Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant thereto or any entity's rights arising from or obligations incurred in connection with the Plan or such documents; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect.*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B.     Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of

the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Statutory Committee and Cessation of Fee and Expense Payment; Oversight Committee.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Creditors' Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

The Oversight Committee shall be formed on the Effective Date and shall consist of up to five members, which members need not have been Persons or Entities who were members of the Creditors' Committee. The Litigation Trustee shall make reasonable best efforts to ensure that the Oversight Committee consists of at least three members at all times; *provided, however,* that the inability to maintain three members on the Oversight Committee at all times shall not impair the ability of the Oversight Committee or the Litigation Trustee to act pursuant to the Litigation Trust Agreement or the Plan. Each member of the Creditors' Committee as of the Effective Date is entitled to be a member of the Oversight Committee. Each such member's appointment to or removal from the Oversight Committee shall be subject to the consent (which shall not unreasonably be withheld) of the Reorganized Debtors and the Creditors' Committee, respectively. The initial members of the Oversight Committee shall be identified by the Debtors in the Plan Supplement. The Oversight Committee shall be authorized to direct the affairs of the Litigation Trust and the Litigation Trustee, as provided for in the Litigation Trust Agreement, which authority shall include the following: (1) overseeing the General Unsecured Claims reconciliation and settlement process conducted by the Litigation Trustee; (2) formulating with the Litigation Trustee appropriate procedures for the settlement of General Unsecured Claims; (3) overseeing the distributions to the Holders of Allowed General Unsecured Claims hereunder; (4) investigating and prosecuting the Litigation Trust Causes of Action; (5) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties; and (6) such other matters as may be agreed upon between the Litigation Trustee and the Oversight Committee and consistent with this Plan and the Litigation Trust Agreement. For so long as the Litigation Trust shall continue, the Litigation Trustee shall make regular reports to the Oversight Committee as and when required under the Litigation Trust Agreement. The Oversight Committee shall be authorized to adopt such by-laws as it deems appropriate without further order of the Bankruptcy Court. The reasonable and documented out-of-pocket non-legal expenses of the members of the Oversight Committee incurred in their capacity as Oversight Committee members shall be reimbursed by the Litigation Trustee out of Litigation Trust Assets; *provided, however,* that the Litigation Trustee shall provide ten Business Days' notice to the Reorganized Debtors before the payment of any such expenses. Members of the Oversight Committee may be added, removed or substituted from time to time, provided that all members of the Oversight Committee shall be Holders of General Unsecured Claims. The Oversight Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties, including any professionals previously retained by the Creditors' Committee in these Chapter 11 Cases and the Litigation Trustee shall pay the reasonable costs and expenses of the Oversight Committee, including reasonable professional fees and expenses, from the Litigation Trust in the ordinary course without further order of the Bankruptcy Court. Nothing herein shall disqualify the Litigation Trustee from retaining the same professionals as those employed or retained by the Creditors' Committee.

D.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

*E.*   *Successors and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

*F.*   *Notices.*

To be effective, all notices, requests and demands to or upon the Debtors, the First Lien Lenders or the Second Lien Note Purchasers shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

**If to the Debtors**:
Appleseed's Intermediate Holdings LLC
138 Conant Street
Beverly, Massachusetts 01915
Facsimile:  (978) 998-3934
Attention:  T. Neale Attenborough
E-mail address:  neale@orchardbrands.com

**With copies to**:
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Joshua A. Sussberg, Esq.
E-mail address:  joshua.sussberg@kirkland.com

- and -

Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Facsimile:  (302) 426-9193
Attention: Domenic E. Pacitti, Esq.
E-mail Address:  dpacitti@klehr.com

**If to the First Lien Lenders**:
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Facsimile:  (212) 839-5599
Attention:  James P. Seery, Jr., Esq.
E-mail address:  jseery@sidley.com

**If to the Second Lien Note Purchasers**:
Kramer Levin Naftalis and Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attention: Douglas Mannal, Esq..
E-mail address: dmannal@kramerlevin.com

**If to the Creditors' Committee:**
Cooley LLP
1114 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 479-6275
Attention: Jay R. Indyke, Esq. and Cathy Hershcopf,
Esq.
E-mail address: jindyke@cooley and
chershcopf@cooley.com

-and-

Drinker Biddle & Reath LLP
1100 North Market Street
Wilmington, Delaware 19801
Facsimile: (302) 467-4201
Attention: Howard A. Cohen, Esq., Robert K.
Malone, Esq. and Michael P. Pompeo, Esq.
E-mail addresses: howard.cohen@dbr.com,
robert.malone@dbr.com, and
michael.pompeo@dbr.com

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Entire Agreement*.

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Exhibits*.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at http://www.kccllc.net/appleseeds or the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*I.*     *Severability of Plan Provisions*.

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) non-severable and mutually dependent.

*J.*     *Votes Solicited in Good Faith*.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the Securities offered and sold under the Plan or any previous plan.

*K.*     *Closing of Chapter 11 Cases*.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

*L.*     *Conflicts*.

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control.

*M.*     *Filing of Additional Documents*.

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

*[Remainder of page intentionally left blank.]*

Dated: April 14, 2011
      Wilmington, DE


APPLESEED'S INTERMEDIATE HOLDINGS LLC, on behalf of
itself and each of the other Debtors

By:      */s/ T. Neale Attenborough*
Name:    T. Neale Attenborough
Title:   Chief Executive Officer


COUNSEL:

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Margaret M. Manning (DE Bar No. 4183)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

- and -

Richard M. Cieri (admitted *pro hac vice*)
Joshua A. Sussberg (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Co-Counsel to the Debtors and Debtors in Possession*