## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ X

| | |
|---|---|
| In re: | ) |
| | ) Case No.: 11-10160 (KG) |
| APPLESEED'S INTERMEDIATE HOLDINGS | ) |
| LLC, et al.,[1] | ) Chapter 11 |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |
| | ) |
| Robert N. Michaelson, as Trustee of the Appleseed's | ) Adversary Proceeding No. ____ |
| Litigation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Golden Gate Private Equity, Inc., a Delaware | ) |
| corporation; Golden Gate Capital Management II, | ) |
| L.L.C., a Delaware limited liability company; GGC | ) |
| Administration, L.L.C., a Delaware limited liability | ) |
| company; Orchard Brands Corporation, f/k/a | ) |
| Appleseed's Topco, Inc., a Delaware corporation; | ) |
| Orchard Brands Topco LLC, a Delaware limited | ) |
| liability company; Catalog Holdings, LLC, a | ) |
| Delaware limited liability company; Catalog | ) |
| Holdings, LLC – Series B (Draper's); Catalog | ) |
| Holdings, LLC – Series C (Appleseed's); Catalog | ) |
| Holdings, LLC – Series D (NTO); Catalog Holdings, | ) |
| LLC – Series E (Haband); Golden Gate Capital | ) |
| Investment Fund II, L.P., a Delaware limited | ) |
| partnership; Golden Gate Capital Investment Fund II | ) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Appleseed's Intermediate Holdings LLC (6322); Appleseed's Acquisition, Inc. (5835); Appleseed's Holdings, Inc. (9117); Arizona Mail Order Company, Inc. (6359); Bedford Fair Apparel, Inc. (3551); Blair Credit Services Corporation (5966); Blair Factoring Company (4679); Blair Holdings, Inc. (0022); Blair International Holdings, Inc. (8962); Blair LLC (1670); Blair Payroll, LLC (1670); Draper's & Damon's Acquisition LLC (1760); Draper's & Damon's LLC (2759); Fairview Advertising, LLC (2877); Gold Violin LLC (0873); Haband Acquisition LLC (8765); Haband Company LLC (8496); Haband Oaks, LP (8036); Haband Online, LLC (1109); Haband Operations, LLC (2794); Johnny Appleseed's, Inc. (5560); Linen Source Acquisition LLC (2920); LM&B Catalog, Inc. (5729); Monterey Bay Clothing Company, Inc. (2076); Norm Thompson Outfitters, Inc. (8344); NTO Acquisition Corporation (0995); Orchard Brands Insurance Agency LLC (4858); and Wintersilks, LLC (0688). The Debtors' main corporate address is 138 Conant Street, Beverly, Massachusetts 01915.

1.

(AI), L.P., a Delaware limited partnership; Golden                    )
Gate Capital Associates II-QP, L.L.C., a Delaware                    )
limited liability company; Golden Gate Capital                    )
Associates II-AI, L.L.C., a Delaware limited liability                    )
company; CCG AV, L.L.C., a Delaware limited                    )
liability company; CCG AV, L.L.C. - Series C (GGC                    )
Co-Invest); CCG AV, L.L.C. - Series I (Bain); CCG                    )
AV, L.L.C. - Series K (K&E); CCG AV, L.L.C. -                    )
Series K; Webster Capital Founders' Fund, L.P., a                    )
Delaware limited partnership; Webster II, L.L.C., a                    )
Delaware limited liability company; Webster III,                    )
L.L.C., a Delaware limited liability company; Stefan                    )
Kaluzny, an individual; Joshua Olshansky, an                    )
individual; Jeffrey D. Farmer, an individual;                    )
Bradford J. Farmer, an individual; Brent Bostwick,                    )
an individual; Karinn Kelly, an individual; Vito                    )
Kowalchuk, an individual; Charles Slaughter, an                    )
individual; Charles Slaughter as Trustee of The                    )
Charles Lewis Slaughter Trust dated December 9,                    )
2003; Christian Feuer, an individual; Geralynn                    )
Madonna, an individual; Jim Brewster, an individual;                    )
and, Does 1-50,                    )
                                                                        )
                Defendants                    )
------------------------------------------------------------- X

## COMPLAINT

Plaintiff Robert N. Michaelson, as Trustee of the Appleseed's Litigation Trust, by

undersigned counsel, alleges, upon knowledge, information and belief, as follows:

### Nature of the Action

1.      This is an action brought by Robert N. Michaelson, as Trustee

("**Plaintiff**") of the Appleseed's Litigation Trust (the "**Trust**") on account of certain transactions

involving Appleseed's Intermediate Holdings LLC dba Orchard Brands ("**Appleseed's**

**Intermediate**"), a Delaware limited liability company, and its debtor affiliates[2] (the "**Debtors**"), transactions which ultimately led to the Debtors' bankruptcy.

2.      In this case, the private equity sponsors of the Debtors used their leveraged buyout of Blair Corporation to saddle the Debtors with more than half a billion dollars of new secured debt to finance the acquisition and simultaneously pay themselves and their investors a massive $310 million dividend. They purported to justify this staggering new debt load with pie-in-the-sky projections about revenue growth, cost savings, and earnings, but the Debtors' own financial performance, both before and after the dividend was paid, showed that these projections were baseless and that the debt was unsustainable. By loading up the Debtors with secured debt and then simultaneously draining the loan proceeds to pay dividends to themselves, the Debtors' private equity sponsors rendered the Debtors insolvent, left the Debtors both with unreasonably small capital to run their businesses and unable to pay their debts as they came due, and put the Debtors on a collision course with bankruptcy. The payment of this enormous dividend was a fraudulent transfer that provided no benefit whatsoever to the Debtors or their creditors, and instead caused substantial damage.

3.      As if the dividend were not enough, the Debtors' private equity sponsors also rewarded themselves with multi-million-dollar "transaction fees," compelled the Debtors to enter into an agreement to pay additional "advisory fees" to the private equity sponsors year after year, and reimbursed themselves with millions of dollars of the Debtors' money for expenses incurred in effecting the fraudulent transfer. These payments would not have been made but for

---

[2] The Debtors are: Appleseed's Intermediate Holdings LLC; Appleseed's Acquisition, Inc.; Appleseed's Holdings, Inc.; Arizona Mail Order Company, Inc.; Bedford Fair Apparel, Inc.; Blair Credit Services Corporation; Blair Factoring Company; Blair Holdings, Inc.; Blair International Holdings, Inc.; Blair LLC; Blair Payroll, LLC; Draper's & Damon's Acquisition LLC; Draper's & Damon's LLC; Fairview Advertising, LLC; Gold Violin LLC; Haband Acquisition LLC; Haband Company LLC; Haband Oaks, LP; Haband Online, LLC; Haband Operations, LLC; Johnny Appleseed's, Inc.; Linen Source Acquisition LLC; LM&B Catalog, Inc.; Monterey Bay Clothing Company, Inc.; Norm Thompson Outfitters, Inc.; NTO Acquisition Corporation; Orchard Brands Insurance Agency LLC; and Wintersilks, LLC.

the domination and control of the Debtors by the private equity sponsors. The Debtors did not receive reasonably equivalent value in return for the payments, making each of these additional payments and transfers fraudulent transfers as well.

4.      In making these fraudulent transfers and the other conduct described herein, the private equity sponsors and other defendants named in this adversary proceeding also breached their fiduciary duties, aided and abetted breaches of fiduciary duties, committed corporate waste, conspired with each other, approved unlawful dividends, received preferential transfers, and damaged the Debtors and their creditors. Further, any claims filed by the defendants should be disallowed and/or equitably subordinated based on their conduct.

### The Parties

### The Trustee

5.      Plaintiff Robert N. Michaelson is Trustee of the Trust.

6.      On January 19, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to manage their assets as debtors-in-possession pursuant to Bankruptcy Code Sections 1007 and 1108.

7.      In its Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364 and 507 and Fed.R.Bankr.P. 2002, 4001 and 9104 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims, and (IV) Granting Adequate Protection to the Prepetition Secured Parties (the "**Final Financing Order**"), the Court approved and implemented the transfer of certain causes of action of the Debtors' estates (the "**Litigation Trust Causes of Action**") to the Official Committee of Unsecured Creditors of the Debtors ("**Committee**"), which was duly appointed on January 28, 2011 by the Office of the United States Trustee, and further granted the Committee

4.

the exclusive right, and full standing, to, inter alia, investigate, institute, file, and prosecute such causes of action without further order of the Court.

8.    On April 14, 2011, the Court entered its Findings of Fact, Conclusions of Law and Order Confirming the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "**Confirmation Order**") confirming the Joint Plan of Reorganization of Appleseed's Intermediate Holdings LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "**Plan**"). Pursuant to the Plan, on the date the Plan became effective, the Trust was established, the Litigation Trust Causes of Action were vested in the Trust, and the Trustee was granted exclusive right, authority and standing to investigate and prosecute the Litigation Trust Causes of Action. The causes of action alleged herein are included in the Litigation Trust Causes of Action.

9.    Article XI.13 of the Plan provided that the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Debtors' Chapter 11 cases and the Plan, including any cases, controversies, suits, or disputes related to the Litigation Trust Causes of Action. Paragraph 141 of the Confirmation Order also provided that, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Debtors' Chapter 11 cases and the Plan pursuant to Article XI of the Plan.

**The Private Equity Sponsors**

10.    Defendant Golden Gate Private Equity, Inc. ("**Golden Gate**") is a Delaware corporation that sponsored and/or participated in the 2007 Transaction (defined below) and the subsequent transactions and actions described below.

11.    Defendant Golden Gate Capital Management II, L.L.C. ("**GGC Management II**") is a Delaware limited liability company that sponsored and/or participated in

the 2007 Transaction (defined below) and the subsequent transactions and actions described below.

      12.    Defendant GGC Administration, L.L.C. ("**GGCA**") is a Delaware limited liability company that entered into an advisory agreement with the Debtors and Appleseed's TopCo (defined below), on or about April 30, 2007.

      13.    Defendant Golden Gate, Defendant GGC Management II, and Defendant GGCA are collectively referred to as the "**PE Sponsors.**"

**The Private Equity Owners**

      14.    Defendant Orchard Brands Corporation is a Delaware corporation organized by the PE Sponsors that was formerly known as Appleseed's Topco, Inc. ("**Appleseed's TopCo**"), and which owns all of the equity of Appleseed's Intermediate.

      15.    Defendant Orchard Brands Topco LLC ("**Orchard TopCo**") is a Delaware limited liability company organized by the PE Sponsors that owns all of the equity of Orchard Brands Corporation and, indirectly, Appleseed's Intermediate and its subsidiaries.

      16.    Defendant Catalog Holdings, LLC, and all Series thereof, including without limitation Catalog Holdings, LLC – Series B (Draper's), Catalog Holdings, LLC – Series C (Appleseed's), Catalog Holdings, LLC – Series D (NTO), and Catalog Holdings, LLC – Series E (Haband) (collectively, "**Catalog Holdings**"), is a Delaware limited liability company organized by the PE Sponsors that owns a majority of the equity of Orchard TopCo and, indirectly, Appleseed's Intermediate and its subsidiaries.

      17.    Defendants Orchard Brands Corporation, Orchard TopCo, and Catalog Holdings shall hereinafter be referred to collectively as the "**PE Owners**."

**The Private Equity Funds**

18.     Defendant Golden Gate Capital Investment Fund II, L.P. ("**GGC Fund II**") is a Delaware limited partnership and investment fund that is managed by one or more of the PE Sponsors and in turn owns direct and/or indirect interests in one or more of the PE Owners.

19.     Defendant Golden Gate Capital Investment Fund II (AI), L.P. ("**GGC Fund II (AI)**") is a Delaware limited partnership and investment fund that is managed by one or more of the PE Sponsors and in turn owns direct and/or indirect interests in one or more of the PE Owners.

20.     Defendant Golden Gate Capital Associates II-QP, L.L.C. ("**GGC Associates II-QP**") is a Delaware limited liability company and investment fund that is managed by one or more of the PE Sponsors and in turn owns direct and/or indirect interests in one or more of the PE Owners.

21.     Defendant Golden Gate Capital Associates II-AI, L.L.C. ("**GGC Associates II-AI**") is a Delaware limited liability company and investment fund that is managed by one or more of the PE Sponsors and in turn owns direct and/or indirect interests in one or more of the PE Owners.

22.     Defendant CCG AV, L.L.C. and all Series thereof, including but not limited to CCG AV, L.L.C. - Series C (GGC Co-Invest), CCG AV, L.L.C. - Series  I (Bain), CCG AV, L.L.C. - Series  K (K&E), and CCG AV, L.L.C. - Series  K (collectively, "**CCG AV**"), is a Delaware limited liability company and investment fund or funds that is managed by one or more of the PE Sponsors and in turn owns direct and/or indirect interests in one or more of the PE Owners.

23.    Defendant Webster Capital Founders' Fund, L.P. ("**Founders' Fund**") is a Delaware limited partnership and investment fund that owns direct and/or indirect interests in one or more of the PE Owners.

24.    Defendant Webster II, L.L.C. ("**Webster II**") is a Delaware limited liability company and investment fund that owns direct and/or indirect interests in one or more of the PE Owners.

25.    Defendant Webster III, L.L.C. ("**Webster III**") is a Delaware limited liability company and investment fund that owns direct and/or indirect interests in one or more of the PE Owners.

26.    Defendants  GGC Fund II, GGC Fund II-AI, GGC Associates II-QP, GGC Associates II-AI, CCG AV, Founders' Fund, Webster II, and Webster III shall hereinafter be collectively referred to as the "**PE Funds**."

27.    The PE Sponsors, the PE Owners and the PE Funds shall hereinafter be referred to collectively as the "**PE Parties**."

**Director Defendants**

28.    Defendant Stefan Kaluzny was, at all relevant times, a director and officer of Appleseed's Intermediate, a director of Appleseed's TopCo (now Orchard Brands Corporation), and was also a managing director of Golden Gate.

29.    Defendant Joshua Olshansky was, at all relevant times, a director and officer of Appleseed's Intermediate, a director of Haband Company, Inc., a director of Appleseed's TopCo (now Orchard Brands Corporation), and was also a managing director of Golden Gate.

30.    Defendants Stefan Kaluzny and Joshua Olshansky shall hereinafter be referred to collectively as the "**Directors**."

8.

## Minority Shareholders

31.     Defendant Jeffrey D. Farmer was a shareholder of Appleseed's TopCo and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

32.     Defendant Bradford J. Farmer was a shareholder of Appleseed's TopCo and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

33.     Defendant Brent Bostwick was a shareholder of Appleseed's TopCo and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

34.     Defendant Karinn Kelly was a shareholder of Appleseed's TopCo and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

35.     Defendant Vito Kowalchuk was a shareholder of Appleseed's TopCo and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

36.     Defendant Charles Slaughter, individually, was a member or shareholder of one or more of the PE Funds and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

37.     Defendant Charles Slaughter, in his capacity as Trustee of The Charles Lewis Slaughter Trust dated December 9, 2003, was a member or shareholder of one or more of the PE Funds and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

38.     Defendant Christian Feuer was a member or shareholder of one or more of the PE Funds and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

39.     Defendant Geralynn Madonna was a member or shareholder of one or more of the PE Funds and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

40.    Defendant Jim Brewster was a member or shareholder of one or more of the PE Funds and, in that capacity, was an immediate or mediate transferee of the Dividends (defined below).

41.    Defendants Jeffrey D. Farmer, Bradford J. Farmer, Brent Bostwick, Karinn Kelly, Vito Kowalchuk, Charles Slaughter individually, Charles Slaughter in his capacity as Trustee of The Charles Lewis Slaughter Trust dated December 9, 2003, Christian Feuer, Geralynn Madonna, and Jim Brewster shall hereinafter be referred to collectively as the "**Minority Shareholders**."

**Doe Defendants**

42.    Plaintiff is unaware of the true names and capacities of Defendants sued herein as Does 1-50, which include, without limitation, any and all affiliates of the PE Sponsors, the PE Owners, the PE Funds and/or any other parties that participated in, were involved in, or benefited from, the 2007 Transaction and/or received any contemporaneous or subsequent transfers of property of the Debtors in connection with the 2007 Transaction, and therefore sues these Defendants by such fictitious names. Each of the fictitiously named Defendants is responsible in some manner for the allegations herein.

43.    Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

44.    At all relevant times each Defendant acted as the agent, servant, representative, partner, joint-venturer, co-conspirator and/or employee of the other Defendants and, in doing the things hereinafter alleged, was acting within the scope of such agency, conspiracy or employment and with the knowledge, permission and consent of each other Defendant.

## Jurisdiction and Venue

45.    The Court has jurisdiction over this adversary proceeding under 28 U.S.C. sections 157(a) and 1334.

46.    Venue is proper in this Court pursuant to 28 U.S.C. sections 1408 and 1409.

47.    This proceeding is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(2) seeking, inter alia, recovery of property of the Debtors' estates.

## Background

48.    At all relevant times, the Debtors were a leading, multi-channel marketer of apparel and home products focused on serving the needs of the growing market segment of women and men over the age of 55. As of the Petition Date, through a portfolio of 17 brands, the Debtors offered apparel, accessories, shoes, and other products, employed more than 4,000 people, and managed their businesses from headquarters located in Beverly, Massachusetts.

49.    In 2005, investment funds and holding companies managed by Golden Gate acquired Appleseed's Intermediate. As of the Petition Date, investment funds managed by Golden Gate indirectly owned approximately 68.4% of the outstanding and issued equity interests of Orchard TopCo based upon their holdings in Catalog Holdings.

## [REDACTED]

50.    [REDACTED]

51.    The Blair Acquisition was a leveraged buyout ("**LBO**"). In general, an LBO is a method of acquiring a company by which the acquirer borrows against the assets of the target company in order to finance the purchase of the target company's shares from the selling shareholder. Much of the equity in the acquired company is typically replaced by debt, and the company's capital structure changes such that former shareholders of the company are replaced

by secured creditors. From the perspective of unsecured creditors, LBOs may be disadvantageous because such creditors bear the increased risk that the LBO will leave the acquired company in a financial condition which leads to bankruptcy.

52.   [REDACTED]

53.   In a dividend recap, a company is "recapitalized" – not with equity capital but through massive borrowing – and the newly borrowed funds are used to pay out a large dividend, earning the private equity sponsors and their investment funds a huge return without having to sell their equity stake through a merger, sale, or public offering.

54.   [REDACTED]

55.   The crippling debt load that the PE Parties imposed on the Debtors to fund the massive dividend recap put the Debtors on an inevitable and foreseeable path to bankruptcy. As discussed below, the PE Parties knew that in completing the 2007 Transaction they were burdening the Debtors and their creditors with huge risks, but the PE Parties forced the transactions through anyway in order to get the massive dividend.

56.   [REDACTED]

**[REDACTED]**

57.   [REDACTED]

58.   [REDACTED]

59.   [REDACTED]

60.   [REDACTED]

61.   The Haband Dividend, Appleseed's Intermediate Dividend, and Appleseed's TopCo Dividend shall be referred to hereinafter as the "**Dividends**." The Blair Acquisition, the borrowings under the Senior Credit Facilities, the payment of the Dividends, and

all related transactions, transfers, and payments shall be referred to hereinafter collectively as the "**2007 Transaction**."

62.    At all times during the negotiation and consummation of the 2007 Transaction, the PE Parties exercised domination and control over the Debtors and their affairs, and the PE Parties acted in furtherance of their own financial interests and in violation and disregard of their fiduciary and other duties to the Debtors.

63.    [REDACTED]

64.    [REDACTED]

65.    [REDACTED]

**[REDACTED]**

66.    [REDACTED]

67.    [REDACTED]

68.    [REDACTED]

69.    The Senior Credit Facilities involved three secured loans, each of which was arranged and later syndicated by ACAS and UBSS. The Senior Credit Facilities included a $125 million asset based line, a $335 million "first lien" loan, and a $250 million "second lien" loan.

70.    [REDACTED]

71.    [REDACTED]

72.    [REDACTED]

    a.    [REDACTED]
    b.    [REDACTED]
    c.    [REDACTED]
    d.    [REDACTED]
    e.    [REDACTED]
    f.    [REDACTED]
    g.    [REDACTED]

h.   [REDACTED]

73.   Attached hereto marked as **Exhibit A** is a copy of a Closing Sources &
Uses document detailing the payments, including specific transfers, made in connection with the
April 30, 2007 closing, which Exhibit A is incorporated herein by this reference.

74.   [REDACTED]

75.   [REDACTED]

76.   [REDACTED]

77.   Attached hereto marked as **Exhibit B** is a copy of a May 10, 2007
Dividend Analysis, providing information on the specific recipients and amounts of transfers
made out of the Dividends, which Exhibit B is incorporated herein by this reference.

78.   [REDACTED]

**Fees And Payments Paid Pursuant To The Advisory Agreement, Which The PE Parties
Imposed On The Debtors, Were Also Fraudulent Transfers**

79.   [REDACTED]

80.   [REDACTED]

81.   [REDACTED]

82.   Although the Advisory Fee was purportedly to be paid for various
services, in reality the Advisory Fee was merely a way for the PE Sponsors to generate revenue
for themselves.  Any services rendered to the Debtors pursuant to the Advisory Agreement did
not provide the Debtors with reasonably equivalent value in return.

83.   [REDACTED]

84.   [REDACTED]

85.   [REDACTED]

86.   [REDACTED]

87.     [REDACTED]

88.     The payment of the Transaction Fee, including the expense reimbursements, were made to or for the benefit of the PE Sponsors and/or the PE Funds, and not the Debtors, and the Debtors did not receive reasonably equivalent value in return. The Transaction Fee and the Advisory Fee, together with the Additional Fees, are collectively referred to hereinafter as the "**Transaction and Advisory Fees**."

**The Senior Credit Facilities Saddled The Debtors With Massive Debt That They Were Unable To Pay**

89.     As described below, the Senior Credit Facilities, substantially funded at the April 30, 2007 closing, comprised the Debtors' prepetition secured debt obligations.

90.     At the direction of the PE Parties, each of the Debtors became obligated under the $125 million credit agreement (as amended, the "**ABL Credit Agreement**"), dated as of April 30, 2007, among American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookrunners, American Capital Financial Services, Inc. as syndication agent, UBS Loan Finance LLC, as swingline lender and UBS AG, Stamford Branch, as issuing bank, administrative agent and co-collateral agent (the "**ABL Administrative Agent**") and Wells Fargo Retail Finance, LLC as co-collateral agents and the lenders party thereto from time to time (the "**ABL Lenders**").

91.     Specifically, the following Debtors were borrowers under the ABL Credit Agreement: Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source

Acquisition LLC. The remaining Debtors were guarantors of the obligations under the ABL Credit Agreement.

92.     The ABL Credit Agreement included: (a) a revolving credit facility in the amount of approximately $125 million; (b) a $20 million sublimit for the issuance of letters of credit; and (c) a $20 million sublimit for swing line loans. Approximately $38.4 million was outstanding under the ABL Credit Agreement as of December 25, 2010.

93.     Pursuant to a security agreement dated April 30, 2007 (the "**ABL Security Agreement**"), the obligations under the ABL Credit Agreement were secured by each of Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 of the ABL Security Agreement, the "**ABL Collateral**").

94.     The parties entered into an amendment to the ABL Credit Agreement on July 12, 2007.

95.     At the direction of the PE Parties, each of the Debtors also became obligated under the $335 million term loan credit agreement (as amended, the "**First Lien Credit Agreement**"), dated as of April 30, 2007, among American Capital Strategies, Ltd. and UBS Securities LLC, as joint lead arrangers and joint bookmanagers, UBS Securities LLC, as syndication agent, Wilmington Trust FSB as successor to American Capital Financial Services, Inc., as administrative agent (the "**First Lien Administrative Agent**") and the lenders party thereto from time to time (the "**First Lien Lenders**").

96.    Specifically, the following Debtors were borrowers under the First Lien Credit Agreement: Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source Acquisition LLC. The remaining Debtors were guarantors of the outstanding obligations under the First Lien Credit Agreement.

97.    Approximately $324.1 million was outstanding under the First Lien Credit Agreement as of December 25, 2010.

98.    Pursuant to a security agreement dated April 30, 2007 (the "**First Lien Security Agreement**"), the obligations under the First Lien Credit Agreement were secured by each of the Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 of the First Lien Security Agreement, the "**First Lien Collateral**").

99.    Additionally, the Intercreditor Agreement (as defined below) provided that the lien granted to the First Lien Administrative Agent and the First Lien Lenders with respect to the Debtors' equipment, mortgaged premises, fixtures, intellectual property collateral and capital stock collateral (and as further defined in section I of the Intercreditor Agreement, the "**Term Loan Priority Collateral**"), were senior to any liens on the Term Loan Priority Collateral securing the ABL Lenders and Second Lien Purchasers.

100.    The parties entered into an amendment to the First Lien Credit Agreement on July 12, 2007.

101.    At the direction of the PE Parties, each of the Debtors also became obligated under the $250 million note purchase agreement (as amended, the "**Second Lien Purchase Agreement**" and, together with the ABL Credit Agreement and the First Lien Credit Agreement, the "**Secured Credit Agreements**"), dated April 30, 2007, among American Capital Strategies, Ltd., as sole lead arranger and bookmanager, American Capital, Ltd. (successor by merger to American Capital Financial Services, Inc.), as documentation agent and administrative agent (the "**Second Lien Administrative Agent**," and together with the ABL Administrative Agent and the First Lien Administrative Agent, the "**Administrative Agents**") and purchasers party thereto from time to time (the "**Second Lien Purchasers**" and, together with the ABL Lenders and the First Lien Lenders, the "**Secured Lenders**").

102.    Specifically, the following Debtors were issuers under the Second Lien Purchase Agreement: Arizona Mail Order Company, Inc., Bedford Fair Apparel, Inc., LM&B Catalog, Inc., Monterey Bay Clothing Company, Inc., Draper's & Damon's, LLC, Norm Thompson Outfitters, Inc., Gold Violin LLC, Haband Company LLC, Johnny Appleseed's, Inc., Wintersilks, LLC, Blair LLC, Orchard Brands Insurance Agency LLC and Linen Source Acquisition LLC. The remaining Debtors are guarantors of the outstanding obligations under the Second Lien Purchase Agreement.

103.    Pursuant to a security agreement dated April 30, 2007 (the "**Second Lien Security Agreement**"), the obligations under the Second Lien Purchase Agreement were secured by each of the Debtors' accounts, equipment, goods, inventory and fixtures, documents, instruments, chattel paper, letters of credit, letter-of-credit rights, securities collateral, investment

18.

property, intellectual property collateral, general intangibles, cash, deposit accounts and the proceeds and products of each of the foregoing categories of collateral (collectively, and as defined more fully in section 2.1 the Second Lien Security Agreement, the "**Second Lien Collateral**").

104.    [REDACTED]

105.    Approximately $289.3 million was outstanding under the Second Lien Purchase Agreement as of December 25, 2010.

106.    The Administrative Agents were party to an intercreditor agreement dated April 30, 2007 (as amended, the "**Intercreditor Agreement**"). Among other things, the Intercreditor Agreement set forth the relative priority of the Secured Lenders' respective security interests in each of the ABL Collateral, the First Lien Collateral and the Second Lien Collateral. Specifically, the Intercreditor Agreement provided, in pertinent part, that:

    a.  the lien granted to the ABL Administrative Agent and the ABL Lenders pursuant to the ABL Security Agreement was senior in all respects to the liens granted to the First Lien Administrative Agent, the First Lien Lenders, the Second Lien Administrative Agent and the Second Lien Purchasers, except with respect to Term Loan Priority Collateral (the "**ABL Priority Collateral**");

    b.  the lien granted to the First Lien Administrative Agent and the First Lien Lenders with respect to the ABL Priority Collateral and the Term Loan Priority Collateral was senior to the lien granted to the Second Lien Administrative Agent and Second Lien Purchasers securing the obligations under the Second Lien Purchase Agreement; and

    c.  the lien granted to the Second Lien Administrative Agent and the Second Lien Purchasers with respect to the Term Loan Priority Collateral was senior to the lien granted to the ABL Agent and the ABL Lenders securing the obligations under the ABL Credit Agreement as to the Term Loan Priority Collateral (but junior to the lien granted to the First Lien Administrative Agent and First Lien Lenders securing the obligations under the First Lien Credit Agreement secured in such collateral).

107.    At the direction of the PE Parties, on July 12, 2007, Appleseed's Intermediate, as issuer, entered into a $50 million unsecured note purchase agreement with

19.

American Capital, Ltd. (successor by merger to American Capital Financial Services, Inc.), as administrative agent and American Capital Strategies, Ltd., as sole lead arranger and bookrunner (the "**Appleseed's Intermediate Note Purchase Agreement**"), and the purchasers party thereto from time to time (the "**Appleseed's Intermediate Note Purchasers**").

108.    Approximately $73.3 million was outstanding under the Appleseed's Intermediate Note Purchase Agreement as of December 25, 2010.

109.    The obligations under the Appleseed's Intermediate Note Purchase Agreement were unsecured. Only Appleseed's Intermediate became obligated under the Appleseed's Intermediate Note Purchase Agreement.

110.    Pursuant to the subordination agreement (the "**Subordination Agreement**") dated July 12, 2007, the obligations under the Appleseed's Intermediate Note Purchase Agreement were subordinate and subject in right and time of payment to the prior discharge of the obligations under the ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Purchase Agreement.

111.    As of December 25, 2010, the Debtors had outstanding secured and unsecured indebtedness totaling approximately $725.1 million. These obligations included (a) $38.4 million outstanding under the ABL Credit Agreement; (b) $324.1 million outstanding under the First Lien Credit Agreement; (c) $289.3 outstanding under the Second Lien Purchase Agreement; and (d) with respect to Appleseed's Intermediate only, $73.3 outstanding under the Appleseed's Intermediate Note Purchase Agreement (collectively the "**Prepetition Indebtedness**").

112.    [REDACTED]

113.    [REDACTED]

**The PE Sponsors' Internal Financial Projections For The Post-Merger Debtors Were Far Less Rosy Than Those Later Provided To Potential Lenders**

    114.    [REDACTED]

    115.    [REDACTED]

    116.    [REDACTED]

       a.  [REDACTED]
       b.  [REDACTED]
       c.  [REDACTED]
       d.  [REDACTED]
       e.  [REDACTED]
       f.  [REDACTED]
       g.  [REDACTED]
       h.  [REDACTED]

    117.    [REDACTED]

    118.    [REDACTED]

    119.    [REDACTED]

**The PE Parties Knowingly Presented Overly Optimistic Projections To Potential Lenders To Induce Them To Make Loans Large Enough To Fund The Dividends**

    120.    [REDACTED]

    121.    [REDACTED]

    122.    [REDACTED]

    123.    [REDACTED]

    124.    [REDACTED]

    125.    [REDACTED]

    126.    [REDACTED]

    127.    [REDACTED]

    128.    [REDACTED]

**The So-Called Solvency Opinion From [REDACTED] Was Based On Unreasonably
Optimistic Projections From The PE Parties, Was Riddled With Errors, and Lacked
Credibility**

129. [REDACTED]

130. [REDACTED]

131. [REDACTED]

132. [REDACTED]

133. [REDACTED]

134. [REDACTED]

135. [REDACTED]

136. [REDACTED]

137. [REDACTED]

138. [REDACTED]

139. [REDACTED]

140. [REDACTED]

141. [REDACTED]

142. [REDACTED]

143. [REDACTED]

144. [REDACTED]

145. [REDACTED]

146. [REDACTED]

147. [REDACTED]

**[REDACTED]**

148. [REDACTED]

149. [REDACTED]

150.   [REDACTED]

151.   [REDACTED]

152.   [REDACTED]

153.   [REDACTED]

**The Debtors' Audited Financial Statements Show How The 2007 Transaction Rendered The Debtors Insolvent**

154.   The Debtors' own audited financial statements show the devastating effect the 2007 Transaction had on the Debtors' financial condition and how it rendered the Debtors insolvent.

155.   [REDACTED]

156.   [REDACTED]

157.   [REDACTED]

158.   [REDACTED]

159.   [REDACTED]

160.   [REDACTED]

161.   [REDACTED]

**The 2007 Transaction Left The Debtors With Unreasonably Small Capital And Unable To Pay Debts As They Matured, As The Debtors' Post-Closing Financial Performance Was Far Worse Than The PE Parties' Unreasonable Projections Had Forecast**

162.   After the 2007 Transaction closed, the Debtors' financial performance fell well short of pre-closing projections in virtually every financial category.

163.   [REDACTED]

164.   [REDACTED]

165.   [REDACTED]

166.   [REDACTED]

167.   [REDACTED]

168.   By the end of June 2010, the Debtors were unable to satisfy the maximum "Consolidated Senior Leverage Ratio" covenant under the ABL Credit Agreement and the First Lien Credit Agreement, leading to the occurrence of defaults and cross-defaults under each of the ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Purchase Agreement.

169.   The Debtors entered into a series of forbearance agreements with the Secured Lenders in the third quarter of 2010.

170.   Looking for alternatives to pay their creditors, the Debtors sought to sell their assets but were unable to find any buyers willing to pay an amount sufficient to cover the Debtors' mounting debts.

171.   Facing further declines in liquidity as vendors imposed tighter credit terms, the full impact of the disastrous 2007 Transaction fell upon the Debtors and their creditors, and on January 19, 2011, the Debtors were forced to file their chapter 11 petitions.

## <u>COUNT I</u>

**(Avoidance of Transfer of Dividends and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants – Actual Fraud)**

172.   Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

173.   All of the participants involved in the 2007 Transaction intended and planned that all transactions, including the Blair Acquisition, the borrowings under the Senior Credit Facilities, and the Dividends, would occur simultaneously and they were interdependent,

related transactions. The Dividends could not have been paid but for the closing of the Blair Acquisition and the borrowings under the Senior Credit Facilities.

174.    The transfer of the Dividends, including the Haband Dividend to Appleseed's Intermediate and the Appleseed's Intermediate Dividend to Appleseed's TopCo and its shareholders, represented a transfer of an interest of the Debtors in property.

175.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

176.    The transfer of the Dividends to Appleseed's TopCo and its shareholders was made with actual intent to hinder, delay or defraud creditors of the Debtors.

177.    The requisite intent can be imputed to the Debtors from the domination and control of the Debtors by the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants. [REDACTED]

178.    From the perspective of the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants, the primary purpose of the 2007 Transaction was to pay the Dividends to Appleseed's TopCo and its shareholders so the PE Sponsors, PE Owners, PE Funds, Minority Shareholders and Doe Defendants could take this cash from the Debtors for their own benefit without those assets being made available to creditors of the Debtors.

179.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least four of those so-called "badges of fraud" apply to the transfer of the Dividends to Appleseed's TopCo and its shareholders: (i) the transfer was to an "insider" as the Debtors were directly or indirectly owned and/or controlled by

the PE Sponsors, PE Owners, and PE Funds; (ii) the transfer of the Dividends to Appleseed's

TopCo and its shareholders occurred at the same time when substantial new debts were incurred;

(iii) the Debtors received no value or consideration in exchange for the transfer of the Dividends;

and (iv) the Debtors were or became insolvent at the time of the 2007 Transaction and the

transfer of the Dividends.

180.    The 2007 Transaction and the transfer to Appleseed's TopCo and its

shareholders of the Dividends was made to or for the benefit of the PE Sponsors, the PE Owners,

the PE Funds, the Minority Shareholders and the Doe Defendants.

181.    The Debtors' transfers of the Dividends to Appleseed's TopCo and its

shareholders should be avoided pursuant to applicable provisions of the Uniform Fraudulent

Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and

550.

182.    Under Bankruptcy Code section 550, Plaintiff may recover the Dividends

from the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and/or the Doe

Defendants as initial, immediate and/or mediate transferees.

## COUNT II

**(Avoidance of Transfer of Dividends and Recovery of Value Under 11 U.S.C. §§544(b) and
550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent
Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds, the Minority
Shareholders and the Doe Defendants – Constructive Fraud - Insolvency)**

183.    Plaintiff repeats and realleges its allegations set forth in the above

paragraphs.

184.    The transfer of the Dividends, including the Haband Dividend to

Appleseed's Intermediate and the Appleseed's Intermediate Dividend to Appleseed's TopCo and

its shareholders, represented a transfer of an interest of the Debtors in property.

185.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Dividends to Appleseed's TopCo and its shareholders.

186.    At the time of the Debtors' transfer of the Dividends to Appleseed's TopCo and its shareholders, the Debtors were insolvent or became insolvent as a result of such transfer.

187.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

188.    The 2007 Transaction and the transfer to Appleseed's TopCo and its shareholders of the Dividends was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants.

189.    The Debtors' transfers of the Dividends to Appleseed's TopCo and its shareholders should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

190.    Under Bankruptcy Code section 550, Plaintiff may recover the Dividends from the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT III

**(Avoidance of Transfer of Dividends and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants – Constructive Fraud – Unreasonably Small Capital)**

191.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

192.    The transfer of the Dividends, including the Haband Dividend to Appleseed's Intermediate and the Appleseed's Intermediate Dividend to Appleseed's TopCo and its shareholders, represented a transfer of an interest of the Debtors in property.

193.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Dividends to the Appleseed's TopCo and its shareholders.

194.    At the time of the Debtors' transfer of the Dividends to Appleseed's TopCo and its shareholders, the Debtors were engaged or were about to engage in business for which their remaining assets and/or capital were unreasonably small in relation to their business.

195.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

196.    The 2007 Transaction and the transfer to Appleseed's TopCo and its shareholders of the Dividends was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants.

197.    The Debtors' transfers of the Dividends to Appleseed's TopCo and its shareholders should be avoided pursuant to applicable provisions of the Uniform Fraudulent

Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

198.    Under Bankruptcy Code section 550, Plaintiff may recover the Dividends from the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT IV

**(Avoidance of Transfer of Dividends and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants – Constructive Fraud – Inability to Pay Debts as Matured)**

199.    Plaintiffs repeat and reallege their allegations set forth in the above paragraphs.

200.    The transfer of the Dividends, including the Haband Dividend to Appleseed's Intermediate and the Appleseed's Intermediate Dividend to Appleseed's TopCo and its shareholders, represented a transfer of an interest of the Debtors in property.

201.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Dividends to the Appleseed's TopCo and its shareholders.

202.    At the time of the Debtors' transfer of the Dividends to Appleseed's TopCo and its shareholders, the Debtors intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

203.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

204.    The 2007 Transaction and the transfer to Appleseed's TopCo and its shareholders of the Dividends was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and the Doe Defendants.

205.    The Debtors' transfers of the Dividends to Appleseed's TopCo and its shareholders should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

206.    Under Bankruptcy Code section 550, Plaintiff may recover the Dividends from the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and/or the Doe Defendants as initial, immediate and/or mediate transferees.

### COUNT V

**(Avoidance of Transfer of Transaction and Advisory Fees and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants – Actual Fraud)**

207.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

208.    All of the participants involved in the 2007 Transaction intended and planned that all transactions, including the Blair Acquisition, the borrowings under the Senior Credit Facilities, the payment of the Dividends and the Transaction Fee, and the entry into the Advisory Agreement, would occur simultaneously and they were interdependent, related transactions. The Transaction Fee could not have been paid, and the Advisory Agreement would not have been executed leading to Advisory Fees, but for the closing of the Blair Acquisition and the borrowings under the Senior Credit Facilities.

209.    The transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants represented a transfer of an interest of the Debtors in property.

210.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

211.    The transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants were made with actual intent to hinder, delay or defraud creditors of the Debtors. The requisite intent can be imputed to the Debtors from the domination and control of the Debtors by the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

212.    From the perspective of the PE Sponsors, the PE Owners, the PE Funds, and the Doe Defendants, the primary purpose of the Transaction and Advisory Fees as part of the 2007 Transaction was to disburse additional cash, in addition to the Dividends, such that the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants could take this cash from the Debtors for their own benefit without having those assets be available to creditors of the Debtors.

213.    The Uniform Fraudulent Transfer Act lists eleven, non-exclusive factors that may be considered, although none need be present, in determining whether to infer fraudulent intent from the circumstances of a transfer. At least four of those so-called "badges of fraud" apply to the transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants: (i) the transfer was to an "insider" as the Debtors were owned and/or controlled by the PE Sponsors, PE Owners, PE Funds and the Doe

31.

Defendants; (ii) the transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants occurred at the same time when substantial new debts were incurred; (iii) the Debtors received little or no value or consideration in exchange for the transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants; and (iv) the Debtors were or became insolvent at the time of the 2007 Transaction.

214.    The 2007 Transaction and the transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

215.    The Debtors' transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, and the PE Funds should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

216.    Under Bankruptcy Code section 550, Plaintiff may recover the Transaction and Advisory Fees from the PE Sponsors, the PE Owners, the PE Funds, and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT VI

**(Avoidance of Transfer of Transaction and Advisory Fees and Recovery of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants – Constructive Fraud - Insolvency)**

217.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

32.

218.    The transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants represented a transfer of an interest of the Debtors in property.

219.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Transaction and Advisory Fees to PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

220.    At the time of the payment of the Transaction and Advisory Fees, the Debtors were insolvent or became insolvent as a result of such transfers.

221.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

222.    The payment of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, and the PE Funds was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

223.    The Debtors' transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

224.    Under Bankruptcy Code section 550, Plaintiff may recover the Transaction and Advisory Fees from the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT VII

**(Avoidance of Transfer of the Transaction and Advisory Fees and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants – Constructive Fraud – Unreasonably Small Capital)**

225.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

226.    The transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants represented a transfer of an interest of the Debtors in property.

227.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Transaction and Advisory Fees to PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

228.    At the time of the Debtors' transfer of the Transaction and Advisory Fees, the Debtors were engaged or were about to engage in business for which their remaining assets and/or capital were unreasonably small in relation to their business.

229.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

230.    The payment of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

231.    The Debtors' transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants should be avoided pursuant to

applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

232.    Under Bankruptcy Code section 550, Plaintiff may recover the Transaction and Advisory Fees from the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT VIII

**(Avoidance of Transfer of the Transaction and Advisory Fees and Recapture of Value Under 11 U.S.C. §§544(b) and 550 and, as applicable, Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act; Against the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants – Constructive Fraud – Inability to Pay Debts as Matured)**

233.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

234.    The transfer of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants represented a transfer of an interest of the Debtors in property.

235.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for transferring the Transaction and Advisory Fees to PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

236.    At the time of the Debtors' transfer of the Transaction and Advisory Fees, the Debtors intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

237.    At all relevant times, the Debtors had actual creditors holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b), including vendors, landlords, suppliers, lenders and other creditors.

238.    The payment of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants was made to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants.

239.    The Debtors' transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants should be avoided pursuant to applicable provisions of the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, and Bankruptcy Code sections 544(b) and 550.

240.    Under Bankruptcy Code section 550, Plaintiff may recover the Transaction and Advisory Fees from the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants as initial, immediate and/or mediate transferees.

## COUNT IX

**(Breach of Fiduciary Duty; Self-Dealing Against the PE Sponsors, the PE Owners, the Directors and the Doe Defendants)**

241.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

242.    At all relevant times, Orchard Brands Corporation, formerly known as Appleseed's TopCo, was the owner of all of the equity of Appleseed's Intermediate and, indirectly, of the other Debtors. As the sole and controlling owner of Appleseed's Intermediate, Orchard Brands Corporation owed fiduciary duties of good faith, care and loyalty to Appleseed's Intermediate and the other Debtors.

243.    Orchard TopCo and Catalog Holdings, as the other PE Owners in addition to Orchard Brands Corporation, indirectly owned all of the equity of Appleseed's Intermediate and the other Debtors, and, as such, Orchard TopCo and Catalog Holdings owed duties of good faith, care and loyalty to Appleseed's Intermediate and the other Debtors. These PE Owners,

together with the PE Funds, the PE Sponsors, and the Doe Defendants had their designees appointed as managers, officers, and directors of the Debtors, including the Directors, and had and exercised the ability to control the Debtors. The PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants owed to Appleseed's Intermediate and the other Debtors fiduciary duties of good faith, care and loyalty.

244.    At the time the Dividends and the Transaction and Advisory Fees were paid, the Debtors: (a) were engaged or were about to engage in a business for which their remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due; and/or (c) were insolvent or would be rendered insolvent by the transactions undertaken in connection with the 2007 Transaction. As such, the PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants owed fiduciary duties to the Debtors and, derivatively, to their unsecured creditors.

245.    The declaration and payment of the Dividends was also unlawful pursuant to 8 Del. Code § 154 because at the time the Dividends were declared, each respective corporation lacked sufficient surplus to support the declaration and payment of any dividends.

246.    Notwithstanding the lack of sufficient surplus to support the declaration and payment of any dividends, each of the Directors willfully and/or negligently declared and directed the payment of the Dividends.

247.    The PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants, who exercised domination and control over the Debtors and the Directors, in bad faith, willfully and/or negligently caused and directed the Directors to declare and direct the payment of the Dividends.

37.

248.    [REDACTED]

249.    Because the PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants owned and/or controlled the Debtors, they were conflicted when balancing the interests of the Debtors and their creditors against their own interests.

250.    The PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants exploited the ownership structure they created and engaged in self-dealing that enabled them to require payment of the Dividends, and of the Transaction and Advisory Fees, for their own benefit and at the expense of the Debtors.

251.    The PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants engaged in self-dealing, had actual conflicts of interest, and breached their fiduciary duties (including but not limited to the duty of loyalty), and took undue advantage of the Debtors, by planning, approving and executing the 2007 Transaction, including the payment of the Dividends, the entry into the Advisory Agreement, and the payment of the Transaction and Advisory Fees, requiring the Debtors to make massive distributions and payments to these Defendants for little or no benefit.

252.    The Debtors suffered substantial damages proximately caused by the breaches of fiduciary duties (including but not limited to the duty of loyalty) by the PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants for which each is jointly and severally liable.

253.    Accordingly, Plaintiff is entitled to the recovery of a monetary judgment in an amount to be determined at trial.

## COUNT X

**(Aiding and Abetting Breach of Fiduciary Duty Against the PE Sponsors, the PE Owners, the PE Funds, the Directors and the Doe Defendants)**

254.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

255.    To the extent any Defendant is found not to have had a fiduciary duty to the Debtors at the time of the 2007 Transaction and the other transactions complained of herein, each such Defendant is nevertheless jointly and severally liable for having aided and abetted the breaches of fiduciary duty by one or more of those other Defendants that did owe such fiduciary duties to the Debtors and/or their creditors at the relevant times.

256.    As alleged above, each non-fiduciary Defendant substantially and knowingly participated in, benefited from and aided and abetted the breaches of fiduciary duty engaged in by the Defendants who owed fiduciary duties to the Debtors and/or their creditors.

257.    The Debtors suffered substantial damages proximately caused by the conduct of each non-fiduciary Defendant in aiding and abetting the breaches of fiduciary duties (including but not limited to the duty of loyalty) by the PE Sponsors, the PE Owners, the PE Funds, the Directors, and the Doe Defendants.

258.    Accordingly, Plaintiff is entitled to the recovery of a monetary judgment in an amount to be determined at trial.

## COUNT XI

**(Corporate Waste Against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders, the Directors and the Doe Defendants)**

259.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

260.    The payments and other transfers in connection with the 2007 Transaction, including the payment of the Dividends and of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders and/or the Doe Defendants, had no rational business purpose and were so one-sided that no business person of ordinary sound judgment could believe that the Debtors received adequate consideration in exchange for these payments and/or transfers.

261.    As a result of the waste of the Debtors' property, the PE Sponsors, the PE Owners, the PE Funds, the Directors, the Minority Shareholders and the Doe Defendants are jointly and severally liable for the full amount paid or transferred in connection with the 2007 Transaction, including the Dividends and the Transaction and Advisory Fees.

262.    Accordingly, Plaintiff is entitled to the recovery of a monetary judgment in an amount to be determined at trial.

### COUNT XII

**(Conspiracy Against the PE Sponsors, the PE Owners, the PE Funds, the Directors, and the Doe Defendants)**

263.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

264.    The PE Sponsors, the PE Owners, the PE Funds, the Directors, and the Doe Defendants agreed and directed the Debtors to pursue the 2007 Transaction, and to pay the Dividends and the Transaction and Advisory Fees, for their own benefit in breach of their fiduciary duties. In furtherance of that agreement, these Defendants implemented the 2007 Transaction and each of the payments and transactions involved was completed, to their benefit at the expense of the Debtors and their creditors.

265.    In furtherance of the conspiracy alleged herein, each of these Defendants undertook substantial overt acts as set forth in the above paragraphs and they are jointly and severally liable for the damages and harm proximately caused to the Debtors.

266.    Accordingly, Plaintiff is entitled to the recovery of a monetary judgment in an amount to be determined at trial.

## COUNT XIII

**(Liability for Willful Payment of Unlawful Dividend Under 8 Del. Code §§ 154 and 174 Against the Directors and Doe Defendants)**

267.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

268.    Each of the Directors willfully declared and directed the payment of the Dividends.

269.    The Directors, and any of the Doe Defendants who were also directors, are jointly and severally liable for the full amount of such Dividends paid, plus interest from April 30, 2007.

270.    Accordingly, Plaintiff is entitled to a monetary judgment in an amount to be determined at trial.

## COUNT XIV

**(Liability for Negligent Payment of Unlawful Dividend Under 8 Del. Code §§ 154 and 174 Against the Directors and Doe Defendants)**

271.    Plaintiff repeats and realleges its allegations set forth in Paragraphs 1 through 266 above.

272.    Each of the Directors negligently declared and directed the payment of the Dividends.

273.    The Directors, and any of the Doe Defendants who were also directors, are jointly and severally liable for the full amount of such Dividends paid, plus interest from April 30, 2007.

274.    Accordingly, Plaintiff is entitled to a monetary judgment in an amount to be determined at trial.

### COUNT XV

**(Avoidance and Recovery of Preferential Transfers Under 11 U.S.C. §§ 547 and 550; Against the PE Sponsors, PE Owners, the PE Funds and the Doe Defendants)**

275.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

276.    On or within one year of the Petition Date, the Debtors made transfers (the "**Preferential Transfers**") of Advisory Fees and other amounts to or for the benefit of the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants, including, without limitation, a payment of $1,250,000 on or about July 27, 2010.  Plaintiff reserves the right to seek the avoidance and recovery of any and all additional Preferential Transfers that the Plaintiff later discovers.

277.    The Preferential Transfers were for or on account of an antecedent debt owed by the Debtors to the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants before the Preferential Transfers were made.

278.    The PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants were creditors of the Debtors within the meaning of section 101(10)(A) of the Bankruptcy Code at the time the Preferential Transfers were made.

279.    The PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants were insiders of the Debtors within the meaning of section 101(31)(B) of the Bankruptcy Code at the time the Preferential Transfers were made.

280.    The Debtors were insolvent at the time the Preferential Transfers were made within the meaning of section 101(32) of the Bankruptcy Code.

281.    The Preferential Transfers enabled the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants, as creditors, to receive more than they would have received if: (i) the Debtors had not made such Preferential Transfers; (ii) the Debtors' Chapter 11 Cases were converted to a case under Chapter 7 of the Bankruptcy Code; and (iii) the antecedent debts owed to the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants were paid to the extent provided by the Bankruptcy Code.

282.    By reason of the foregoing, the Preferential Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

283.    Under Bankruptcy Code section 550, Plaintiffs may recover a monetary judgment from the PE Sponsors, the PE Owners, the PE Funds and/or the Doe Defendants as initial, immediate and/or mediate transferees in an amount to be determined at trial.

## COUNT XVI

**(Objections to Proofs of Claims under and Equitable Subordination Under 11 U.S.C. §§ 502(d), 502(e), and 510(c); Against GGCA, Stefan Kaluzny, Joshua Olshansky, Christian Feuer and the Doe Defendants)**

284.    Plaintiff repeats and realleges its allegations set forth in the above paragraphs.

285.    Certain of the Defendants have filed one or more general unsecured proofs of claim against the Debtors and/or have had such general unsecured claims scheduled by one or more of the Debtors (collectively, the "**Defendant Claims**").

43.

286.    The Defendant Claims that were filed are identified on the copies of the proofs of claims attached hereto as **Exhibit C** through **Exhibit F** (which attach only the first page of each such claim), which underlying filed proofs of claims and their respective exhibits in their entirety are incorporated herein by this reference.

287.    The wrongdoing and inequitable conduct of each Defendant as alleged above necessitates that the Defendant Claims be subordinated to the claims of all other creditors of the Debtors pursuant to 11 U.S.C. §§ 510(c) and the equitable powers of the Court.

288.    As a result of the Defendants' breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, receipt of fraudulent transfers, inequitable conduct, and other wrongdoing, pursuant to 11 U.S.C. §§ 502(d), 502(e), and 510(c), the Court should (i) deny Defendants any right of set-off or recoupment against the claims asserted by Plaintiff in this litigation, (ii) disallow each of the Defendant Claims against the Debtors, and/or (iii) equitably subordinate each of the Defendant Claims until all other claims against the Debtors have been satisfied in full.

### Prayer for Relief

**WHEREFORE**, Plaintiff demands that judgment be entered as follows:

A.    On Counts I through IV, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders, and the Doe Defendants avoiding the Debtors' transfers of the Dividends to Appleseed's TopCo and its shareholders and awarding Plaintiff monetary judgment against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders, and the Doe Defendants, jointly and severally, in an amount to be determined at trial;

B.      On Counts V through VIII, awarding Plaintiff judgment, pursuant to sections 544(b) and 550 of the Bankruptcy Code and, as applicable, the Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act, against the PE Sponsors, the PE Owners, the PE Funds, and the Doe Defendants avoiding the Debtors' transfers of the Transaction and Advisory Fees to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants and awarding Plaintiff monetary judgment against the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants, jointly and severally, in an amount to be determined at trial;

C.      On Count IX, awarding Plaintiff judgment against the PE Sponsors, the PE Owners, the PE Funds, the Directors, and the Doe Defendants, jointly and severally, for damages caused to the Debtors resulting from their breach of fiduciary duties in an amount to be determined at trial;

D.      On Count X, awarding Plaintiff judgment against the PE Sponsors, the PE Owners, the PE Funds, the Directors, and the Doe Defendants, jointly and severally, for damages caused to the Debtors resulting from their aiding and abetting breaches of fiduciary duties in an amount to be determined at trial;

E.      On Counts XI and XII, awarding Plaintiff judgment against the PE Sponsors, the PE Owners, the PE Funds, the Minority Shareholders, the Directors and the Doe Defendants, jointly and severally, for damages caused to the Debtors resulting from their corporate waste and conspiracy in an amount to be determined at trial;

F.      On Counts XIII and XIV, awarding Plaintiff judgment against the Directors and the Doe Defendants, jointly and severally, for the amount of the unlawful Dividends declared and paid, plus interest, in an amount to be determined at trial;

G.      On Count XV, awarding Plaintiff judgment, pursuant to sections 547 and 550 of the Bankruptcy Code, against the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants avoiding the Debtors' transfers of the Preferential Transfers to the PE Sponsors, the PE Owners, the PE Funds and the Doe Defendants and awarding Plaintiff monetary judgment against the PE Sponsors, the PE Owners, the PE Funds, and the Doe Defendants, jointly and severally, in an amount to be determined at trial;

H.      On Count XVI, awarding Plaintiff judgment, pursuant to sections 502(d), 502(e), and 510(c) of the Bankruptcy Code, against GGCA, Stefan Kaluzny, Joshua Olshansky, Christian Feuer and the Doe Defendants (i) denying such Defendants any right of set-off or recoupment against the claims asserted by Plaintiff in this litigation, (ii) disallowing each of the Defendant Claims against the Debtors, and/or (iii) equitably subordinating each of the Defendant Claims until all other claims against the Debtors have been satisfied in full;

I.       Awarding Plaintiff interest, costs, and its attorney's fees; and

J.    Granting Plaintiff such other and further relief as the Court deems just and

proper.

Dated: April 27, 2011                DRINKER BIDDLE & REATH LLP

/s/ Howard A. Cohen
Howard A. Cohen (DE 4082)
Robert K. Malone (admitted *pro hac vice*)
Michael P. Pompeo (admitted *pro hac vice*)
1100 North Market Street, Suite 1000
Wilmington, DE  19801
(302) 467-4200
Howard.Cohen@dbr.com
Robert.Malone@dbr.com
Michael.Pompeo@dbr.com

- and -

COOLEY LLP
Jay R. Indyke
Cathy Hershcopf
Richard S. Kanowitz
1114 Avenue of the Americas
New York, NY 10036
(212) 479-6000
jindyke@cooley.com
chershcopf@cooley.com
rkanowitz@cooley.com

*Counsel for Robert N. Michaelson, as Trustee of the
Appleseed's Litigation Trust*